UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| [RELATOR UNDER SEAL], | ) | Civil Action No. _____ **\*SEALED\*** |
| | ) | |
| LOUISIANA MEDICAL ASSISTANCE | ) | |
| PROGRAMS ex rel. [RELATOR | ) | |
| UNDER SEAL], | ) | |
| | ) | **FILED <u>IN CAMERA</u> AND** |
| Plaintiff-Relator, | ) | **<u>UNDER SEAL</u>** |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Requested |
| [DEFENDANTS UNDER SEAL] | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# <u>FILED UNDER SEAL</u>

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| JEFFREY H. BYRD, | ) | Civil Action No. _____ **\*SEALED\*** |
| | ) | |
| LOUISIANA MEDICAL ASSISTANCE | ) | |
| PROGRAMS ex rel. JEFFREY H. BYRD, | ) | |
| | ) | **FILED IN CAMERA AND** |
| Plaintiff-Relator, | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Requested |
| ACADIA HEALTHCARE | ) | |
| COMPANY, INC. and | ) | |
| VERMILION HOSPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Jeffrey H. Byrd ("Relator"), for himself and

on behalf of the United States and the State of Louisiana, to recover damages and civil penalties

arising from Defendants' actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et*

*seq.*, and the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§

46:437 *et seq.*

## JURISDICTION AND VENUE

2.

This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq.*

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, in that Counts I and III of this action arise under the laws of the United States. Supplemental jurisdiction over Counts II and IV arises under 31 U.S.C. § 3732(b), since those counts arise from the same transactions or occurrences as Counts I and III, and under 28 U.S.C. § 1367, since those counts are so related to the federal claims that they form part of the same case or controversy.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a).  At least one of the Defendants can be found, resides, and transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

## THE PARTIES AND RELATED ENTITIES

5.

Acadia Healthcare Company, Inc. ("Acadia") is a Delaware corporation with its headquarters in Franklin, Tennessee.  Acadia operates more than 75 behavioral health facilities in at least 24 states as well as overseas, including Acadia Vermilion Hospital in Lafayette, Louisiana.

6.

Vermilion Hospital, LLC ("Vermilion") is a Delaware limited liability company and a subsidiary of Acadia, and operates under the trade names Vermilion Behavioral Health Systems and Acadia Vermilion Hospital.  Vermilion operates Acadia Vermilion Hospital ("AVH"), a 78-bed psychiatric hospital in Lafayette, Louisiana.  AVH includes a 54-bed main facility and a 24-bed facility previously known as Optima Specialty Hospital, but now known as Acadia

Vermilion Hospital South Campus (sometimes referred to herein as "Optima"). As used herein, "AVH" refers to both the main facility and Optima. Although the two facilities have historically had different provider numbers, Vermilion had plans to consolidate them under a single provider number.

7.

Vermilion submits numerous claims to Medicare, Medicaid, and other government payors for services provided at AVH. Based on Relator's experience, the Medicare utilization rates are approximately 24% at the main AVH facility and 50% at Optima, and the Medicaid utilization rates are approximately 32% at the main AVH facility and 24% at Optima. A draft 2015 Strategic Plan prepared by Vermilion noted that, in 2014, Medicare accounted for 28% of the total number of patient days at AVH, Medicaid accounted for 32%, and Tricare accounted for 11%. This plan projected that, in 2015, Medicare and Medicaid would each account for 30% of total patient days, while Tricare would remain at 11%.

8.

Relator Jeffrey H. Byrd is an individual resident of the State of Georgia and a former employee of Vermilion. From July 2014 to January 2015, Relator served as Vermilion's Chief Financial Officer (CFO). Periodically he would also serve as acting Chief Executive Officer (CEO) when the CEO was away. Relator was terminated on January 21, 2015.

## LEGAL AUTHORITY

### The Anti-Kickback Statute

9.

The Anti-Kickback Statute ("AKS") makes it illegal to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly

or covertly, in cash or in kind, in return for (i) referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

10.

The AKS also makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b)(2).

11.

The payment or receipt of remuneration violates the AKS if one purpose of the remuneration is to induce or reward referrals, even if the remuneration is also intended for a valid purpose.

12.

The regulations issued pursuant to the AKS set forth a number of "safe harbors," compliance with which will protect a person from application of the statute.  Although each safe harbor has its own specific requirements, most of the safe harbors require that the arrangement

4

between the parties be set forth in a written agreement signed by the parties, and that the

compensation reflect fair market value for the services provided.  The burden is on the party

seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe

harbor.

