UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| JEFFREY H. BYRD, | ) | Civil Action No. 18-312-JWD-EWD |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Requested |
| ACADIA HEALTHCARE | ) | |
| COMPANY, INC. and | ) | |
| VERMILION HOSPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Jeffrey H. Byrd ("Relator"), for himself and

on behalf of the United States, to recover damages and civil penalties arising from Defendants'

actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq*.

## JURISDICTION AND VENUE

2.

This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq*.

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a) and 28 U.S.C.

§ 1331, in that Counts I and II of this action arise under the laws of the United States.

Supplemental jurisdiction over Count III arises under 31 U.S.C. § 3732(b), since that count arises

from the same transactions or occurrences as Counts I and II, and under 28 U.S.C. § 1367, since

that count is so related to the federal claims that they form part of the same case or controversy.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a).  At least one of the Defendants

can be found, resides, and transacts business within the district, and many of the acts forming the

basis of this action occurred within the district.

## THE PARTIES AND RELATED ENTITIES

5.

Acadia Healthcare Company, Inc. ("Acadia") is a Delaware corporation with its

headquarters in Franklin, Tennessee.  Acadia operates more than 75 behavioral health facilities

in at least 24 states as well as overseas, including Acadia Vermilion Hospital in Lafayette,

Louisiana.

6.

Vermilion Hospital, LLC ("Vermilion") is a Delaware limited liability company and a

subsidiary of Acadia, and operates under the trade names Vermilion Behavioral Health Systems

and Acadia Vermilion Hospital.  Vermilion operates Acadia Vermilion Hospital ("AVH"), a 78-

bed psychiatric hospital in Lafayette, Louisiana.  AVH includes a 54-bed main facility and a 24-

bed facility previously known as Optima Specialty Hospital, but now known as Acadia

Vermilion Hospital South Campus (sometimes referred to herein as "Optima").  As used herein,

"AVH" refers to both the main facility and Optima.  Although the two facilities have historically

had different provider numbers, Vermilion had plans to consolidate them under a single provider

number.

7.

Vermilion submits numerous claims to Medicare, Medicaid, and other government payors for services provided at AVH. Based on Relator's experience, the Medicare utilization rates are approximately 24% at the main AVH facility and 50% at Optima, and the Medicaid utilization rates are approximately 32% at the main AVH facility and 24% at Optima. A draft 2015 Strategic Plan prepared by Vermilion noted that, in 2014, Medicare accounted for 28% of the total number of patient days at AVH, Medicaid accounted for 32%, and Tricare accounted for 11%. This plan projected that, in 2015, Medicare and Medicaid would each account for 30% of total patient days, while Tricare would remain at 11%.

8.

At all times relevant to this complaint, Acadia has exercised control over Vermilion and participated in its operations. Acadia's website describes Acadia as "a provider of behavioral healthcare services," noting that "Acadia provides behavioral health and addiction services to its patients in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers and outpatient clinics." The website states that "[a]t September 30, 2019, Acadia operated a network of 589 behavioral healthcare facilities with approximately 18,000 beds in 40 states, the United Kingdom and Puerto Rico," including Vermilion.

9.

On or about December 5, 2019, the State of Louisiana entered into a settlement agreement with Defendants, under which Defendants agreed to pay $500,000 to the State to resolve claims asserted on behalf of the State in Relator's original complaint. The agreement was signed on behalf of both Acadia and Vermilion by a corporate officer of Acadia.

10.

Relator Jeffrey H. Byrd is an individual resident of the State of Georgia and a former employee of Vermilion.  From July 2014 to January 2015, Relator served as Vermilion's Chief Financial Officer (CFO).  Periodically he would also serve as acting Chief Executive Officer (CEO) when the CEO was away.  Relator was terminated on January 21, 2015.

## LEGAL AUTHORITY

### The Anti-Kickback Statute

11.

The Anti-Kickback Statute ("AKS") makes it illegal to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for (i) referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

12.

