## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES ex rel. JEFFREY H. BYRD

VERSUS

ACADIA HEALTHCARE COMPANY, INC., ET AL.

CIVIL ACTION

NO. 18-312-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on *Defendants' Motion to Dismiss Relator's First Amended Complaint* (Doc. 67) filed by Defendants Acadia Healthcare Company, Inc. ("Acadia") and Vermilion Hospital, LLC ("Vermilion") (collectively, "Defendants"). Plaintiff-Relator Jeffrey H. Byrd ("Relator" or "Byrd") opposes the motion, (Doc. 70), and Defendants have filed a reply, (Doc. 72). Oral argument is not necessary. The Court has carefully considered the law, the well-pleaded allegations of the *First Amended Complaint*, (Doc. 57), and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motion is granted in part and denied in part. Specifically, the motion is granted in that all claims are dismissed except Relator's claims for retaliation under state and federal law. However, Relator will be given leave to amend to cure the deficiencies of the operative complaint.

### I.    Introduction

#### A.    Relevant Laws and Summary of Fraudulent Actions

"The False Claims Act, 31 U.S.C. § 3729 *et seq.*, 'imposes significant penalties on those who defraud the Government.' " *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (unpublished), *cert. denied*, No. 20-786, 2021 WL 161045 (U.S. Jan. 19, 2021) (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct.

1989, 1995 (2016)). "The Act is remedial, first passed at the behest of President Lincoln in 1863 to stem widespread fraud by private Union Army suppliers in Civil War defense contracts." *United States rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009). "It is 'intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side.' " *Id.* (quoting S. Rep. No. 99–345, at 11 (1986), U.S. Code Cong. & Admin. News 1986, pp. 5266, 5276 (quoting *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885))). "To aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators, who serve as a 'posse of *ad hoc* deputies to uncover and prosecute frauds against the government.' " *Id.* (quoting *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992)). "In *qui tam*[1] suits brought by private persons on behalf of the Government the statute entitles the relator to between ten and thirty percent of any recovery made on behalf of the Government, depending on the extent of the relator's contribution to the action." *Id.* (citing 31 U.S.C. § 3730(d)).

"There are four elements of a False Claims Act claim." *Porter*, 810 F. App'x at 240. "Plaintiffs suing under the statute must show that (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).' " *Id.* (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009))).

Under the False Claims Act, a person is subject to liability if he, *inter alia*, (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2)

---

[1] As the Fifth Circuit has explained, " 'Qui tam' is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who as well for the king as for himself sues in this matter.' " *Grubbs*, 565 F.3d at 184 n.5 (quoting *Black's Law Dictionary* 1262 (7th ed. 1999)).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" ; (3) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government"; and (4) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(A), (B), (G).

Here, Relator is a former Chief Financial Officer of Vermilion, which is a health system and subsidiary of Acadia. (*First Amend. Compl.* ¶¶ 5–10, Doc. 57.)  He brings claims against these Defendants alleging that they violated the False Claims Act and that they terminated his employment in violation of the anti-retaliation provisions of the False Claims Act (31 U.S.C. § 3730(h)) and the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 49:439.1(E)). (*Id.* ¶¶ 71–78.)  More specifically, Relator alleges that Defendants violated the False Claims Act under each of the above four provisions because they failed to comply with three health care laws in five different ways. (*Id.* ¶¶ 27–68, 71–73.)

First, Defendants allegedly violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"). (*See First Amend. Compl.* ¶¶ 11–15, Doc. 57.)  "The AKS is a criminal statute prohibiting the knowing or willful offering to pay, or soliciting, any remuneration to induce the referral of an individual for items or services that may be paid for by a federal health care program." *United States v. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) (per curiam) (citing 42 U.S.C. § 1320a–7b(b)(1–2); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997)).[2]

---

[2] Specifically, the AKS law generally makes it unlawful: . . .

The AKS contains a number of exceptions, called "safe harbors." 42 U.S.C. § 1320a-7b(b)(3). For example, the AKS does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services[.]" *Id.* § 1320a-7b(b)(3)(B). Some of these exceptions involve written contracts between organizations and individuals. *See id.* § 1320a-7b(b)(3). Further, fair market value is a key concept with the AKS, *see Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (unpublished), though the parties dispute whether Byrd must properly allege this at the pleading stage, (Doc. 67-1 at 28–29; Doc. 70 at 18–20).

Second, Relator claims that Defendants violated the Stark Law, 42 U.S.C. § 1395nn, and its regulations, 42 C.F.R. § 350 *et seq.* (*First Amend. Compl.* ¶ 16–20, Doc. 57.) The Stark Law provides that, if a physician has a "financial relationship" with an entity (that is, an ownership or

---

> [To] knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

42 U.S.C. § 1320a-7b(b)(1). The AKS also makes it unlawful:

> [To] knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

*Id.* § 1320a-7b(b)(2).

4

investment interest or a "compensation arrangement"), then that physician generally cannot make a referral to the entity for the furnishing of "designated health services" for which payment may be made, and "the entity may not present or cause to be presented a claim under [Medicare or Medicaid] or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited" by the Stark Law. 42 U.S.C. § 1395nn(a).

The Stark Law includes a number of defined terms.  For example, a " 'compensation arrangement' [generally] means any arrangement involving any remuneration between a physician . . . and an entity[,]" subject to certain exceptions. *Id.* § 1395nn(h)(1)(A).  " 'Remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *Id.* § 1395(h)(1)(B).  "Designated health services" includes, *inter alia*, inpatient and outpatient hospital services, clinical laboratory services, outpatient prescription drugs, and radiology services.  *Id.* § 1395nn(h)(6).

The Stark Law also contains exceptions, one of which is for bona fide employment relationships. *Id.* § 1395nn(e)(2).  Specifically, the Stark Law excepts from the definition of "compensation arrangement" "[a]ny amount paid by an employer to a physician . . . who has a bona fide employment relationship with the employer for the provision of services if" certain requirements are met. *Id.*  Such requirements include that "(B) the amount of the remuneration under the employment—(i) is consistent with the fair market value of the services, and (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and "(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer[.]"[3] *Id.*

---

[3] The entire bona fide employment relationships exception provides:

Third, Relator claims that Defendants violated the False Claims Act by failing to comply with Louisiana licensure law. (*First Amend. Compl.* ¶ 26, Doc. 57.)  Byrd alleges that, "To be payable under Medicare, Medicaid, or other government healthcare programs, services must be furnished by a physician or other practitioner licensed to provide such services under applicable state law," (*id.* ¶ 21), though Defendants dispute whether this requirement is material to payment, (Doc. 67-1 at 27–28).

In any event, under the Louisiana Nurse Practice Act, La. Rev. Stat. Ann. § 37:911 *et seq*. ("LNPA"), an " 'Advanced practice registered nurse' or 'APRN' means a licensed registered nurse who is certified by a nationally recognized certifying body . . . as having an advanced nursing

---

The following shall not be considered to be a compensation arrangement described in subsection (a)(2)(B) [(i.e., a prohibited one)]: . . .

**(2) Bona fide employment relationships**
Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if—

(A) the employment is for identifiable services,

(B) the amount of the remuneration under the employment—

    (i) is consistent with the fair market value of the services, and

    (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

(D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

Subparagraph (B)(ii) shall not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician (or an immediate family member of such physician).

42 U.S.C. § 1395nn(e)(2).

specialty as described in [the LNPA] and who meets the criteria for an advanced practice registered nurse as established by the [nursing] board." La. Rev. Stat. Ann. § 37:913(1).  The LNPA provides that, as a general rule, "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement." *Id.* § 37:913(8).

The LNPA also contains a number of defined terms.  For example, a " 'Collaborative practice agreement' means a formal written statement addressing the parameters of the collaborative practice which are mutually agreed upon by the advanced practice registered nurse and one or more licensed physicians . . .  which shall include but not be limited to" certain described provisions. *Id.* § 37:913(9).[4]  " 'Collaborative practice' means the joint management of the health care of a patient by an advanced practice registered nurse performing advanced practice registered nursing and one or more consulting physicians[.]" *Id.* § 37:913(8).

Thus, Relator alleges, "under Louisiana law, an advanced practice nurse may only perform acts of medical diagnosis and prescription pursuant to a collaborative practice agreement with a licensed physician who is involved in the joint management of the patient's treatment." (*First Amend. Compl.* ¶ 25, Doc. 57.)

Relator claims that Defendants violated the above three health care laws and thus submitted false claims in five ways:

---

[4] Specifically, the collaborative practice agreement's formal written statement "shall include but not be limited to the following provisions:

> (a) Availability of the collaborating physician or dentist for consultation or referral, or both.

> (b) Methods of management of the collaborative practice which shall include clinical practice guidelines.

> (c) Coverage of the health care needs of a patient during any absence of the advanced practice registered nurse, physician, or dentist.

La. Rev. Stat. Ann. § 37:913(9).

(1) by allowing Ms. Rhonda Kimball ("Kay") Rodriguez, a psychiatric APRN, to perform services without a valid and updated collaborative practice agreement, (*id.* ¶¶ 27–39);

(2) by providing free staff to psychiatrist Dr. Susan Uhrich in exchange for referrals (in violation of the AKS) and in a financial relationship that was not fair market value or commercially reasonable in the absence of referrals (in violation of the Stark Law), (*id.* ¶¶ 40–49);

(3) by paying Dr. Daniel Salmeron, a family practice doctor, a salary substantially higher than fair market value, despite his not working forty hours a week at Vermilion, in exchange for referrals (in violation of the AKS); and in a financial relationship that was not fair market value or commercially reasonable in the absence of referrals (in violation of the Stark Law), (*id.* ¶¶ 50–55);

(4) by engaging in patient brokering, or the paying of remuneration to induce patient referrals or the paying of patients to induce them to purchase or use items or services, (*id.* ¶¶ 56–60); and

(5) by receiving "disproportionate share payments" (or payments from the United States for serving a large number of Medicaid and uninsured patients) to which Vermilion was not entitled because, *inter alia*, it did not have at least two obstetricians with staff privileges to provide such services, as required by federal law, (*id.* ¶¶ 61–68).

Additionally, Byrd claims that Defendants retaliated against Relator by terminating him after he raised concerns about Defendants' actions and by interfering with his efforts to find comparable employment after his termination. (*Id.* ¶¶ 69–70, 74–76.)

## B. Relevant Factual Background

The following allegations are largely taken from the *First Amended Complaint* (Doc. 57.) For purposes of this motion, the well-pleaded allegations are assumed to be true. *See Thompson v. City of Waco*, 764 F.3d 500, 502–03 (5th Cir. 2014).

### 1. The Parties

Relator in this action is Jeffrey H. Byrd. (*First Amend. Compl.* ¶ 10, Doc. 57.) From July 2014 to January 2015, Relator was Vermilion's Chief Financial Officer. (*Id.*) "Periodically he

would also serve as acting Chief Executive Officer (CEO) when the CEO was away." (*Id.*)  On January 21, 2015, Relator was terminated. (*Id.*)

Defendants in this action are Acadia and Vermilion.  "Acadia operates more than 75 behavior health facilities in at least 24 states as well as overseas, including Acadia Vermilion Hospital in Lafayette, Louisiana." (*First Amend. Compl.* ¶ 5, Doc. 57.)  Vermilion is a "subsidiary of Acadia[] and operates under the trade names Vermilion Behavioral Health Systems and Acadia Vermilion Hospital." (*Id.* ¶ 6.)  "Vermilion operates Acadia Vermilion Hospital ('AVH'), a 78-bed psychiatric hospital in Lafayette, Louisiana." (*Id.*)  "AVH includes a 54-bed main facility and a 24-bed facility previously known as Optima Specialty Hospital, but now known as Acadia Vermilion Hospital South Campus" ("Optima"). (*Id.*)  " 'AVH' refers to both the main facility and Optima." (*Id.*)  Historically, the two facilities have used different provider numbers, but "Vermilion had plans to consolidate them under a single provider number." (*Id.*)

During the times relevant to this action, "Acadia has exercised control over Vermilion and participated in its operations." (*First Amend. Compl.* ¶ 8, Doc. 8.)  The operative complaint refers to Acadia's website, which "describes Acadia as 'a provider of behavioral healthcare services,' noting that 'Acadia provides behavioral health and addiction services to its patients in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers and outpatient clinics.' " (*Id.*)  Further, as of " 'September 30, 2019, Acadia operated a network of 589 behavioral healthcare facilities with approximately 18,000 beds in 40 states, the United Kingdom and Puerto Rico,' including Vermilion." (*Id.*)

Relator alleges that "Vermilion submits numerous claims to Medicare, Medicaid, and other government payors for services provided at AVH." (*First Amend. Compl.* ¶ 7, Doc. 57.)  As Relator understands from his experience, "the Medicare utilization rates are approximately 24% at the

main AVH facility and 50% at Optima, and the Medicaid utilization rates are approximately 32% at the main AVH facility and 24% at Optima." (*Id.*)  According to Vermilion's draft 2015 Strategic Plan, " in 2014, Medicare accounted for 28% of the total number of patient days at AVH, Medicaid accounted for 32%, and Tricare accounted for 11%." (*Id.*)[5]  "This plan projected that, in 2015, Medicare and Medicaid would each account for 30% of total patient days, while Tricare would remain at 11%." (*Id.*)

### 2. Ms. Rodriguez and the Services She Performed as an APRN, Allegedly Without a Valid Collaborative Practice Agreement

According to the operative complaint, a Vermilion APRN performed services at Vermilion without a valid collaborative practice agreement. (*See First Amend. Compl.* ¶¶ 27–38, Doc. 57.) Relator maintains that submission of claims for these services constitute false claims. (*See id.*)

Specifically, Rhonda Kimball "Kay" Rodriguez is a psychiatric APRN and wife of the former CEO of Vermilion. (*Id.* ¶ 27.)[6]  "For several years, Ms. Rodriguez has been paid a monthly stipend by Vermilion, and has routinely seen and treated Vermilion patients without the supervision of a physician. Vermilion submits claims for payment for such services to Medicare, Medicaid, and other payors." (*Id.*)

In late December 2014, while Relator was acting as CEO, "Relator was contacted by an official with the Health Standards section of the Louisiana Department of Health and Hospitals." (*Id.* ¶ 28.)  The official told Relator that a Vermilion patient had complained about the treatment Ms. Rodriguez provided to him. (*Id.*)  According to the official, "a state patient advocate would be

---

[5] Though not mentioned in the operative complaint, the Court takes judicial notice of the fact that "TRICARE is the health care program for uniformed service members, retirees, and their families around the world." TRICARE, https://www.tricare.mil/About (last visited Mar. 9, 2021).

