UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES ex rel.                    )
JEFFREY H. BYRD,                         )          Civil Action No. 18-312-JWD-EWD
                                         )
    Plaintiff-Relator,                  )
                                         )
v.                                       )
                                         )          Jury Trial Requested
ACADIA HEALTHCARE                        )
COMPANY, INC. and                        )
VERMILION HOSPITAL, LLC,                 )
                                         )
    Defendants.                         )
_____ )

## SECOND AMENDED COMPLAINT

1.

    This is an action by Plaintiff-Relator Jeffrey H. Byrd ("Relator"), for himself and on

behalf of the United States, to recover damages and civil penalties arising from Defendants'

actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq*.

## JURISDICTION AND VENUE

2.

    This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437 *et seq*.

3.

    Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a) and 28 U.S.C.

§ 1331, in that Counts I to IV of this action arise under the laws of the United States.

Supplemental jurisdiction over Count V arises under 31 U.S.C. § 3732(b), since that count arises

from the same transactions or occurrences as Counts I to IV, and under 28 U.S.C. § 1367, since that count is so related to the federal claims that they form part of the same case or controversy.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a).  At least one of the Defendants can be found, resides, and transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

## THE PARTIES AND RELATED ENTITIES

5.

Acadia Healthcare Company, Inc. ("Acadia") is a Delaware corporation with its headquarters in Franklin, Tennessee.  Acadia operates more than 75 behavioral health facilities in at least 24 states as well as overseas, including Acadia Vermilion Hospital in Lafayette, Louisiana.

6.

Vermilion Hospital, LLC ("Vermilion") is a Delaware limited liability company and a subsidiary of Acadia, and operates under the trade names Vermilion Behavioral Health Systems and Acadia Vermilion Hospital.  Vermilion operates Acadia Vermilion Hospital ("AVH"), a 78-bed psychiatric hospital in Lafayette, Louisiana.  AVH includes a 54-bed main facility and a 24-bed facility previously known as Optima Specialty Hospital, but now known as Acadia Vermilion Hospital South Campus (sometimes referred to herein as "Optima").  As used herein, "AVH" refers to both the main facility and Optima.  Although the two facilities have historically had different provider numbers, Vermilion had plans to consolidate them under a single provider number.

7.

Vermilion submits numerous claims to Medicare, Medicaid, and other government payors for services provided at AVH.  Based on Relator's experience, the Medicare utilization rates during the period at issue in this case were approximately 24% at the main AVH facility and 50% at Optima, and the Medicaid utilization rates were approximately 32% at the main AVH facility and 24% at Optima.  A draft 2015 Strategic Plan prepared by Vermilion noted that, in 2014, Medicare accounted for 28% of the total number of patient days at AVH, Medicaid accounted for 32%, and Tricare accounted for 11%.  This plan projected that, in 2015, Medicare and Medicaid would each account for 30% of total patient days, while Tricare would remain at 11%.  Select pages from this plan are attached as Exhibit 1.  Relator was personally involved in the preparation of the Strategic Plan and was aware of the factual information set forth therein. In all material respects, the information from the draft plan discussed herein was included in the final 2015 Strategic Plan.

8.

At all times relevant to this complaint, Acadia has exercised control over Vermilion and participated in its operations.  Acadia's website describes Acadia as "a provider of behavioral healthcare services," noting that "Acadia provides behavioral health and addiction services to its patients in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers and outpatient clinics."  The website states that "[a]t September 30, 2019, Acadia operated a network of 589 behavioral healthcare facilities with approximately 18,000 beds in 40 states, the United Kingdom and Puerto Rico," including Vermilion.

9.

On or about December 5, 2019, the State of Louisiana entered into a settlement agreement with Defendants, under which Defendants agreed to pay $500,000 to the State to resolve claims asserted on behalf of the State in Relator's original complaint.  The agreement was signed on behalf of both Acadia and Vermilion by a corporate officer of Acadia.  A copy of the settlement agreement is attached as Exhibit 2.  The State intervened in this action in connection with the settlement.

10.

Relator Jeffrey H. Byrd is an individual resident of the State of Georgia and a former employee of Defendants.  From July 2014 to January 2015, Relator served as Vermilion's Chief Financial Officer (CFO) and reported to Vermilion's Chief Executive Officer (CEO) and Acadia's division CFO.  Periodically he would also serve as acting CEO when the CEO was away.  Relator was terminated on January 21, 2015.

## FEDERAL HEALTHCARE PROGRAMS

### Medicare

11.

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals.  The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

12.

Part A of the Medicare program authorizes payment for impatient hospital services and other forms of institutional care.  See 42 U.S.C. §§ 1395c-1395i-4.  Part B primarily covers physician and other ancillary services, including outpatient hospital services.  See 42 U.S.C. § 1395k.

13.

To assist in the administration of Medicare Part A and Part B, CMS contracts with Medicare Administrative Contractors ("MACs").  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 C.F.R. § 421.5(b).

14.

Providers who wish to be eligible to participate in Medicare must periodically sign an application to participate in the program.  The application, which must be signed by an authorized representative of the provider, contains a certification statement that states "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.…  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

15.

The certification further states that "I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments," and that "I will not knowingly present or cause to be presented a false or

fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

16.

Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

17.

Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays.  Hospitals submit patient-specific claims for interim payments on a Form UB-04.

18.

As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

19.

After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.180l(b)(l).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. See 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(l).

20.

AVH was, at all times relevant to this complaint, required to submit annually a hospital cost report.

21.

During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

22.

Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial representations made by AVH to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. See 42 C.F.R. § 413.64(f).

23.

Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

24.

For all relevant years, the responsible provider official was required to certify, and did certify, in pertinent part, that

to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

25.

During the period at issue in this case, the hospital cost report certification page also included the following notice:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

26.

Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Anti-Kickback Statute and Stark Law (described below).

27.

For each of the years at issue, AVH submitted cost reports attesting, among other things, to the certification quoted above.

28.

Hospitals submit Medicare claims for hospital services using the UB-04 format.  The form provides various types of information regarding the claim, including the provider name and identification number; the patient name and identification number; the admission date; the date of service for outpatient claims; a description of the billed services and associated procedure codes; diagnosis codes; the name and NPI number of the attending physician, operating physician, or other physician involved in the service; and the amount charged.

29.

The reverse side of the UB-04 states that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

30.

For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital if formally admitted as an inpatient pursuant to an order for inpatient admission by a physician or other qualified practitioner in accordance with 42 C.F.R. §§ 412.3, 482.24(c), and 482.12(c).  During the period relevant to this complaint, this physician order was required to be present in the medical record and be supported by the physician admission and progress notes, in order for the hospital to be paid for hospital inpatient services under Medicare Part A.  42 C.F.R.

