UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| JEFFREY H. BYRD, | ) | Civil Action No. 18-312-JWD-EWD |
| | ) | |
| Plaintiff-Relator, | ) | Judge deGravelles |
| | ) | |
| v. | ) | Magistrate Judge Wilder-Doomes |
| | ) | |
| ACADIA HEALTHCARE | ) | Jury Trial Demanded |
| COMPANY, INC. and | ) | |
| VERMILION HOSPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## RESPONSE TO PARTIAL MOTION TO DISMISS COUNTS I-III OF RELATOR'S SECOND AMENDED COMPLAINT

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

J. Marc Vezina, TA LA BAR #24683
Kelli M. Khalaf LA BAR #23213
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798 (fax)
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

Attorneys for Relator

# **TABLE OF CONTENTS**

1.      The SAC states a claim with respect to Dr. Uhrich…………………………………………...1

2.      The SAC states a claim with respect to Kay Rodriguez…………………………………...6

3.      The SAC states a claim with respect to DSH payments…………………………………16

        a.      Contrary to Defendants' apparent belief, a "request for payment"
                is a "claim"……………………………………………………………………………16

        b.      The SAC properly alleges non-repayment of the DSH payments………………..18

4.      Defendants' public disclosure arguments are without merit and are based on a
        version of the statute that was repealed in 2010…………………………………………..20

Conclusion ……………………………………………………………………………………25

Plaintiff-Relator Jeffrey H. Byrd ("Relator") hereby submits this response to the partial

motion to dismiss filed by Defendants Acadia Healthcare Company, Inc. ("Acadia") and

Vermilion Hospital, LLC ("Vermilion") (collectively, "Defendants"). For the reasons discussed

below, the motion should be denied.

1.      <u>The SAC states a claim with respect to Dr. Uhrich</u>.

The original complaint alleged that the arrangement with Dr. Uhrich violated the Stark

Law and the Anti-Kickback Statute ("AKS"), and that all claims submitted pursuant to referrals

from Dr. Uhrich were therefore false claims. *See* Order, Doc. 85, p. 12-15 (discussing

allegations relating to Dr. Uhrich). In its earlier order, the Court noted that "Relator provides

details about the nature of the scheme," *id.*, p. 39, and held that

> Relator adequately pled that the arrangements with Dr. Uhrich … were not
> commercially reasonable or for fair market value. As with Dr. Uhrich, Relator
> specifically alleges that "Defendant[s] provide[d] free staff to Dr. Uhrich in return
> for referral of patients to AVH." (*First Amend. Compl*. ¶ 40, Doc. 57.) Further, the draft
> 2015 Strategic Plan also describes the "channeling mechanism" for Dr. Uhrich:
> "Currently a member of our Medical Staff. Has high volume private practice and
> nursing home ties. Employs three NP's who work the nursing homes and the IP units.
> Nurse liaison is a part of our staff.'" (Id. ¶ 42.) "The plan noted that 'Dr. Uhrich is
> exclusively referring patients to VBHS with the support of three mid-level
> practitioners.'" (Id.) A reasonable inference from this draft Strategic Plan allegations
> is that Defendants paid for Dr. Uhrich's staff. The Court agrees with Relator that
> providing a doctor free staff solely in exchange for referrals is necessarily a payment
> below fair market value and one that is not commercially reasonable in the absence of
> referrals.[1]

Order, Doc. 85, p. 50-51 fn. 9. Although the complaint adequately pled the nature of the scheme,

the Court held that

---

[1] As discussed in Relator's prior brief, when services are provided for free or less than fair
market value, it may be inferred that they are provided in exchange for referrals. *See* Doc. 70, p.
3-4; *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 fn. 3
(N.D. Ill. 2002). Defendants do not dispute this in their motion, nor do they challenge the
existence of a Stark Law financial relationship with Dr. Uhrich. Indeed, the words "Stark,"
"financial relationship," "AKS," and "kickback" do not appear in Defendants' brief.

unlike *Grubbs*, Relator fails to provide "details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into[.]" *Grubbs*, 565 F.3d 190–91. Further, unlike *Grubbs*, Byrd fails to allege any "first-hand experience of the scheme unfolding as it related to him," *id.* at 192 …

*Id.*, p. 40, quoting *United States rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009).

The Second Amended Complaint ("SAC") clearly addresses the Court's concerns on this point. It alleges that the hospital tracked the referral source for patients using multiple sources of information, and that this information was reviewed by Relator in the performance of his duties as CFO. SAC, ¶ 46. Such information was routinely used by Relator and the hospital for budgeting and other purposes, including the preparation of the 2015 Strategic Plan, which noted that Dr. Uhrich was the hospitals' fifth largest referral source and that her primary payor source was Medicare. *Id.*, ¶ 47, 94. Relator was personally involved in the preparation of the strategic plan and was aware of the factual information set forth therein, including Dr. Uhrich's role as a leading referral source, the number of her admissions, and her primary payor source. *Id.*, ¶ 7.

As in *Grubbs*, the SAC provides details about Defendants' billing system and Relator's familiarity with it. *See, e.g.*, SAC, ¶ 44-47, 102, 103, 146. When services were provided for a patient, the billing department would as a matter of course generate and submit a claim to the appropriate payor, and there was no policy or practice of withholding claim submission for services provided or referred by particular providers. *Id.*, ¶ 44. The hospital tracked billings by physician and payor source, and Relator reviewed this information in his role as CFO. *Id.*, ¶ 45. Relator would routinely review financial information, such as accounts receivable spreadsheets that identified the referring physician, the patient, the payor, and the amount billed and collected, and thus had personal knowledge that Defendants submitted claims for payment to federal healthcare programs for services where Dr. Uhrich was the referring physician. *Id.*, ¶ 102.

