IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES ex rel. ) | |
| JEFFREY H. BYRD, ) | |
| ) | |
| Plaintiff-Relator, ) | |
| ) | CIVIL ACTION |
| v. ) | NO. 18-312-JWD-EWD |
| ) | |
| ACADIA HEALTHCARE ) | |
| COMPANY, INC. and ) | |
| VERMILION HOSPITAL, LLC, ) | |
| ) | |
| Defendants. ) | |

**<u>DEFENDANTS' REPLY IN SUPPORT OF PARTIAL MOTION TO DISMISS
COUNTS I-III OF RELATOR'S SECOND AMENDED COMPLAINT</u>**

Despite criticizing Defendants' counsel, extensively bolding and italicizing arguments for apparent emphasis, and using blistering language about Defendants' arguments[1] the Response to Defendants' Partial Motion to Dismiss Counts I-III of the Second Amended Complaint (D.E. 95) ("Relator's Response" or "Rel.'s Resp."), the SAC remains deficient. The Response cannot, itself, add the necessary specificity to the SAC, and it does not offer up argument as to why those deficiencies, many of which the Court highlighted in its order granting Defendants' motion to dismiss the First Amended Complaint. (D.E. 85, Order), should be overlooked.

1. **The Allegations as to Dr. Uhrich Remain Deficient.**

Aside from alleging that Relator would "routinely review financial information including accounts receivable" and has "personal knowledge that Defendants" submitted claims, the SAC's section relating to Dr. Uhrich only adds two paragraphs—in addition to Exhibit 5—in remedying the deficiencies noted in the Court's prior Order. (Defs.' Mot., p. 16) (D.E. 85, Order, pp. 39-40) (holding that Relator "fail[ed] to allege any 'first-hand experience of the scheme unfolding as it related to him"). In response to this holding, Relator added paragraphs 102 and 103 to the SAC, which allege that Relator reviewed financial information, has personal knowledge that Defendants submitted claims for services where Dr. Uhrich was the referring physician, and attaches a spreadsheet of alleged claims. Yet these two paragraphs say little about Relator's "first-hand experience of the scheme unfolding as it related to him." (D.E. 85, Order, pp. 39-40).

And, as noted in Defendants' Motion, the Court previously cited Relator's allegations about Optima staff questioning the medical appropriateness of referrals by Dr. Uhrich, and this allegation remains largely identical from the FAC to the SAC. (*See* Defs.' Mot., pp. 17-18). Relator

---

[1] The Response's overly dramatic language does nothing to advance Relator's points. His description of Defendants' arguments as "egregious[ ]," "stunning mischaracterization[s]," "without merit," "blithely (and false) assuring," "utter failure[s]," "flatly wrong," "astonishing," "preposterous," "disingenuous[ ]," "puzzling," "completely erroneous," and "silly" do nothing to advance his argument, and, if anything, distract from his Response.

states that the reference to this set of allegations is a "red herring," and yet this is precisely one of the set of allegations in the Court's previous Order that were cited in holding that Relator's FAC was deficient. (D.E. 85, Order, p. 40). The same is true for the continued reliance on the settlement agreement between Defendants and the State of Louisiana, on which the Court determined Relator could not rely to plead the required specificity. (D.E. 85, Order, p. 50). The SAC's inclusion of these largely identical allegations is not a red herring, but rather a notable deficiency in Relator's efforts to address the Court's prior Order.