13.

Claims submitted to federal health care programs, including Medicare, Medicaid, and

Tricare, that arise from unlawful kickbacks, are false claims.

<u>The Stark Law</u>

14.

42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its associated

regulations, 42 C.F.R. § 350 *et seq.* (collectively, the "Stark Law"), provide that, if a physician

has a "financial relationship" with an entity, the physician may not make a referral to the entity

for the provision of "designated health services," unless the relationship satisfies the

requirements of an exception set forth in the Stark Law.  42 U.S.C. § 1395nn(a)(1)(A); 42 C.F.R.

§ 411.353(a).  The Stark Law further provides that an entity may not present or cause to be

presented to Medicare a claim for designated health services furnished pursuant to a prohibited

referral.  42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).  In addition, Medicare is

prohibited from making payment on any such claim.  42 U.S.C. § 1395nn(g)(1); 42 C.F.R. §

411.353(c).  An entity is required to return any funds received from Medicare for services

furnished pursuant to a prohibited referral.  42 C.F.R. § 411.353(d).  The provisions of the Stark

Law have been extended to Medicaid pursuant to 42 U.S.C. §1396b(s).

15.

"Designated health services" include, among other things, inpatient and outpatient hospital services, clinical laboratory services, outpatient prescription drugs, and radiology and other imaging services.  42 U.S.C. § 1395nn(h)(6).

16.

Under the Stark Law, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement."  The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(A).  The term "remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

17.

The Stark Law contains a number of exceptions, and if an arrangement strictly complies with the requirements of an exception, it will be deemed not to constitute a prohibited financial relationship.  Although each exception has its own specific requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, that the compensation reflect fair market value for the services provided by the physician, and that the arrangement be commercially reasonable in the absence of referrals. The burden is on the party seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe harbor.

6

18.

Claims submitted to Medicare or Medicaid for designated health services furnished pursuant to a referral prohibited by the Stark Law constitute false claims, in that they seek payment to which the entity is not entitled.

<u>Services performed by nurse practitioner</u>

19.

To be payable under Medicare, Medicaid, or other government healthcare programs, services must be furnished by a physician or other practitioner licensed to provide such services under applicable state law.

20.

An advanced registered nurse practitioner (ARNP) is a licensed registered nurse who has been certified by an appropriate certifying body as having an advanced nursing specialty.  The Louisiana Nurse Practice Act, La. Rev. Stat. Ann. § 37:911 *et seq*., allows ARNPs, under certain circumstances, to see patients independently, although the Act requires that they practice in collaboration with a licensed physician.

21.

The Act defines "collaboration as "a cooperative working relationship with licensed physicians, dentists, or other health care providers to jointly contribute to providing patient care," and defines "collaborative practice" as "the joint management of the health care of a patient by an advanced practice registered nurse performing advanced practice registered nursing and one or more consulting physicians or dentists."  La. Rev. Stat. Ann. § 37:913(7)-(8).

22.

The Act further states that "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement," which is "a formal written statement addressing the parameters of the collaborative practice which are mutually agreed upon by the advanced practice registered nurse and one or more licensed physicians."  La. Rev. Stat. Ann. § 37:913(8)-(9).

23.

Thus, under Louisiana law, an advanced practice nurse may only perform acts of medical diagnosis and prescription pursuant to a collaborative practice agreement with a licensed physician who is involved in the joint management of the patient's treatment.

24.

Claims for payment submitted for services performed by a nurse practitioner outside the scope of her practice constitute false claims.

## FACTUAL ALLEGATIONS

### Services performed by nurse practitioner without proper supervision

25.

Rhonda Kimball "Kay" Rodriguez is a psychiatric ARNP, and the wife of Joe Rodriguez, the former CEO of Vermilion.  For at least the past two years, Ms. Rodriguez has been paid a monthly stipend by Vermilion, and has routinely seen and treated Vermilion patients without the supervision of a physician.  Vermilion submits claims for payment for such services to Medicare, Medicaid, and other payors.

26.

Around December 29, 2014, while Relator was serving as acting CEO when Luis Betances was away, Relator was contacted by an official with the Health Standards section of the Louisiana Department of Health and Hospitals.  This official told Relator that she had spoken with a Vermilion inpatient who was being treated by Ms. Rodriguez, and who complained about his treatment.  The official stated that a state patient advocate would be visiting the hospital the next day to investigate, and would need to see a copy of Ms. Rodriquez's collaboration agreement.