The AKS also makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which

4

payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b)(2).

13.

The payment or receipt of remuneration violates the AKS if one purpose of the remuneration is to induce or reward referrals, even if the remuneration is also intended for a valid purpose.

14.

The regulations issued pursuant to the AKS set forth a number of "safe harbors," compliance with which will protect a person from application of the statute.  Although each safe harbor has its own specific requirements, most of the safe harbors require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided.  The burden is on the party seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe harbor.

15.

Claims submitted to federal health care programs, including Medicare, Medicaid, and Tricare, that arise from unlawful kickbacks, are false claims.

The Stark Law

16.

42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its associated regulations, 42 C.F.R. § 350 *et seq*. (collectively, the "Stark Law"), provide that, if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services," unless the relationship satisfies the

requirements of an exception set forth in the Stark Law.  42 U.S.C. § 1395nn(a)(1)(A); 42 C.F.R. § 411.353(a).  The Stark Law further provides that an entity may not present or cause to be presented to Medicare a claim for designated health services furnished pursuant to a prohibited referral.  42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).  In addition, Medicare is prohibited from making payment on any such claim.  42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c).  An entity is required to return any funds received from Medicare for services furnished pursuant to a prohibited referral.  42 C.F.R. § 411.353(d).  The provisions of the Stark Law have been extended to Medicaid pursuant to 42 U.S.C. §1396b(s).

17.

"Designated health services" include, among other things, inpatient and outpatient hospital services, clinical laboratory services, outpatient prescription drugs, and radiology and other imaging services.  42 U.S.C. § 1395nn(h)(6).

18.

Under the Stark Law, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement."  The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(A).  The term "remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

19.

The Stark Law contains a number of exceptions, and if an arrangement strictly complies with the requirements of an exception, it will be deemed not to constitute a prohibited financial

relationship.  Although each exception has its own specific requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, that the compensation reflect fair market value for the services provided by the physician, and that the arrangement be commercially reasonable in the absence of referrals. The burden is on the party seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe harbor.

20.

Claims submitted to Medicare or Medicaid for designated health services furnished pursuant to a referral prohibited by the Stark Law constitute false claims, in that they seek payment to which the entity is not entitled.

Services performed by nurse practitioner

21.

To be payable under Medicare, Medicaid, or other government healthcare programs, services must be furnished by a physician or other practitioner licensed to provide such services under applicable state law.

22.

An advanced registered nurse practitioner (ARNP) is a licensed registered nurse who has been certified by an appropriate certifying body as having an advanced nursing specialty.  The Louisiana Nurse Practice Act, La. Rev. Stat. Ann. § 37:911 *et seq*., allows ARNPs, under certain circumstances, to see patients independently, although the Act requires that they practice in collaboration with a licensed physician.

23.

The Act defines "collaboration as "a cooperative working relationship with licensed physicians, dentists, or other health care providers to jointly contribute to providing patient care," and defines "collaborative practice" as "the joint management of the health care of a patient by an advanced practice registered nurse performing advanced practice registered nursing and one or more consulting physicians or dentists." La. Rev. Stat. Ann. § 37:913(7)-(8).

24.

The Act further states that "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement," which is "a formal written statement addressing the parameters of the collaborative practice which are mutually agreed upon by the advanced practice registered nurse and one or more licensed physicians." La. Rev. Stat. Ann. § 37:913(8)-(9).

25.

Thus, under Louisiana law, an advanced practice nurse may only perform acts of medical diagnosis and prescription pursuant to a collaborative practice agreement with a licensed physician who is involved in the joint management of the patient's treatment.

26.

Claims for payment submitted for services performed by a nurse practitioner outside the scope of her practice constitute false claims.

## FACTUAL ALLEGATIONS

### Services performed by nurse practitioner without proper supervision

27.