[6] The *First Amended Complaint* abbreviates Ms. Rodriguez's job as "ARNP" rather than "APRN," which is what the statute uses.  The Court notes this minor discrepancy and states that it will use the statutory language.

visiting the hospital the next day to investigate[] and would need to see a copy of Ms. Rodriquez's collaboration agreement." (*Id.*)

Relator looked into Ms. Rodriguez's file to see her collaboration agreement, but the agreement, dated April 2011, identified two collaborating doctors—Dr. Sanders and Dr. Murphy— whom Relator did not recognize. (*First Amend. Compl.* ¶ 29, Doc. 57.) Relator investigated further and discovered that (1) "Dr. Sanders had resigned and left the area about a year earlier, and" (2) "Dr. Murphy was a professor residing in New Orleans." (*Id.* ¶ 30.) "Neither of these physicians had collaborated with Ms. Rodriguez in the joint management of patients for a long time, if ever." (*Id.*)

Relator broached this issue with several people at Vermilion, including Luis Betances, the CEO; Glynis DeRouche, the AVH clinical director; and Tony Miller, the program director of the hospital's FLAGS program. (*Id.* ¶ 31.) The CEO was on vacation, but he "told Relator that he would take care of it when he returned." (*Id.*) Byrd claims, "Relator was also informed that Kim Leger, the AVH administrative assistant who helped Relator locate the collaboration agreement, asked Ms. Rodriguez whether she had an updated agreement, and was told by Ms. Rodriguez that Ms. Rodriguez would 'get back' with her." (*Id.* ¶ 32.) Betances returned to the office the following week, and, when Relator showed Betances the expired collaboration agreement, Betances said "he was 'sure' Ms. Rodriguez had another collaboration agreement with Dr. Dickens, the AVH medical director." (*Id.* ¶ 33.) Relator requested to see a copy of this agreement, and Betances said " 'we'll see,' or words to that effect." (*Id.*) Relator also pleads, "Later that week, Relator was told by Tony Miller that Ms. Rodriguez was 'scrambling' to find a physician to update her collaboration agreement, and that Dr. Dickens told her 'no way am I backdating an agreement for you.' " (*Id.* ¶ 34.)

11

Relator was terminated on January 21, 2015, and, at that time, he had not seen a collaboration agreement besides the expired one with Dr. Sanders and Dr. Murphy. (*First Amend. Compl.* ¶ 35, Doc. 57.)   The operative complaint asserts, "Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez independently saw and treated numerous patients at AVH, in violation of Louisiana law, and Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services. All such claims constitute false claims." (*Id.* ¶ 36.)

Byrd also alleges that, in December of 2019, the State of Louisiana entered into a settlement with Defendants in which they agreed to pay the State $500,000 to resolve the claims asserted on the State's behalf in Relator's original complaint. (*Id.* ¶ 37.)   The operative complaint states:

> The settlement agreement provided, among other things, as follows:
>
> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
> . . .
> 3. Acadia submitted claims for payment to the Medicaid program for services provided by advanced practice registered nurses that did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law.

(*Id.* ¶ 38.)  The *First Amended Complaint* further says, "Medicaid is a joint federal-state program, and claims submitted to the Louisiana Medicaid program are paid for, in part, out of federal funds. Thus, false claims submitted to the Louisiana Medicaid program are false claims under the federal False Claims Act." (*Id.* ¶ 39.)

### 3. Dr. Uhrich and Vermilion's Alleged Provision of Free Staffing to Her

Byrd also alleges that Defendants had an arrangement with Dr. Susan Uhrich, a psychiatrist in Lafayette, Louisiana, that violated the Stark Law and AKS. (*First Amend. Compl.* ¶¶ 40–49,

Doc. 57.)  Specifically, Relator claims that, "[f]or the last several years . . . Defendants provide[d] free staff to Dr. Uhrich in return for referral of patients to AVH." (*Id.* ¶ 40.)  Byrd says that "[t]his scheme was devised and implemented by former AVH CEO Joe Rodriguez and current AVH CEO Luis Betances." (*Id.*)  Further, "Dr. Uhrich is a significant source of patient referrals for AVH, principally to the Optima facility, and Vermilion routinely submits claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant to such referrals." (*Id.*)

The operative complaint alleges, "A draft 2015 Strategic Plan prepared by Vermilion identified Dr. Uhrich as its fifth-highest volume referral source, with a projected 60 acute admissions for 2014." (*First Amend. Compl.* ¶ 41, Doc. 57.)  She was also the "only individual physician on the list of the top 10 referral sources" and, the strategic plan "identified Dr. Uhrich's primary payor source as Medicare, followed by indigent and private insurance." (*Id.*)

Byrd claims that, "[f]or each referral source, the strategic plan described a 'channeling mechanism,' which it defined as 'any gate-keeping process required to obtain referrals/admissions.' " (*Id.* ¶ 42.)  Dr. Uhrich's channeling mechanism was described as follows: " 'Currently a member of our Medical Staff. Has high volume private practice and nursing home ties. Employs three NP's who work the nursing homes and the IP units. Nurse liaison is a part of our staff.' " (*Id.*) "The plan noted that 'Dr. Uhrich is exclusively referring patients to VBHS with the support of three mid-level practitioners.' " (*Id.*)

Relator next makes allegations related to Cheryl Smith and Donna Tally, who during this period were "employed and paid by Vermilion." (*First Amend. Compl.* ¶ 43, Doc. 57.)  Smith was an "advanced practice nurse practitioner," and Tally was a "licensed practical nurse." (*Id.*) Vermilion paid their salaries, but they "did not actually work at Vermilion[.]" (*Id.*)  Rather, they worked at Dr. Uhrich's office. (*Id.*)  Tally is listed on Dr. Uhrich's webpage as staff, and Smith is

identified on Dr. Uhrich's LinkedIn page as staff. (*Id.* ¶¶ 44–45.)  Tally served as Dr. Uhrich's office manager. (*Id.* ¶ 44.)  Smith "routinely perform[ed] patient rounds at local nursing homes on behalf of Dr. Uhrich." (*Id.* ¶ 45.)  "Although her salary is paid by Vermilion, claims for payment for Smith's services are submitted by Dr. Uhrich's office." (*Id.*)

The operative complaint asserts, "Optima staff have frequently questioned the medical appropriateness of the referrals by Uhrich/Smith. Many of these patients suffer from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment is unnecessary." (*First Amend. Compl.* ¶ 46, Doc. 57.)

Byrd alleges that Defendants' providing Dr. Uhrich free staff constitutes "remuneration" under the Stark Law and creates a "financial relationship" between her and Vermilion. (*Id.* ¶ 47.) Further, no Stark Law exception applies because, *inter alia*, "the provision of free services by definition is not fair market value, and the arrangement would not be commercially reasonable in the absence of referrals." (*Id.*)  As a result, "Dr. Uhrich is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services. All such claims therefore constitute false claims." (*Id.*)

Relator further asserts that Vermilion's giving free staff to Dr. Uhrich violates the AKS because it "was intended, at least in part, to induce the referral of patients by Dr. Uhrich to AVH," and, "[i]ndeed, the 2015 Strategic Plan expressly identified as a 'channeling mechanism' the fact that Dr. Uhrich's '[n]urse liaison is a part of our staff.' " (*First Amend. Compl.* ¶ 48, Doc. 57.) Consequently, because this remuneration violates the AKS, "claims submitted pursuant to such referrals constitute false claims." (*Id.*)

Byrd closes this section of the *First Amended Complaint* by again referring to the December 2019 settlement agreement between the State and Defendants. (*Id.* ¶ 49.)  He states that this agreement stated, *inter alia*:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly Case engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
> . . .
> 2. From March 1, 2013, through October 31, 2016, Acadia paid improper remuneration via free staff; improper lease arrangements; and inflated salaries to certain physicians in the Lafayette area for the purpose of inducing referrals to Acadia facilities in Lafayette, Louisiana[.]

(*Id.*)

### 4. Dr. Salmeron and the Allegedly Inflated Salary He Received from Vermilion

Byrd next claims that Defendants violated the Stark Law and AKS with respect to Dr. Daniel Salmeron. (*First Amend. Compl.* ¶¶ 50–55, Doc. 57.)  Specifically, Relator alleges that Dr. Salmeron was a family practice doctor in Lafayette, Louisiana, and friend of Luis Betances, Vermilion's CEO. (*Id.* ¶ 50.)  Byrd alleges that, since January 2014, Vermilion paid  Dr. Salmeron about $350,000 per year, despite the fact that the doctor had "his own private practice and only occasionally [saw] patients at AVH." (*Id.*)   The operative complaint asserts that, "This is substantially higher than fair market value even for a full-time physician in the Lafayette area, where the typical internal medicine physician salary is approximately $130,000." (*Id.*)

Vermilion's 2015 Strategic Plan identified Dr. Salmeron as a "key physician" and "indicated that he worked 40 hours a week for a salary of $350,000." (*Id.* ¶ 51.)  But, in fact, the doctor did not work 40 hours weekly at Vermilion. (*Id.*)  Further, a "draft internal audit performed

in 2014 noted that physicians did not provide timesheets or invoices for payments, although this was required by their contracts, but were instead paid based on scheduled hours." (*Id.*)

Byrd alleges, "Division president Keith Furman had concerns over the amount of money paid to Dr. Salmeron, and stated that Dr. Salmeron did not refer enough patients to Vermilion to be paid that amount of money." (*Id.* ¶ 52.)

As with Dr. Uhrich, Relator claims that the payments to Dr. Salmeron are "remuneration" under the Stark Law and create a "financial relationship" between him and Vermilion. (*First Amend. Compl.* ¶ 53, Doc. 57.) Further, no exception to the Stark Law applies because "the remuneration exceeds fair market value, and the arrangement would not be commercially reasonable in the absence of referrals." (*Id.*) Byrd concludes, "Therefore, Dr. Salmeron is prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion is prohibited from submitting claims to Medicare or Medicaid for such services. All such claims therefore constitute false claims." (*Id.*)

Relator also asserts that "the payments to Dr. Salmeron were intended, at least in part, to induce the referral of patients by Dr. Salmeron to AVH. Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims." (*Id.* ¶ 54.)

Byrd closes this section by again referring to the December 2019 settlement agreement. (*Id.* ¶ 55.) This document allegedly provides in part:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
> …
> 2. From March 1, 2013, through October 31, 2016, Acadia paid improper remuneration via free staff; improper lease arrangements; and inflated salaries to certain physicians in the Lafayette area for

the purpose of inducing referrals to Acadia facilities in Lafayette,
Louisiana[.]