§ 412.3; 78 Fed. Reg. 50496, 50939-50940 (Aug. 19, 2013); 78 Fed. Reg. 27486, 27647 (May 10, 2013).

31.

The order must be furnished by a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition. The practitioner may not delegate the decision (order) to another individual who is not authorized by the State to admit patients, or has not been granted admitting privileges applicable to that patient by the hospital's medical staff.  The physician order must be furnished at or before the time of the inpatient admission.  42 C.F.R. § 412.3(b),(c).

32.

42 C.F.R. § 482.12(c) requires that every Medicare patient be under the care of "a doctor of medicine or osteopathy," although such doctor may "delegate tasks to other qualified health care personnel to the extent recognized under State law or a State's regulatory mechanism."  It further requires that "[p]atients are admitted to the hospital only on the recommendation of a licensed practitioner permitted by the State to admit patients to a hospital."

33.

42 C.F.R. § 482.24(c) requires that "[a]ll orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations."

34.

Part B of the Medicare program pays for "medical and other health services," 42 U.S.C. § 1395k(a), which includes services performed by nurse practitioner "working in collaboration … with a physician … which the nurse practitioner … is legally authorized to perform by the State in which the services are performed." 42 U.S.C. § 1395x(s)(2)(K)(ii). A nurse practitioner is one "who performs such services as such individual is legally authorized to perform (in the State in which the individual performs such services) in accordance with State law." 42 U.S.C. § 1395x(aa)(5). The term "collaboration" is defined as "a process in which a nurse practitioner works with a physician to deliver health care services within the scope of the practitioner's professional expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms as defined by the law of the State in which the services are performed." 42 U.S.C. § 1395x(aa)(6).

Medicaid

35.

Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

36.

To participate in the Louisiana Medicaid program, providers must enter into a provider agreement with the Louisiana Department of Health ("DOH") requiring the provider to comply fully with all applicable federal and state laws and rules pertaining to Medicaid and the practice of medicine. The provider agreement also requires the provider to provide goods, services, or

supplies only if medically necessary and that are within the scope and quality of standard care.
LSA-RS 46:437.11.

37.

The provider agreement also requires the provider to report and refund any monies
received in error or in excess of the amount to which the health care provider is entitled.  LSA-
RS 46:437.12(7).

38.

In the State of Louisiana, provider hospitals participating in the Medicaid program submit
claims for hospital services rendered to beneficiaries using the UB-04 format.

39.

In addition, Louisiana requires hospitals participating in the Medicaid program to file a
copy of their Medicare cost report with the Medicaid contractor.

40.

The Louisiana Medicaid Hospital Services Provider Manual requires that "[h]ospital
providers are to ensure that the services provided to Medicaid recipients are medically necessary,
appropriate and within the scope of current medical practice and Medicaid guidelines."

41.

The provider manual further requires that inpatient hospital services must be ordered by
the attending physician, an emergency room physician, or a dentist.  The manual states that
"[p]hysicians responsible for a recipient's care at the hospital are responsible for deciding
whether the recipient should be admitted as an inpatient," and that "the decision to admit a
patient is a complex medical judgment, which can be made only after the physician has
considered a number of factors."

42.

The provider manual defines "outpatient hospital services" as "diagnostic and therapeutic services rendered under the direction of a physician or dentist to an outpatient in an enrolled, licensed and certified hospital," and provides that "[c]overed outpatient hospital services provided to Medicaid recipients are reimbursable."

Tricare

43.

TRICARE/CHAMPUS ("Tricare") is a federally-funded program that provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces, as well. 10 U.S.C. §§ 1071-1110b; 32 C.F.R. § 199.4(a). Hospital claims under Tricare are submitted using the UB-04 form.

44.

As CFO, Relator had knowledge of the billing process at AVH. When inpatient or outpatient hospital services were provided for a patient, the billing department would input the relevant information into the billing system, which would as a matter of course generate and submit a claim to Medicare, Medicaid, Tricare, and other payors. There was no policy or practice of withholding claim submission for services provided or referred by particular providers.

45.

The hospital tracked billings by physician and by payor source, and Relator reviewed this

information in the performance of his duties as CFO.

46.

The hospital also identified and tracked the referral source for patients, using multiple

sources of information, and this information was reviewed by Relator in the performance of his

duties as CFO.  The 2015 Strategic Plan discussed these tracking methods as follows:

**Discuss current method and plans to improve tracking of referrals**

Currently all marketing contact information is gathered weekly from DBD, liaisons
and a few leadership staff members. That information is entered into an excel
spreadsheet at this time. It will also start to be entered into HMS on a weekly basis
effective October 2014. Also, a weekly business development metrics tracker is
completed (with data from HMS) with total number of admissions by referral
sources and type and any new referral sources as well. In addition, a daily Intake
matrix is completed monitoring total number of calls and admissions daily. Currently
utilizing HMS Call Management allowing facility to track all referral sources.

47.

 This type of information was routinely used by the hospital for budgeting and other

purposes, including in the preparation of the 2015 Strategic Plan, and was routinely reviewed by

Relator.

## LEGAL AUTHORITY

### The Anti-Kickback Statute

48.

The Anti-Kickback Statute ("AKS") makes it illegal to knowingly and willfully solicit or

receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly

or covertly, in cash or in kind, in return for (i) referring an individual to a person for the

furnishing or arranging for the furnishing of any item or service for which payment may be made

in whole or in part under a Federal health care program, or (ii) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

49.

The AKS also makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b)(2).

50.

The payment or receipt of remuneration violates the AKS if one purpose of the remuneration is to induce or reward referrals, even if the remuneration is also intended for a valid purpose.

51.

The regulations issued pursuant to the AKS set forth a number of "safe harbors," compliance with which will protect a person from application of the statute.  Although each safe harbor has its own specific requirements, most of the safe harbors require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided.  The burden is on the party

seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe harbor.

52.

Claims submitted to federal health care programs, including Medicare, Medicaid, and Tricare, resulting from a violation of the AKS, are false claims for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

53.

At all times, Defendants were required to be, and were, aware of the requirements of the AKS.

<u>The Stark Law</u>

54.