These allegations are more than sufficient to satisfy *Grubbs*, in that they lead to a strong inference (far stronger than in *Grubbs*, where the relator did not review billing information) that claims were actually submitted for patients referred by Dr. Uhrich. And unlike in *Grubbs*, the falsity of the claims does not turn on the details of any particular claim, or on whether the services were actually provided – rather, if the arrangement with Dr. Uhrich violated the Stark Law or AKS, then ***all*** claims resulting from referrals from Dr. Uhrich are false claims. Defendants do not dispute this point in their motion.

However, the SAC does not simply rely on a "strong inference" that claims were submitted for patients referred by Dr. Uhrich, but identifies examples of ***specific claims*** submitted to federal healthcare programs for services where Dr. Uhrich was the referring physician. *Id.*, ¶ 103 and Exhibit 5. As alleged in the SAC, "[t]his list is not comprehensive, but consists of information printed out from a May 2014 spreadsheet, of a type reviewed monthly by Relator in the course of his employment, that identified claims with outstanding balances…. Complete claims information is within the unique possession of Defendants." *Id.*, ¶ 103. Even Defendants concede that "these exhibits and additional allegations may address the Court's concerns that the FAC failed to identify a single claim with the necessary specificity." Defendants' Brief, p. 7; *id.*, p. 16. They certainly make no argument that the additional allegations are insufficient on this point, and should not be allowed to do so in a reply brief. *See* Order, Doc. 85, p. 54 (failure to adequately raise or develop argument constitutes waiver).

Defendants' only actual arguments with respect to Dr. Uhrich are based largely on a mischaracterization of the Court's prior order and the SAC. Most egregiously, Defendants falsely assert that the Court criticized Relator for relying on a "mere draft" strategic plan to support his allegations regarding Dr. Uhrich, claiming that Relator "has simply chosen to

eliminate the term 'draft' to respond to the Court's criticisms of his reliance on this document. *See* Doc. 85 at 41 (noting that the strategic plan 'is a mere draft')." Defendants' Brief, p. 17. This is a stunning mischaracterization of the Court's order, which emphatically did ***not*** dismiss the strategic plan as "a mere draft" or criticize Relator's reliance on it. Rather, on the page cited by Defendants, the Court was simply ***describing Defendants' argument***, in a section of the order titled "Parties' Arguments." Order, Doc. 85, p. 41.

Indeed, the Court went on to ***reject*** Defendants' argument on this point, ***expressly relying on the allegations regarding the strategic plan***. *Id*., ¶ 50-51 fn. 9 ("Relator adequately pled that the arrangements with Dr. Uhrich … were not commercially reasonable or for fair market value…. A reasonable inference from this draft Strategic Plan allegations is that Defendants paid for Dr. Uhrich's staff. The Court agrees with Relator that providing a doctor free staff solely in exchange for referrals is necessarily a payment below fair market value and one that is not commercially reasonable in the absence of referrals."). The Court even prefaced this discussion by stating that "the Court disagrees with Defendants" on this issue. It is incredibly misleading for Defendants to claim that the Court dismissed the strategic plan as "a mere draft," or that it "critici[zed Relator's] reliance on this document," when the Court itself relied on the document to hold that Relator's allegations on these points were sufficient.[2]

---

[2] Defendants claim that "[t]he only substantive difference is that Relator has apparently chosen to eliminate the term "draft" and capitalize the words 'Strategic Plan.'" Defendants' Brief, p. 17. Defendants ignore paragraph 7 of the SAC, which alleges that "[i]n all material respects, the information from the draft plan discussed herein was included in the final 2015 Strategic Plan." In any event, as the Court recognized, whether the document is a draft or a final document is irrelevant – either way, it provides support for the allegation that Defendants provided free staff to Dr. Uhrich and that this was a "channeling mechanism" to obtain her referrals. There is no rule of evidence, and certainly no rule of pleading, that a party's internal documents may be considered only if they have the word "final" stamped on them.

Defendants assert that "[t]he SAC also does nothing to address the Court's holding that Relator 'fail[ed] to allege any "first-hand experience in the scheme unfolding as it related to him."' Doc. 85 at 40 (citing *Grubbs*, 565 F.3d at 192)." Defendants' Brief, p. 17. This argument is without merit. There is no stand-alone requirement that a relator have "first-hand experience in the scheme unfolding" in order to state a claim – rather, such experience is simply one way in which a relator may show a "strong inference" that claims were submitted as a result of the fraudulent scheme.[3] Indeed, the "first-hand experience" in *Grubbs* simply consisted of other people telling the relator about the fraudulent scheme, and the Court noted that this made it "probable, nigh likely … that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." *Grubbs*, *supra* at 191-192.

In this case, the Court has already held that the original complaint adequately alleged the nature of the arrangement with Dr. Uhrich, and that it was not fair market value or commercially reasonable. And as discussed above, the SAC provides abundant allegations, based on Relator's first-hand knowledge and experience, showing that Defendants submitted claims to federal healthcare programs pursuant to referrals from Dr. Uhrich, and even gives examples of actual claims for specific patients. Defendants do not challenge the sufficiency of these allegations, but concede that "these exhibits and additional allegations may address the Court's concerns that the FAC failed to identify a single claim with the necessary specificity." Defendants' Brief, p. 7; *id.*, p. 16. Accordingly, the complaint sufficiently states a claim with respect to Dr. Uhrich.[4]

---

[3] The only allegation Defendants point to in this argument relates to staff questioning the medical appropriateness of some of Dr. Uhrich's referrals. Defendants' Brief, p. 17-18. This is a red herring, since that allegation, which is unrelated to claim submission or Defendants' paying for her staff, could be excised from the complaint altogether without affecting its validity.