### 2. The SAC Still Fails to Allege Materiality of Compliance with the LNPA.

Relator is correct that Defendants do not challenge that the SAC addresses the Court's first two bases for granting Defendants' previous motion to dismiss Relator's claims concerning Ms. Rodriguez. (*See* Rel.'s Resp., p. 6 (citing D.E. 85, Order, pp. 37-38, 48)). However, the SAC does not rectify the third basis identified in Defendants' Motion and the Court's subsequent Order—the failure to allege that the specific violations of LPNA identified in the SAC are "material" to the government's decision to pay the claims that were submitted. In analyzing Relator's allegations it is important to focus on the fact that he has not alleged a blanket violation of the LPNA. Instead the SAC asserts that Ms. Rodriguez was not in compliance with specific provisions of the LPNA, and lacked a "valid collaboration agreement" and collaborative relationship with (not supervision by) a physician. (*See* SAC, ¶¶ 62-65 (setting for the LPNA's "collaboration requirements")). As a result, Relator alleges that claims submitted for services she provided were false. (*Id.*, ¶ 76 ("Notwithstanding the lack of a valid collaboration agreement, Ms. Rodriquez independently saw and treated hundreds of patients at AVH, in violation of Louisiana law. . . . Vermilion submitted numerous claims [and all] such claims constitute false claims."). In doing so, however, Relator

3

points to nothing (other than his own allegations) that compliance with those specific provisions of the LPNA is "material to the payment of claims." (*Id.*, ¶ 66).

In *Escobar*, the Supreme Court specifically rejected the blanket assertion that "every violation of such a [legal] requirement gives rise to liability" under the FCA. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). The Court went on to state that "not every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." *Id.* at 2001. The *Escobar* court explicitly rejected the core of the SAC's allegation "that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004.

The FCA's materiality requirement is a "rigorous one." *Id.* at 2004 n.6. A relator must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Id.* A misrepresentation is not material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. . . . [or because] the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003; *see also U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020) (noting that allegations of violations of "boilerplate language" requiring compliance with "all laws, which is the same type of language *Escobar* found too general to support a FCA claim," did not satisfy the high materiality bar set by *Escobar*).

Relator does not contest that Ms. Rodriguez was an otherwise properly licensed and qualified APRN. (SAC, ¶¶ 62, 67). Rather the SAC alleges that Ms. Rodriguez lacked a "valid

4

collaboration agreement," rendering claims for services she provided "false." (*Id.*, ¶ 79; *see also id.*, ¶¶ 62-64 (noting that the LPNA allows APRN's to see patients "independently" but requires they do so in "collaboration" with a physician and under a "formal written statement addressing the parameters of the collaborative practice."); ¶¶ 71-79 (alleging Relator's search for a collaborative practice agreement and conclusion that the only one that existed was "expired.").[2] The SAC goes on to claim that this alleged failure to maintain a formal written collaborative practice agreement is "material" to the payment decision of multiple government payors, all of whom impose their own regulations on payment. Yet the only regulations the SAC points to with specificity—as required by Rule 9(b) and *Escobar*—merely state that services must be provided in compliance with "state law" requirements. (*Id.*, ¶¶ 31-34, 80). Other than alleging that compliance with the LNPA is "material" under these regulations, the SAC provided no additional specificity. This is not enough, since "not every violation of such a requirement gives rise to liability [and a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 1999; *see also U.S. ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 111 (1st Cir. 2016) ("[T]he FCA is not a vehicle for punishing garden-variety breaches of contract or regulatory violations.").

Moreover, and despite Relator's argument to the contrary, the conduct alleged in the SAC is wholly different from *Escobar*. In *Escobar*, the relators' daughter died as a result of the care provided by the defendant. The First Circuit, on remand, noted that relators had alleged that neither of "the counselors assigned to [relators' daughter] had a professional license and at no time . . .

---

[2] Relator may also point to Paragraph 71, which alleges that Ms. Rodriguez was not authorized to engaged in her alleged practice by Vermilion's medical staff by-laws. But again, nothing in the SAC shows how compliance with a facilities medical staff by-laws (inherently a contract between a practitioner and the facility they work at) is material to the government's decision to pay a particular claim.

5

were they supervised by anyone that did." *Escobar*, 842 F.3d at 108. Here, Relator has not alleged that Ms. Rodriguez lacked professional certification. (SAC, ¶ 67 ("Rhonda Kimball 'Kay' Rodriguez is a psychiatric APRN")). Nor does he allege she was *unsupervised* while providing services. (*Id.*, ¶ 79 (alleging Ms. Rodriguez provided services "without the involvement of a physician," but not that she was not *supervised* by a physician); ¶ 76 (noting that there was a physician "medical director" at Vermillion at the time). Rather, the core claim in the SAC is that the absence of a "valid collaboration agreement" resulted in the claims for these services being false. (*Id.* ¶ 76). *Escobar* requires more.