27.

Relator then went to Ms. Rodriguez's file to review a copy of her collaboration agreement.  He noticed that the agreement, dated April 2011, identified two collaborating physicians, Dr. Jerry Sanders and Dr. Carol Murphy.  Relator did not recognize either of these names.

28.

Upon further investigation, Relator was told that Dr. Sanders had resigned and left the area about a year earlier, and that Dr. Murphy was a professor residing in New Orleans.  Neither of these physicians had collaborated with Ms. Rodriguez in the joint management of patients for a long time, if ever.

29.

Relator raised the issue of the expired collaboration agreement with several individuals at Vermilion, including CEO Luis Betances; Glynis DeRouche, AVH clinical director; and Tony Miller, program director of AVH's FLAGS program.  Betances, who was away on vacation, told Relator that he would take care of it when he returned.

30.

Relator was also informed that Kim Leger, the AVH administrative assistant who helped Relator locate the collaboration agreement, asked Ms. Rodriguez whether she had an updated agreement, and was told by Ms. Rodriguez that Ms. Rodriguez would "get back" with her.

31.

When Betances returned to the office the following week, Relator showed him the expired collaboration agreement.  Betances stated that he was "sure" Ms. Rodriguez had another collaboration agreement with Dr. Dickens, the AVH medical director.  Relator asked if he could see a copy of any such agreement, and Betances said "we'll see," or words to that effect.

32.

Later that week, Relator was told by Tony Miller that Ms. Rodriguez was "scrambling" to find a physician to update her collaboration agreement, and that Dr. Dickens told her "no way am I backdating an agreement for you."

33.

Until he was terminated on January 21, 2015, Relator never saw any collaboration agreement other than the expired agreement with Dr. Sanders and Dr. Murphy.

34.

Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez independently saw and treated numerous patients at AVH, in violation of Louisiana law, and Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services.  All such claims constitute false claims.

Arrangement with Dr. Uhrich

35.

For the last several years, Defendants have had an arrangement with Dr. Susan Uhrich, a
psychiatrist in Lafayette, Louisiana, in which Defendants provide free staff to Dr. Uhrich in
return for referrals of patients to AVH.   This scheme was devised and implemented by former
AVH CEO Joe Rodriguez and current AVH CEO Luis Betances.  Dr. Uhrich is a significant
source of patient referrals for AVH, principally to the Optima facility, and Vermilion routinely
submits claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant
to such referrals.

36.

A draft 2015 Strategic Plan prepared by Vermilion identified Dr. Uhrich as its fifth-
highest volume referral source, with a projected 60 acute admissions for 2014.  Dr. Uhrich is the
only individual physician on the list of the top 10 referral sources.  This document identified Dr.
Uhrich's primary payor source as Medicare, followed by indigent and private insurance.

37.

For each referral source, the strategic plan described a "channeling mechanism," which it
defined as "any gate-keeping process required to obtain referrals/admissions."  For Dr. Uhrich,
the plan described the channeling mechanism as follows: "Currently a member of our Medical
Staff.  Has high volume private practice and nursing home ties. Employs three NP's who work
the nursing homes and the IP units. Nurse liaison is a part of our staff."  The plan noted that "Dr.
Uhrich is exclusively referring patients to VBHS with the support of three mid-level
practitioners."

38.

Cheryl Smith and Donna Talley are nurses who at all relevant times were employed and paid by Vermilion.  Smith is an advanced practice nurse practitioner and Talley is a licensed practical nurse.  However, although their salaries were paid by Vermilion, Smith and Talley did not actually work at Vermilion, but instead worked at Dr. Uhrich's office.

39.

Donna Talley has served essentially as Dr. Uhrich's office manager, and is identified on various web pages as being part of Dr. Uhrich's staff.  *See* http://dr-susan-uhrich-md.lafayette.la.amfibi.directory/us/c/4915493-dr-susan-uhrich-md;

http://www.manta.com/c/mt599py/susan-uhrich-md.

40.

Cheryl Smith, as a nurse practitioner, routinely performs patient rounds at local nursing homes on behalf of Dr. Uhrich.  Although her salary is paid by Vermilion, claims for payment for Smith's services are submitted by Dr. Uhrich's office.  These visits frequently result in referrals of nursing home patients to AVH for inpatient or outpatient hospital services.  Dr. Uhrich's LinkedIn page identifies Smith as a member of her staff, stating that "[t]his multidisciplinary practice includes not only Dr. Uhrich, but Cheryl Smith, Advanced Practice Nurse Practitioner …."  https://www.linkedin.com/in/susan-uhrich-md-112a4b6b.