Rhonda Kimball "Kay" Rodriguez is a psychiatric ARNP, and the wife of Joe Rodriguez, the former CEO of Vermilion. For several years, Ms. Rodriguez has been paid a monthly stipend by Vermilion, and has routinely seen and treated Vermilion patients without the supervision of a physician. Vermilion submits claims for payment for such services to Medicare, Medicaid, and other payors.

28.

Around December 29, 2014, while Relator was serving as acting CEO when Luis Betances was away, Relator was contacted by an official with the Health Standards section of the Louisiana Department of Health and Hospitals. This official told Relator that she had spoken with a Vermilion inpatient who was being treated by Ms. Rodriguez, and who complained about his treatment. The official stated that a state patient advocate would be visiting the hospital the next day to investigate, and would need to see a copy of Ms. Rodriguez's collaboration agreement.

29.

Relator then went to Ms. Rodriguez's file to review a copy of her collaboration agreement. He noticed that the agreement, dated April 2011, identified two collaborating physicians, Dr. Jerry Sanders and Dr. Carol Murphy. Relator did not recognize either of these names.

30.

Upon further investigation, Relator was told that Dr. Sanders had resigned and left the area about a year earlier, and that Dr. Murphy was a professor residing in New Orleans. Neither of these physicians had collaborated with Ms. Rodriguez in the joint management of patients for a long time, if ever.

31.

Relator raised the issue of the expired collaboration agreement with several individuals at Vermilion, including CEO Luis Betances; Glynis DeRouche, AVH clinical director; and Tony Miller, program director of AVH's FLAGS program. Betances, who was away on vacation, told Relator that he would take care of it when he returned.

32.

Relator was also informed that Kim Leger, the AVH administrative assistant who helped Relator locate the collaboration agreement, asked Ms. Rodriguez whether she had an updated agreement, and was told by Ms. Rodriguez that Ms. Rodriguez would "get back" with her.

33.

When Betances returned to the office the following week, Relator showed him the expired collaboration agreement. Betances stated that he was "sure" Ms. Rodriguez had another collaboration agreement with Dr. Dickens, the AVH medical director. Relator asked if he could see a copy of any such agreement, and Betances said "we'll see," or words to that effect.

34.

Later that week, Relator was told by Tony Miller that Ms. Rodriguez was "scrambling" to find a physician to update her collaboration agreement, and that Dr. Dickens told her "no way am I backdating an agreement for you."

35.

Until he was terminated on January 21, 2015, Relator never saw any collaboration agreement other than the expired agreement with Dr. Sanders and Dr. Murphy.

36.

Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez independently saw and treated numerous patients at AVH, in violation of Louisiana law, and Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services.  All such claims constitute false claims.

37.

On or about December 5, 2019, the State of Louisiana entered into a settlement agreement with Defendants, under which Defendants agreed to pay $500,000 to the State to resolve claims asserted on behalf of the State in Relator's original complaint.

38.

The settlement agreement provided, among other things, as follows:

The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
…
3.    Acadia submitted claims for payment to the Medicaid program for services provided by advanced practice registered nurses that did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law.

39.

Medicaid is a joint federal-state program, and claims submitted to the Louisiana Medicaid program are paid for, in part, out of federal funds.  Thus, false claims submitted to the Louisiana Medicaid program are false claims under the federal False Claims Act.

Arrangement with Dr. Uhrich

40.

For the last several years, Defendants have had an arrangement with Dr. Susan Uhrich, a psychiatrist in Lafayette, Louisiana, in which Defendants provide free staff to Dr. Uhrich in return for referrals of patients to AVH.   This scheme was devised and implemented by former AVH CEO Joe Rodriguez and current AVH CEO Luis Betances.  Dr. Uhrich is a significant source of patient referrals for AVH, principally to the Optima facility, and Vermilion routinely submits claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant to such referrals.

41.

A draft 2015 Strategic Plan prepared by Vermilion identified Dr. Uhrich as its fifth-highest volume referral source, with a projected 60 acute admissions for 2014.  Dr. Uhrich is the only individual physician on the list of the top 10 referral sources.  This document identified Dr. Uhrich's primary payor source as Medicare, followed by indigent and private insurance.