(*Id.*)

### 5. Patient Brokering

Byrd next alleges that, on January 5, 2015, he went to lunch with David Dempsey, his

corporate supervisor and an Acadia division CFO who worked from the corporate headquarters in

Tennessee. (*First Amend. Compl.*¶ 56, Doc. 57.)  At that lunch, the two discussed how Vermilion's

"average patient census (the number of patients per day) had fallen off." (*Id.* ¶ 57)  Relator alleges,

"Dempsey assured Relator that corporate 'patient brokers' paid by Defendants were working to

bring back Medicare, Medicaid, and TRICARE patients. Dempsey stated that 'we don't want to

call them patient brokers, but that's what they are.' " (*Id.*)

The operative complaint alleges that Byrd "expressed concerns as to the legality of paying

for referrals." (*Id.* ¶ 58.)  He was later "summoned on short notice to a meeting a [sic] corporate

headquarters . . .  on January 19, 2015," and "was fired shortly thereafter, on January 21, 2015."

(*Id.*)

Relator also claims to be aware of how, on "several occasions[,] . . . Tony Miller, a

Vermilion case manager, with the approval of Luis Betances, flew to California, Alaska and other

out of state locales to pick up and return with TRICARE beneficiaries for admission to AVH."

(*First Amend. Compl.* ¶ 59, Doc. 57.)  "In one case a TRICARE beneficiary was flown into

Lafayette from Japan for admission to AVH. All of these expenses are charged out on the hospital

credit card." (*Id.*)

Byrd alleges, "Patient brokering violates the AKS, as it involves the payment of money to

induce referrals of patients for items or services paid by a federal healthcare program, or the

payment of remuneration to patients to induce them to purchase or use such items or services." (*Id.* ¶ 60.)  Further, "[a]ll claims submitted pursuant to such referrals constitute false claims." (*Id.*)

### 6. Disproportionate Share Payments

According to the operative complaint, the United States gives funds to the states to compensate hospitals who serve a great number of Medicaid or uninsured patients. (*First Amend Compl.* ¶ 61, Doc. 57.)  Such payments are called "disproportionate share payments," or " 'DSH' " payments." (*Id.*)

Relator alleges that, "[i]n 2010 and 2011, Vermilion received at least $150,136 in DSH payments from the State of Louisiana, using funds provided in whole or in part by the United States." (*Id.* ¶ 62.)  The *First Amended Complaint* states, "Vermilion was not entitled to such payments because, among other things, it did not have at least two obstetricians with staff privileges who agreed to provide obstetric services to individuals entitled to medical assistance for such services, as required by 42 U.S.C. § 1396r-4(d)." (*Id.*)

Relator also claims that, around August 2014, the State of Louisiana entered into an agreement with Myers & Stauffer to audit Vermilion's cost reports regarding the DSH issue. (*Id.* ¶ 63.)  This firm asked that Vermilion provide additional information to support the DSH payment. (*Id.*)  Byrd alleges, "Upon information and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit." (*Id.*)

Vermilion consulted with a CPA in New Orleans named Byron Elsas to help in their response to the audit. (*First Amend. Compl.* ¶ 64, Doc. 57.)  Byrd claims, "Relator had several discussions with Mr. Elsas, who told Relator that Vermilion should not have received the DSH payments in the first place." (*Id.*)   The *First Amended Complaint* further alleges:

On December 29, 2014, Elsas sent Relator an email noting that, if the state noticed the problems, Vermilion would have to repay $150,136.00, but if it did not, Vermilion would be able to receive an additional $135,833.00:

> PLEASE SEE LAST PAGE OF 3RD & 4TH ATTACHMENT. TITLED"MEDICAID DSH REPORT NOTES"
> **1. OB REQUIREMENT NOT MET**
> THERE EXISTS TWO OUTCOMES TO THESE AUDITS.
> 1. IF MEDICAID (STATE) DOES NOT SEE OR UNDERSTAND THE REPORT NOTES YOU WILL RECEIVE ANOTHER $135,833.00
> 2. IF MEDICAID (STATE) SEES & UNDERSTANDS THE REPORT NOTES YOU WILL OWE $150,136.00
> NEVER CAN TELL.
> IT WILL BE ONE OR THE OTHER.
> GOOD LUCK
> BYRON ELSAS

(*Id.* ¶ 65.)

Byrd was fired on January 21, 2015, before the audit was complete. (*Id.* ¶ 66.)  "Upon information and belief, however, Vermilion has not returned the DSH payments it was aware it was not entitled to receive." (*Id.*)  Additionally, "Vermilion also requested and received DSH payments in other years, which it was not entitled to receive because it did not meet the requirements for such payments." (*Id.* ¶ 67.)

Relator finishes this section by again referring to the settlement agreement between the State and Defendants. (*Id.* ¶ 68.) This agreement said in relevant part.

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
>
> 1. From January 1, 2007, through December 31, 2015, Acadia submitted applications to the State of Louisiana for a disproportionate share ("DSH") payments that misrepresented

> Acadia's qualification for DSH payments, thereby causing the State
> to pay to Acadia DSH payments it was not entitled to[.]

(*Id.*)

### 7. Retaliation

Relator claims he was terminated on January 21, 2015. (*First Amend. Compl.* ¶ 69, Doc.

57.)  He states that this happened after he "rais[ed] concerns about Defendants' actions." (*Id.*)

Byrd further alleges:

> Upon information and belief, Defendants interfered with Relator's
> attempts to find comparable employment following his termination.
> Relator received an offer of employment from another behavioral
> health care provider, and was provided an employment agreement
> and a start date, but the offer was suddenly withdrawn. Relator was
> informed that the withdrawal was the result of information provided
> by Defendants.

(*Id.* ¶ 70.)

Relator asserts that Vermilion unlawfully terminated him because of his lawful actions

done in furtherance of his federal False Claims Act case or for "other efforts to stop one or more

violations of the Federal False Claims Act." (*Id.* ¶ 75.)  Byrd asserts this claim under 31 U.S.C. §

3730(h).

Byrd also makes a substantially similar retaliation claim under state law. (*First Amend.*

*Compl.* ¶¶ 77–79, Doc. 57.)  Specifically, he claims that he was unlawfully terminated by

Vermilion because of lawful actions in took under the Louisiana Medical Assistance Program

Integrity Law and because of efforts he took to stop violations of this state law. (*Id.* ¶ 78.)

### 8. Prayer for Relief

Relator seeks a judgment against Defendants equal to three times the amount of damages

the United States sustained from Defendants' actions, plus a civil penalty of between $5,500 and

$11,000 for each violation of the federal False Claims Act. (*Id.* at 22.)  He also seeks an award that

is reasonable for collecting the civil penalty and damages, which will be 15–25% of the proceeds of the action or settlement if the government intervenes or 25–30% of the proceeds or settlement if the government does not intervene. (*Id.*)  Byrd also asks for "all relief necessary to make him whole for his unlawful termination, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages." (*Id*. at 23.)  Lastly, Byrd seeks costs, expenses (including reasonable attorneys' fees), and "such other relief as is appropriate." (*Id.* at 23.)

### C.  Relevant Procedural Background

Relator originally filed his complaint on April 1, 2016, in the Middle District of Tennessee. (Doc. 1.)  The United States sought numerous extensions to decide whether to intervene which were granted, (*see* Docs. 17, 19, 20, 22, 23, 25, 26, 28), and, on March 14, 2018, the United States filed a notice declining to intervene, (*See* Doc. 29).  On March 20, 2018, the case was transferred to this district. (Doc. 33.)

On October 16, 2019, the State of Louisiana was allowed to intervene for the limited purpose of settlement. (Doc. 44.)  On December 6, 2019, the Louisiana Medical Assistance Program Integrity Law, the State of Louisiana, and the Relator filed a joint dismissal of the claims asserted on behalf of the State pursuant to a settlement agreement. (Doc. 45.)  The claims on behalf of the United States were reserved and not dismissed. (*Id.*)  The Joint Dismissal only encompassed the claims asserted on behalf of the State and Relator's personal claims under state law. (*Id.* at 2.) Following a status conference on December 12, 2019, the Court granted the joint stipulation as unopposed. (Docs. 48–49.)

On January 30, 2020, Byrd filed the *First Amended Complaint*. (Doc. 57.)  On May 13, 2020, Defendants filed the instant *Motion to Dismiss Relator's First Amended Complaint* (Doc. 67.)

On August 20, 2020, Byrd filed *Relators' Motion for Leave to File Second Amended Complaint*. (Doc. 77.)  Relator attached a proposed seventy-one-page *Second Amended Complaint*. (Doc. 77-1.)  The Magistrate Judge denied Relator's motion by oral order on September 3, 2020, and explained in her minute entry:

> Although leave to amend should be freely granted, judicial efficiency dictates denying leave to amend at this time. The Motion to Dismiss is fully briefed and the outcome of the Motion to Dismiss will dictate how the claims in this case proceed. Additionally, Relator has already raised, as an alternative argument in opposition to the Motion to Dismiss, that he should be given leave to amend the operative complaint to cure any deficiencies. Accordingly, there is no prejudice to denying Relator leave to amend at this time.

(Doc. 83 at 1–2.)

## II.   Relevant Standards

### A.  Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading

stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

### B.  The False Claims Act and Rule 9(b) Standard

"The False Claims Act is a potent remedial statute. As a counterweight to the statute's power and as a shield against fishing expeditions, FCA suits are subject to the screening function of Federal Rule of Civil Procedure 9(b)." *United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 623 (5th Cir. 2015) (unpublished); *see also id.* at 625 ("An FCA complaint must meet the heightened pleading standard of Rule 9(b)."). Under this Rule, "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' " *Id.* (quoting Fed. R. Civ. P. 9(b)). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Id.* at 625 (quoting *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010)); *see also United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir.2003) ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated . . .  in order to satisfy Rule 9(b)." (internal quotation marks and citation omitted)).

The Fifth Circuit " 'appl[ies] Rule 9(b) to fraud complaints with bite and without apology.' " *Porter*, 810 F. App'x at 240 (quoting *Grubbs*, 565 F.3d at 185). But, as will explored below, " 'to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " *Id.* (quoting *Grubbs,* 565 F.3d at 190).

### III.    Discussion

#### A.  Submission of False Claim

##### 1. Parties' Arguments

###### a.    Defendants' Original Memorandum (Doc. 67-1)

Defendants first argue that Relator fails to identify a single false claim and thus fails to state a viable cause of action under Rule 9(b). (Doc. 67-1 at 13–19.)  Defendants assert, "Nowhere in the five categories of allegedly improper conduct identified by the FAC[7] does it identify a single claim with any kind of specificity, much less allege reliable indicia that lead to a strong inference that [false] claims were actually submitted." (Doc. 67-1 at 14 (cleaned up).)

For instance, concerning the allegations related to Ms. Rodriguez, Byrd "fail[s] to identify a single specific claim, much less the government program that the claims were allegedly submitted to, or the specific date (or even date range) on which the claims were allegedly submitted." (*Id.*)  Byrd thus fails to provide a sufficient "reliable indicia" that could lead to the conclusion that false claims were submitted. (*Id.*) "There are no particulars regarding the patients Ms. Rodriguez treated, when she treated them, if claims for this treatment were submitted to government payors, and if so, when the submissions occurred, are insufficient to meet 9(b)." [sic] (*Id.*)

Similarly, with respect to Dr. Uhrich, the operative complaint "fails to identify any patients referred to AVH by Dr. Uhrich, when she allegedly referred patients to AVH, what services were provided to those patients, what payors those claims were allegedly submitted to among other things." (*Id.* at 15 (citing *First Amend. Compl.* ¶¶ 40, 46, Doc. 57).)  Defendants also emphasize

---

[7] Defendants refer to the *First Amended Complaint* (Doc. 57) as "FAC."  The Court has preserved that abbreviation when quoting Defendants' arguments.

that lack of specificity with respect to the dates, as Byrd alleges only that this fraud happened "for the last several years." (*Id.* at 15–16 (quoting *First Amend. Compl.* ¶ 40, Doc. 57).)

Defendants say that the claims about Dr. Salmeron "are even more deficient," as "[n]owhere in the six paragraphs covering Defendants' alleged arrangement with Dr. Salmeron does the FAC allege that Defendants even submitted a single false claim for a patient referred or treated by Dr. Salmeron." (*Id.* at 16 (*First Amend. Compl.* ¶¶ 50, 52, 54, Doc. 57).) Further:

> [T]he FAC provides the opposite of "reliable indicia." It describes Dr. Salmeron as a "family practice doctor," states he "occasionally sees patients at [Vermilion]," and compares his alleged salary to that of other "internal medicine physician[s]." *See* FAC ¶ 50. Yet Vermilion is a "psychiatric hospital." *Id.* ¶ 6. It is not difficult to infer that an internal medicine doctor did not submit claims for any services, or make any referrals to a psychiatric hospital. The FAC does nothing to clarify this dissonance.

(*Id.* at 17.)