42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its associated regulations, 42 C.F.R. § 350 *et seq*. (collectively, the "Stark Law"), provide that, if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services," unless the relationship satisfies the requirements of an exception set forth in the Stark Law.  42 U.S.C. § 1395nn(a)(1)(A); 42 C.F.R. § 411.353(a).  The Stark Law further provides that an entity may not present or cause to be presented to Medicare a claim for designated health services furnished pursuant to a prohibited referral.  42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).  In addition, Medicare is prohibited from making payment on any such claim.  42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c).  An entity is required to return any funds received from Medicare for services furnished pursuant to a prohibited referral.  42 C.F.R. § 411.353(d).  The provisions of the Stark Law have been extended to Medicaid pursuant to 42 U.S.C. §1396b(s).

55.

"Designated health services" include, among other things, inpatient and outpatient hospital services, clinical laboratory services, outpatient prescription drugs, and radiology and other imaging services.  42 U.S.C. § 1395nn(h)(6).

56.

Under the Stark Law, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement."  The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(A).  The term "remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

57.

The Stark Law contains a number of exceptions, and if an arrangement strictly complies with the requirements of an exception, it will be deemed not to constitute a prohibited financial relationship.  Although each exception has its own specific requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, that the compensation reflect fair market value for the services provided by the physician, and that the arrangement be commercially reasonable in the absence of referrals. The burden is on the party seeking the protection of a safe harbor to establish that it has satisfied all the elements of a safe harbor.

58.

Claims submitted to Medicare or Medicaid for designated health services furnished pursuant to a referral prohibited by the Stark Law constitute false claims for a number of reasons, including (i) such submission is prohibited by the Stark Law, (ii) they seek payment to which the entity is not entitled, (iii) the submission of the claim constitutes a false certification that the services were provided in compliance with the Stark Law, and (iv) the entity has failed to disclose that the claim is submitted in violation of the Stark Law.

59.

An entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts within 60 days.  42 C.F.R. §§ 411.353(d), 1003.110.

60.

At all times, Defendants were required to be, and were, aware of the requirements of the Stark Law.

<u>Services performed by nurse practitioner</u>

61.

To be payable under Medicare, Medicaid, or other government healthcare programs, services must be furnished by a physician or other practitioner licensed to provide such services under applicable state law.

62.

An advanced practice registered nurse (APRN) is a licensed registered nurse who has been certified by an appropriate certifying body as having an advanced nursing specialty.  The Louisiana Nurse Practice Act, La. Rev. Stat. Ann. § 37:911 *et seq*., allows APRNs, under certain

circumstances, to see patients independently, although the Act requires that they practice in collaboration with a licensed physician.

63.

The Act defines "collaboration" as "a cooperative working relationship with licensed physicians, dentists, or other health care providers to jointly contribute to providing patient care," and defines "collaborative practice" as "the joint management of the health care of a patient by an advanced practice registered nurse performing advanced practice registered nursing and one or more consulting physicians or dentists." La. Rev. Stat. Ann. § 37:913(7)-(8).

64.

The Act further states that "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement," which is "a formal written statement addressing the parameters of the collaborative practice which are mutually agreed upon by the advanced practice registered nurse and one or more licensed physicians." La. Rev. Stat. Ann. § 37:913(8)-(9).

65.

Thus, under Louisiana law, an advanced practice nurse may only perform acts of medical diagnosis and prescription pursuant to a collaborative practice agreement with a licensed physician who is involved in the joint management of the patient's treatment.

66.

Compliance with the collaboration requirements of the Nurse Practice Act is material to the payment of claims by Medicare, Medicaid, and other federal healthcare programs. The submission of a claim for services furnished by an advanced practice nurse constitutes an implied representation that the nurse furnished such services in accordance with the collaboration

requirements of the Nurse Practice Act, including the requirement of a valid collaborative

practice agreement.  Claims for payment submitted for services performed by a nurse practitioner

outside the scope of her practice constitute false claims.

## FACTUAL ALLEGATIONS

### Services performed by nurse practitioner without proper supervision

67.

Rhonda Kimball "Kay" Rodriguez is a psychiatric APRN, and the wife of Joe Rodriguez,

the former CEO of Vermilion.  Beginning around December 2011, and continuing at least until

2015, Ms. Rodriguez entered into a services agreement with Vermilion, and would routinely see

and treat Vermilion patients without the supervision of a physician.  Vermilion submitted claims

for payment for such services to Medicare, Medicaid, and other payors.

68.

Among other things, Ms. Rodriguez would routinely perform inpatient examinations and

make decisions to admit patients, including Medicare and Medicaid patients, as hospital

inpatients.  She would issue inpatient admission orders for such patients without any

participation from a collaborating physician.  She would manage the patients' care and issue all

physician orders for such patients, without collaborating with a physician.  No other physician

would be part of the patients' treatment team, and Ms. Rodriguez was identified in hospital

records as the admitting and attending physician.  Ms. Rodriguez would also routinely perform

outpatient services for hospital patients, without supervision by a qualified physician.

69.

The 2015 Strategic Plan identified Ms. Rodriquez as one of seven "key physicians," and

noted that her average daily census was 20-22 patients.  This referred to patients for whom she

was the attending physician, and included Medicare and Medicaid patients.  This was tied for the highest daily census with Dr. Nicole Dickens, the hospital's medical director, and represented approximately 30% of the total average daily census for the hospital.  The plan noted that Ms. Rodriguez's length of service was three years.

70.

Under the hospital bylaws and regulations, APRNs were not eligible to be members of Vermilion's medical staff, and were not authorized to issue orders to admit or discharge patients. Only the attending medical staff member was authorized to admit or discharge patients.

71.

Around December 29, 2014, while Relator was serving as acting CEO when Luis Betances was away, Relator was contacted by an official with the Health Standards section of the Louisiana Department of Health and Hospitals.  This official told Relator that she had spoken with a Vermilion inpatient who was being treated by Ms. Rodriguez, and who complained about his treatment.  The official stated that a state patient advocate would be visiting the hospital the next day to investigate, and would need to see a copy of Ms. Rodriguez's collaboration agreement.

72.

Relator then went to Ms. Rodriguez's file to review a copy of her collaboration agreement.  He noticed that the agreement, dated April 2011, identified two collaborating physicians, Dr. Jerry Sanders and Dr. Carol Murphy.  Relator did not recognize either of these names.

73.

Upon further investigation, Relator was told that Dr. Sanders had resigned and left the area about a year earlier, and that Dr. Murphy was a professor residing in New Orleans.  Neither of these physicians had collaborated with Ms. Rodriguez in the joint management of patients while Relator was employed.

74.

Relator raised the issue of the expired collaboration agreement with several individuals at Vermilion, including CEO Luis Betances; Glynis DeRouche, AVH clinical director; and Tony Miller, program director of AVH's FLAGS program.  Betances, who was away on vacation, told Relator that he would take care of it when he returned.