[4] In its prior order, the Court also indicated that Relator should amend his complaint to include allegations of false certifications. Order, Doc. 85, p. 46-48. Relator continues to assert, as

2.      The SAC states a claim with respect to Kay Rodriguez.

In its prior order, the Court held that the allegations regarding Kay Rodriguez failed to satisfy Rule 9(b) for three reasons: (i) failure to "provide sufficient details about the relevant time period," Order, Doc. 85, p. 37, (ii) failure to show that Rodriguez "provided services to patients that ultimately lead to claims being submitted," *id*., p. 38, and (iii) failure to show that Rodriguez's noncompliance was "material," *id*., p. 48.

In the SAC, Relator provided additional allegations addressing each of these points. With respect to the first issue, the SAC alleged that the relevant time period was approximately December 2011 through at least 2015.  SAC, ¶ 67.  The 2015 strategic plan noted that Rodriguez's length of service was three years.  *Id*., ¶ 69.  Relator provided examples of specific claims for services provided by Rodriguez with dates of service ranging from December 2012 through March 2014, although those examples are illustrative and not exhaustive.  *Id*., ¶ 82 and Exhibits 3-4.  As of May 28, 2015, Rodriguez was listed on the census as the attending physician for 20 of 22 patients on the East Wing, and was continuing to make admission and discharge decisions.  *Id*., ¶¶ 87-91.  In their motion, Defendants do not challenge the sufficiency of the allegations about the relevant time period.

With respect to the second issue, Relator provided additional allegations showing that claims were submitted for services provided by Rodriguez.  *See, e.g., id*., ¶¶ 80-82 and Exhibits 3-4.  Indeed, as with Dr. Uhrich, Relator provided examples of actual claims for services

_____

discussed in his earlier brief, that claims submitted in violation of the Stark Law or AKS are false claims irrespective of any certification.  *See* Doc. 70, p. 14-17.  In light of the Court's ruling, however, the SAC includes allegations regarding false certifications.  *See, e.g.*, SAC, ¶¶ 14-29, 52, 58, 156.  Defendants do not challenge the sufficiency of these allegations in their motion to dismiss, and do not make any argument regarding certification.  Indeed, the word "certification" does not appear in the motion, and the word "certified" appears only in connection with the DSH payments.  Defendants' Brief, p. 25.

provided by Rodriguez to specific patients, while noting that complete claim information was in the exclusive possession of Defendants. *Id.*, ¶ 82 and Exhibits 3-4. Defendants do not challenge the sufficiency of these allegations, and indeed concede that "these exhibits and additional allegations may address the Court's concerns that the FAC failed to identify a single claim with the necessary specificity." Defendants' Brief, p. 7.

The only argument Defendants make concerns the third issue, materiality. Defendants assert that "Relator has done nothing to address the fact that he has not (and apparently cannot) plead that the failure to abide by the supervision requirements of the LNPA is material to the Government's decision to pay claims for services provided by Ms. Rodriguez." Defendants' Brief, p. 7-8. This assertion is astonishing, since the SAC clearly explains how the alleged violations with respect to Rodriguez are material. *See, e.g.*, SAC, ¶¶ 30-42, 61-66, 80. Defendants make no attempt to address these allegations, but simply elect to ignore them altogether, while assuring the Court that "[t]he SAC does not include any new allegations that address this concern." Defendants' Brief, p. 8.

To begin with, the SAC alleges that

> For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital if formally admitted as an inpatient pursuant to an order for inpatient admission ***by a physician or other qualified practitioner in accordance with 42 C.F.R. §§ 412.3, 482.24(c), and 482.12(c)***. During the period relevant to this complaint, this physician order was required to be present in the medical record and be supported by the physician admission and progress notes, ***in order for the hospital to be paid for hospital inpatient services under Medicare Part A***. 42 C.F.R. § 412.3; 78 Fed. Reg. 50496, 50939-50940 (Aug. 19, 2013); 78 Fed. Reg. 27486, 27647 (May 10, 2013).

SAC, ¶ 30 (emphasis added). Thus, the SAC plainly alleges that, "in order for the hospital to be paid for hospital inpatient services under Medicare Part A," a patient must be "formally admitted as an inpatient pursuant to an order for inpatient admission by a physician or other qualified

practitioner in accordance with 42 C.F.R. §§ 412.3, 482.24(c), and 482.12(c)" and the physician order must "be present in the medical record."[5]  This is an express allegation that an admission order by a physician or other qualified practitioner is material to the payment decision for inpatient Medicare claims.  Defendants do not challenge the sufficiency of this allegation, ***or even mention it***, and thus have waived any argument that this requirement is not material.  Order, Doc. 85, p. 54 ("[F]ailure to brief an argument in the district court waives that argument in that court.  Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones.") (cleaned up, citations omitted).

The SAC then discusses who constitutes a "qualified practitioner in accordance with 42 C.F.R. §§ 412.3, 482.24(c), and 482.12(c)," and is thus authorized to provide the inpatient admission order that is required "in order for the hospital to be paid for hospital inpatient services under Medicare Part A."  As alleged in the SAC, these provisions require that the admission order "must be furnished by a qualified and licensed practitioner ***who has admitting privileges at the hospital as permitted by State law***," and that "[t]he practitioner may not delegate the decision (order) to another individual ***who is not authorized by the State to admit patients, or has not been granted admitting privileges applicable to that patient by the hospital's medical staff***."  SAC, ¶ 31 (emphasis added).  They require that every Medicare patient must be under the care of a doctor of medicine or osteopathy, although such doctor may

---

[5] Relators note that 42 C.F.R. § 412.3 was amended in August 2018 "to remove the language stating that a physician order must be present in the medical record … in order for the hospital to be paid for hospital inpatient services under Medicare Part A."  83 Fed. Reg. 41144, 41510 (August 17, 2018).  The requirement that the patient must be admitted by a physician or other qualified practitioner was not changed. *See id*. at 41508.