For example, and as noted in Relator's Response, on remand the First Circuit ascribed weight to the regulations at issue being labeled as "conditions of payment" and the "centrality of the licensing and supervision requirements in the MassHealth regulatory program." (Rel's Resp., p. 15 (citing *Escobar*, 842 F.3d at 110)). But the SAC does not allege that compliance with the LPNA is a "condition of payment" in any of the regulations it cites,[3] or that a written collaborative practice agreement is "central" to Medicare, Medicaid, or TRICARE's regulatory program. The "rigorous" materiality requirements of the FCA demands these type of allegations.

In fact, despite the Court's holding that Relator "fail[ed] to meet that [materiality] standard with respect to Ms. Rodriguez" in the FAC, and the central importance of *alleging* that non-compliance with the LNPA was material, the only reference to materiality in the SAC is a sole reference in Paragraph 66, in which Relator asserts that "[c]ompliance with the collaboration requirements of the Nurse Practice Act is material to the payment of claims . . . ." (SAC, ¶ 66). While preceding paragraphs lay out various Medicare and Medicaid regulations, state regulations,

---

[3] Presumably if any of the regulations cited in the SAC were conditions of participation, Relator would have noted so in his Response. He does not. Indeed, 42 C.F.R. § 482.12 (SAC, ¶ 32) and 42 C.F.R. 482.24 (SAC, ¶ 33) are clearly labeled as "conditions of participation," not "conditions of payment."

6

and provider manual requirements, nowhere in the SAC (other than his unsupported assertion in Paragraph 66) does Relator connect the dots to allege, with particularity, how compliance with the collaboration requirements of the LNPA is material to the government's decision to pay claims. (*See* SAC, ¶¶ 30-34, 36, 40-42).

Relator also cannot rely on the argument in his Response to shore up these deficiencies. *See Roebuck v. Dothan Sec., Inc.*, 515 F. App'x 275, 280 (5th Cir. 2013) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"); *U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*, No. 3:12-CV-1894-B, 2013 U.S. Dist. LEXIS 160905, at *14-15 (N.D. Tex. Nov. 12, 2013) (a relator "cannot rely on his brief . . . [which] attempts to insert factual allegations . . . that are missing from his Complaint" in order to "cure some of these shortcomings as to the who-what-when-where-and-how of the alleged scheme"). The SAC, itself, must allege with specificity that compliance with the provisions of the LNPA Relator claims were violated are material to the government's payment decision. It does not, and these claims should be dismissed.

### 3. Relator Fails to Allege Required Details of Defendants' Alleged Requests for DSH Payments

Relator suggests that Defendants attach some "magical significance" to the use of the word "requests" instead of "claim." (Rel.'s Resp., pp. 16-17). That is not the case. Instead, as Defendants' Motion makes clear, the SAC fails to allege any of the necessary "who, what, when, where, and how" of the alleged "request" for DSH funds, as required by Rule 9(b). (*See* Defs.' Mot., pp. 4, 19). The Court's prior Order held that "Relator fail[ed] to allege with particularity the time, place, and circumstances, such as *who* was involved in the DSH payment process, *how* the DSH payments were sought (akin to the billing process described in *Grubbs*), *when* the relevant

7

events occurred (i.e. *with specific dates*), etc." (D.E. 85, Order, p. 39) (emphasis added). None of that detail is present in the SAC.