41.

Optima staff have frequently questioned the medical appropriateness of the referrals by Uhrich/Smith.  Many of these patients suffer from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment is unnecessary.

42.

The provision of free staff to Dr. Uhrich constitutes "remuneration" under the Stark Law, and creates a financial relationship between Dr. Uhrich and Vermilion.  The parties cannot satisfy the terms of any exception under the Stark Law because, among other things, the provision of free services by definition is not fair market value, and the arrangement would not be commercially reasonable in the absence of referrals.  Therefore, Dr. Uhrich is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services.  All such claims therefore constitute false claims.

43.

In addition, the provision of free staff to Dr. Uhrich was intended, at least in part, to induce the referral of patients by Dr. Uhrich to AVH.  Indeed, the 2015 Strategic Plan expressly identified as a "channeling mechanism" the fact that Dr. Uhrich's "[n]urse liaison is a part of our staff."  Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims.

Arrangement with Dr. Salmeron

44.

Dr. Daniel Salmeron is a family practice doctor in Lafayette, Louisiana, and a friend of Luis Betances.  Since January 2014, Vermilion has paid Dr. Salmeron approximately $350,000 per year, even though Dr. Salmeron has his own private practice and only occasionally sees patients at AVH.  This is substantially higher than fair market value even for a full-time physician in the Lafayette area, where the typical internal medicine physician salary is approximately $130,000.

45.

The 2015 Strategic Plan prepared by Vermilion identified Dr. Salmeron as a "key physician," and indicated that he worked 40 hours a week for a salary of $350,000.  In fact, Dr. Salmeron did not work 40 hours a week at Vermilion.  A draft internal audit performed in 2014 noted that physicians did not provide timesheets or invoices for payments, although this was required by their contracts, but were instead paid based on scheduled hours.

46.

Division president Keith Furman had concerns over the amount of money paid to Dr. Salmeron, and stated that Dr. Salmeron did not refer enough patients to Vermilion to be paid that amount of money.

47.

The payments to Dr. Salmeron constitute "remuneration" under the Stark Law, and create a financial relationship between Dr. Salmeron and Vermilion.  The parties cannot satisfy the terms of any exception under the Stark Law because, among other things, the remuneration exceeds fair market value, and the arrangement would not be commercially reasonable in the absence of referrals.  Therefore, Dr. Salmeron is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services.  All such claims therefore constitute false claims.

48.

In addition, the payments to Dr. Salmeron were intended, at least in part, to induce the referral of patients by Dr. Salmeron to AVH.  Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims.

14

<u>Patient brokering</u>

49.

On January 5, 2015, Relator went to lunch with his corporate supervisor, David Dempsey, an Acadia division CFO based out of corporate headquarters in Franklin, Tennessee. Mr. Dempsey was in town for a site visit at AVH.

50.

During lunch, Relator and Dempsey discussed the fact that Vermilion's average patient census (the number of patients per day) had fallen off.  Dempsey assured Relator that corporate "patient brokers" paid by Defendants were working to bring back Medicare, Medicaid, and TRICARE patients.  Dempsey stated that "we don't want to call them patient brokers, but that's what they are."

51.

Relator expressed concerns as to the legality of paying for referrals.  Later, Relator was summoned on short notice to a meeting a corporate headquarters in Franklin, Tennessee on January 19, 2015.  Relator was fired shortly thereafter, on January 21, 2015.

52.

Relator is also aware of several occasions in which Tony Miller, a Vermilion case manager, with the approval of Luis Betances, flew to California, Alaska and other out of state locales to pick up and return with TRICARE beneficiaries for admission to AVH.  In one case a TRICARE beneficiary was flow into Lafayette from Japan for admission to AVH.  All of these expenses are charged out on the hospital credit card.

53.

Patient brokering violates the AKS, as it involves the payment of money to induce

referrals of patients for items or services paid by a federal healthcare program, or the payment of

remuneration to patients to induce them to purchase or use such items or services.  All claims

submitted pursuant to such referrals constitute false claims.

Disproportionate share payments

54.

The United States provides funds to the states to compensate hospitals who serve a large

number of Medicaid and uninsured patients.  These payments are referred to as "disproportionate

share payments" or "DSH" payments.