42.

For each referral source, the strategic plan described a "channeling mechanism," which it defined as "any gate-keeping process required to obtain referrals/admissions."  For Dr. Uhrich, the plan described the channeling mechanism as follows: "Currently a member of our Medical Staff.  Has high volume private practice and nursing home ties. Employs three NP's who work

the nursing homes and the IP units. Nurse liaison is a part of our staff."  The plan noted that "Dr. Uhrich is exclusively referring patients to VBHS with the support of three mid-level practitioners."

43.

Cheryl Smith and Donna Talley are nurses who at all relevant times were employed and paid by Vermilion.  Smith is an advanced practice nurse practitioner and Talley is a licensed practical nurse.  However, although their salaries were paid by Vermilion, Smith and Talley did not actually work at Vermilion, but instead worked at Dr. Uhrich's office.

44.

Donna Talley has served essentially as Dr. Uhrich's office manager, and is identified on various web pages as being part of Dr. Uhrich's staff.  *See* http://dr-susan-uhrich-md.lafayette.la.amfibi.directory/us/c/4915493-dr-susan-uhrich-md; http://www.manta.com/c/mt599py/susan-uhrich-md.

45.

Cheryl Smith, as a nurse practitioner, routinely performs patient rounds at local nursing homes on behalf of Dr. Uhrich.  Although her salary is paid by Vermilion, claims for payment for Smith's services are submitted by Dr. Uhrich's office.  These visits frequently result in referrals of nursing home patients to AVH for inpatient or outpatient hospital services.  Dr. Uhrich's LinkedIn page identifies Smith as a member of her staff, stating that "[t]his multidisciplinary practice includes not only Dr. Uhrich, but Cheryl Smith, Advanced Practice Nurse Practitioner …."  https://www.linkedin.com/in/susan-uhrich-md-112a4b6b.

46.

Optima staff have frequently questioned the medical appropriateness of the referrals by Uhrich/Smith. Many of these patients suffer from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment is unnecessary.

47.

The provision of free staff to Dr. Uhrich constitutes "remuneration" under the Stark Law, and creates a financial relationship between Dr. Uhrich and Vermilion. The parties cannot satisfy the terms of any exception under the Stark Law because, among other things, the provision of free services by definition is not fair market value, and the arrangement would not be commercially reasonable in the absence of referrals. Therefore, Dr. Uhrich is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services. All such claims therefore constitute false claims.

48.

In addition, the provision of free staff to Dr. Uhrich was intended, at least in part, to induce the referral of patients by Dr. Uhrich to AVH. Indeed, the 2015 Strategic Plan expressly identified as a "channeling mechanism" the fact that Dr. Uhrich's "[n]urse liaison is a part of our staff." Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims.

49.

The December 5, 2019 settlement agreement between the State of Louisiana and Defendants provided, among other things, as follows:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly

engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):

…

2.    From March 1, 2013, through October 31, 2016, Acadia paid improper remuneration via free staff; improper lease arrangements; and inflated salaries to certain physicians in the Lafayette area for the purpose of inducing referrals to Acadia facilities in Lafayette, Louisiana[.]

### Arrangement with Dr. Salmeron

50.

Dr. Daniel Salmeron is a family practice doctor in Lafayette, Louisiana, and a friend of Luis Betances. Since January 2014, Vermilion has paid Dr. Salmeron approximately $350,000 per year, even though Dr. Salmeron has his own private practice and only occasionally sees patients at AVH. This is substantially higher than fair market value even for a full-time physician in the Lafayette area, where the typical internal medicine physician salary is approximately $130,000.

51.