Defendants next attack the patient brokering allegations. The allegations describe "nothing more than efforts to increase 'Vermilion's average patient census' and 'bring back Medicare, Medicaid, and TRICARE patients.' " (*Id.* at 17 (quoting *First Amend. Compl.* ¶ 50, Doc. 57).) Further, according to Defendants, "[a]dvertising efforts, even those targeted at government healthcare program beneficiaries, do not violate the ASK or FCA." *Id.* (citing *United States v. Crane*, 781 F. App'x 331, 334–35 (5th Cir. 2019)).) While Byrd describes a base manager taking a trip to unnamed locations in different states, "Relator fails to allege that the activities resulted in a single admission or claim to any government healthcare program." (*Id.* at 17–18 (*First Amend. Compl.* ¶¶ 56–60, Doc. 57).) Further, he provides no details about these trips, such as a date range or precise locations, despite saying he has personal knowledge of them. (*Id.* at 18.)

For the DSH payments, Defendants say, "Nowhere in these allegations does Relator allege that Vermilion received DSH funds as the result of a 'claim' it submitted. While Relator may later

allege Vermilion made a 'claim' for DSH payments in 'other years,' those allegations are woefully

inadequate, and fail to identify the years at issue." (*Id.* at 18–19.)

In closing, Defendants assert:

> Presentment of an allegedly false claim is the "*sine qua non*" of a §
> 3729(a)(1)(A) claim. *Grubbs*, 565 F.3d at 188. The FAC fails to
> identify a single submitted claim with the specificity demanded by
> Rule 9(b). In the absence of such an allegation, Relator cannot
> sustain a cause of action pursuant to § 3729(a)(1)(A), and any claims
> brought pursuant to that sub-section in Count I of the FAC must be
> dismissed.

(*Id.* at 19.)

### b.  Relator's Opposition (Doc. 70)

After describing how Relator plausibly alleges how Vermilion violated the AKS and the

Stark Law with respect to Dr. Uhrich and Dr. Salmeron (Doc. 70 at 1–6), Byrd then addresses how

he adequately alleged that Defendants submitted claims for referrals for these doctors. (*Id.* at 7–

14.) Relator argues that he need not specifically identify claims, and he cites *Grubbs* for this

position. (*Id.* at 7.)  Relator discusses the facts and result of *Grubbs* in detail and maintains that

Defendants misrepresent its holding. (*Id.* at 7–8.) Byrd states that, unlike *Grubbs*, Relator here

alleges that the above doctors violated the AKS and the Stark Law and Defendants were thus

barred from submitted claims to Medicaid or Medicare for any hospital services these doctors

referred. (*Id.* at 10.) Relator states:

> Indeed, unless the arrangements satisfied a Stark Law exception or
> AKS safe harbor (which are affirmative defenses that ***Defendants***
> must plead and prove), the only way there could be no false claims
> would be if Defendants never submitted ***a single claim*** pursuant to
> a referral from Dr. Uhrich or Dr. Salmeron.

(*Id.*)

But, contrary to Defendants' position, "[t]he complaint contains more than sufficient indicia of reliability to show that Defendants submitted claims pursuant to referrals from Drs. Uhrich and Salmeron." (Doc. 70 at 10.)   Relator cites the allegations that Dr. Uhrich "is a significant source of patient referrals for AVH, principally to the Optima facility, and Vermilion routinely submits claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant to such referrals." (*Id.*)   Further, Byrd cites the 2015 Strategic Plan which highlights Dr. Uhrich as a referral source and identifies his "primary payor source as Medicare, followed by indigent and private insurance." (*Id.* at 10–11.)   Relator maintains:

> As in *Grubbs*, "[i]t would stretch the imagination to infer" that Defendants would "go through the charade" of providing staff to Dr. Uhrich as a channeling mechanism in order to obtain referrals, "only for the scheme to deviate from the regular billing track at the last moment so that the … [referred] services never get billed." *Grubbs, supra* at 192. "That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in [Relator's] complaint even though it does not include exact billing numbers or amounts." *Id.*

(*Id.* at 11.)   The same goes for Dr. Salmeron:

> As with Dr. Uhrich, the submission of claims for services referred by Dr. Salmeron is the "logical conclusion" of Relator's allegations. Indeed, it would "stretch the imagination" for Defendants to complain that Dr. Salmeron did not "refer enough patients to Vermilion to be paid that amount of money," if they were not submitting claims for the patients that he did refer.

(*Id.* at 12.)

Byrd then closes by citing to the settlement agreement between Defendants and the State as further "reliable indicia." (Doc. 70 at 13.)   Relator cites an Eleventh Circuit case of *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006), for the proposition that governments do not intervene in *qui tam* actions for discovery, as they already possess the relevant information. (Doc. 70 at 13.)   Byrd states that "it is hard to imagine a defendant" paying

$500,000 to settle a claim "if it **did not even submit any claims at all.**" (*Id.* at 13.)  Though the state settlement involved only Medicaid claims, "Medicaid is a joint federal-state program funded in part by the federal government. Thus, false claims submitted to the Louisiana Medicaid program are also false claims under the federal False Claims Act, since the federal government pays a portion of the claim." (*Id.* at 14 (citing *First Amend. Compl.* ¶ 39, Doc. 57; 31 U.S.C. § 3729(b)(2)(A)).)

With respect to Ms. Rodriguez, Relator argues that he stated a viable cause of action. Concerning the submission of claims, Byrd repeats earlier arguments:

> As with Drs. Uhrich and Salmeron, the falsity of such claims does not turn on anything specific to the individual claims; rather, **every** claim for Ms. Rodriguez's services was false because she did not have a valid collaboration agreement and was not authorized to perform such services under state law. As in *Grubbs*, "[i]t would stretch the imagination to infer" that Defendants would "go through the charade" of having Ms. Rodriguez see patients without supervision, and then not bill for any such services. *Grubbs, supra* at 192. "That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in [Relator's] complaint even though it does not include exact billing numbers or amounts." *Id.*

(Doc. 70 at 22.)  Byrd also relies on the settlement agreement between the State and Defendants. (*Id.* at 23.)

As to the DSH payments, Relator largely recites the facts alleged in the operative complaint.  Byrd concludes, "Only by the most tendentious reading of the complaint could one assert that it does not allege that Defendants received DSH payments as a result of a claim." (*Id.* at 24.)

*c.*  Defendants' Reply (Doc. 72)

Defendants reply that "*Grubbs* requires a qui tam relator to plead the necessary 'details' to create a plausible inference that claims were submitted." (Doc. 72 at 1 (citing *Grubbs*, 565 F.3d at 191).)  Defendants say the *First Amended Complaint* fails to provide these details:

> There is no list of claims, either specific or generalized. The FAC does not indicate what time period it covers. Instead, it alleges that the conduct occurred over the "last several years," an undefined period that could be from 2013 to 2016, or 2017 to 2020. Unlike *Grubbs*, the FAC contains no alleged statements of Luis Betances or Joe Rodriguez, the alleged architects of the scheme. And again, unlike *Grubbs*, the FAC does not allege that Relator personally participated in the scheme.

(*Id.* at 1–2.)

Defendants dispute that the "draft strategic plan" is controlling. (*See id*. at 2.)  First, the plain language of the "plan" does not support Byrd's allegations. (*Id.*)  For example, Dr. Uhrich has Medicare has a primary payor source, but that does not mean Vermilion has the same source. (*Id.*)

Next, Defendants attack Byrd's reliance on "the simplistic argument that '[i]t would stretch the imagination to infer' that Defendants would 'go through the charade' of providing staff to Dr. Uhrich as a channeling mechanism in order to obtain referrals, 'only for the scheme to deviate from the regular billing track at the last moment so that the . . . [referred] services never get billed.' " (*Id.* at 2.)  Defendants maintain that this is not enough under Rule 9(b). (*Id.* at 3.)  Further, such "deficiencies are particularly troubling since Relator later asserts that he could 'easily' provide 'additional facts relating to the claims submission process.' " (*Id.* at 3.)  Defendants say Rule 9(b) does not allow a relator "to conceal information from defendants and the court while hiding behind assertions that such information could 'easily' be provided." (*Id.*).

Defendants next argue that Byrd fails to plead the submission of claims for Dr. Salmeron. (*Id.*)  Relator relies solely on a statement from " 'Division president Keith Furman' that Dr. Salmeron did not refer enough patients to Vermilion to be paid what Relator claimed he was paid." (*Id.*)  But the operative complaint "does not explain how, to whom, or when this statement was made." (*Id.* (Doc. 70 at 3).)  Moreover, "nothing in this alleged statement allows the Court to infer that Dr. Salmeron referred patients to Vermilion, since 'not . . . enough patients' could easily mean none at all, which was in fact the case." (*Id.*)

For Ms. Rodriguez, Relator's opposition "utterly fails to identify where or how the FAC adequately alleges a claim submitted for services provided by [Ms.] Rodriguez." (*Id.*)  Byrd merely incorporates the same arguments made with respect to Drs. Uhrich and Salmeron. (*Id.*)  But the *First Amended Complaint* does not identify a single claim Defendants allegedly submitted for Ms. Rodriguez. (*Id.* at 3–4.)

Byrd's reliance on the settlement agreement also fails. (*Id.* at 4.)  "First, entities settle with state regulators for a myriad of reasons, many of which have nothing to the merit of a particular claim. Second, Relator cannot rely on the settlement agreement, because it offers no additional specificity about *his* claims." (*Id.*)

### 2. Applicable Law

As stated above, "§ 3729(a)(1) . . . makes liable any person who 'knowingly presents, or causes to be presented' a false claim to the Government." *Grubbs*, 565 F.3d at 188.  "This provision includes an express presentment requirement." *Id.*  "[T]he provision's *sine qua non* is the presentment of a false claim." *Id.*[8]

---

[8] As also stated above, "[o]ther elements include that the claim was false or fraudulent and that the action was undertaken knowingly." *Grubbs*, 565 F.3d at 188.  "Notably, stating a claim under § 3729(a)(1) does not require actual or specific damages, as the statute imposes a liquidated civil penalty on violators." *Id.*

Again, under Rule 9(b), "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' " *Gage*, 623 F. App'x at 625 (quoting Fed. R. Civ. P. 9(b)). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Id*. (quoting *Steury*, 625 F.3d at 266); *see also Doe*, 343 F.3d at 329 ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated . . . in order to satisfy Rule 9(b)." (internal quotation marks and citation omitted)).

But "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *Grubbs*, 565 F.3d at 190. Thus, " 'to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " *Porter*, 810 F. App'x at 240 (quoting *Grubbs*, 565 F.3d at 190).

*Grubbs* gives guidance in determining what level of detail is necessary. For instance, before laying out the above holding, the Fifth Circuit stated that "surely a procedural rule [such as Rule 9(b)] ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial." *Grubbs*, 565 F.3d at 189. As *Grubbs* stated:

> Fraudulent presentment requires proof only of the claim's falsity, not of its exact contents. If at trial a *qui tam* plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure—a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite

32

> no evidence of the particular contents of the misrepresentation. Of course, the exact dollar amounts fraudulently billed will often surface through discovery and will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty. Nevertheless, a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted. To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.

*Id.* at 189–90 (internal citation omitted).

The Fifth Circuit next rejected the defendants' argument that "because presentment is the conduct that gives rise to § 3729(a)(1) liability, Rule 9(b) demands that it is the contents of the presented bill itself that must be pled with particular detail and not inferred from the circumstances." *Id.* at 190. The appellate court stated:

> We must disagree with the sweep of that assertion. Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme. A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone. Standing alone, raw bills— even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*Id.*

The *Grubbs* court also discussed how the standard it established "comport[ed] with Rule 9(b)'s objectives of ensuring the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover

unknown wrongs.' " *Id.* (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).  In doing

so, the Fifth Circuit said:

> Confronting False Claims Act defendants with both an alleged
> scheme to submit false claims and details leading to a strong
> inference that those claims were submitted—such as dates and
> descriptions of recorded, but unprovided, services and a description
> of the billing system that the records were likely entered into—gives
> defendants adequate notice of the claims. In many cases, the
> defendants will be in possession of the most relevant records, such
> as patients' charts, doctors' notes, and internal billing records, with
> which to defend on the grounds that alleged falsely-recorded
> services were not recorded, were not billed for, or were actually
> provided.

*Id.* at 190–91.