75.

Relator was also informed that Kim Leger, the AVH administrative assistant who helped Relator locate the collaboration agreement, asked Ms. Rodriguez whether she had an updated agreement, and was told by Ms. Rodriguez that Ms. Rodriguez would "get back" with her.

76.

When Betances returned to the office the following week, Relator showed him the expired collaboration agreement.  Betances stated that he was "sure" Ms. Rodriguez had another collaboration agreement with Dr. Dickens, the AVH medical director.  Relator asked if he could see a copy of any such agreement, and Betances said "we'll see," or words to that effect.

77.

Later that week, Relator was told by Tony Miller that Ms. Rodriguez was "scrambling" to find a physician to update her collaboration agreement, and that Dr. Dickens told her "no way am I backdating an agreement for you."

78.

Until he was terminated on January 21, 2015, Relator never saw any collaboration agreement other than the expired agreement with Dr. Sanders and Dr. Murphy.

79.

Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez independently saw and treated hundreds of patients at AVH, in violation of Louisiana law. She made admission decisions for hospital inpatients and managed such patients' care without the participation of a collaborating physician. In addition, she routinely performed outpatient services without the involvement of a physician. Vermilion submitted numerous claims to Medicare, Medicaid, and other payors for such services. All such claims constitute false claims.

80.

As it did for all patients, Vermilion as a matter of course submitted claims for inpatient services to Medicare, Medicaid, and other payors for patients admitted pursuant to Ms. Rodriguez's order, and for whom she was the attending physician managing the patients' care. These services were not payable by Medicare or Medicaid because, among other things (i) the patients were not admitted pursuant to an order by a licensed and qualified practitioner as required by 42 C.F.R. § 412.3 and the Louisiana Medicaid program, (ii) the patients were not under the care of a doctor of medicine or osteopathy as required by 42 C.F.R. § 482.12(c) and the Louisiana Medicaid program, and (iii) the orders for admission and treatment were not in accordance with State law and hospital bylaws and rules, as required by 42 C.F.R. § 482.24(c).

81.

As part of his duties, Relator would routinely review financial information, including accounts receivable spreadsheets that identified the physician, the patient, the payor, and the

amount billed and collected. Relator has personal knowledge that Defendants submitted claims for payment to federal healthcare programs, including Medicare, Medicaid, and TriCare, for services provided by Ms. Rodriguez.

82.

Attached as Exhibits 3 and 4 are partial lists of some specific claims submitted to Medicare, Medicaid, and Tricare for services provided by Ms. Rodriguez. Exhibit 3 identifies claims for services provided at the main facility, and Exhibit 4 identifies services provided at Optima. Where the Payor Name is identified as "MEDICARE," the claim is an inpatient claim, and where the Payor Name is identified as "MEDICARE OUTPATIENT," the claim is an outpatient claim. Where the Payor Name is identified as "MEDICAID (Magellan)," the claim was submitted to the Managed Care Medicaid program. Where the Payor Name is identified as "TRICARE" or "TRICARE PRIME, the claim was submitted to the Tricare program. For all inpatient claims, Ms. Rodriguez was the admitting and attending provider, and was solely responsible for the decision to admit the patient and for the patient's care. For all outpatient and inpatient claims, Ms. Rodriguez provided the services without supervision from a qualified physician. This list is not comprehensive, but consists of information printed out from a May 2014 spreadsheet, of a type reviewed monthly by Relator in the course of his employment, that identified claims with outstanding balances. Patient names are not included, but are tied to the number in the MrAdmit column, which has been redacted for privacy purposes. Complete claims information is within the unique possession of Defendants.

83.

On or about December 5, 2019, the State of Louisiana entered into a settlement agreement with Defendants, under which Defendants agreed to pay $500,000 to the State to

24

resolve claims asserted on behalf of the State in Relator's original complaint.  The State

intervened in this lawsuit in connection with the settlement.

84.

The settlement agreement provided, among other things, as follows:

The State contends that it has certain civil and administrative causes of action against
Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly
engaging in the following conduct in connection with the services Acadia's facilities in
Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to
as the "Alleged Conduct"):
…
3.    Acadia submitted claims for payment to the Medicaid program for services
      provided by advanced practice registered nurses that did not have the required
      collaborative practice agreement with a collaborating physician as required by
      Louisiana law.

85.

Medicaid is a joint federal-state program, and claims submitted to the Louisiana

Medicaid program are paid for, in part, out of federal funds.  Thus, false claims submitted to the

Louisiana Medicaid program are false claims under the federal False Claims Act.

86.

At all relevant times, Defendants either knew that Ms. Rodriguez did not have a valid

collaboration agreement, that she was performing services without collaborating with a physician

as required by law, and that claims submitted for her services were false claims, or recklessly

disregarded or were deliberately ignorant of such facts.

87.

In May 2015, after Relator was terminated, state inspectors conducted an investigation at

Vermilion, and interviewed numerous individuals.  Although the investigation report identified

individuals by position and number rather than by name, Relator's first-hand knowledge of

Vermilion and the individuals involved allows him to identify such individuals.  For example,

the report discusses an APRN identified as "S7APRN," and states that "[r]eview of the current census on 5/28/15 revealed S7APRN was listed as the attending physician for 20 of the 22 patients on the East unit." Because of his own knowledge of who was identified as attending physician, as reflected in the Strategic Plan, as well as other information, Relator is able to identify S7APRN as Ms. Rodriguez. The report also identified the medical director as "S8MD," stating that she was the attending physician for the other two patients on the East unit. Because of his personal knowledge, Relator is able to identify S8MD as Dr. Dickens.

88.

The report confirmed Relators' knowledge that Ms. Rodriguez was routinely seeing patients independently without any supervision from a qualified physician. In relevant part, the report states as follows:

> In an interview on 5/28/15 at 10:00 a.m. with S8MD, she verified she was the medical director of the hospital. She stated, "Dr. S7APRN admits her own patients. She is one of the equal staff members." S8MD said S7APRN was an independent practitioner and a doctor, so patients could be admitted to S7APRN and managed by her. S8MD said she was not managing the patients admitted to S7APRN because they were her (S7APRN) patients. S8MD confirmed that she only attended treatment teams when it was her patient. She stated patients that are followed by nurse practitioners do not have psychiatrist on treatment team. After reviewing the Medical Staff By-laws, Rules & Regulations, she confirmed Article V, AHP section indicated AHPs [Allied Health Professionals, such as APRNs] are not members of the medical staff. She also confirmed the Rules & Regulations indicated the psychiatrist was to be a member of the treatment team. She confirmed being a member of the treatment team meant being present for the treatment team meetings. She stated the hospital's current practice related to Nurse Practitioners was not in compliance with the bylaws and the hospital needed to look at that. She stated the Nurse Practitioners function as independent practitioners. S8MD confirmed provisions throughout the bylaws for members of medical staff to admit and discharge were not adhered to by the current practices.