"delegate tasks to other qualified health care personnel ***to the extent recognized under State law or a State's regulatory mechanism***." *Id.*, ¶ 32 (emphasis added). They require that "[p]atients are admitted to the hospital only on the recommendation of a licensed practitioner ***permitted by the State to admit patients to a hospital***." *Id.* (emphasis added). And they require that all orders be by a practitioner who "is ***acting in accordance with State law***, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." *Id.*, ¶ 33 (emphasis added). These allegations clearly explain why compliance with state law, including the Louisiana Nurse Practice Act, is material to the payment decision. Again, Defendants do not argue that these provisions are not material to the payment decision, and thus have waived any argument on that point.[6]

As to outpatient claims, the SAC alleges that "Part B of the Medicare program pays for 'medical and other health services,' 42 U.S.C. § 1395k(a), which includes services performed by nurse practitioner 'working in collaboration … with a physician … ***which the nurse practitioner … is legally authorized to perform by the State in which the services are performed***.' 42 U.S.C. § 1395x(s)(2)(K)(ii)." SAC, ¶ 34. "The term 'collaboration' is defined as 'a process in which a nurse practitioner works with a physician to deliver health care services within the scope of the practitioner's professional expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms ***as defined by the law of the***

---

[6] The only time Defendants even mention these allegations is a two-sentence footnote stating that "[t]he SAC also cites various Medicare regulations in an apparent attempt to establish the materiality of the LPNA. *See* Doc. 88 at ¶¶ 31-33. Each of these regulations look [sic] to 'State law' (here the LPNA) to determine whether a particular activity is material to the government's decision to pay a claim. *Id.*" Defendants' Brief, p. 9 fn. 4. This is not an argument, since Defendants do not even ***assert*** that the requirements are not material to the payment decision, much less explain why this is so. If anything, the footnote seems to concede that compliance with state law is material.

***State in which the services are performed***.' 42 U.S.C. § 1395x(aa)(6)." SAC, ¶ 34 (emphasis added). The SAC thus explains how services provided by a nurse practitioner outside the scope of her authority under state law are not "medical and other health services" payable by Medicare. Once again, Defendants do not challenge the sufficiency of these allegations, or even mention them, and make no argument that these requirements are not material to the payment decision.

As to Medicaid claims, the SAC alleges that providers must enter into a provider agreement requiring them to "comply fully with all applicable federal and state laws and rules pertaining to Medicaid and the practice of medicine," and to provide services only if they are "within the scope and quality of standard care." SAC, ¶ 36. The Medicaid provider manual requires that "inpatient hospital services must be ordered by the ***attending physician***, an emergency room physician, or a dentist," and that "***[p]hysicians*** responsible for a recipient's care at the hospital are responsible for deciding whether the recipient should be admitted as an inpatient." *Id*., ¶ 41 (emphasis added). As to outpatient services, the provider manual states that "[c]overed outpatient hospital services provided to Medicaid recipients are reimbursable," and defines "outpatient hospital services" as "diagnostic and therapeutic services rendered ***under the direction of a physician*** or dentist to an outpatient in an enrolled, licensed and certified hospital." *Id*., ¶ 42 (emphasis added). This plainly constitutes an allegation relating to materiality, since services that are not rendered under the direction of a physician are not "covered outpatient hospital services." As with the Medicare requirements, Defendants do not challenge the sufficiency of these allegations, or even mention them, and do not make any argument that these requirements are not material to the payment decision.

The SAC also alleges various false representations made in connection with claims for Rodriguez's services. It alleges that Medicare, Medicaid, and TriCare claims are submitted

using the UB-04 format, which sets forth various items of information, including a description of the services provided and the physician involved in the service. SAC, ¶¶ 28-29, 38, 43. The form states that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." *Id*., ¶ 29. The SAC alleges that "[c]ompliance with the collaboration requirements of the Nurse Practice Act is material to the payment of claims by Medicare, Medicaid, and other federal healthcare programs. The submission of a claim for services furnished by an advanced practice nurse constitutes an implied representation that the nurse furnished such services in accordance with the collaboration requirements of the Nurse Practice Act, including the requirement of a valid collaborative practice agreement. Claims for payment submitted for services performed by a nurse practitioner outside the scope of her practice constitute false claims." *Id*., ¶ 66*; see also id*., ¶ 80, 156.

Incredibly, in their motion to dismiss, Defendants present ***no argument whatsoever*** showing why the various requirements discussed above are not material to the payment decision. Indeed, Defendants do not even acknowledge the existence of most of these allegations, blithely (and falsely) assuring the Court that "[t]he SAC does not include any new allegations that address this concern." Defendants' Brief, p. 8. As the Court noted in its earlier ruling, "failure to brief an argument in the district court waives that argument in that court. Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones." Order, Doc. 85, p. 54 (cleaned up, citations omitted). Given Defendants' utter failure to address the voluminous allegations showing materiality, the Court

should deny the motion out of hand, and Defendants should not be allowed to make new arguments in their reply brief.

The only "argument" Defendants make regarding materiality is their assertion that "Relator has alleged the State was aware of the non-compliance he complains about but has not alleged that the State actually viewed the non-compliance as material to its decision to pay claims for those services." Defendants' Brief, p. 10.[7]  As discussed below, this misstates what is required to show materiality, but even accepting Defendants' argument at face value, it is flatly wrong as a factual matter.  Defendants assert that Relator can demonstrate materiality by including "allegations of other enforcement actions concerning the LPNA's supervision requirements, settlements involving similar violations to those alleged, or citations to criminal or civil actions based on such violations." *Id.*, p. 10-11.  Defendants assert that "[n]otably absent, however, is any allegation that after learning Ms. Rodriguez was not in compliance with the LPNA, the State ceased paying claims for services she provided or sought to recoup funds already paid to Vermilion." *Id.*, p. 10.