Relator's Response claims that "the SAC clearly describes the form of the requests," and cites to Paragraph 115 and Exhibit 6 in support. (Rel.'s Resp., p. 17).[4] But Paragraph 115 of the SAC merely states that facilities "must submit documentation" in order to receive DSH payments; it does not say *when* such a request was allegedly submitted by Defendants, or *who* submitted it.[5] As to the *how*, Relator's Response points to Exhibit 6, a copy of the form that must be submitted, but does not include the actual form that was submitted, which would presumably include (as discussed below) the specific certifications Defendants allegedly made. As Vermilion's Chief Financial Officer at the time, Relator should know these details, but pointedly fails to allege them. Reference to a blank form that providers allegedly must submit is insufficient. To comply with Rule 9(b), the SAC must provide more.

Next, Relator's Response asserts that Paragraph 116 of the SAC alleges "what was requested." (Rel.'s Resp., p. 17). However, all that Paragraph 116 alleges is that "[f]or the years 2009-2015, Vermilion submitted requests for DSH payments to the State of Louisiana and *received* DSH payments in the following amounts . . . ." (SAC, ¶ 116) (emphasis added). There are no specific dates alleged, and the list of payments in Paragraph 116 only cover the years 2008-11, and 2015. This is not a list of "what was requested" for years 2009-2015. As this Court noted, Relator must "allege with particularity the time, place, and circumstances, such as who was involved in the DSH payment process, how the DSH payments were sought (akin to the billing process

---

[4] Relator asserts that Defendants have failed to address these issues in their motion. That is not the case. (*See* Defs.' Mot., p. 19 (citing to Paragraphs 110-116 and noting that "[t]he SAC is devoid of any particularized allegations as to what form those requests took, what specifically was requested, when it was requested, who requested those payments, and, most importantly, what Defendants may or may not have certified in making those 'requests.'")).
[5] Relator also points to Paragraph 116 in support of the notion that he provided the required specificity as to "who submitted the requests." (Rel.'s Resp., p. 17). Yet Paragraph 116 says nothing about who submitted requests for DSH payments—no name, title, or even division that person allegedly worked in.

described in *Grubbs*), when the relevant events occurred (i.e. with specific dates), etc." (D.E. 85, Order, p. 39). This broad brush timeline, setting forth just the year a payment was allegedly received and lacking in any specific names or dates, does not meet this requirement. *See Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("[O]utlining a four-month window during which all of the misrepresentations occurred . . . does not satisfy the pleading standard of rule 9(b)."); *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 627 (5th Cir. 2015) (holding that allegations "that defendants submitted nearly $4 million of false invoices to the government between 2009 and 2011 . . . is not specific enough to comply with Rule 9(b)."); *Meyers v. Textron Fin. Corp.*, No. 4:11-CV-624-A, 2011 U.S. Dist. LEXIS 114459, at *4 (N.D. Tex. Oct. 4, 2011) (dismissing complaint with prejudice and noting that "[e]xcept for unacceptable general allegations such as 'in September 2008' or '[i]n early 2009' . . . the 'when' element of particularity is absent").

Relator next contends that Paragraphs 115, 118, and Exhibit 6 of the SAC support his allegation of "what was certified." (Rel.'s Resp., p. 17). Paragraph 115 alleges that "[t]o receive a DSH payment, a facility must submit documentation stating that it either (a) satisfies the obstetrician requirement, (b) did not offer non-emergency obstetric services to the general public as of December 22, 1987, or (c) treats inpatients who are predominantly under 18 years of age." (SAC, ¶ 115). Yet, despite stating that Defendants could make one of two certifications (and the form he attaches having two such certifications), Relator is unable to identify specifically what certification Defendants actually made. (*Id.*).