55.

In 2010 and 2011, Vermilion received at least $150,136 in DSH payments from the State

of Louisiana, using funds provided in whole or in part by the United States.  Vermilion was not

entitled to such payments because, among other things, it did not have at least two obstetricians

with staff privileges who agreed to provide obstetric services to individuals entitled to medical

assistance for such services, as required by 42 U.S.C. § 1396r-4(d).

56.

In or around August 2014, the State of Louisiana contracted with Myers & Stauffer to

audit Vermilion's cost reports with respect to the DSH issue, and Myers & Stauffer requested

that Vermilion provide additional information to support the DSH payment.  Upon information

and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain

bad debts for patient care had been written off during the 2010-2011 period, when in fact they

were not written off until the 2014 audit.

57.

Vermilion consulted with a New Orleans CPA, Byron Elsas, to assist in its response to that audit.  Relator had several discussions with Mr. Elsas, who told Relator that Vermilion should not have received the DSH payments in the first place.

58.

On December 29, 2014, Elsas sent Relator an email noting that, if the state noticed the problems, Vermilion would have to repay $150,136.00, but if it did not, Vermilion would be able to receive an additional $135,833.00:

> PLEASE SEE LAST PAGE OF 3RD & 4TH ATTACHMENT. TITLED"MEDICAID DSH REPORT NOTES"
> **1. OB REQUIREMENT NOT MET**
> THERE EXISTS TWO OUTCOMES TO THESE AUDITS.
> 1. IF MEDICAID (STATE) DOES NOT SEE OR UNDERSTAND THE REPORT NOTES YOU WILL RECEIVE ANOTHER $135,833.00
> 2. IF MEDICAID (STATE) SEES & UNDERSTANDS THE REPORT NOTES YOU WILL OWE $150,136.00
> NEVER CAN TELL.
> IT WILL BE ONE OR THE OTHER.
> GOOD LUCK
> BYRON ELSAS

59.

Relator was terminated on January 21, 2015, before the audit process was completed. Upon information and belief, however, Vermilion has not returned the DSH payments it was aware it was not entitled to receive.

## COUNT I
## FEDERAL FALSE CLAIMS ACT

60.

The allegations in the preceding paragraphs are incorporated by reference.

17

61.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they:

(1)    knowingly presented or caused to be presented numerous false claims for payment or approval;

(2)    knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims;

(3)    knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government; and

(4)    knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

62.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

63.

The allegations in the preceding paragraphs are incorporated by reference.

64.

Defendants violated the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq*., in that they:

(1)    knowingly presented or caused to be presented numerous false claims;

(2)    knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims; and

(3)     knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to Louisiana medical assistance programs, or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the programs.

65.

As a result of Defendants' violations of La. Rev. Stat. Ann. §§ 46:437 *et seq.,* the State of Louisiana has suffered damages in an amount to be determined at trial.

**COUNT III**
**RETALIATION – 31 U.S.C. § 3730(h)**

66.

The allegations in the preceding paragraphs are incorporated by reference.

67.

Vermilion unlawfully terminated Relator because of lawful acts done by Relator in furtherance of an action under the Federal False Claims Act or other efforts to stop one or more violations of the Federal False Claims Act.

68.

As a result of Vermilion's actions, Relator has suffered damages in an amount to be determined at trial.

**COUNT IV**
**RETALIATION – LA. REV. STAT. ANN. § 46:439.1(E)**

69.

The allegations in the preceding paragraphs are incorporated by reference.

70.

Vermilion unlawfully terminated Relator because of lawful acts done by Relator in furtherance of an action under the Louisiana Medical Assistance Programs Integrity Law Louisiana Medical Assistance Programs Integrity Law or other efforts to stop one or more violations of the Louisiana Medical Assistance Programs Integrity Law.

71.

As a result of Vermilion's actions, Relator has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself, the United States, and the State of Louisiana, pray:

(a)    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States or the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act and the Louisiana Medical Assistance Programs Integrity Law;

(b)    That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(c)    That Relator receive all relief necessary to make him whole for his unlawful termination, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages;

20

(d)    That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e)    That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Dated: April 1, 2016

Respectfully submitted,

David W. Garrison (TNBPR No. 24968)
Seth M. Hyatt (TNBPR No. 31171)
Barrett Johnston Martin & Garrison, LLC
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

J. Marc Vezina
Louisiana Bar No. 24683
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

*Attorneys for Plaintiff-Relator*