The 2015 Strategic Plan prepared by Vermilion identified Dr. Salmeron as a "key physician," and indicated that he worked 40 hours a week for a salary of $350,000. In fact, Dr. Salmeron did not work 40 hours a week at Vermilion. A draft internal audit performed in 2014 noted that physicians did not provide timesheets or invoices for payments, although this was required by their contracts, but were instead paid based on scheduled hours.

52.

Division president Keith Furman had concerns over the amount of money paid to Dr. Salmeron, and stated that Dr. Salmeron did not refer enough patients to Vermilion to be paid that amount of money.

53.

The payments to Dr. Salmeron constitute "remuneration" under the Stark Law, and create a financial relationship between Dr. Salmeron and Vermilion.  The parties cannot satisfy the terms of any exception under the Stark Law because, among other things, the remuneration exceeds fair market value, and the arrangement would not be commercially reasonable in the absence of referrals.  Therefore, Dr. Salmeron is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services.  All such claims therefore constitute false claims.

54.

In addition, the payments to Dr. Salmeron were intended, at least in part, to induce the referral of patients by Dr. Salmeron to AVH.  Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims.

55.

The December 5, 2019 settlement agreement between the State of Louisiana and Defendants provided, among other things, as follows:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
> …
> 2.    From March 1, 2013, through October 31, 2016, Acadia paid improper remuneration via free staff; improper lease arrangements; and inflated salaries to certain physicians in the Lafayette area for the purpose of inducing referrals to Acadia facilities in Lafayette, Louisiana[.]

<u>Patient brokering</u>

56.

On January 5, 2015, Relator went to lunch with his corporate supervisor, David Dempsey, an Acadia division CFO based out of corporate headquarters in Franklin, Tennessee. Mr. Dempsey was in town for a site visit at AVH.

57.

During lunch, Relator and Dempsey discussed the fact that Vermilion's average patient census (the number of patients per day) had fallen off. Dempsey assured Relator that corporate "patient brokers" paid by Defendants were working to bring back Medicare, Medicaid, and TRICARE patients. Dempsey stated that "we don't want to call them patient brokers, but that's what they are."

58.

Relator expressed concerns as to the legality of paying for referrals. Later, Relator was summoned on short notice to a meeting a corporate headquarters in Franklin, Tennessee on January 19, 2015. Relator was fired shortly thereafter, on January 21, 2015.

59.

Relator is also aware of several occasions in which Tony Miller, a Vermilion case manager, with the approval of Luis Betances, flew to California, Alaska and other out of state locales to pick up and return with TRICARE beneficiaries for admission to AVH. In one case a TRICARE beneficiary was flow into Lafayette from Japan for admission to AVH. All of these expenses are charged out on the hospital credit card.

60.

Patient brokering violates the AKS, as it involves the payment of money to induce referrals of patients for items or services paid by a federal healthcare program, or the payment of remuneration to patients to induce them to purchase or use such items or services. All claims submitted pursuant to such referrals constitute false claims.

Disproportionate share payments

61.

The United States provides funds to the states to compensate hospitals who serve a large number of Medicaid and uninsured patients. These payments are referred to as "disproportionate share payments" or "DSH" payments.

62.

In 2010 and 2011, Vermilion received at least $150,136 in DSH payments from the State of Louisiana, using funds provided in whole or in part by the United States. Vermilion was not entitled to such payments because, among other things, it did not have at least two obstetricians with staff privileges who agreed to provide obstetric services to individuals entitled to medical assistance for such services, as required by 42 U.S.C. § 1396r-4(d).

63.

In or around August 2014, the State of Louisiana contracted with Myers & Stauffer to audit Vermilion's cost reports with respect to the DSH issue, and Myers & Stauffer requested that Vermilion provide additional information to support the DSH payment. Upon information and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit.

64.

Vermilion consulted with a New Orleans CPA, Byron Elsas, to assist in its response to

that audit.  Relator had several discussions with Mr. Elsas, who told Relator that Vermilion

should not have received the DSH payments in the first place.

65.