Further, in explaining why the district court erred in concluding that the relator failed to

comply with Rule 9(b), the *Grubbs* court found:

> The complaint sets out the particular workings of a scheme that was
> communicated directly to the relator by those perpetrating the fraud.
> Grubbs describes in detail, including the date, place, and
> participants, the dinner meeting at which two doctors in his section
> attempted to bring him into the fold of their on-going fraudulent
> plot. He alleges his first-hand experience of the scheme unfolding
> as it related to him, describing how the weekend on-call nursing staff
> attempted to assist him in recording face-to-face physician visits that
> had not occurred. Also alleged are specific dates that each doctor
> falsely claimed to have provided services to patients and often the
> type of medical service or its Current Procedural Terminology code
> that would have been used in the bill.
>
> Taking the allegations of the scheme and the relator's own alleged
> experience as true, as we must on a motion to dismiss, and
> considering the complaint's list of dates that specified, unprovided
> services were recorded amounts to more than probable, nigh likely,
> circumstantial evidence that the doctors' fraudulent records caused
> the hospital's billing system in due course to present fraudulent
> claims to the Government. It would stretch the imagination to infer
> the inverse; that the defendant doctors go through the charade of
> meeting with newly hired doctors to describe their fraudulent
> practice and that they continually record unprovided services only
> for the scheme to deviate from the regular billing track at the last

> moment so that the recorded, but unprovided, services never get billed. That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in Grubbs' complaint even though it does not include exact billing numbers or amounts.

*Id.* at 191–92.

Later, the Fifth Circuit rejected the argument that *Grubbs* absolved relators of Rule 9(b)'s heightened pleading requirements. *See Nunnally*, 519 F. App'x at 893. The appellate court stated:

> To the contrary, *Grubbs* reaffirms the importance of Rule 9(b) in FCA claims, while explaining that a relator may demonstrate a strong inference of fraud without necessitating that the relator detail the particular bill. *See* 565 F.3d at 190. We established that a relator could, in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to *each* false claim. *Id.* This standard nonetheless requires the relator to provide other reliable indications of fraud and to plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment. *Id.* Significantly, the complaint in *Grubbs* rested on the relator's actual description of a solicitation by two of the defendants to the relator to participate in an elaborate scheme to defraud the government, the particulars of which were there alleged.

*Id.* The Fifth Circuit then agreed with the district court that the relator failed to plead with sufficient particularly under Rule 9(b) and *Grubbs* that the hospital submitted false claims in violation of the FCA:

> [Relator] Nunnally's wholly generalized allegations of false claims presented to the Government do not "alleg[e] *particular* details of a scheme" (emphasis added) and are not "paired with reliable indicia that lead to a strong inference that [false] claims were actually submitted." *See Grubbs,* 565 F.3d at 190. We held in *Grubbs* that the contents of a false claim need not always be presented under this subsection because, given that the Government need not rely on or be damaged by the false claim, "the contents of the bill are less significant." *Id.* at 189. This does not absolve Nunnally of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits. *See id.* at 190. Nunnally's allegations of a scheme to submit fraudulent claims

35

> are entirely conclusory, do not offer factual information with sufficient indicia of reliability, and do not demonstrate a strong inference that the claims were presented to the Government in violation of § 3729(a)(1).

*Id.* at 895. The district court's order dismissing the FCA claims was thus affirmed. *Id.*

### 3. Analysis

As *Nunnally* makes clear, to satisfy the presentment requirement Relator must " 'alleg[e] *particular* details of a scheme' " that are " 'paired with reliable indicia that lead to a strong inference that [false] claims were actually submitted.' " *Nunnally*, 519 F. App'x at 895 (quoting *Grubbs,* 565 F.3d at 190). "[T]he contents of a false claim need not always be presented[,]" but "[t]his does not absolve [Relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits." *Id.* (quoting *Grubbs*, 565 F.3d at 190).

Preliminarily, Relator overextends with his reliance on *Grubbs.* He is correct that, in that case, the Fifth Circuit found that it was "more than probable, nigh likely," from "circumstantial evidence that the doctors' fraudulent records caused the hospitals billing system in due course to present fraudulent claims to the Government" and that

> It would stretch the imagination to infer the inverse; that the defendant doctors go through the charade of meeting with newly hired doctors to describe their fraudulent practice and that they continually record unprovided services only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed.

*Grubbs*, 565 F.3d at 192. Thus, the "logical conclusion" of relator's complaint was "[t]hat fraudulent bills were presented to the Government." *Id.* at 192.

But Relator ignores the specifics that the *Grubbs* relator provided. The Fifth Circuit based its decision on "the allegations of the scheme[;] . . . the relator's own alleged experience[;] . . . and

. . . the complaint's list of dates that specified, unprovided services were recorded[.]" *Id.* at 192. The Fifth Circuit also stated that the "complaint set[] out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud"; "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot"; and "allege[d] his first-hand experience of the scheme unfolding as it related to him, describing how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred"; and pled "specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill." *Id.* at 191–92.  Thus, as Defendants argue and as *Nunnally* recognized, the relator still satisfied Rule 9(b) by "pleading the time, place, or identity details of the traditional standard[.]" *Nunnally*, 519 F. App'x at 895.

Relator also overlooks the examples that *Grubbs* provides.  Again, *Grubbs* said that, to give False Claims Act defendants adequate notice, relators should confront them "with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into[.]" *Grubbs*, 565 F.3d 190–91.

Having carefully considered the matter, the Court finds that the *First Amended Complaint* falls short of this standard as to each of the alleged schemes.  With respect to Ms. Rodriguez, Relator fails to provide sufficient details about the relevant time period.  The operative complaint only vaguely alleges that Ms. Rodriguez was paid a monthly stipend "[f]or several years"; that Relator discovered the issue with her collaboration agreement in December 2014; that the old

collaboration agreement was dated April 2011; and that Drs. Murphy and Sanders had not collaborate with her "for a long time, if ever." (*First Amend. Compl.* ¶¶ 27–30, Doc. 57.)  Further, Relator fails to provide any particularized details that Ms. Rodriguez provided services to patients that ultimately lead to claims being submitted.  Relator alleges only in a general and conclusory way that "[n]otwithstanding the lack of a valid collaboration agreement, Ms. Rodriguez independently saw and treated numerous patients at AVH, in violation of Louisiana law, and Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services.  All such claims constitute false claims." (*Id.* ¶ 36.)  Unlike *Grubbs*, there is no personal involvement in the alleged scheme, and there are no "dates and descriptions of recorded, but unprovided, services" or "specific dates that [Ms. Rodriguez] falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill[.]" *Grubbs*, 565 F.3d at 190–92. Without more, Byrd fails to satisfy Rule 9(b).

The same result is warranted for the patient brokering scheme.  Relator's allegations boil down to (1) discussing with his corporate supervisor David Dempsey how Vermilion's "average patient census (the number of patients per day) had fallen off"; being "assured . . . that corporate 'patient brokers' paid by Defendants were working to bring back Medicare, Medicaid, and TRICARE patients; and Dempsey saying that " 'we don't want to call them patient brokers, but that's what they are,' " (*First Amend. Compl.* ¶ 57, Doc. 57); (2) being fired after he "expressed concerns" about the legality of "paying for referrals," (*id.* ¶ 58.); and (3) being aware of how, on "several occasions[,] . . . Tony Miller, a Vermilion case manager, with the approval of Luis Betances, flew to California, Alaska and other out of state locales to pick up and return with TRICARE beneficiaries for admission to AVH" and how " [i]n one case a TRICARE beneficiary

was flow into Lafayette from Japan for admission to AVH," with "these expenses" having been "charged out on the hospital credit card," (*id.* ¶ 59). Even accepting the first as true, Byrd fails to allege that any patient brokers were in fact successful in "bring[ing] back Medicare, Medicaid, and TRICARE patients" such that false claims were submitted, and he certainly does not provide the time, place, and circumstances of treating such patients. (*See id.* ¶ 57.) As to the third, the Court agrees with Defendants that Relator fails to provide the specifics of when these "several occasions" occurred, the specific places visited, or details about the particular beneficiaries that were treated or the billing system used.

Relator also fails to allege with particularity that Defendants submitted claims for DSH payments. Byrd alleges only that, "[i]n 2010 and 2011, Vermilion received at least $150,136 in DSH payments from the State of Louisiana, using funds provided in whole or in part by the United States." (*Id.* ¶ 62.) Byrd further alleges, "Upon information and belief, Vermilion responded to the [Myers & Stauffer] audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit." (*Id.* ¶ 63.) Relator claims, "Vermilion also requested and received DSH payments in other years, which it was not entitled to receive because it did not meet the requirements for such payments." (*Id.* ¶ 67.) But, again, Relator fails to allege with particularity the time, place, and circumstances, such as who was involved in the DSH payment process, how the DSH payments were sought (akin to the billing process described in *Grubbs*), when the relevant events occurred (i.e., with specific dates), etc.

The Court reaches the same result for the claims related to Dr. Uhrich. Though Relator provides details about the nature of the scheme (*First Amend. Compl.* ¶¶ 41–45, Doc. 57), the *First Amended Complaint* says only that Defendants provided her with free staff "[f]or the last

39

several years" and that the 2015 Strategic Plan listed her in 2014 as a "top 10 referral source[]" with "primary payor source as Medicare, followed by indigent and private insurance." (*Id.* ¶¶ 40–41.)  Thus, unlike *Grubbs*, Relator fails to provide "details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into[.]" *Grubbs*, 565 F.3d 190–91.  Further, unlike *Grubbs*, Byrd fails to allege any "first-hand experience of the scheme unfolding as it related to him," *id.* at 192, as Relator says only that "Optima staff have frequently questioned the medical appropriateness of the referrals by Uhrich/Smith" and that "[m]any of these patients suffer from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment is unnecessary." (*First Amend. Compl.*¶ 46, Doc. 57.)

The claims against Dr. Salmeron are equally unavailing.  Relator essentially alleges that Dr. Salmeron was overpaid and that "Division president Keith Furman had concerns over the amount of money paid to Dr. Salmeron, and stated that Dr. Salmeron did not refer enough patients to Vermilion to be paid that amount of money." (*Id.* ¶ 52.)   But, as Defendants argue, Byrd fails to provide details about the time, place, and circumstances of Furman's statements.  Moreover, Relator fails to plead in sufficient detail that Dr. Salmeron, a "family practice doctor" who dealt in "typical internal medicine," made referrals to Vermilion, a psychiatric health system, that would ultimately be reimbursed by Medicare, Medicaid, or TRICARE. (*Id.* ¶ 50.)  And, again, little is said about the dates of service to such patients, the types of services provided, and the billing system used, and Relator lacks any first-hand experience in this alleged scheme.

Again, this circuit " 'appl[ies] Rule 9(b) to fraud complaints with bite and without apology.' " *Porter*, 810 F. App'x at 240 (quoting *Grubbs*, 565 F.3d at 185). Relator must " 'alleg[e] *particular* details of a scheme' " that are " 'paired with reliable indicia that lead to a strong

inference that [false] claims were actually submitted.' " *Nunnally*, 519 F. App'x at 895 (quoting *Grubbs,* 565 F.3d at 190). "[T]he contents of a false claim need not always be presented[,]" but "[t]his does not absolve [Relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits." *Id.* (citing *Grubbs*, 565 F.3d at 190).

As demonstrated above, Relator has failed to satisfy this standard for each of the alleged schemes. Consequently, these claims are dismissed, though, as will be explained below, Byrd will be given leave to amend to cure the deficiencies.

### B. False Certifications

#### 1. Parties' Arguments

##### a.  Defendants' Original Memorandum (Doc. 67-1)

Defendants next argue that Relator fails to state a false certification claim under the False Claims Act. First, Defendants link their argument to their previous one, saying, "Without a single claim or referral that allegedly occurred as the result of, or in connection with, a violation of AKS, Stark, or the Louisiana Nurse Practice Act, Defendants could not have expressly or impliedly falsely certified compliance with any of those regulations." (Doc. 67-1 at 24.)

For instance, the operative complaint "fails to connect the alleged provision of free staff to Dr. Uhrich's referrals of patients to Defendants" and instead relies only on the draft 2015 Strategic Plan. (*Id.*)  But this document does not provide a basis for inferring that Defendants gave Dr. Uhrich free staffing for referrals, and in any event, this is a mere draft.

Defendants next assert that the "allegations regarding Dr. Salmeron and 'patient brokering' are even flimsier." (*Id.* at 25.)  "The FAC fails to allege that Dr. Salmeron ever referred patients to Vermilion, let alone that he did so in exchange for kickbacks, and fails to allege that Vermilion

submitted false claims for services provided to referred patients or for services provided by Dr. Salmeron." (*Id.*)  Similarly, for the patient brokering, Relator fails to plead that any patients were admitted to Vermilion for such efforts.  "Absent sufficient facts alleging a link between purported kickbacks and referrals, the FAC cannot sustain violations of the Anti-Kickback Statute and Stark Law sufficient to serve as the basis for a claim under the FCA." (*Id.*)

Defendants then argue that Relator fails to identify any certifications allegedly made by them.  According to Defendants, Byrd does not even attempt to satisfy this requirement, and that is fatal to his claim.