89.

The investigators reviewed clinical records for three patients, which confirmed that Ms. Rodriguez admitted and treated such patients without any involvement or supervision from a qualified physician:

> Review of the clinical records for Patient #6, #7, and #8 revealed the patients were current inpatients on the Adult Acute Unit (East). Review of the demographic form (face sheet) of the clinical records revealed the Admitting and Attending Physician was identified as S7APRN for all 3 patients. Review of the pre-printed admission orders revealed the following was pre-printed on the top of the orders: "Inpatient Admit to S8MD (Medical Director), S7APRN, DNP (Doctor Nurse Practitioner)." Further review of the physician's orders for this hospital stay revealed all physician orders were written or were verbal orders by a nurse practitioner (APRN) for all 3 patients. The psychiatric evaluation was documented by S7APRN, and S7APRN signed the treatment plan under "Physician approval of treatment plan." Further review of the records revealed no documented evidence that a physician/psychiatrist had seen, evaluated or examined Patient #6, #7, #8 during their hospital stay.

90.

The report went on to confirm that Ms. Rodriguez made discharge decisions without any involvement of a qualified physician:

> In an interview on 5/28/15 at 10:00 a.m. with S8MD, she said she was the Medical Director of the hospital. She said S7APRN did her own discharge summaries and did not have them co-signed by a physician. S8MD verified S7APRN was not a medical doctor.

91.

The report indicated that the health information manager mistakenly believed that Ms. Rodriguez was a doctor:

> In an interview on 5/28/15 at 10:45 a.m. with S22HIM Manager, she said S7APRN had patients admitted to her because she was a doctor. When S22HIM Manager was told S7APRN was an advanced practice registered nurse, she said she thought S7APRN was a psychiatrist.

27

92.

The report also indicates that Defendants had recently changed their policies to require

more physician involvement in a patient's treatment plan.  Describing an interview with

S9Psychiatrist, the report states as follows:

> In a telephone interview on 05/28/15 at 5:30 p.m., S9Psychiatrist was asked what her
> documentation, "Pt. seen today" indicated on the progress notes. S9Psychiatrist
> stated, "I just laid eyes on the patient, I did not assess her." She stated she reviewed
> the nurse practitioner notes and the treatment plan. S9Psychiatrist stated she was
> only involved in treatment teams on the adolescent unit and stated S8MD and
> S7APRN do the treatment teams on the adult units. She stated the hospital started a
> new policy 2 weeks ago and according to the new policy she was required to review
> and sign the psychiatric evaluation (done by the nurse practitioner) and the treatment
> plan. She stated she also has to "lay eyes" on the patient one time a week.
> S9Psychiatrist stated the hospital did not indicate how that was to be documented, so
> she has been documenting it on the bottom of the nurse practitioner progress notes.
> S9Psychiatrist stated an evaluation of the patient was not conducted when she
> documented "Pt. seen today."

Arrangement with Dr. Uhrich

93.

From at least 2013, Defendants had an arrangement with Dr. Susan Uhrich, a psychiatrist

in Lafayette, Louisiana, in which Defendants provided free staff to Dr. Uhrich in return for

referrals of patients to AVH.   This scheme was devised and implemented by former AVH CEO

Joe Rodriguez and current AVH CEO Luis Betances.  Dr. Uhrich was a significant source of

patient referrals for AVH, principally to the Optima facility, and Vermilion routinely submitted

claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant to such

referrals.  The arrangement continued following Relator's termination in January 2015.

94.

The 2015 Strategic Plan prepared by Vermilion identified Dr. Uhrich as its fifth-highest

volume referral source, with a projected 60 acute admissions for 2014.  Dr. Uhrich is the only

individual physician on the list of the top 10 referral sources. This document identified Dr.

Uhrich's primary payor source as Medicare, followed by indigent and private insurance.

95.

For each referral source, the Strategic Plan described a "channeling mechanism," which it

defined as "any gate-keeping process required to obtain referrals/admissions." For Dr. Uhrich,

the plan described the channeling mechanism as follows: "Currently a member of our Medical

Staff. Has high volume private practice and nursing home ties. Employs three NP's who work

the nursing homes and the IP units. Nurse liaison is a part of our staff." The plan noted that "Dr.

Uhrich is exclusively referring patients to VBHS [Vermilion Behavioral Health Systems] with

the support of three mid-level practitioners."

96.

Cheryl Smith and Donna Talley are nurses who at all relevant times were employed and

paid by Vermilion. Smith is an advanced practice nurse practitioner and Talley is a licensed

practical nurse. However, although their salaries were paid by Vermilion, Smith and Talley did

not actually work at Vermilion, but instead worked at Dr. Uhrich's office.

97.

Donna Talley has served essentially as Dr. Uhrich's office manager, and is identified on

various web pages as being part of Dr. Uhrich's staff. *See* http://dr-susan-uhrich-

md.lafayette.la.amfibi.directory/us/c/4915493-dr-susan-uhrich-md;

http://www.manta.com/c/mt599py/susan-uhrich-md.

98.

Cheryl Smith, as a nurse practitioner, routinely performed patient rounds at local nursing

homes on behalf of Dr. Uhrich. Although her salary was paid by Vermilion, claims for payment

for Smith's services were submitted by Dr. Uhrich's office.  These visits frequently resulted in referrals of nursing home patients to AVH for inpatient or outpatient hospital services.  Dr. Uhrich's LinkedIn page identifies Smith as a member of her staff, stating that "[t]his multidisciplinary practice includes not only Dr. Uhrich, but Cheryl Smith, Advanced Practice Nurse Practitioner …."  https://www.linkedin.com/in/susan-uhrich-md-112a4b6b.

99.

Optima staff frequently questioned the medical appropriateness of the referrals by Uhrich/Smith.  Many of these patients suffered from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment was unnecessary.

100.