This assertion is astounding, since the State ***intervened in this very lawsuit*** and entered into a settlement agreement expressly stating that it had "civil and administrative causes of action" against Defendants because they "submitted claims for payment to the Medicaid program for services provided by advanced practice registered nurses that did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law." SAC, ¶ 83-84.  The settlement involved the payment of money by Defendants to settle these claims – i.e., the State "sought to recoup funds already paid to Vermilion."  It is preposterous for

---

[7] Defendants do not challenge the sufficiency of the allegations that Rodriguez was not a qualified practitioner authorized to admit patients or provide the services at issue.  Rather, the only issue they raise is whether this non-compliance is material.

Defendants to argue that materiality may be demonstrated by "allegations of *other* enforcement actions concerning the LPNA's supervision requirements" or by "settlements involving *similar* violations to those alleged," while ignoring the fact that the State intervened and settled the violations *in this very case*, which is the strongest possible indication that the State "view[s] the non-compliance as material." This shows the disingenuousness of Defendants' argument that the settlement is irrelevant. Defendants cannot, on the one hand, assert that Relator must present evidence that the State considers the violations to be material and, on the other hand, complain when Relator includes allegations proving that exact point.

Even apart from the State's intervention and settlement, Defendants' argument is misplaced. Nothing in the SAC suggests that the Louisiana Medicaid program knowingly paid for services rendered by Rodriguez despite full knowledge that she was not authorized by state law to provide such services. The complaint alleges that state inspectors conducted an investigation at Vermilion in May 2015, but does not allege that they had any involvement in the processing or payment of Medicaid claims. Indeed, there is no suggestion in the complaint that the results of the investigation were ever made known to the Louisiana Medicaid program. *See United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 112 (1st Cir. 2016) ("Even assuming … that various state regulators had some notice of complaints against Arbour … there is no evidence in the complaint that MassHealth, the entity paying Medicaid claims, had actual knowledge of any of these allegations (much less their veracity) as it paid UHS's claims."). Even if they had been, the report did not refer to Rodriguez or other individuals by name. For Defendants to claim that "the only valid inference is that the State did not view the alleged lack of supervision as material to its payment decision" would therefore be absurd even if we did not know that the State took the exact *opposite* position by intervening and settling the

claims in this case.  In any event, on a motion to dismiss, inferences are to be drawn in favor of Relator, not in favor of Defendants.

Moreover, the State has no role in the payment of Medicare and Tricare claims, which are processed and paid by the federal government or its contractors.  *See* SAC, ¶ 13, 43.  There is not the slightest suggestion in the SAC that anyone involved in the processing of such federal claims was ever made aware of the investigation, much less that they knowingly paid for services rendered by Rodriguez despite full knowledge that she was not authorized to provide them.

Although Defendants cite *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) for the banal proposition that "[m]ateriality … cannot be found where noncompliance is minor or insubstantial," the actual holding in *Escobar* strongly demonstrates the materiality of the violations at issue.  The central claim in *Escobar* was that the defendant, a mental health facility, submitted claims to Medicaid for counseling services provided by employees who were not licensed or qualified to provide such services under state law.  *Id*. at 1997-1998.   The Supreme Court noted that the provider submitted claims with billing codes and provider identification numbers corresponding to specific job titles, and held that "these representations were clearly misleading in context," because

> [a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. §429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, §429.424(C). By using payment and other codes that conveyed this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.

*Id*. at 2000-2001.  These allegations are substantially similar to those in this case, where Defendants submitted claims identifying the inpatient or outpatient services provided and

identifying Rodriguez as the physician.  SAC, ¶¶ 28, 82.  As in *Escobar*, these representations were clearly misleading, since anyone informed that Rodriguez had provided such services would wrongly conclude that she had complied with core federal and state requirements regarding who is qualified and authorized to provide such services under federal and state law.

On remand in *Escobar*, the First Circuit held that "we have little difficulty in concluding that Relators have sufficiently alleged that UHS's misrepresentations were material."  *United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 110 (1st Cir. 2016).  The Court first noted that the Massachusetts licensing and professionalism regulations were described as conditions of payment, which the Supreme Court held was relevant to the materiality inquiry.  *Id.* at 111.  Second, the Court noted "the centrality of the licensing and supervision requirements in the MassHealth regulatory program, which go to the 'very essence of the bargain.'"  *Id.* at 110. As the Court stated:

> MassHealth has made it clear in its regulations that it expects that individuals in the business of providing mental health services in the Commonwealth have adequate training and professional credentials. Compliance, or lack thereof, with these regulations seem to us the textbook example of representations that would "likely ... induce a reasonable person to manifest his assent," *Escobar II*, 136 S. Ct. at 2003 (citing Restatement (Second) of Contracts, § 162(2)), in determining whether to pay for the healthcare services. Indeed, we struggle to think of a misrepresentation-by-omission that would give rise to a breach more material to the government's decision to pay.

*Id.* at 111.  And finally, the Court noted that

> we see no evidence that MassHealth continued to pay claims despite actual knowledge of the violations…. Even assuming, on the most generous reading of the Second Amended Complaint for UHS, that various state regulators had some notice of complaints against Arbour in late 2009 and 2010, mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance. Additionally, there is no evidence in the complaint that MassHealth, the entity paying Medicaid claims, had actual knowledge of any of these allegations (much less their veracity) as it paid UHS's claims.

*Id.* at 112.