In an effort to address this lack of required specificity, Relator resorts to alleging that "upon information and belief . . . Vermilion checked the box on the qualification form indicating that it

9

did not offer non-emergency obstetric services to the general public as of December 22, 1987."[6] The Court has already rejected Relator's use of "upon information and belief." (*See* D.E. 85, Order, p. 53 (citing *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994) ("If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.")). Relator offers no allegations that these facts are peculiarly within Defendants' possession. Indeed, he has pled the opposite—his own direct involvement with the alleged DSH claims. (SAC, ¶¶ 120-22). Moreover, as noted in Defendants' Motion, Relator's reliance on an alleged "discussion with counsel for the State," is similarly deficient. (Def.'s Mot., p. 22). First, and notably, Relator does not allege that *he* spoke with "counsel for the State," as opposed to his *counsel* speaking with that unnamed attorney. If Relator's counsel learned this information and relayed it to Relator, then Relator is not its original source. *See, e.g.*, *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg. Healthcare Sys.*, 384 F.3d 168, 177-78 (5th Cir. 2004) (concluding that relator did not have "independent" knowledge underlying the claims, under the FCA's "original source" test in § 3730(e)(4)(B)).

Finally, Relator cannot rely on the SAC's general allegations describing the State of Louisiana's process for making DSH payments. (SAC, ¶¶ 110-15). *See U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 47 (1st Cir. 2009) ("The complaint largely ignores the fact that it is the fraud itself which must be pled with particularity, not just who benefits from the fraud and what pot of federal money may be the object of the fraud."). The SAC must provide specifics about how

---

[6] Relator also relies on this impermissible pleading tool in alleging that Defendants attempted to hide the fact they allegedly did not qualify for DSH payments. (*See* SAC, ¶ 119 ("Upon information and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit")). But Relator again provides no allegations for why this information is in Defendants' control, or even what facts his "belief" if based on.

10

the alleged fraud set forth by Relator occurred, not generalized allegations about the DSH program itself. Without those specifics, Relator's DSH claims must fail.

    **4.**    **Defendants' Reliance on *Solomon* and *Jamison* For Application of the Public Disclosure Bar was Misplaced, However Relator's Claims Should be Dismissed for Other Reasons Stated in Defendants' Motion.**

Relator points out in his Response that Defendants' argument on the application of the public disclosure bar under the FCA relies on two cases applying the pre-PPACA public disclosure bar test. (Rel.'s Resp., p. 23). Upon reviewing Defendants' response and the 2017 *Solomon* decision and a similar 2011 *Jamison* decision, Defendants realized their reliance on those decisions was misplaced. Although *Solomon* was decided seven years later, as Relator notes, these two decisions interpret a version of the FCA that was amended in 2010. While Defendants recognize their public disclosure bar argument should no longer be considered, the other grounds stated in their Motion remain, and are sufficient to warrant dismissal of the SAC, even without application of the public disclosure bar as applied post-PPACA.

    **5.**    **Conclusion**

Relator has had three chances to allege the specifics of an alleged multi-year fraud scheme. Following the Court's Order granting Defendants' motion to dismiss the FAC, Relator amended in an effort to address the shortcomings noted by the Court. Despite this effort, the SAC lacks key particularity required by Rule 9(b) and the FCA. Relator cannot rectify these deficiencies through argument in his Response. Because many of the same deficiencies present in the FAC remain in the SAC, because Relator has already had the opportunity to amend his complaint on two occasions, and because the Court noted precisely what Relator was required to do to cure his complaint, any further amendment of the remaining claims would be futile, and as such any dismissal should be with prejudice.

11

Respectfully submitted,

*s/ Joshua T. Wood*
Joshua T. Wood (LA # 35593)
John-David H. Thomas *(Pro Hac Vice)*
*(Lead Attorney)* Tennessee BPR No. 027582
Helen L. Eckinger *(Pro Hac Vice)*
Alabama State Bar No. ASB-9088-C170
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union St., Suite 2700
Telephone: (615) 850-8596
Facsimile: (615) 244-6804
joshua.wood@wallerlaw.com
jd.thomas@wallerlaw.com
helen.eckinger@wallerlaw.com

*Attorneys for Defendants Acadia Healthcare Company, Inc. and Vermilion Hospital, LLC.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2021, I filed this Defendants' Reply in Support of Partial Motion to Dismiss Counts I-III of Relator's Second Amended Complaint, using the Court's CM/ECF system, resulting in service on all counsel of record in this matter.

*s/ Joshua T. Wood*
Joshua T. Wood