On December 29, 2014, Elsas sent Relator an email noting that, if the state noticed the

problems, Vermilion would have to repay $150,136.00, but if it did not, Vermilion would be able

to receive an additional $135,833.00:

> PLEASE SEE LAST PAGE OF 3RD & 4TH ATTACHMENT. TITLED"MEDICAID
> DSH REPORT NOTES"
> **1. OB REQUIREMENT NOT MET**
> THERE EXISTS TWO OUTCOMES TO THESE AUDITS.
> 1. IF MEDICAID (STATE) DOES NOT SEE OR UNDERSTAND THE REPORT
> NOTES YOU WILL RECEIVE ANOTHER $135,833.00
> 2. IF MEDICAID (STATE) SEES & UNDERSTANDS THE REPORT NOTES YOU
> WILL OWE $150,136.00
> NEVER CAN TELL.
> IT WILL BE ONE OR THE OTHER.
> GOOD LUCK
> BYRON ELSAS

66.

Relator was terminated on January 21, 2015, before the audit process was completed.

Upon information and belief, however, Vermilion has not returned the DSH payments it was

aware it was not entitled to receive.

67.

Vermilion also requested and received DSH payments in other years, which it was not

entitled to receive because it did not meet the requirements for such payments.

68.

The December 5, 2019 settlement agreement between the State of Louisiana and

Defendants provided, among other things, as follows:

> The State contends that it has certain civil and administrative causes of action against
> Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly
> engaging in the following conduct in connection with the services Acadia's facilities in
> Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to
> as the "Alleged Conduct"):
>
> 1.    From January 1, 2007, through December 31, 2015, Acadia submitted
>        applications to the State of Louisiana for a disproportionate share ("DSH")
>        payments that misrepresented Acadia's qualification for DSH payments, thereby
>        causing the State to pay to Acadia DSH payments it was not entitled to[.]

Retaliation

69.

As discussed above, Relator was suddenly terminated on January 21, 2015, after raising

concerns about Defendants' actions.

70.

Upon information and belief, Defendants interfered with Relator's attempts to find

comparable employment following his termination.  Relator received an offer of employment

from another behavioral health care provider, and was provided an employment agreement and a

start date, but the offer was suddenly withdrawn.  Relator was informed that the withdrawal was

the result of information provided by Defendants.

**COUNT I**
**FEDERAL FALSE CLAIMS ACT**

71.

The allegations in the preceding paragraphs are incorporated by reference.

72.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, in that they:

(1)    knowingly presented or caused to be presented numerous false claims for payment or approval;

(2)    knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims;

(3)    knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government; and

(4)    knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

73.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## RETALIATION – 31 U.S.C. § 3730(h)

74.

The allegations in the preceding paragraphs are incorporated by reference.

75.

Vermilion unlawfully terminated Relator because of lawful acts done by Relator in furtherance of an action under the Federal False Claims Act or other efforts to stop one or more violations of the Federal False Claims Act.

76.

As a result of Vermilion's actions, Relator has suffered damages in an amount to be determined at trial.

## <u>COUNT III</u>
## <u>RETALIATION – LA. REV. STAT. ANN. § 46:439.1(E)</u>

77.

The allegations in the preceding paragraphs are incorporated by reference.

78.

Vermilion unlawfully terminated Relator because of lawful acts done by Relator in furtherance of an action under the Louisiana Medical Assistance Programs Integrity Law Louisiana Medical Assistance Programs Integrity Law or other efforts to stop one or more violations of the Louisiana Medical Assistance Programs Integrity Law.

79.

As a result of Vermilion's actions, Relator has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, prays:

(a)     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act;

(b)     That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(c)     That Relator receive all relief necessary to make him whole for his unlawful termination, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages;

(d)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

*/s/ J. Marc Vezina*
J. Marc Vezina LA BAR #24683
Kelli M. Khalaf LA BAR #23213
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219

(615) 244-2202
(615) 252-3798 (fax)
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

Attorneys for Plaintiff-Relator