Vermilion and Acadia next contend that Relator fails to plead that any violation of the Louisiana Nurse Practices Act was material to payment.  Defendants rely on *Escobar* and *United States ex rel. Porter v. Centene Corp*., No. 16-75, 2018 WL 9866507 (S.D. Miss. Sept. 27, 2018), for this issue.  Defendants say, "What remains constant is that Relator has not identified any statutory, regulatory, or contractual terms that make the existence of a valid collaborative practice agreement material to the government's decision to pay a claim. Without that, Relator's allegations of violations of the Louisiana Nurse Practices Act are meaningless." (Doc. 67-1 at 28.)

Defendants then assert that Relator fails to sufficiently allege that payments were in excess of fair market value or were otherwise improper.  According to Defendants, Byrd must plead a benchmark, and he fails to do so.

*b.*  Relator's Opposition (Doc. 70)

Byrd responds that Defendants' arguments are misplaced because, "while falsely certifying compliance with a material statutory requirement is **one** reason a claim may be considered to be 'false,' the Fifth Circuit has never held that it is the **only** reason." (Doc. 70 at 14.)  For example, the AKS expressly states that a " 'a claim that includes items or services resulting from a violation

of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].' " *Id.* (quoting 42 U.S.C. § 1320a-7b(g)). Thus, "there is no requirement that the claim be accompanied by a false certification of compliance, whether express or implied." (*Id.* at 15.) Similarly, the Stark Law forbids the submission of the claim itself. (*Id.*) "An entity that submits a claim for payment is thus not merely asking to be paid when it is not entitled to payment, but it is affirmatively violating the law by the very act of submitting the claim, regardless of whether the claim is accompanied by a false certification of compliance." (*Id.*)

Relator then explains how "[t]he Fifth Circuit has never held that a claim for payment submitted in violation of the Stark Law is only a 'false claim' if it is accompanied by a false certification stating that the entity has complied with the statute." (*Id.*) Relator relies on *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997), which left open the question and remanded it to the district court for consideration. The district court allegedly held that " 'the submission of Medicare claims in violation of the Stark laws' express prohibition' was an independent basis for False Claims Act liability, separate from any false certification of compliance." (*Id.* at 16 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1021 (S.D. Tex. 1998)).)

Further, according to Relator:

> In any event, even if a "false certification" is required to make a claim submitted in express violation of a statute a "false claim," the Supreme Court has held that it is an open question "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016). Given the Stark Law's unique prohibition on the ***submission*** of a claim (and not simply on the ***payment*** of such claim), the Court should recognize that the submission of a claim includes an implied representation that the party is not violating the law by doing so. *See, e.g., United States ex rel. Urbanek v. Lab. Corp. of Am. Holdings, Inc.*, 2003 U.S. Dist. LEXIS 27469, at *24-25 (E.D. Pa. Aug. 14, 2003) ("a

43

party implicitly certifies compliance with the Stark law because the statute expressly states that the provider must comply in order to be paid").

(*Id.* at 16–17.)  Byrd closes this issue by noting that, "Should the Court hold that an express allegation of an express or implied certification is required to state a claim, this is easily enough accomplished in an amended complaint." (*Id.* at 17 n.3.)

Relator also disputes Defendants' position on fair market value.  First, Byrd did allege a bench mark with respect to Dr. Salmeron and what the appropriate salary for doctors in Lafayette is. Further, the free services provided to Dr. Uhrich are, by definition, below fair market value.  In any event, "allegations of fair market value are not necessary to state a claim under the Stark Law or the AKS," as they play a role only in whether an exception or safe harbor applies.  Again, "Stark Law exceptions are affirmative defenses as to which **Defendants** have the burden of proof, and the plaintiff need not prove, as an element of its case, that a defendant's conduct does not fit within a safe harbor or exception." (*Id*. at 19 (cleaned up).)  In any event, the "bona fide employment relationship" contains a number of other requirements besides fair market value, so Defendants can violate this law even if their arrangements were for fair market value.

As to the AKS, "even a fair market value payment will violate the statute if one purpose is to induce referrals." (*Id.* (citing *United States ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 677 (W.D. Pa. 2014) ("'Importantly, under the anti-kickback statute, neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose (i.e., inducing Federal health care program business).'") (quoting 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005); *U.S. ex rel. Armfield v. Gills*, No. 07-2374, 2012 U.S. Dist. LEXIS 197724, *13 (M.D. Fla. Oct. 17, 2012))).)  Additionally, the AKS safe harbors are

affirmative defenses, so, for the same reasons given above, Byrd need not plead fair market value. Lastly, the safe harbors contain other requirements aside from fair market value that must be met.

With respect to Ms. Rodriguez, Relator describes Defendants' argument as "absurd." (*Id.* at 20.) According to Byrd, he specifically alleges that compliance with licensure law is material to payment. (*Id.* at 21.)  Byrd urges that *Centene* is "completely inapposite" because "[h]ere, Relator alleges that the services were not payable because they were not provided in accordance with state law, and identifies the relevant provisions of state law." (*Id.* at 21 n. 55.)

### c.   Defendants' Reply (Doc. 72)

Defendants first respond by stating that Courts routinely grant motions to dismiss on the basis of exceptions and safe harbors. (Doc. 72 at 6.)  Defendants cite a number of cases in the context of the AKS and Stark Law as well as other statutes to support this. (*See id.* at 6–7.) Relator's reasoning would open the floodgates of discovery and eviscerate Rule 9(b)'s protections. (*Id.* at 6.)

Defendants next urge that Relator fails to point to an "*actual* benchmark, not just his own unsupported assertions that 'the typical internal medicine physician salary [in Lafayette] is approximately $130,000.' " (Doc. 72 at 7.)  Relator's allegation about a "typical" benchmark is insufficient. (*Id.*)

As to Ms. Rodriguez, Defendants argue that Byrd ignores the materiality standard set forth by the Supreme Court. (Doc. 72 at 8.)  Relator also fails to address the *Centene* decision, as "Relator must point to a *Federal* statute, rule or regulation that makes that state law violation 'material' to the *Federal* government's payment decision." (*Id.* at 8–9.)  Further:

> Relator must demonstrate that compliance with the Louisiana Nurse Practice act was "material" to the *Federal* government's decision to pay claims, a hurdle he does not meet. Of course, Relator must also specifically identify a claim submitted for services provided by Ms.

> Rodriguez during the time she allegedly lacked a valid collaborative practice arrangement. Since the FAC does neither, it must be dismissed.

(*Id.* at 9.)

### 2. Analysis

"[W]hen 'the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.' " *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 389 (5th Cir. 2008) (quoting *Thompson*, 125 F.3d at 902). "These 'false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit.' " *Id.* (quoting *Thompson*, 125 F.3d at 902).

Having carefully considered the matter, the Court will grant Defendants' motion on this issue.  First, in *Nunnally*, the Fifth Circuit strongly indicates that a relator must still allege certification, even with a FCA claim rooted in the AKS.  The *Nunnally* court directly stated that "[a] violation of the AKS can serve as the basis for a FCA claim when the Government has conditioned payment of a claim upon the claimant's certification of compliance with the statute, *and the claimant falsely certifies compliance*." *Nunnally*, 519 F. App'x at 893 (emphasis added) (citing *Thompson*, 125 F.3d at 902).  Thus, *Nunnally* reflects that a claimant must still "falsely certify[y] compliance," even for an AKS violation.

Additionally, *Nunnally*'s holding on the false certification issue also supports Defendants' position.  There, the Fifth Circuit found that the relator "fail[ed] to allege with particularity an actual certification to the Government that was a prerequisite to obtaining the government benefit." *Id.* at 894 (citing *Thompson*, 125 F.3d at 902).  Relator had alleged that the provider had "violated

the AKS by 'periodically either certif[ying] in writing or impliedly certif[ying] to the Medicare program that it complied with all of Medicare's program rules, regulations and laws applicable thereto.' " *Id.* The Fifth Circuit found this insufficient:

> Nunnally's complaint does not identify a single claim submitted by WCCH for services rendered pursuant to an illegal referral, let alone one for which WCCH expressly certified its compliance with federal law. Thus, even if we assume that Nunnally's allegations of remuneration are sufficient, Nunnally has pleaded no facts regarding actual Medicare referrals or the billing and payment services provided to any Medicare patient. There is no basis to infer from the complaint that WCCH expressly certified compliance with the AKS as a part of submitting claims to the Government. Nunnally's pleadings of an AKS violation are deficient and cannot serve as a basis for FCA liability.

*Id.* at 894–95. Thus, despite the fact that the relator made a general allegation that the provider failed to certify, the Fifth Circuit still found that this was insufficient because there was "no basis to infer from the complaint that WCCH expressly certified compliance with the AKS as a part of submitting claims to the Government." *Id*.

Second, *Nunnally* directly found that there is no false certification claim because the relator had not "idenit[fied] a single claim submitted by [the provider] for services rendered pursuant to an illegal referral[.]" *Id.* at 894. Because this Court already determined that Relator had failed to sufficiently allege the submission of a false claim, his false certification claim also fails.

Third, even if *Nunnally* did not reach the above results, and even if that analysis did not apply with equal force to a Stark Law violation claim, Relator has indicated that these alleged deficiencies can be easily cured by an amendment. Specifically, Relator said, "Should the Court hold that an express allegation of an express or implied certification is required to state a claim, this is easily enough accomplished in an amended complaint." (Doc. 70 at 17 n. 3.)  Because

Relator will already have to amend his complaint to address the failure to allege a false claim, Byrd can "easily cure[]" the false certification issue.

Fourth, one of the requirements of a FCA claim is that the false statement or certification be "material," *Porter*, 810 F App'x at 240, and here Relator fails to meet that standard with respect to Ms. Rodriguez. "In 2016, the Supreme Court clarified how courts should interpret the materiality requirement." *Id.* "The Court noted that the False Claims Act itself defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Id.* (quoting *Escobar*, 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(b)(4))). "Describing the materiality standard as 'demanding' and 'rigorous,' [*Escobar*, 136 S. Ct.] at 2002–03, the Court explained:

> The False Claims Act is not "an all-purpose antifraud statute" or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* (quoting *Escobar*, 136 S. Ct. at 2003 (citations omitted)). "The Court went on:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in

48

> position, that is strong evidence that the requirements are not
> material.

*Id.* at 240–41 (quoting *Escobar*, 136 S. Ct. at 2003–04).

> In so holding, the Court expressly rejected the view of materiality
> advanced by the federal government and the U.S. Court of Appeals
> for the First Circuit: "that any statutory, regulatory, or contractual
> violation is material so long as the defendant knows that the
> Government would be entitled to refuse payment were it aware of
> the violation." [*Escobar*, 136 S. Ct.] at 2004.

*Id.* at 241.

Here, Relator's allegations fall short of this standard. Byrd alleges, "To be payable under

Medicare, Medicaid, or other government healthcare programs, services must be furnished by a

physician or other practitioner licensed to provide such services under applicable state law." (*First

Amend. Compl.* ¶ 21, Doc. 57.) After discussing the requirements of a collaborative practice

agreement, the operative complaint then states,

> Thus, under Louisiana law, an advanced practice nurse may only
> perform acts of medical diagnosis and prescription pursuant to a
> collaborative practice agreement with a licensed physician who is
> involved in the joint management of the patient's treatment.
>
> . . .
>
> Claims for payment submitted for services performed by a nurse
> practitioner outside the scope of her practice constitute false claims.

(*Id.* ¶¶ 25–26.) Later, after describing Ms. Rodriguez' failure to have the required agreement, Byrd

alleges, "Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez

independently saw and treated numerous patients at AVH, in violation of Louisiana law, and

Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services.

All such claims constitute false claims." (*Id.* ¶ 36.)

Each of Relator's allegations, individually or combined, fail the *Escobar* materiality standard.    Again, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Porter*, 810 F App'x at 240 (quoting *Escobar*, 136 S. Ct. at 2003 (citations omitted)).  For the same reasons, relator's efforts to distinguish *Porter* as being about a contractual requirement rather than a statutory one miss the mark, as (1) in that case, the Fifth Circuit agreed with the district court that relator failed to state a claim because the operative complaint did not "identify any specific federal or state statute or regulation mandating that a registered nurse provide those services," *id.* at 241, and (2) in any event, the plain language *Porter* quotes from *Escobar* applies to "statutory, regulatory, *or* contractual requirements," *id.* at 240–42 (emphasis added) (quoting *Escobar*, 136 S. Ct. at 2003 (citations omitted)).  In short, without more, any false certification claim related to Ms. Rodriguez fails.

Finally, the Court also agrees with Defendants that their settlement agreement with and payment of $500,000 to the State does not save Relator's false certification claim.  As Defendants argue in their briefing, settlements occur for a number of reasons other than liability.  But, even more importantly, Relator fails to allege in the operative complaint that these payments were made because Defendants were in fact liable to the State for the alleged violations.