The provision of free staff to Dr. Uhrich constitutes "remuneration" under the Stark Law, and creates a financial relationship between Dr. Uhrich and Vermilion.  The parties cannot satisfy the terms of any exception under the Stark Law because, among other things, the provision of free services by definition is not fair market value, and the arrangement would not be commercially reasonable in the absence of referrals.  Therefore, Dr. Uhrich was prohibited from referring patients to Vermilion for designated health services, including inpatient and outpatient hospital services, and Vermilion was prohibited from submitting claims to Medicare or Medicaid for such services.  All such claims therefore constitute false claims.

101.

In addition, the provision of free staff to Dr. Uhrich was intended, at least in part, to induce the referral of patients by Dr. Uhrich to AVH.  Indeed, the 2015 Strategic Plan expressly identified as a "channeling mechanism" the fact that Dr. Uhrich's "[n]urse liaison is a part of our

staff." Accordingly, such remuneration violates the AKS, and claims submitted pursuant to such referrals constitute false claims.

102.

As part of his duties, Relator would routinely review financial information, including accounts receivable spreadsheets that identified the referring physician, the patient, the payor, and the amount billed and collected. Relator has personal knowledge that Defendants submitted claims for payment to federal healthcare programs, including Medicare and Medicaid, for services where Dr. Uhrich was the referring physician.

103.

Attached as Exhibit 5 is a partial list of some specific claims submitted to Medicare and Medicaid for services where Dr. Uhrich was the referring physician. Where the Payor Name is identified as "MEDICARE," the claim is an inpatient claim, and where the Payor Name is identified as "MEDICARE OUTPATIENT," the claim is an outpatient claim. Where the Payor Name is identified as "MEDICAID (Magellan)," the claim was submitted to the Managed Care Medicaid program. This list is not comprehensive, but consists of information printed out from a May 2014 spreadsheet, of a type reviewed monthly by Relator in the course of his employment, that identified claims with outstanding balances. Patient names are not included, but are tied to the number in the MrAdmit column, which has been redacted for privacy purposes. Complete claims information is within the unique possession of Defendants.

104.

The December 5, 2019 settlement agreement between the State of Louisiana and Defendants provided, among other things, as follows:

The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly

engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):

…

2.    From March 1, 2013, through October 31, 2016, Acadia paid improper remuneration via free staff; improper lease arrangements; and inflated salaries to certain physicians in the Lafayette area for the purpose of inducing referrals to Acadia facilities in Lafayette, Louisiana[.]

105.

In May 2015, after Relator was terminated, state inspectors conducted an investigation at Vermilion, and interviewed numerous individuals.  Although the investigation report identified individuals by position and number rather than by name, Relator's first-hand knowledge of Vermilion and the individuals involved allows him to identify such individuals.  For example, the report refers to an individual as "S5Psychiatrist," whom Relator is able to identify as Dr. Uhrich.  The report refers to another individual as "S4APRN," whom Relator is able to identify as Cheryl Smith.

106.

The report noted that S4APRN (Smith) had received clinical privileges for the period November 15, 2013 through November 15, 2015, and that S5Psychiatrist (Dr. Uhrich) was identified as her collaborating physician.

107.

Smith confirmed to the investigators that she was part of Dr. Uhrich's practice:

In an interview on 05/28/15 at 8:34 a.m. with S4APRN, she confirmed she was familiar with Patient #3 and the patient had been seen in her practice since 2013. She stated her practice consisted of S5Psychiatrist and 3 nurse practitioners. … She stated patients are admitted under S5Psychiatrist's services, but she treats them.

108.

At all relevant times, Defendants either knew that the arrangement with Dr. Uhrich

violated the Stark Law and the AKS, and that claims resulting from her referrals were false

claims, or recklessly disregarded or were deliberately ignorant of such fact.

Disproportionate share payments

109.

The United States provides funds to the states to compensate hospitals who serve a large

number of Medicaid and uninsured patients.  These payments are referred to as "disproportionate

share payments" or "DSH" payments.

110.

To qualify as a disproportionate share hospital, and be eligible for DSH payment, a

hospital must have at least 2 obstetricians who have staff privileges at the hospital and who have

agreed to provide obstetric services to individuals who are entitled to medical assistance for such

services under the State Medicaid plan.  42 U.S.C. § 1396r-4(d)(1).  However, this requirement

"shall not apply to a hospital – (i) the inpatients of which are predominantly individuals under 18

years of age; or (ii) which does not offer nonemergency obstetric services to the general

population as of the date of the enactment of this Act [Dec. 22, 1987]."  42 U.S.C. § 1396r-

4(d)(2)(A).

111.

To qualify as a disproportionate share hospital, and be eligible for DSH payment, a

hospital must also have a Medicaid inpatient utilization rate of not less than 1 percent. 42 U.S.C.

§ 1396r-4(d)(3).

112.

The State of Louisiana relies upon information contained in hospital cost reports when determining whether hospitals qualify for DSH payments.

113.

The State Medicaid plan provides that "Hospitals are notified by letter at least 60 days in advance of calculation of the DSH payment to submit documentation required to establish DSH qualification. Required documents are: 1) obstetrical qualification criteria form; 2) low income utilization revenue calculation; 3) Medicaid cost report: 4) uncompensated cost calculation. Only hospitals that timely return disproportionate share qualification documentation will be considered for disproportionate share payments."

114.

The State Medicaid plan provides that "[a]ppropriate action including, but not limited to, deductions from DSH, Medicaid payments and cost report settlements shall be taken to recover any overpayments resulting from the use of erroneous data, or if it is determined upon audit that a hospital did not qualify."

115.

To receive a DSH payment, a facility must submit documentation stating that it either (a) satisfies the obstetrician requirement, (b) did not offer non-emergency obstetric services to the general public as of December 22, 1987, or (c) treats inpatients who are predominantly under 18 years of age. The required form advises that hospitals opening after December 22, 1987, must either meet criteria (a) or (c). A copy of this form is attached as Exhibit 6.

116.

For the years 2008-2015, Vermilion submitted requests for DSH payments to the State of

Louisiana and received DSH payments in the following amounts:.

| | |
|---|---|
| 2008 | $309,446 |
| 2009 | $698,903 |
| 2010 | $918,466 |
| 2011 | $150,136 |
| 2015 | $34,026 |

117.

Vermilion was not entitled to such payments because, among other things, it did not have

at least two obstetricians with staff privileges who agreed to provide obstetric services to

individuals entitled to medical assistance for such services, as required by 42 U.S.C. § 1396r-

4(d).

118.

Upon information and belief, based upon discussion with counsel for the State, Vermilion

checked the box on the qualification form indicating that it did not offer non-emergency obstetric

services to the general public as of December 22, 1987.  The State believed Defendants were not

entitled to this exception due to changes in the nature of the facility, changes in licensure, and

changes in ownership occurring after that date.  Because of these changes, the hospital that

submitted claims for DSH payments was not the same hospital that had existed in December

1987.