The present case is on all fours with *Escobar*. Medicare regulations expressly state that there must be an admission order from a "physician or other qualified practitioner" in order to be paid for inpatient claims, and outpatient services performed by a nurse practitioner are not covered "medical and other health services" unless they are performed by someone "working in collaboration … with a physician … which the nurse practitioner … is legally authorized to perform by the State in which the services are performed." SAC, ¶¶ 30, 34. Medicaid services are not "[c]overed outpatient hospital services" unless they are "rendered under the direction of a physician." *Id*., ¶ 42 (emphasis added). As in *Escobar*, provisions governing who is authorized to admit inpatients and perform medical services clearly "go to the very essence of the bargain," and "[c]ompliance, or lack thereof" with such requirements is a "textbook example" of something that would be considered important by someone determining whether to pay. And there is no indication in the complaint that anyone processing or approving payments had actual knowledge that the services were provided by someone not authorized to do so. Defendants make no effort to show how the core licensing and authorization requirements at issue in this case are different from those that the *Escobar* court had "little difficulty" in concluding were material, and present nothing in the way of argument on that point. They should not be allowed to make such arguments for the first time in a reply brief.

3.    <u>The SAC states a claim with respect to DSH payments</u>.

      a.    <u>Contrary to Defendants' apparent belief, a "request for payment" is a "claim."</u>

With respect to the requests for DSH payments, Defendants' only argument is that "nowhere in Relator's allegations in the SAC does he allege that Vermilion received DSH funds as the result of a 'claim' it submitted." Defendants' Brief, p. 18 (cleaned up). This assertion is puzzling, since the complaint expressly alleges that "[f]or the years 2008-2015, Vermilion

submitted requests for DSH payments to the State of Louisiana and received DSH payments in the following amounts …." SAC, ¶ 116 (totaling $2,110,977). For some unexplained reason, Defendants attach magical significance to the fact that the SAC uses the word "requests" instead of "claims," stating that Relator

> has not (and apparently cannot) allege that Defendants submitted or presented any claims for DSH payments. *See* Doc. 88, ¶¶ 110-16. Instead, Relator alleges that "Vermilion submitted *requests* for DSH payments to the State of Louisiana and received DSH payments in [specified] amounts." *Id.* (emphasis added).

Defendants' Brief, p. 19 (emphasis added by Defendants).

It appears that Defendants are somehow unfamiliar with the definition of "claim" under the False Claims Act, which states that "the term 'claim' … (A) means ***any request*** or demand, whether under a contract or otherwise, ***for money*** or property …" 31 U.S.C. § 3729(b)(2) (emphasis added). To allege that someone submits a "request for payment" is thus to allege the submission of a claim, and Relator is at a loss for why Defendants would believe otherwise. Certainly the motion to dismiss does not give any explanation.

Defendants go on to assert, without elaboration, that "[t]he SAC is devoid of any particularized allegations as to what form those requests took, what specifically was requested, when it was requested, who requested those payments, and, most importantly, what Defendants may or may not have certified in making those 'requests.'" Defendants' Brief, p. 19. As they do throughout their brief, Defendants do not support this conclusory assertion with any argument, and do not bother to discuss the actual allegations of the complaint, but simply expect the Court to take their word for it. Contrary to their assertions, the SAC clearly describes the form of the requests (SAC, ¶ 115 and Exhibit 6), what was requested (*id.*, ¶ 116), who submitted the requests (*id.*), and what was certified (*id.*, ¶¶ 115, 118, and Exhibit 6). If Defendants think that any of these allegations is somehow insufficient, they do not say why, and indeed do not mention them

at all.  *See* Order, Doc. 85, p. 54 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones.") (cleaned up, citation omitted).

      b.      The SAC properly alleges non-repayment of the DSH payments.

      As to Count III, the "reverse false claim" count, Defendants' only argument is that the SAC fails to allege that Defendants did not repay the DSH funds they had received.[8]  This assertion is plainly incorrect, since the complaint alleges that (i) Defendants did not return the money before Relator was terminated, (ii) after Relator filed his original complaint, the State and Defendants entered into a December 5, 2019 settlement agreement under which Defendants paid $500,000 to settle its liability to the State for the DSH and other claims, and (iii) counsel for the State has confirmed that, except for the settlement, Defendants have not repaid any of the DSH funds they received.  SAC, ¶¶ 9, 123-125.

      Defendants' only real "argument" on this point is that Rule 9(b) somehow requires the complaint to give the name of the attorney for the State who confirmed that there has been no repayment other than in connection with the settlement, and the date on which he provided this

---

[8] Defendants incorrectly state that the reverse false claims act count is only directed toward the DSH claim.  Count III clearly alleges that the "false records or statements included annual cost reports, which concealed an obligation to return money received as a result of false claims." SAC, ¶ 160.  The SAC alleges that Medicare uses hospital cost reports to determine whether the provider has been overpaid during the year and must reimburse Medicare.  *Id*., ¶¶ 17-22.  It also alleges that cost reports include a certification that services provided during the year were provided in accordance with applicable laws and regulations, including the Stark Law and AKS. *Id*., ¶¶ 23-27.  The SAC alleges that the Medicaid provider agreement requires a provider to report and refund monies received that the provider is not entitled to, and that hospitals must submit a copy of their cost report to the Medicaid contractor.  *Id*., ¶¶ 37, 39.  It also alleges that an entity that collects payment for services in violation of the Stark Law has an obligation to refund such payments within 60 days.  *Id*., ¶ 59.  Defendants inexplicably fail to address these allegations, or to make any argument that they are insufficient to state a claim.

confirmation.  Defendants' Brief, p. 21.[9]  This assertion is completely erroneous.  Rule 9(b) requires only that the "circumstances constituting fraud" be stated with particularity, and the name of the State attorney and the date of his conversation with Relator's counsel are obviously not "circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  No one contends that the State's attorney was involved in the fraud – he simply negotiated the settlement with Defendants.[10]  The only question is whether, as the Court stated in its prior order, the complaint "provide[s] a sufficient factual basis from which the Court can conclude that Defendants in fact failed to repay its obligations to the government," and the SAC plainly does so.  Order, Doc. 85, p. 56.