For all of the above reasons, Defendants' motion is granted on this issue, and Byrd's false certification claims are dismissed.[9]

---

[9] The Court notes in closing that, while all false certification claims will be dismissed, the Court disagrees with Defendants in at least one respect: Relator adequately pled that the arrangements with Dr. Uhrich and Dr. Salmeron were not commercially reasonable or for fair market value.  As with Dr. Uhrich, Relator specifically alleges that "Defendant[s] provide[d] free staff to Dr. Uhrich in return for referral of patients to AVH." (*First Amend. Compl.* ¶ 40, Doc. 57.)  Further, the draft 2015 Strategic Plan also describes the "channeling mechanism" for Dr. Uhrich: "Currently a member of our Medical Staff. Has high volume private practice and nursing home ties. Employs three NP's who work the nursing homes and the IP units. Nurse liaison is a part of our staff.' " (*Id.* ¶ 42.) "The plan noted that 'Dr. Uhrich is exclusively referring patients to VBHS with the support of three mid-level practitioners.' " (*Id.*)  A

### C.  Reverse False Claim

#### 1. Parties' Arguments

Defendants next argue that Relator failed to adequately plead a "reverse" false claim under § 3729(a)(1)(G), which penalizes a person who "(1) 'knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government', or (2) 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.' " (Doc. 67-1 at 29–30 (quoting 31 U.S.C. § 3729(a)(1)(G)).)  Defendants maintain that such claims must also satisfy Rule 9(b) and that general recitations of the statutory language are insufficient.

First, Relator cannot use allegations of direct false claims, like those concerning Ms. Rodriguez, Dr. Uhrich, Dr. Salmeron, and patient brokering.  These claims are redundant to a false statement claim.

Second, "[e]ven if the FAC could identify an allegedly false claim with the required specificity, it must also provide specific allegations about a known obligation to the Government in order to make out a claim pursuant to subsection (a)(1)(G)." (*Id.* at 30–31.)  The only allegation that could potentially satisfy this requirement is Relator's claim that " '[u]pon information and belief . . . Vermilion has not returned the DSH payments it was aware it was not entitled to receive.' " (*Id.* at 31.)  But "upon information and belief" statements fail to satisfy Rule 9(b)'s requirements

---

reasonable inference from this draft Strategic Plan allegations is that Defendants paid for Dr. Uhrich's staff.  The Court agrees with Relator that providing a doctor free staff solely in exchange for referrals is necessarily a payment below fair market value and one that is not commercially reasonable in the absence of referrals.

The Court reaches the same conclusion as to Dr. Salmeron.  Defendants complain that Relator failed to provide a proper benchmark, but Relator specifically alleges (1) that Vermilion paid  Dr. Salmeron about $350,000 per year, despite the fact that the doctor had "his own private practice and only occasionally [saw] patients at AVH," (*id.* ¶ 50); and (2) that, "This is substantially higher than fair market value even for a full-time physician in the Lafayette area, where the typical internal medicine physician salary is approximately $130,000," (*id.*).  The Court finds these allegations sufficient and non-conclusory.

unless the information is peculiarly within the perpetrator's knowledge, and even then Relator must still "plead a particular statement of facts upon which his belief is based." (*Id.* (citations omitted).)

Relator responds about the "reverse false claim" issue in a footnote only, and only with respect to the DSH payments. (*See* Doc. 70 at 25 n.6.)  Byrd asserts:

> The complaint alleges that, during the audit performed by the State, Defendants took action to conceal the fact that they had received DSH funds to which they were not entitled. Complaint, ¶¶ 63-65. Defendants' only real argument on this point is that Relator's allegation that the money was not repaid is based on "information and belief." MTD Brief, p. 24. But the complaint provides sufficient basis for such allegation, including (i) the fact that Defendants had not repaid the money when they fired Relator, and (ii) the fact that Defendants paid $500,000 to the State to settle the DSH claims. Complaint, ¶¶ 66, 68.

(*Id.* at 25–26 n.6)

Defendants reply in a footnote that, "Relator's wholesale reliance on 'information and belief' to allege that Defendants never 'returned' DSH funds completely unravels the Response's argument that the FAC sufficiently pleads a reverse false claim." (Doc. 72 at 9 n.5)

### *2. Applicable Law*

#### a. <u>Reverse False Claims</u>

"31 U.S.C. § 3729(a)(1)(G) provides for liability against any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015).  "A claim brought under the Act's subsection (G), also known as the "reverse" claims section, has four elements:

> (1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result.

*Id*. (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 840 (S.D. Tex. 2003)). "Following a 1999 amendment to the Act, an obligation is defined as 'an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.' " *Id.* (quoting 31 U.S.C. § 3729(b)(3)).

### b.  Pleading Fraud "On Information and Belief"

"While fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *United States ex rel. Williams v. Bell Helicopter Textron Inc*., 417 F.3d 450, 454 (5th Cir. 2005).  But, even when this "relaxed standard" applies, "[p]leading on information and belief does not otherwise relieve a qui tam plaintiff from the requirements of Rule 9(b)." *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 723 (5th Cir. 2008) (unreported) (citing *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 226 (1st Cir. 2004) (" '[I]nformation and belief' allegations remain subject to the particularity requirements of Rule 9(b)."); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.") (internal quotations and citation omitted)).

### c. Waiver

"The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003)); *see also United States v. Dominguez–Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or develop his due process and equal protection arguments in his appellate brief, and, thus, they are waived."); *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver").

"By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n.10); *see also Wuestenhoefer*, 105 F. Supp. 3d at 672 (citing *Dominguez-Chavez*, 300 F. App'x at 313; *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")); *Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

### *3. Analysis*

Preliminarily, the Court notes that Relator did not respond to Defendants' argument about the reverse false claim with respect to Ms. Rodriguez, Dr. Ulrich, Dr. Salmeron, and patient brokering. Consequently, the Court will reject any "reverse-false-claims" cause of action on these issues on the grounds of waiver. *See JMCB*, 336 F. Supp. 3d at 634 (finding that operative complaint could be dismissed because plaintiff failed to respond to the substance of defendant's arguments); *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 672 (M.D. La. 2019) (deGravelles, J.) (finding that policy exclusion could apply because plaintiff failed to oppose insurer's argument on the issue); *see also Wuestenhoefer*, 105 F. Supp. 3d at 672 (finding that relator waived argument as to how certain write-offs fell within a particular provision of the False Claims Act).

Turning to the DSH payment, the Court agrees with Relator that the sole issue Defendants raised is whether he adequately pled that Defendants have not repaid the DSH money to the Government. But the Court agrees with Defendants that Relator failed to satisfy Rule 9(b) on this issue.

Again, Relator was fired on January 21, 2015, *before* the audit was complete. (*First Amend. Compl.* ¶ 66, Doc. 57.) Relator alleges, "Upon information and belief, however, Vermilion has not returned the DSH payments it was aware it was not entitled to receive." (*Id.*) Relator originally filed his complaint on April 1, 2016. (Doc. 1.)

Relator is entitled to plead "upon information and belief" because the question of whether Defendants repaid the DSH money after he was fired and after the audit was completed is peculiarly within their knowledge. *See Williams*, 417 F.3d at 454. But, even when this "relaxed standard" applies, "[p]leading on information and belief does not otherwise relieve a qui tam

plaintiff from the requirements of Rule 9(b)." *Hebert*, 295 F. App'x at 723.  Thus, given the fact

that Relator left before the completion of the audit, and given the fact that over a year passed

between when he left Vermilion and when suit was filed, Relator has failed to provide a sufficient

factual basis from which the Court can conclude that Defendants in fact failed to repay its

obligation to the government.  Without more, Relator fails to pass Rule 9(b) muster.

Consequently, Defendants' motion on this issue is granted, all claims related to "reverse"

false claims are dismissed.

### D.  DSH Payments

#### *1. Parties' Arguments*

Defendants next argue that any claim related to the DSH payments fail.  Again, Relator

relies on 42 U.S.C.A. § 1396r-4(d), which provides in relevant part:

> (d) Requirements to qualify as disproportionate share hospital
>
> (1) Except as provided in paragraph (2), no hospital may be defined
> or deemed as a disproportionate share hospital under a State plan
> under this subchapter or under subsection (b) of this section unless
> the hospital has at least 2 obstetricians who have staff privileges at
> the hospital and who have agreed to provide obstetric services to
> individuals who are entitled to medical assistance for such services
> under such State plan.

*Id.*; *see also First Amend. Compl.* ¶ 62, Doc. 57.  Defendants now argue that there is an exception

to this rule for "a hospital . . . which does not offer nonemergency obstetric services to the general

population as of December 22, 1987." (Doc. 67-1 at 32 (quoting 42 U.S.C. § 1396r-4(d)(2)(A) –

(A)(ii)).)  According to Defendants, Relator conveniently omits from the operative complaint the

fact that AVH satisfies this exception.  Defendants maintain that Relator must plead that the

exception does not apply.  In any event, Defendants submit a newspaper article to demonstrate that

AVH meets the exception.

Further, Relator "fails to allege why Mr. Elsas' statements were accurate when he allegedly told Relator that Vermilion should not have received the DSH payments." (*Id.* at 32.)  Moreover, the email from Mr. Elsas "raises more questions than it answers," as it does not explain the significance of Vermilion's alleged failure to meet the "OB REQUIREMENT" or the relevant exception. (*Id.*)  The email also does not say whether Defendants were "not entitled to such payments" or even that the audit was not complete. (*Id.*)

In response, Relator first details the allegations of the operative complaint and argues that he has submitted a claim. (Doc. 70 at 23.)  After this, Relator focuses on the obstetrician exception, saying that (1) the court cannot take judicial notice of the contents of any newspaper article for the truth of those facts; (2) even if the Court did consider the contents of the newspaper article, it does not demonstrate that the exemption applies; and (3) the settlement agreement is a further indication that Relator stated a claim. (*Id.* at 24–25.)

In reply, Defendants assert that, even if the Court cannot take judicial notice of the newspaper article, the fact of the article "demonstrates the glaring lack of specificity in the FAC." (Doc. 72 at 10.)  Defendants urge that Relator's pleading does not satisfy Rule 9(b).

### 2. Analysis

Given the Court's finding that Relator has no FCA claim because he has failed to adequately allege (1) the submission of a claim; (2) a false certification; and (3) a "reverse" false claim, the Court passes on the issues raised in this part of Defendants' motion.

The Court notes, however, that it agrees with Relator's persuasive authority on the issue of pleading that exceptions do not apply.  As one Court said in the context of the Stark Law and AKS:

> Relators correctly argue in response . . . the AKS and Stark employment exemptions are affirmative defenses on which Citizens has the burden of proof. *See United States v. Robinson,* 505 Fed. Appx. 385, 387 (5th Cir. 2013) (per curiam) (stating that the AKS's

employment exception is an affirmative defense); *United States v. Vernon,* 723 F.3d 1234, 1270–72 (11th Cir. 2013) (same); *United States ex rel. Kosenske v. Carlisle HMA, Inc.,* 554 F.3d 88, 95 (3d Cir.2009) ("Once the plaintiff or the government has established proof of each element of a violation under the [Stark] Act, the burden shifts to the defendant to establish that the conduct was protected by an exception." (citing *Rogan,* 459 F. Supp. 2d at 716)). "[A]ffirmative defenses are generally not appropriate grounds on which to dismiss a complaint under a Rule 12(b)(6) motion," unless a successful defense is apparent from "the facts pleaded and judicially noticed." *Johnson v. Deutsche Bank Nat. Trust Co.,* 2013 WL 3810715, at *8 (N.D. Tex. July 23, 2013) (quoting *Hall v. Hodgkins,* 305 Fed. Appx. 224, 227–28 (5th Cir. 2008)).

*United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 668–69 (S.D. Tex. 2013), *aff'd sub nom. United States ex rel. Parikh v. Brown,* 762 F.3d 461 (5th Cir. 2014), *opinion withdrawn and superseded on reh'g,* 587 F. App'x 123 (5th Cir. 2014), *withdrawn from bound volume* (Oct. 1, 2014), and *aff'd sub nom. United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014). The same reasoning applies on this issue; Relator need not prove at the pleading phase that the exception to the obstetrician requirement does not apply.

Further, even if the Court were to take judicial notice of the newspaper article Defendants attach as Exhibit A, (Doc. 67-2), it would not establish as a matter of law that the exception to the obstetrician requirement applies. This exception provides that the obstetrician requirement "shall not apply to a hospital— . . . (ii) which does not offer nonemergency obstetric services to the general population as of December 22, 1987." 42 U.S.C.A. § 1396r-4(d)(2)(A)(ii). But the article simply says that "CDU of Acadiana, which began serving the people of Lafayette and Acadiana in 1961 with outpatient and later inpatient treatment services for chemical dependency, will change its name to Vermilion Hospital for Psychiatric and Addictive Medicine on Aug. 1[,]" 1991. (Doc. 67-2.) The article goes on to say that "Vermilion Hospital . . .will provide inpatient and outpatient

services for adults and adolescents with physiatrist, alcohol or other drug abuse concerns. (*Id.*)  As

Byrd argues:

> Nothing in the newspaper article addresses whether the hospital offered such [nonemergency obstetric] services as of December 22, 1987. Moreover, the article does not establish that CDU of Acadiana in 1987 is the same hospital as Acadia Vermilion Hospital in 2007-2015, which would be necessary to claim entitlement to the exemption.