119.

In or around August 2014, the State of Louisiana contracted with Myers & Stauffer to

audit Vermilion's cost reports with respect to the DSH issue, and Myers & Stauffer requested

that Vermilion provide additional information to support the DSH payment.  Upon information

and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain

bad debts for patient care had been written off during the 2010-2011 period, when in fact they

were not written off until the 2014 audit.

120.

Vermilion consulted with a New Orleans CPA, Byron Elsas, to assist in its response to

that audit.  Relator had several discussions with Mr. Elsas, who told Relator that Vermilion

should not have received the DSH payments in the first place.

121.

On December 29, 2014, Elsas sent Relator an email noting that, if the state noticed the

problems, Vermilion would have to repay $150,136.00, but if it did not, Vermilion would be able

to receive an additional $135,833.00:

> PLEASE SEE LAST PAGE OF 3RD & 4TH ATTACHMENT. TITLED"MEDICAID
> DSH REPORT NOTES"
> **1. OB REQUIREMENT NOT MET**
> THERE EXISTS TWO OUTCOMES TO THESE AUDITS.
> 1. IF MEDICAID (STATE) DOES NOT SEE OR UNDERSTAND THE REPORT
> NOTES YOU WILL RECEIVE ANOTHER $135,833.00
> 2. IF MEDICAID (STATE) SEES & UNDERSTANDS THE REPORT NOTES YOU
> WILL OWE $150,136.00
> NEVER CAN TELL.
> IT WILL BE ONE OR THE OTHER.
> GOOD LUCK
> BYRON ELSAS

122.

Relator kept management informed of his investigation of the DSH issue and his

discussions with Elsas, including Elsas's concern that they would have to return the DSH funds.

123.

Relator was terminated on January 21, 2015, before the audit process was completed.  To the best of Relator's knowledge, Vermilion did not return the DSH payments it was aware it was not entitled to receive.

124.

The December 5, 2019 settlement agreement between the State of Louisiana and Defendants provided, among other things, as follows:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
>
> 1.      From January 1, 2007, through December 31, 2015, Acadia submitted applications to the State of Louisiana for a disproportionate share ("DSH") payments that misrepresented Acadia's qualification for DSH payments, thereby causing the State to pay to Acadia DSH payments it was not entitled to[.]

125.

Counsel for the State of Louisiana has confirmed that, other than in connection with the December 2019 settlement, Defendants have not repaid any of the DSH funds they received.

Relator's Termination

126.

In 2007, Relator filed a *qui tam* action in the Southern District of Florida against Hollywood Pavilion, LLC d/b/a Hollywood Pavilion, and High Ridge Management Corp. d/b/a Hollywood Hills Nursing Home (the "Florida *qui tam*").

127.

The defendants in the Florida *qui tam* operated an inpatient psychiatric facility and a skilled nursing facility in Hollywood, Florida.  Relator worked for the defendants for a period of

six months.  The lawsuit alleged, among other things, that defendants illegally paid patient brokers to refer patients.

128.

The Florida *qui tam* was settled in 2016 after the defendants filed bankruptcy.  In addition, several individuals, including Hollywood Pavilion's former chief executive officer, chief operating officer, and a patient recruiter, went to prison as a result of related criminal charges arising out of Relator's allegations.

129.

Defendants were not aware that Relator had filed the Florida *qui tam* action when he was hired.  As discussed below, however, Defendants later learned of the Florida *qui tam*, and stated to AVH personnel that Relator worked undercover for the government.  When Relator began questioning certain of Defendants' own practices, Defendants summarily terminated Relator.

130.

Defendants were aware that Relator was engaged in protected activity. As discussed above, in the period before his termination, Defendants were aware that Relator was investigating and had raised concerns about various issues, including the arrangement with Ms. Rodriguez and the DSH payments.  In addition, as discussed below, Relator raised concerns about Defendants' patient brokering activities.

131.

On January 5, 2015, Relator went to lunch with his corporate supervisor, David Dempsey, an Acadia division CFO based out of corporate headquarters in Franklin, Tennessee. Mr. Dempsey was in town for a site visit at AVH.

132.

During lunch, Relator and Dempsey discussed the fact that Vermilion's average patient census (the number of patients per day) had fallen off. Dempsey assured Relator that corporate "patient brokers" paid by Defendants were working to bring back Medicare, Medicaid, and TRICARE patients. Dempsey stated that "we don't want to call them patient brokers, but that's what they are." Relator expressed concerns as to the legality of paying for referrals.

133.

Patient brokering violates the AKS, as it involves the payment of money to induce referrals of patients for items or services paid by a federal healthcare program, or the payment of remuneration to patients to induce them to purchase or use such items or services.

134.

Relator is aware of several occasions in which Tony Miller, a Vermilion case manager, with the approval of Luis Betances, flew to California, Alaska and other out of state locales to pick up and return with TRICARE beneficiaries for admission to AVH. In one case a TRICARE beneficiary was flow into Lafayette from Japan for admission to AVH. All of these expenses are charged out on the hospital credit card.

135.

Later, Relator and CEO Luis Betances were summoned on short notice to a meeting a corporate headquarters in Franklin, Tennessee on January 19, 2015. Relator and Betances met with Dempsey and Keith Furman, and discussed the hospital's bottom line and referral development. Relator again raised concerns about the legality of patient brokering.

136.

On January 20, 2015, Melissa Rogers, an Acadia corporate executive, sent a

congratulatory email to Relator and his team regarding their work on the hospital's denial log.

The email stated that "Due to everyone's hard work and team effort in regard to the denial log's

management and processes, you are no longer a focus facility. Each of you have continued to

show consistent progress with the processes needed to make the denial log a valuable and useful

tool for your facility. … Again, you all have done a GREAT job of working together and

improving the process and management of your denial log…. GREAT WORK

VERMILLION!!!!!!"

137.

The day after receiving the congratulatory email, Relator was summarily terminated.  The

"Corrective Action Report" listed the following reason for the termination: "Products and reports

that Jeff has submitted to the Corporate Office over the past 30·60 days have fallen below

corporate standards and expectations."  A copy of the termination notice is attached as Exhibit 7.

138.

The preprinted Corrective Action Report contained the following language identifying

the different types of "corrective action" available:

CORRECTIVE ACTION
(Personnel files should be reviewed by the immediate supervisor
to determine the appropriate step. If this is the Employee's
second written warning, the employee is herby reminded that
having three disciplinary infractions within a twelve month
period Is cause for discharge.)