Relator confesses that he is at a loss to know what Defendants are talking about when they say that "these new allegations actually weaken Relator's claim that Vermilion failed to repay the DSH funds," or that they "tend[] to suggest Vermilion actually *returned* DSH funds between the time Relator filed his prior complaint and the SAC."  Defendants' Brief, p. 21. The SAC makes it clear that, other than in connection with the 2019 settlement (which occurred well after the filing of this lawsuit, and involved the payment of $500,000 to settle Defendants' liability to the State, but not to the federal government), Defendants have not repaid any of the $2,110,977 in DSH funds they received.  Relator fails to see how this could possibly support an

---

[9] Defendants' assertion that the complaint does not allege "*what* precisely that person told him" is factually incorrect, since the complaint states that counsel confirmed that "other than in connection with the December 2019 settlement, Defendants have not repaid any of the DSH funds they received."  SAC, ¶ 125.

[10] Defendants know who they dealt with in negotiating the settlement, making their objection on this point somewhat disingenuous.  *See* Doc. 67-1, p. 2 (noting that, while case was under seal, "Defendants and counsel for the State engaged in ongoing dialogue and in-person meetings concerning this action").  If the Court believes that the sufficiency of the complaint turns on including counsel's name, that can certainly be added by amendment, although Defendants would likely then claim that they need to know some other unpredictable detail.

inference that Defendants actually returned all DSH money they received – and in any event, on

a motion to dismiss the allegations are to be viewed in the light most favorable to Relator, with

all reasonable inferences drawn in his favor, not the other way around.[11]

4.    Defendants' public disclosure arguments are without merit and are based on a version of the statute that was repealed in 2010.

Defendants assert that Relator's allegations regarding an investigation performed by state

inspectors in May 2015 "calls into question whether his claims are barred by the public

disclosure bar."  Defendants' Brief, p. 11, 22.  This argument is without merit for a number of

reasons, not least of which is that Defendants do not point to any qualifying "public disclosure."

Indeed, Defendants seem unaware that the statute was amended more than a decade ago to make

it clear that *state* investigations and reports do not implicate the public disclosure bar.

Before enactment of the Patient Protection and Affordable Care Act ("PPACA" or

"ACA") on March 23, 2010, the public disclosure statute barred actions "based upon the public

disclosure of allegations or transactions … in a congressional, administrative, or Government

Accounting Office report, hearing, audit, or investigation."  Former 31 U.S.C. § 3730(e)(4).  This

language led to a split among courts as to whether the bar applied only to *federal* reports or

investigations, or whether it also encompassed state and local proceedings.  In 2010, the

Supreme Court held that, by using the term "administrative," the pre-PPACA statute

encompassed disclosures made in state and local sources. *Graham Cty. Soil & Water Cons. Dist.*

_____

[11] Defendants' argument is even more confusing given that returning money *after* Relator filed this action would not relieve Defendants from liability, since the SAC relates back to the filing of the original complaint under Fed. R. Civ. P. 15(c)(1).  Defendants make no argument to the contrary in their motion to dismiss.  At most, assuming Defendants could prove they made a post-filing payment other than the settlement payment, they may be entitled to an offset against any judgment for treble damages under the False Claims Act.  Relator notes that Defendants themselves assert that whether they made any payment is "peculiarly within [Defendants'] knowledge," which makes their whole argument rather silly.  Defendants' Brief., p. 23.

*v. United States ex rel. Wilson*, 559 U.S. 280, 283 (2010); *see A1 Procurement, LLC v. Thermcor, Inc.*, 2017 U.S. Dist. LEXIS 105343, *22 n.12 (E.D. Va. Apr. 4, 2017).

In the PPACA amendments, however, which were enacted while *Graham* was pending before the Supreme Court, Congress amended the statute to clarify that the public disclosure bar only applies to disclosures in *federal* proceedings. As amended, the statute provides in relevant part that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed … (ii) in a congressional, Government Accountability Office, or other *Federal* report, hearing, audit, or investigation," unless the relator is an original source of the information. 31 U.S.C. § 3730(e)(4)(A) (emphasis added).[12] Thus, since March 2010, the public disclosure bar has not applied to disclosures made in state or local reports, hearings, audits, or investigations. *See United States ex rel. Judd v. Quest Diagnostics Inc.*, 2014 U.S. Dist. LEXIS 73760, at *13 (D.N.J. May 30, 2014) ("the ACA-amended version is limited to federal fora"). Because the allegations in the SAC refer only to a state investigation, they do not trigger the public disclosure bar.

Defendants cite the Supreme Court's *Graham* decision for the proposition that "the jurisdiction public disclosure bar includes allegations of fraud within the public domain, including those contained with federal, *state, or local* administrative reports, audits, or investigations." Defendants' Brief, p. 13 (emphasis added). What Defendants fail to tell the Court, however, is that *Graham* interpreted the *pre-PPACA* version of the statute, and not the

_____

[12] The statute also applies to disclosures "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party" and to disclosures "from the news media." 31 U.S.C. § 3730(e)(4)(A)(i),(iii). Defendants do not point to any such disclosures alleged in the SAC, and do not mention any such disclosures in their motion.

version that has been in place since March 2010.  It is impossible to see how Defendants could

have cited *Graham* on this point while failing to mention the PPACA amendments.  Not only are

the amendments widely known to anyone who practices in this area, or who simply reads the

statute, but the *Graham* decision ***itself*** notes that the Court was only applying the former statute

because the amendments did not contain a retroactivity provision:

> On March 23, 2010, the President signed into law the Patient Protection and Affordable
> Care Act, Pub. L. 111-148, 124 Stat. 119. Section 10104(j)(2) of this legislation replaces
> the prior version of 31 U.S.C. § 3730(e)(4) with new language. The legislation makes no
> mention of retroactivity, which would be necessary for its application to pending cases
> given that it eliminates petitioners' claimed defense to a *qui tam* suit. Throughout this
> opinion, we use the present tense in discussing the statute as it existed at the time this
> case was argued.