(Doc. 70 at 25.)  Thus, Defendants, who have the burden of showing this affirmative defense, are

not entitled to dismissal on this ground at this time.

### E.  Retaliation

#### *1. Parties' Arguments*

Defendants first acknowledge that Relator's retaliation claims do not need to satisfy Rule

9(b). They need only meet Rule 8, but, even under this standard, Relator's claims fail.  For

example, Relator alleges "[u]pon information and belief" that Defendants interfered with Relator's

attempts to obtain comparable employment. (Doc. 67-1 at 35.)  Relator also alleges that an offer

was withdrawn and that he was told it was withdrawn because of information received from

Defendants. (*Id.* at 35–36.)  But, according to Defendants, the operative complaint makes no

connection between these events and his termination, and the pleading does not describe who

terminated him. (*Id.* at 36.) Such information is not within the peculiar control of the Defendants,

so Relator's failure to plead such information makes his retaliation claims implausible.

In response, Relator describes Defendants' efforts to dismiss the retaliation claim as "half-

hearted[]". (Doc. 70 at 26.)  Relator then traces how he satisfies the elements of a retaliation claim.

He engaged in protected activity by raising the issue of Ms. Rodriguez's failure to have a valid

collaboration agreement; was involved in the issue of the DSH payments; and discussed

Defendants' "patient brokering" activities with his corporate supervisor and expressed concerns

about same shortly before termination. (*Id.* at 27 (citations omitted).) As to causation, "Defendants quibble with the fact that one sentence includes the words 'information and belief,' " but "the complaint clearly proceeds to provide the basis of this information, alleging that a job offer was 'suddenly withdrawn' and that Relator 'was informed that the withdrawal was the result of information provided by Defendants.' " (*Id.* at 28.)

Defendants do not address the retaliation claim in their reply.

### 2. Applicable Law

"Under the False Claims Act's anti-retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Wuestenhoefer*, 105 F. Supp. 3d at 675 (quoting 31 U.S.C. § 3730(h)(1)). "There are three elements to a claim of retaliation under the Act: '(1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity.' " *Id.* (quoting *United States ex rel George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 604 (S.D.Tex.2012) (collecting cases)).

" 'A protected activity is one motivated by a concern regarding fraud against the government.' " *Id.* at 675–76 (quoting *McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss. 2014) (quoting *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013)). " 'To engage in protected activity under the Act, an employee need not have filed a lawsuit or have developed a winning claim at the time of the alleged retaliation. Instead, an employee's

actions must be aimed at matters that reasonably could lead to a viable claim under the Act.' " *Id.* at 676 (quoting *Boston Scientific*, 864 F. Supp. 2d at 604–05 (internal citations omitted) (collecting cases)). "Stated another way, the actions must relate to 'matters demonstrating a "distinct possibility" of False Claims Act litigation.' " *Id.* (quoting *Boston Scientific*, 864 F. Supp. 2d at 605). "This standard is satisfied when '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.' " *Id.* (quoting *Boston Scientific*, 864 F. Supp. 2d at 605).

"The 'kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that Plaintiff is engaged in protected activity as defined [in the first element]—that is, in activity that reasonably could lead to a False Claims Act case.' " *Id.* (quoting *United States ex rel. Yesudian v. Howard Univ.* 153 F.3d 731, 742 (D.C. Cir. 1998)). "At the second stage, it is sufficient to show knowledge of a supervisor." *Id.* at 676–77 (citing *United States v. Columbia Healthcare Corp.*, No. H–98–861, 2005 WL 1924187, at *17 (S.D. Tex. Aug. 10, 2005) (citing *Yesudian*, 2005 WL 1924187, at *17)).

To satisfy the last element (causation), a relator need only make a prima facie showing. *See Boston Scientific*, 864 F. Supp. 2d at 609–11. A "prima facie case requires only that [Relator] demonstrate a 'causal connection' between his protected activity and his firing, even if he must ultimately demonstrate but-for causation at the pretext stage of the *McDonnell Douglas* framework" for a motion for summary judgment. *Garcia v. Prof'l Contract Servs.*, *Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). "At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Id.* at 243.

### *3. Analysis*

Having carefully considered the matter, the Court finds that Relator easily satisfies the Rule 8 requirements for a retaliation claim under the False Claims Act.  For example, in December 2014, Relator raised the fact that Ms. Rodriguez had an expired collaboration agreement with several people at Vermilion, including the CEO, AVH clinical director, and program director, and Relator was ultimately fired on January 21, 2015. (*First Amend. Compl.* ¶¶ 28–35, Doc. 57.)   In raising this issue, Relator clearly engaged in protected activity because his "actions [were] aimed at matters that reasonably could lead to a viable claim under the Act." *Wuestenhoefer*, 105 F. Supp. 3d at 676.  Further, construing Relator's allegations in a light most favorable to him, he in good faith believed, and a reasonable employee in his position might believe, that Defendants were committing fraud against the government. *Id.* (quoting *Boston Scientific*, 864 F. Supp. 2d at 605). Additionally, the other two requirements for a retaliation claim are met; his supervisor, the CEO, knew about this protected activity, and there was a close temporal connection between his raising the issue and his termination less than two months later. *See Garcia,* 938 F.3d at 243 ("This court has previously held that a period of two months is close enough to show a causal connection. We have even suggested that four months is close enough." (citations omitted)).  Thus, Relator satisfies all the elements of a retaliation claim with respect to Ms. Rodriguez and her expired collaboration agreement.

Relator also states a viable claim for retaliation with respect to the patient brokering scheme.  Byrd alleges that, on January 5, 2015, he discussed patient brokering with his corporate supervisor, and he "expressed concerns as to the legality of paying for referrals." (*First Amend. Compl.* ¶¶ 56–58, Doc. 57.) Again, he was fired later that month after being summoned on short

notice to a meeting at the corporate headquarters. (*Id.* ¶ 58.)  For the same reasons listed above, Relator satisfies the three elements for a retaliation claim.

The Court agrees with Relator that his use of the phrase "upon information and belief" does not defeat an otherwise valid retaliation claim.  Specifically, Bryd alleges:

> Upon information and belief, Defendants interfered with Relator's attempts to find comparable employment following his termination. Relator received an offer of employment from another behavioral health care provider, and was provided an employment agreement and a start date, but the offer was suddenly withdrawn. Relator was informed that the withdrawal was the result of information provided by Defendants.

(*Id.* ¶ 70.)   The Court finds that Relator sufficiently pleads a "causal connection" between his protected activity and Defendants' conduct, which is all that is required for the prima facie stage. *See Garcia*, 938 F.3d at 241.  Moreover, this allegation provides Defendants sufficient notice of Relator's claim such that they can either deny the allegation outright or deny for lack of sufficient information.

Again, Defendants concede that Rule 8 governs a retaliation claim (Doc. 67-1 at 28), and, under that standard, "[t]he complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim." *Lormand*, 565 F.3d at 257.  The Court finds that Relator easily meets this standard in the above two respects.[10]  As a result, Defendants' motion to dismiss the federal retaliation claim is denied.

---

[10] The Court notes that Relator fails to state a viable claim of retaliation with respect to the DSH payments.  While Relator alleges that he was involved in consulting with a CPA about Vermilion's audit (*First Amend. Compl.* ¶¶ 63–65, Doc. 57.), there are no allegations that his supervisors knew of Relator's protected activity. But, Byrd will be given leave to amend, and he can cure this deficiency, if he has a good faith basis to do so.

In closing, Defendants do not separately address Relator's retaliation claims under state law. Relator simply states without authority that the analysis for the state and federal claims is identical. Given Defendants' failure to brief the issue, *see Wuestenhoefer*, 105 F. Supp. 3d at 672 (citing *Dominguez-Chavez*, 300 F. App'x at 313; *El–Moussa*, 569 F.3d at 257), and given the Court's holding on the federal retaliation issue, the Court declines to dismiss the state law retaliation claim as well.

### F. Leave to Amend

#### 1. Parties' Arguments

Defendants assert that "Relator has already had the opportunity to amend once, any further amendment would be futile, and any dismissal should be with prejudice." (Doc. 67-1 at 37.) Defendants do not elaborate on these arguments.

Relator responds, "At the time of the amendment, Relator had not been placed on notice of any alleged deficiencies by Defendants, since they had not yet appeared or filed a motion to dismiss." (Doc. 70 at 28.) Further, according to Relator, "[t]here is no reason to believe that, if the Court agrees with any of Defendants' arguments, Relator would not be able to cure any deficiencies in an amended complaint. Indeed, many of Defendants' arguments are exceedingly technical, rather than substantive." (*Id.* at 29.) Relator explains:

> For example, although Relator believes that the complaint sufficiently alleges that the DSH payments were received as the result of a "claim" submitted by Defendants, he could certainly include an express allegation to that effect if the Court disagrees. Similarly, although Relator believes that the facts alleged support a "strong inference" that claims were submitted, if the Court disagrees Relator could provide additional facts relating to the claim submission process. And if the Court holds that there needs to be an express allegation that the submission of a claim for payment includes an implied certification of compliance with the Stark Law or AKS, that could easily be included in an amended complaint.

(*Id.* at 29–30.)  Thus, Relator seeks leave to amend.

Defendants respond that any dismissal should be with prejudice.  They respond:

> Relator has had an opportunity to amend his complaint. That came almost four years after he filed his initial complaint—during which Relator could have conducted additional investigation of his allegations, and a settlement with the State, which Relator claims proves that all his claims have merit. Both these circumstances put Relator in a "position to weigh the practicality and possible means of curing [the] deficiencies" in his complaint. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (cited by Relator). If Relator is unable set forth sufficient allegations at this stage of this action, he will never be able to.

(Doc. 72 at 10.)

## 2. Applicable Law

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the

> shortcomings in the initial pleading. Thus, the cases make it clear
> that leave to amend the complaint should be refused only if it
> appears to a certainty that the plaintiff cannot state a claim. A district
> court's refusal to allow leave to amend is reviewed for abuse of
> discretion by the court of appeals. A wise judicial practice (and one
> that is commonly followed) would be to allow at least one
> amendment regardless of how unpromising the initial pleading
> appears because except in unusual circumstances it is unlikely that
> the district court will be able to determine conclusively on the face
> of a defective pleading whether the plaintiff actually can state a
> claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

### 3. Analysis

In short, the Court will grant Relator leave to amend.  Although he has amended his complaint once, he has not done so in response to a ruling by this Court assessing the sufficiency of his claims.  Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff's request." *JMCB*, 336 F. Supp. 3d at 642; *see also Fetty v. Louisiana State Bd. of Private Sec. Examiners*, --- F. Supp. 3d ----, No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, *inter alia*, *JMCB*).

However, the Court reminds both parties of the need for judicial economy and their obligations under Federal Rule of Civil Procedure 11.  Specifically, by signing the pleading, Relator's attorneys are "certify[ying] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery

Fed. R. Civ. P. 11(b)(2), (3). Thus, for example, Relator is under a duty to investigate his claims, and if in that investigation he realizes that there is not a good faith basis for pursuing the DSH payment claim because the obstetrician exception applies, he should abandon this theory. Similarly, Defendants are under a duty to have a good faith basis for legal arguments; so, for instance, had they searched undersigned's approach to amendments (cited above), they would have realized that their request to deny leave to amend would likely not win the day, and they could have withdrawn it. In sum, given the age and complexity of this case, and given the Court's caseload (both generally and since the COVID-19 pandemic began), both parties are encouraged to act in a way to maximize judicial economy and conserve party, attorney, and judicial resources.

Finally, the Court notes in closing that it makes no determination at this time whether Relator's proposed *Second Amended Complaint* (Doc. 77-1) adequately addresses the deficiencies outlined in this ruling.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that *Defendants' Motion to Dismiss Relator's First Amended Complaint* (Doc. 67) filed by Defendants Acadia Healthcare Company, Inc. and Vermilion Hospital, LLC is **GRANTED IN PART** and **DENIED IN PART.**   The motion is **DENIED** as to the retaliation claims under federal and state law.   In all other respects, the motion is **GRANTED**, and all other False Claims Act claims are **DISMISSED WITHOUT PREJUDICE.**   Relator shall be given twenty-eight (28) days in which to amend his complaint to cure the above deficiencies.   Failure to do so will result in the dismissal of these claims with prejudice.

Signed in Baton Rouge, Louisiana, on <u>March 18, 2021</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**