__ Verbal Warning

__ Written Warning (1st, 2nd, 3rd, ____)

__ Final Warning

__ Suspension pending investigation to begin

**X** Dismissal

139.

Before being terminated, Relator had never been the subject of any corrective action report or other report of substandard performance.  Relator was never given a verbal warning or a written warning or otherwise disciplined in any way before his dismissal.  During the January 19, 2015 meeting with Dempsey and Furman, there was no discussion of Relator's supposed substandard performance.  Defendants never identified any "[p]roducts and reports … submitted to the Corporate Office over the past 30·60 days" that had "fallen below corporate standards and expectations."  To the contrary, Relator had been congratulated for his performance the day before the termination.

140.

About two months after Relator's termination, David Dempsey, the Acadia division CFO, was at AVH, where he was training Relator's successor.  Dempsey asked a hospital employee whether the employee had heard from Relator, and Dempsey said that Relator goes undercover for the federal government as a CFO.

141.

Afterwards, a rumor went around the hospital that Relator worked undercover for the government.

142.

In late January 2015, Relator applied for an administrator position with Oceans Behavioral Hospital, a new hospital in San Marcos, Texas.  After a telephone and in-person interview, Relator was invited to visit the Oceans facility.

143.

On March 5, 2015, Relator toured the Oceans facility, and was given an offer letter for the hospital administrator position, with a salary of $105,000.  He had a congratulatory dinner with an Oceans vice-president, and returned to Louisiana on March 6, with the expectation of reporting to work on April 1.

144.

On March 9, 2015, Relator received a call from the Oceans regional vice-president, who told him to fly to Texas the next day for a meeting with the Oceans president.

145.

On March 10, Relator met with the Oceans president, who asked about Relator's termination by Vermilion, and said that Relator's last supervisor didn't have any kind words to say about him.  Relator had not told Oceans that he had been terminated by Vermilion.  The president questioned Relator about his work in Florida, specifically asking about whether there were any regulatory issues or audits.  The president's questioning suggested that he had learned of the Florida *qui tam* from Defendants.  Later that evening, Oceans withdrew its offer to Relator.

Acadia and Vermilion

146.

Acadia corporate officers, including division president Keith Furman and division CFO David Dempsey, were heavily involved in the operation of Vermilion, and were aware of and participated in the above actions.  Hospital management reported directly to Acadia corporate headquarters, and worked closely with headquarters in the operation of the hospital.  Acadia management closely tracked the hospital's financial performance, including its relationship with

referral sources, and pressured hospital management to increase business. Every month, the hospital was required to prepare an operations report covering all aspects of the hospital's management and submit it to corporate headquarters. Acadia policy called for all physician contracts to be approved by corporate headquarters. Patient billing was done using an Acadia billing package, and the corporate office oversaw all aspects of the billing and accounts receivable process.

147.

As an example, after Luis Betances and Relator meet with Keith Furman and David Dempsey on January 19, 2015 to discuss the hospital's performance, Betances sent an email to Furman, copied to Dempsey and Relator, on the subject "Requested Information." The email informed Furman in detail of the hospital's plans going forward, and repeatedly referenced the need for plans to be reviewed and approved by Furman and Dempsey. A copy of the email is attached as Exhibit 8.

148.

Among other things, the email stated that Betances would meet with Dempsey to "discuss expectations," and that the hospital had "3 month to increase volume or make a change." The email also discussed the hospital's plans to increase referrals, and the need to evaluate the "productivity" of all "employed providers" and "make changes where needed." This email is illustrative of Acadia's close involvement in the operations of the hospital and its pressure on the hospital to meet financial goals.

149.

Acadia corporate headquarters was also closely involved in the preparation and review of hospital cost reports, which were outsourced to a private vendor and managed by Acadia.

Planning documents such as the 2015 Strategic Plan discussed above were submitted to Acadia for review and approval.

## COUNT I
## FEDERAL FALSE CLAIMS ACT – FALSE CLAIMS FOR PAYMENT

150.

The allegations in the preceding paragraphs are incorporated by reference.

151.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they knowingly presented or caused to be presented numerous false claims for payment or approval.

152.

Such false claims include claims for services provided to individual patients, annual cost reports, and claims for DSH payments.

153.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## FEDERAL FALSE CLAIMS ACT – FALSE RECORDS OR STATEMENTS

154.

The allegations in the preceding paragraphs are incorporated by reference.

155.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

156.

Such false records or statements include claims for services provided to individual patients, annual cost reports, and claims for DSH payments, which falsely represented, expressly or implicitly, that services were provided in compliance with applicable law and that Defendants were entitled to be paid.

157.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT III
## FEDERAL FALSE CLAIMS ACT – OBLIGATION TO PAY MONEY

158.

The allegations in the preceding paragraphs are incorporated by reference.

159.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

160.

Such false records or statements included annual cost reports, which concealed an obligation to return money received as a result of false claims, and the response to the DSH audit.

161.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered

damages in an amount to be determined at trial.

## COUNT IV
## RETALIATION – 31 U.S.C. § 3730(h)

162.

The allegations in the preceding paragraphs are incorporated by reference.

163.

Defendants unlawfully terminated Relator because of lawful acts done by Relator in

furtherance of an action under the Federal False Claims Act or other efforts to stop one or more

violations of the Federal False Claims Act.

164.

As a result of Defendants' actions, Relator has suffered damages in an amount to be

determined at trial.

## COUNT V
## RETALIATION – LA. REV. STAT. ANN. § 46:439.1(E)

165.

The allegations in the preceding paragraphs are incorporated by reference.

166.

Defendants unlawfully terminated Relator because of lawful acts done by Relator in

furtherance of an action under the Louisiana Medical Assistance Programs Integrity Law or other

efforts to stop one or more violations of the Louisiana Medical Assistance Programs Integrity

Law.

167.

As a result of Defendants' actions, Relator has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, prays:

(a)    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of the Federal False Claims Act;

(b)    That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim;

(c)    That Relator receive all relief necessary to make him whole for his unlawful termination, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages;

(d)    That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e)    That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

/s/ J. Marc Vezina
J. Marc Vezina
Louisiana Bar No. 24683
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223

(504) 361-3624 (fax)
jmv@vezinalaw.com

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798 (fax)
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

Attorneys for Plaintiff-Relator

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this day filed a copy of the foregoing document using the

Court's CM/ECF system, which will automatically send notice of such filing to counsel of

record.

This 15th day of April, 2021.

<u>/s/ G. Mark Simpson</u>
G. Mark Simpson