*Graham*, 559 U.S. at 283 n.1 (citation omitted).

The PPACA amendments also made other sweeping changes to the public disclosure

rule, including (i) removing its jurisdictional nature, (ii) greatly expanding the definition of

"original source" to include someone who has "knowledge that is independent of and materially

adds to the publicly disclosed allegations or transactions," and (iii) eliminating the "based upon"

language and asking instead whether "substantially the same allegations or transactions as

alleged in the action or claim were publicly disclosed."  *See United States ex rel. Freedom

Unlimited, Inc. v. City of Pittsburgh*, 2016 U.S. Dist. LEXIS 43701, at *36-42 (W.D. Pa. Mar.

31, 2016), vacated on other grounds, 728 Fed. Appx. 101 (3d Cir. 2018); *Abbott v. BP Expl. &

Prod.*, 851 F.3d 384, 387 n.2 (5th Cir. 2017).  Defendants appear to be unaware of these changes

as well, since their motion relies entirely on cases interpreting the pre-PPACA version of the

statute, without any suggestion that the statute might have changed.  *See, e.g.,* Defendants' Brief,

p. 12 (wrongly stating that public disclosure is a "jurisdictional bar"); *id*., p. 11 (wrongly

asserting that Fifth Circuit applies obsolete "based upon" test to determine whether claims are

"jurisdictionally barred"); *id.*, p. 12-13 (describing obsolete test for determining whether relator is "original source" under pre-PPACA statute, without mentioning PPACA's expanded test).

Indeed, Defendants' entire argument is based on supposed tests articulated in *U.S. ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139 (5th Cir. 2017) and *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011), without mentioning that the Court in each of those cases noted that it was applying the pre-PPACA version of the statute because the conduct at issue occurred before the amendments. *Solomon, supra* at 143; *Jamison, supra* at 326-327 and fn. 6. Nowhere in their motion do Defendants even refer to, much less make any argument about, the version of the statute that actually applies in this case. Because Defendants do not even set forth the correct law, their motion does not present any legitimate argument for Relator to counter.

The above is sufficient to require denial of the motion. Relator notes, however, that the public disclosure bar does not apply merely because some relevant information has been publicly disclosed – it only applies if "substantially the same allegations or transactions" as alleged in the complaint were publicly disclosed in one of the specified fora (which do not include a state investigation). Because Defendants never mention the requirements of the post-PPACA statute, they do not even ***assert*** that the investigative report disclosed "substantially the same allegations or transactions" as those alleged in the complaint, much less present any argument on this point. At most, the investigative report disclosed that, in May 2015, an unidentified nurse was admitting, treating, and discharging patients without physician supervision, and another unidentified nurse had clinical privileges and was in practice with an unidentified psychologist. SAC, ¶¶ 87-92, 106-107. As to the former, there is no identification of the nurse providing unsupervised services (an indispensable fact), no discussion of her practices before that time, no

mention of an expired collaboration agreement, no mention of Relator's investigation of the issue or his discussions with management about it, and no mention of Acadia's involvement with Vermilion's operations.  As to the latter, there is no identification of either the nurse or the psychiatrist, no indication that Defendants were paying for the unidentified psychiatrist's staff as a "channeling mechanism" to obtain her referrals, no mention of a Stark Law "financial relationship" between the hospital and the unnamed psychiatrist, and no mention that she was a major referral source.

Perhaps most fundamentally, there is no mention of the fact that Defendants submitted claims to Medicare, Medicaid, and other federal healthcare programs for the unnamed nurse's services, or for patients referred by the unnamed psychiatrist, and no description of any express or implied false certifications in connection with such claims.  As Defendants themselves have successfully argued, mere regulatory violations do not lead to False Claims Act liability, and "[p]resentment of an allegedly false claim is the '*sine qua non*' of a § 3729(a)(1)(A) claim." Doc. 67-1, p. 24; Order, Doc. 85, p. 27.  Since the investigative report says nothing about the submission of false claims, it does not disclose an "allegation or transaction" of a False Claims Act violation.

Finally, Relator notes that "[t]he public disclosure bar is an affirmative defense, and an affirmative defense can only be adjudicated on a motion to dismiss when the allegations in the complaint or information that the court can take judicial notice of are sufficient to establish the defense."  *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 U.S. Dist. LEXIS 125352, at *47 (C.D. Cal. July 16, 2019).  Because they do not mention the PPACA amendments, Defendants do not argue that the SAC affirmatively shows that Relator does not meet the expanded definition of an "original source" – i.e., one who has "knowledge

that is independent of and materially adds to the publicly disclosed allegations or transactions"
and has provided the information to the government before filing the action.  31 U.S.C. §
3730(e)(4)(B).  In light of the above discussion, and because Defendants do not purport to rely
on matters outside the pleadings, Relator assumes that the Court will not *sua sponte* convert the
motion to dismiss into a summary judgment motion under Fed. R. Civ. P. 12(d).  Should the
Court provide notice that it intends to do so, however, Relator would intend to present evidence
that he is an original source.

## **CONCLUSION**

For the reasons discussed above, the motion to dismiss should be denied.

Respectfully submitted, this 23rd day of June, 2021.

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

/s/ J. Marc Vezina
J. Marc Vezina, TA LA BAR #24683
Kelli M. Khalaf LA BAR #23213
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

/s/ David W. Garrison
David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798 (fax)
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day filed a copy of the foregoing document using the

Court's CM/ECF system, which will automatically send notice of such filing to counsel of

record.

This 23rd day of June, 2021.

/s/ J. Marc Vezina
J. Marc Vezina