# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES ex rel. JEFFREY H. BYRD

VERSUS

ACADIA HEALTHCARE COMPANY, INC., ET AL.

CIVIL ACTION

NO. 18-312-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on *Defendants' Partial Motion to Dismiss Counts I-III of Relator's Second Amended Complaint* (Doc. 92) filed by Defendants Acadia Healthcare Company, Inc. ("Acadia") and Vermilion Hospital ("Vermilion") (collectively "Defendants"). Plaintiff-Relator Jeffrey H. Byrd ("Relator" or "Byrd") opposes the motion. (Doc. 95.) Defendants filed a reply, (Doc. 96), and Relator filed a surreply, (Doc. 99). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motion is denied.

## I.      Relevant Factual and Procedural Background

This is a *qui tam* action brought under the False Claims Act, 31 U.S.C. § 3729 *et seq.* "Plaintiffs suing under the statute must show that (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (unpublished) (cleaned up), *cert. denied*, 141 S. Ct. 1238 (2021).

Here, Relator is a former Chief Financial Officer of Vermilion, which is a health system and subsidiary of Acadia. (*Second Am. Compl.* ("*SAC*") ¶¶ 5–6, 10, Doc. 88.) He brings claims against these Defendants alleging that they violated the False Claims Act and that they terminated his employment in violation of the anti-retaliation provisions of the False Claims Act (31 U.S.C. § 3730(h)) and the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 49:439.1(E)). (*SAC* ¶¶ 150–167, Doc. 88.)

More specifically, Relator alleges that Defendants violated various provisions of the False Claims Act because they failed to comply with three health care laws in three different ways. (*Id.* ¶¶ 48–125.) Those health care laws include:

(1) the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), which "is a criminal statute prohibiting the knowing or willful offering to pay, or soliciting, any remuneration to induce the referral of an individual for items or services that may be paid for by a federal health care program." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) (per curiam) (citing 42 U.S.C. § 1320a–7b(b)(1–2); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997));

(2) the Stark Law, 42 U.S.C. § 1395nn, and its regulations, 42 C.F.R. § 411.350 *et seq.*, which provide that, if a physician has a "financial relationship" with an entity (that is, an ownership or investment interest or a "compensation arrangement"), then that physician generally cannot make a referral to the entity for the furnishing of "designated health services" for which payment may be made under Medicare or Medicaid, and "the entity may not present or cause to be presented a claim under [Medicare or Medicaid] or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited" by the Stark Law, 42 U.S.C. § 1395nn(a)(1); and

(3) Louisiana licensure law (specifically, the Louisiana Nurse Practice Act, La. Rev. Stat. Ann. § 37:911 *et seq.* ("LNPA")), (a) which requires "Advanced practice registered nurses" (or "APRN") to perform "acts of medical diagnosis and prescription . . . in accordance with a collaborative practice agreement," *id.* § 37:913(8), and (b) the compliance with which law is, according to Relator, material to the payment of claims by Medicare, Medicaid, and other federal healthcare programs, (*SAC* ¶ 66, Doc. 88), though Defendants dispute that this is properly alleged, (*see* Doc. 92 at 2).

(*See SAC* ¶¶ 48–66, Doc. 88.)

Relator claimed in the prior complaint that Defendants violated these three health care laws and thus submitted false claims in five ways. (*See* Doc. 85 at 7–8 (citations omitted).)  In its prior ruling, the Court dismissed Relator's claims as to each to these theories but allowed leave to amend to make them viable. (*Id.* at 36–41, 46–50, 55–56, 57–59.)  Following the amendment, Relator now re-asserts three of those five fraudulent schemes:

(1) That Ms. Rhonda Kimball ("Kay") Rodriguez, a psychiatric APRN, performed services without a valid and updated collaborative practice agreement and without proper supervision, (*SAC* ¶¶ 67–92, Doc. 88);

(2) That Defendants provided psychiatrist Dr. Susan Uhrich free staff in exchange for referrals (in violation of the AKS) and that they were in a financial relationship that was not fair market value or commercially reasonable in the absence of referrals (in violation of the Stark Law), (*id.* ¶¶ 93–108); and

(3) That Defendants received "disproportionate share payments" (or payments from the United States for serving a large number of Medicaid and uninsured patients) ("DSH payments") to which Vermilion was not entitled because, *inter alia*, it did not have at least two obstetricians with staff privileges to provide obstetric services to those entitled to medical assistance for such services, as required by federal law, (*id.* ¶¶ 109–125).

This ruling will discuss below the Court's prior rulings about these schemes and the *SAC*'s more recent allegations regarding same.

Additionally, Relator alleges that Defendants retaliated against Relator by terminating him after he raised concerns about Defendants' actions and by interfering with his efforts to find comparable employment after his termination. (*Id.* ¶¶ 126–145.)  The Court's prior ruling denied Defendants' efforts to dismiss the state and federal retaliation claims, (Doc. 85 at 59–64), and Defendants do not seek dismissal of those claims at this time, (Doc. 92 at 1 n.1).

Instead, Defendants now move to dismiss the claims related to Ms. Rodriguez, Dr. Uhrich, and the DSH payments. (*See id.* at 2–3.)  Specifically, Defendants assert that the *SAC* contains the following deficiencies.

(1) With respect to Ms. Rodriguez, Relator has again failed to adequately allege that compliance with the LNPA was "material to the Government's decision to pay for services [she] provided"—"a fatal deficiency under the Supreme Court's . . . materiality test" in *Universal Health Services, Inc. v. United States and Commonwealth of Mass. ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989 (2016) ("*Escobar I*"), (Doc. 92 at 2);

(2) With respect to Dr. Uhrich, Relator has failed (a) "to connect Defendants' alleged provision of free staff to Dr. Uhrich with her referral of patients to Defendants"; and (b) "to allege any first-hand experience in this alleged scheme," (*id.*); and

(3) With respect to the DSH payments, Relator has not alleged with particularity (a) that Defendants submitted false claims for such payments, or (b) that Defendants failed to repay any improperly obtained DSH payments, (*id.*).

Defendants also make overarching complaints about the *SAC*: (1) that, contrary to the prior ruling, Relator relies on the settlement agreement between the State and Defendants; and (2) that Relator relies heavily on publicly disclosed information for which Relator is not the "original source," which is purportedly barred. (*Id.*)  In their reply brief, Defendants concede that the latter argument was based on outdated law, and they have withdrawn it. (Doc. 96 at 11.)

## II.    Relevant Standards

### A.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556 [ ].

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir.

2014).  The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### B.  The False Claims Act and Rule 9(b) Standard

"The False Claims Act is a potent remedial statute. As a counterweight to the statute's power and as a shield against fishing expeditions, FCA suits are subject to the screening function of Federal Rule of Civil Procedure 9(b)." *United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 623 (5th Cir. 2015) (unpublished); *see also id.* at 625 ("An FCA complaint must meet the heightened pleading standard of Rule 9(b)."). Under this Rule, "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' " *Id.* (quoting Fed. R. Civ. P. 9(b)). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Id*. at 625 (quoting *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010)); *see also United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated . . . in order to satisfy Rule 9(b)." (cleaned up)).

The Fifth Circuit " 'appl[ies] Rule 9(b) to fraud complaints with bite and without apology.' " *Porter*, 810 F. App'x at 240 (quoting *United States rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009)). Nevertheless, " 'to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " *Id.* (quoting *Grubbs,* 565 F.3d at 190).

### III.   Discussion

#### A.  Kay Rodriguez Claims

##### *1. Parties' Arguments*

###### *a.*  Defendants' Motion (Doc. 92) and Memorandum (Doc. 92-1)

Defendants object to Relator's Ms. Rodriguez-based claims on the grounds of materiality. (Doc. 92-1 at 13.)   Specifically, Defendants say that, while Relator has cured other deficiencies in the prior complaint, he has not shown that compliance with the supervision requirements of the LNPA is material to the Government's decision to pay claims for services provided by Ms. Rodriguez. (*Id.* at 13–14.)   Indeed, Byrd's new allegations only undermine any claim of materiality. (*Id.* at 14.)   A FCA plaintiff must, according to Defendants, "offer more than mere assertions" to show that compliance with the rule is "material." (*Id.*)  Defendants continue:

> In order to survive a motion to dismiss, a *qui tam* FCA complaint must specifically allege how and why the statutory, regulatory, or contractual violation is material to the Government's decision to pay the claims. Where "[n]othing in Relators' filings suggests that the government would stop the flow of funds to this hospital if it knew the truth of its ownership . . . [and] Relators do not allege that the government 'consistently refuses to pay claims'" in these circumstances, a motion to dismiss should be granted. [*United States] ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019) (citing *Escobar I*, 136 S. Ct. at 2003); *see also U.S. ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-cv-803-S, 2019 WL 4450371, at *10-11 (N.D. Tex. Sep. 17, 2019) (holding that the relator failed to plead sufficient facts to show an alleged violation was material because, among other reasons, "Relator did not allege any facts showing that the Government denies or recoups payment . . . under similar circumstances").

(*Id.* at 14–15.)

Defendants maintain that the only changes to the prior complaint (which this Court deemed deficient) were a conclusory assertion that the claims are material and citations to various Medicare regulations, all of which look to "State law" to determine if a particular activity is material. (*Id.* at

15 & n.4.)  Relator fails to show how compliance is material or "to explain away the fact that the State apparently knew of this alleged non-compliance and did nothing about it." (*Id.*)  All of this is particularly problematic given the "demanding" and "rigorous" standard applied for this element. (*Id.*)

In fact, again, the new allegations lead to the opposite inference. (*Id.* at 16)  There is no claim that the State stopped making payments after learning that Defendants were non-compliant with respect to the collaboration agreement or that the State tried to recoup funds already paid to Vermillion, despite an audit in May 2015. (*Id.*)  If the state knew that Ms. Rodriguez improperly performed services without proper supervision yet continued to pay and did not seek recoupment, "the only valid inference is that the State did not view the alleged lack of supervision as material to its payment decision." (*Id.* at 16.)

Defendants also emphasize:

> A relator is not constrained to showing that the government would refuse to pay the specific claims at issue and can offer "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar [I],* 136 S. Ct. at 2003*;* see also *Patel*, 792 F. App'x at 301 (allegations that the government "consistently refuses to pay claims" in similar circumstances can satisfy materiality requirement); *see also Emerson Park*, 2019 WL 4450371, at \*10-11 (finding that Relator did not sufficiently plead materiality where "Relator did not allege any facts showing that the Government denies or recoups payment . . . under similar circumstances").

(*Id.*)  Defendants maintain that Relator should be able to point to CMS or State guidance about compliance with this law, other enforcement actions, "settlements involving similar violations to those alleged, or citations to criminal or civil actions based on such violations." (*Id.* at 16–17.) Without more, say Defendants, Relator's mere "unsupported belief" fails. (*Id.* at 17.)

*b.*  Relator's Opposition (Doc. 95)

Byrd first describes how he cured the two uncontested deficiencies of the prior complaint concerning Ms. Rodriguez, and he then emphasizes how the only issue for her now is materiality. (Doc. 95 at 8–9.)  Relator calls Defendants' position "astonishing, since the SAC clearly explains how the alleged violations with respect to Rodriguez are material." (*Id.* at 9 (citing *SAC* ¶¶ 30–42, 61–66, 80, Doc. 88).)  Defendants fail to address these allegations and in fact ignore them. (*Id.*)  Relator then quotes a portion of the *SAC* in which he makes an "express allegation that an admission order by a physician or other qualified practitioner is material to the payment decision for inpatient Medicare claims" and that the order must "be present in the medical record." (*Id.* at 9–10 (citations omitted).)  Defendants' ignoring of these allegations constitutes a waiver. (*Id.* (citations omitted).)

Relator then focuses on allegations from the *SAC* related to inpatient and outpatient claims and the *SAC*'s specifically quoting of Medicare statutes and regulations. (*Id.* at 10–12 (quoting *SAC* ¶¶ 31–34, Doc. 88).)  These provisions demonstrate that compliance with state law is material to payment decisions. (*Id.*)  Since Defendants did not address these allegations, they have waived the argument. (*Id.*)  Plaintiffs next do the same for Medicaid claims and draw the same conclusions. (*Id.* at 12.)

Byrd also alleges that Defendants made certain misrepresentations with respect to Ms. Rodriguez's services. (*Id.* at 12–13.)  Medicare, Medicaid, and Tricare claims are submitted on a certain form that contains a certification of accuracy, and the *SAC* alleges that Defendants made implied representations that they complied with state law when they submitted claims to these programs. (*Id.*)  These submissions are, says Relator, false claims. (*Id.* at 13.)

Byrd argues that Defendants make "no argument whatsoever showing why the various requirements discussed above are not material to the payment decision," and they "do not even acknowledge the existence of most of these allegations, blithely (and falsely) assuring the Court that '[t]he SAC does not include any new allegations that address this concern.' " (*Id.* (emphasis omitted) (citation omitted).)  Again, this constitutes waiver. (*Id.*)

Relator then addresses Defendants' position that he should have alleged things like the State ceasing to pay claims or seeking recoupment. (*Id.* at 14.)  Relator exclaims:

> This assertion is astounding, since the State ***intervened in this very lawsuit*** and entered into a settlement agreement expressly stating that it had "civil and administrative causes of action" against Defendants because they "submitted claims for payment to the Medicaid program for services provided by advanced practice registered nurses that did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law." SAC, ¶ 83-84. The settlement involved the payment of money by Defendants to settle these claims – i.e., the State "sought to recoup funds already paid to Vermilion." It is preposterous for Defendants to argue that materiality may be demonstrated by "allegations of ***other*** enforcement actions concerning the LPNA's supervision requirements" or by "settlements involving ***similar*** violations to those alleged," while ignoring the fact that the State intervened and settled the violations ***in this very case***, which is the strongest possible indication that the State "view[s] the non-compliance as material." This shows the disingenuousness of Defendants' argument that the settlement is irrelevant. Defendants cannot, on the one hand, assert that Relator must present evidence that the State considers the violations to be material and, on the other hand, complain when Relator includes allegations proving that exact point.

(*Id.* at 14–15 (emphasis in original).)

Putting the intervention and settlement aside, Relator contends that "Defendants' argument is misplaced" because the *SAC* does not suggest that Medicaid "knowingly paid for services rendered by Rodriguez despite full knowledge that she was not authorized by state law to provide such services." (*Id.* at 15.)  State inspectors may have conducted an investigation, but the *SAC* does

not say that they "had any involvement in the processing or payment of Medicaid Claims." (*Id.*) Further, "there is no suggestion in the [*SAC*] that the results of the investigation were made known to the Louisiana Medicaid program." (*Id.*)  The report did not refer to Ms. Rodriguez by name, and, again, the State intervened in this case and settled the claim. (*Id.* at 15–16.)  "In any event, on a motion to dismiss, inferences are to be drawn in favor of Relator, not in favor of Defendants." (*Id.* at 16.)  Further, the State is not involved in paying federal claims under Medicare and Tricare, and there is no allegation that anyone processing these claims knew of the investigation or paid for services by Rodriguez with full knowledge she was unauthorized. (*Id.*)

Relator then focuses on the Supreme Court's decision in *Escobar I* and argues that the instant case is similar, as "Defendants submitted claims identifying the inpatient or outpatient services provided and identifying Rodriguez as the physician." (*Id.* at 16–17 (citing *SAC* ¶¶ 28, 82).)  "As in *Escobar*, these representations were clearly misleading, since anyone informed that Rodriguez had provided such services would wrongly conclude that she had complied with core federal and state requirements regarding who is qualified and authorized to provide such services under federal and state law" (*Id.* at 17.)

Relator then addresses the First Circuit's decision following remand in *United States ex rel. Escobar v. Universal Health Servs., Inc*., 842 F.3d 103 (1st Cir. 2016) ("*Escobar II*"), where the appellate court purportedly found materiality (1) because "Massachusetts licensing and professionalism regulations were described as conditions of payment, which the Supreme Court held was relevant to the materiality inquiry," and (2) because the "licensing and supervision requirements in the MassHealth regulatory program" were central and "go to the 'very essence of the bargain.' " (*Id.* (quoting *Escobar II*, 842 F.3d at 110–11).)  Byrd contends that the instant case "is on all fours" with *Escobar II* because (1) the Medicare and Medicaid laws require the

participation and supervision of a physician for inpatient and outpatient services; (2) these provisions go to the "very essence of the bargain," with a lack of compliance being a "textbook example of something that would be considered important by someone determining whether to pay;" and (3) "there is no indication in the complaint that anyone processing or approving payments had actual knowledge that the services were provided by someone not authorized to do so." (*Id.* at 18 (cleaned up).)

*c.*  Defendants' Reply (Doc. 96)

Defendants respond that Relator still fails to show how the specific violations of the LNPA are material to the government's decision to pay. (Doc. 96 at 3.)  They say that Byrd points to a number of provisions of the LNPA that were allegedly breached, but he does not show how each of these was material. (*Id.* at 3–4 (citations omitted).)  This is important because *Escobar I* rejected the idea that every violation gives rise to liability. (*Id.* at 4 (citing *Escobar I*, 136 S. Ct. at 1996).) "The Court went on to state that 'not every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry.'" (*Id.* (quoting *Escobar I*, 136 S. Ct. at 2001).)

Here, Ms. Rodriguez is alleged to have violated the LNPA by not having a valid collaboration agreement, but the only regulations Relator describes with specificity merely mandate compliance with "state law" requirements. (*Id.* at 4–5 (citing *SAC* ¶¶ 31–34, 80, Doc. 88).)  "This is not enough, since 'not every violation of such a requirement gives rise to liability [and a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.' " (*Id.* at 5 (quoting *Escobar I*, 136 S. Ct. at 1999).)

This case is also "wholly different from *Escobar*." (*Id.*)  There, a death occurred because of the care provided and the lack of supervision. (*Id.* at 5–6 (citation omitted).)  Here, "the core claim . . . is that the absence of a 'valid collaboration agreement' resulted in the claims for services being false. . . . *Escobar* [*I*] requires more." (*Id.* at 6.)  Moreover, in *Escobar II*, the First Circuit emphasized that the regulations at issue were "conditions of payment" with MassHealth. (*Id.*)  Here, however, Relator does not allege or address this point, and the relevant regulations are conditions of participation, not of payment. (*Id.* at 6 & n.3.)  Additionally, there is no indication "that a written collaboration practice agreement is 'central' to Medicare, Medicaid, or TRICARE's regulatory program." (*Id.*)  Byrd points to a number of "Medicare and Medicaid regulations, state regulations, and provider manual requirements," but he fails to "connect the dots" in the *SAC* "to allege, with particularity, how compliance with the collaboration agreement of the LNPA is material to the government's decision to pay claims." (*Id.* at 6–7 (citing *SAC* ¶¶ 30–34, 36, 40–42).)

Byrd cannot rely on his response to cure deficiencies. (*Id.* at 7.)  "The SAC, itself, must allege with specificity that compliance with the provisions of the LNPA Relator claims were violated are material to the government's payment decision. It does not, and these claims should be dismissed." (*Id.*)

### 2. Applicable Law

"The False Claims Act is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Porter*, 810 F. App'x at 240 (quoting *Escobar I*, 136 S. Ct. at 2003 (citations omitted)).  Again, plaintiffs suing under the statute must show, *inter alia*, that any false statement or fraudulent course of conduct was material to the payment of a claim. *Id.* (citations omitted).

"[T]he False Claims Act itself defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.' " *Id.* (quoting *Escobar I,* 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(b)(4))).

> A violation is material if a reasonable person "would attach importance to [it] in determining his choice of action in the transaction" or "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not."

*United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 163 (5th Cir. 2019) (quoting *Escobar I,* 136 S. Ct. at 2002–03 (alteration in original) (quoting Restatement (Second) of Torts § 538 (1976))).

Under *Escobar I*, evidence relevant to the materiality issue includes: "(1) 'the Government's decision to expressly identify a provision as a condition of payment' and (2) 'evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.' " *Lemon*, 924 F.3d at 160 (quoting *Escobar I*, 136 S. Ct. at 2003). "Moreover, (3) materiality 'cannot be found where noncompliance is minor or insubstantial.' " *Id.* (quoting *Escobar I*, 136 S. Ct. at 2003).

As to the first of these factors, "[t]hough [the Fifth Circuit] recognize[s] from *Escobar [I]* that if a requirement is labelled a condition of payment and it is violated, that alone does not conclusively establish materiality." *Lemon*, 924 F.3d at 161 (citing *Escobar I*, 136 S. Ct. at 2003). "To use the [Supreme] Court's example, just because the government might require contractors to use American-made staplers does not mean that it would be a *material* misrepresentation under the FCA to knowingly use foreign-made ones." *Patel*, 792 F. App'x at 301 (citing *Escobar I,* 136

S. Ct. at 2004). But the labeling of a requirement as a condition of payment and violation of same are "certainly probative evidence of materiality." *Lemon*, 924 F.3d at 161 (cleaned up).

As to the government enforcement factor, "[i]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Porter*, 810 F. App'x at 241 (quoting *Escobar I,* 136 S. Ct. at 2003–04). "Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* (quoting *Escobar I,* 136 S. Ct. at 2003–04). But the opposite is also true: if there is "no evidence that [the government] continued to pay claims despite actual knowledge of the violations," that can also support a finding of materiality. *See Escobar II*, 842 F.3d at 112.

Additionally, a relator is not required to "allege in the complaint specific prior government actions prosecuting similar claims." *Lemon*, 924 F.3d at 162 (citing *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 833 (6th Cir. 2018)). "The Supreme Court was explicit that none of the factors it enumerated were dispositive[,]" so "it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive." *Id.* (quoting *Prather*, 892 F.3d at 834). "Indeed, the Government's legal investigations are often conducted in secrecy; [the Fifth Circuit does] not expect Relators to know precisely the Government's prosecutorial practices without the benefit of discovery." *Id.* (citing *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (noting that although discovery may reveal "that the government regularly pays this particular type of claim in full

despite actual knowledge that certain requirements were violated, such evidence is not before us" and the relator had sufficiently alleged facts supporting that the requirement at issue was material)).

Further, "[m]ateriality is more likely to be found where the information at issue goes 'to the very essence of the bargain,' " *Escobar II*, 842 F.3d at 110 (quoting *Escobar I*, 136 S. Ct. at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672 (1931) (Cardozo, C.J.))). "To use the Civil War-era example cited at oral argument in *Escobar [I]*," a material misrepresentation that would be "central to the bargain" is "the United States ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing." *Id.* at 111 (citing *Escobar I*, 136 S. Ct. at 2001).

In sum, "the Supreme Court understands materiality to turn on whether the government would pay the claim or not if it knew of the claimant's violation." *Patel*, 792 F. App'x at 301 (citation omitted). "No one factor is dispositive, and [the Court's] inquiry is holistic." *Lemon*, 924 F.3d at 161 (citing *Escobar I,* 136 S. Ct. at 2003).

Thus, in *Patel*, the Fifth Circuit affirmed the lower court's finding of no materiality. *Patel*, 792 F. App'x at 301. There, relators alleged that, by representing to the "government that ownership of the Hospital passed from the original partnership to its management entity by operation of law (without a winding-up period)—a theory that was held to be incorrect by a Texas Court of Appeals—the System made a material misrepresentation and thereby violated the FCA." *Id.* at 298. In finding no materiality, the Fifth Circuit explained that "[n]othing in Relators' filings suggests that the government would stop the flow of funds to this hospital if it knew the truth of its ownership; Relators' allegations concern only the direction in which they think the funds should flow." *Id.* at 301 (citation omitted). Relators failed to "allege that the government 'consistently refuse[d] to pay claims' that contain an incorrect statement concerning the ownership of a

hospital." *Id.* (citing *Escobar I,* 136 S. Ct. at 2003). Rather, the complaint stated that the health system had continued to "submit claims and receive reimbursement, even after a court determined that the entity designated as owner of the Hospital was not really the owner." *Id.* The Fifth Circuit found that "[t]his suggests that the government does not care who the 'rightful' owner of the Hospital is, and Relators [had] not alleged facts to the contrary." *Id.* The Fifth Circuit also said, "Importantly, nothing about the alleged misrepresentation here suggests that goods or services were falsely certified or improperly provided." *Id.*

Conversely, in *Lemon*, the Fifth Circuit reversed the district court and found that certain fraudulent claims were material. 924 F.3d at 156. Relators alleged a number of "irregularities in [d]efendants' billing practices to Medicare for hospice services," including but not limited to:

> fail[ing] to complete and maintain certifications and recertifications for hospice patients; . . . allow[ing] non-medical personnel to complete certifications for hospice patients; fail[ing] to have required face-to-face encounters between physicians and patients; [and] permitt[ing] nurses to conduct required face-to-face encounters with hospice patients instead of a physician or nurse practitioner.

*Id.* at 157. Despite such problems, "[d]efendants submitted claims to Medicare affirming that they satisfied these statutory and regulatory requirements." *Id.*

The Fifth Circuit found these misrepresentations material. *Id.* at 161. First, defendants fraudulently certified compliance with a number of statutory and regulatory requirements of the Medicare statute, and these false certifications "violate[d] conditions of payment[.]" *Id.*

Second, the Fifth Circuit looked at Government enforcement and found this factor weighed in favor of materiality. *Id.* at 162. "Relators alleged that the U.S. Department of Health and Human Service's Office of Inspector General has taken criminal and civil enforcement actions against other hospice providers that submitted bills for ineligible services or patients, including situations

where the provider failed to conduct appropriate certifications." *Id.* This led the appellate court to be "satisfied that Relators raised a reasonable inference that the Government would deny payment if it knew about [d]efendants' alleged violations." *Id.* Additionally, as stated above, the Fifth Circuit found that relators need not allege "specific prior government actions prosecuting similar claims." *Id.* (citing *Prather*, 892 F.3d at 833).

Third, the Fifth Circuit found that noncompliance was not "minor or insubstantial" and that "the Government would 'attach importance' to the underlying violations." *Id.* at 163. "The reason is apparent: Because a patient must be certified as terminally ill to be eligible for Medicare, false terminally-ill certifications may lead the government to make a payment which it would not otherwise have made." *Id.* (cleaned up). Defendants maintained that "they billed for what they did . . . and therefore did not commit fraud," but the Fifth Circuit said this "assertion misse[d] the point. Defendants cannot provide and charge for services without certifying that the patients are first eligible for those services under the terms of eligibility established by Congress and Medicare, which limit hospice services to a distinct class of patients." *Id.* Thus, the alleged violations were not minor. *Id.* Considering all of these factors in light of *Escobar I*, the Fifth Circuit found that the relators had alleged material violations. *Id.*

Likewise, following the Supreme Court's decision in *Escobar I*, the First Circuit found "little difficulty in concluding" that relators adequately pled that certain misrepresentations were material. *Escobar II*, 842 F.3d at 110. There, a woman died of a seizure after receiving mental health care at a facility. *Id.* at 105. Following her death, her parents "learned that [the facility] had employed unlicensed and unsupervised personnel, in violation of state regulations—many of whom" had helped treat their daughter. *Id.*; *see id.* at 108 ("According to the allegations in [the

operative complaint], of the five specific individuals who treated [their daughter] . . . only one of

them . . . had the proper license or was under the proper supervision to deliver treatment to [her].").

    The First Circuit based its finding of materiality on three reasons. *Id.* at 110.  First, Relators

had alleged that "regulatory compliance was a condition of payment—itself a 'relevant' though

'not dispositive' factor in determining materiality." *Id.* (quoting *Escobar I,* 136 S. Ct. at 2001).

> Second, the centrality of the licensing and supervision requirements
> in the MassHealth regulatory program, which go to the "very
> essence of the bargain," [*Escobar I,* 136 S. Ct. ] at 2003, n. 5, of
> MassHealth's contractual relationships with various healthcare
> providers under the Medicaid program, is strong evidence that a
> failure to comply with the regulations would be "sufficiently
> important to influence the behavior" of the government in deciding
> whether to pay the claims. [(citation omitted)].

*Id.* at 110.  And third, though the government's payments of claims with knowledge of violations

is "very strong evidence" of immateriality, the Supreme Court "did not state that such knowledge

is dispositive." *Id.* (quoting *Escobar I,* 136 S. Ct. at 2003–04).  In any event, the relevant factual

allegations "were limited to reimbursement claims filed by [the facility] during the course of their

daughter's treatment and prior to the filing of the litigation[,] . . . and there [was] no evidence in

the record that MassHealth paid those claims to [the facility] despite knowing of the violations."

*Id.* at 110–11.

    Elaborating, the appellate court stated:

> MassHealth has made it clear in its regulations that it expects that
> individuals in the business of providing mental health services in the
> Commonwealth have adequate training and professional credentials.
> Compliance, or lack thereof, with these regulations seem to us the
> textbook example of representations that would "likely . . . induce a
> reasonable person to manifest his assent," *Escobar II*, 136 S. Ct. at
> 2003 (citing Restatement (Second) of Contracts, § 162(2)), in
> determining whether to pay for the healthcare services. Indeed, we
> struggle to think of a misrepresentation-by-omission that would give
> rise to a breach more material to the government's decision to pay.

> While we recognize that the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Escobar [II]*, 136 S. Ct. at 2003, [the facility's] alleged misrepresentations were not garden-variety breaches. At the core of the MassHealth regulatory program in this area of medicine is the expectation that mental health services are to be performed by licensed professionals, not charlatans. To use the Civil War-era example cited at oral argument in *Escobar [II]*, [the facility's] violations in the instant case are as central to the bargain as the United States ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing. *Id*. at 2001.

*Id.* at 111.

### *3. Analysis*

#### *a.*  Summary of Analysis

The *SAC* pleads how, under the LNPA, generally, "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement[.]" (*SAC* ¶ 64, Doc. 88.)  The operative complaint also alleges how Ms. Rodriguez performed a number of services without complying with this requirement. (*Id.* ¶¶ 67–68.)  The sole issue on this motion is whether that requirement was material to payment under Medicare, Medicaid, and Tricare.

The Court finds that it was.  Even taking into account the "demanding" standard the Court must apply, having carefully considered all of the *Escobar I* factors "holistically," *Lemon*, 924 F.3d at 161 (citing *Escobar I*, 136 S. Ct. at 2003), and having construed the allegations of the *SAC* in a light most favorable to Byrd, with reasonable inferences drawn in his favor, the Court finds that Defendants' purported false representations with respect to the collaboration agreement would "hav[e] a natural tendency to influence, or [would] be capable of influencing, the payment or receipt of money or property," *id.* at 159 (quoting, *inter alia*, 31 U.S.C. § 3729(b)(4)).  That is, the

Court finds that Relator has sufficiently alleged that the government "would [not] pay the claim . . . if it knew of [Defendants'] violation[s]." *Patel*, 792 F. App'x at 301 (citation omitted).

The Court bases this conclusion on several reasons: (1) compliance with the LNPA supervision requirements was a condition of payment for Medicare, Medicaid, and Tricare; (2) this requirement was part of the "very essence of the bargain" for such services; (3) while not required, Byrd provides an example of the Government enforcing a violation of this requirement—through the settlement agreement in this very case; (4) there is no allegation that the Government paid any claims for Ms. Rodriguez after learning of Defendants' failure to comply; and (5) the instant violations are not "minor or insubstantial," and this conclusion is demonstrated by the fact that this case is much closer to *Lemon* and *Escobar II*, which found materiality, than to *Patel*, which did not. For all these reasons, the motion to dismiss the Ms. Rodriguez-based claims will be denied.

*b.*  Condition of Payment

First, Relator has adequately pled that compliance with this requirement was a condition of payment for the healthcare programs at issue.  Byrd specifically alleges how:

(a) Medicare Part A requires a physician's order to admit someone for inpatient care and how that responsibility cannot be delegated to those who are not allowed to do so under state law, (*see SAC* ¶¶ 30–33, Doc. 88 (citations omitted));

(b) Medicare Part B reimburses for services performed by a nurse practitioner "working in collaboration . . . with a physician . . . which the nurse practitioner . . . is legally authorized to perform by the State in which the services are performed," (*id.* ¶ 34 (citation omitted));

(c) Medicaid provider agreements require that the provider (i) "comply fully with all applicable federal and state laws and rules pertaining to Medicaid and the practice of medicine," (ii) render care "within the scope and quality of standard care," and (iii) report and refund any monies received in error or in excess of the amount to which the health care provider is entitled, (*id.* ¶¶ 36–37 (citations omitted); *see id.* at ¶ 40); and

(d) Medicaid's provider manual also requires that inpatient admission be ordered by physicians and outpatient hospital services take place "under the direction of a physician," (*id.* ¶¶ 41–42).

Relator also alleges how Medicare, Medicaid, and Tricare each require submission of claims in the UB-04 format, (*id.* ¶¶ 28, 38, 43), which contains on its back an express certification that the "billing information" on the form (which includes the name of the physician involved in the service) is "true, accurate and complete" and that the "submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts," (*id.* ¶¶ 28–29.) The *SAC* also pleads:

> Compliance with the collaboration requirements of the Nurse Practice Act is material to the payment of claims by Medicare, Medicaid, and other federal healthcare programs. The submission of a claim for services furnished by an advanced practice nurse constitutes an implied representation that the nurse furnished such services in accordance with the collaboration requirements of the Nurse Practice Act, including the requirement of a valid collaborative practice agreement. Claims for payment submitted for services performed by a nurse practitioner outside the scope of her practice constitute false claims.

(*Id.* ¶ 66.)

Considering these allegations as a whole, the Court finds that Relator has sufficiently alleged that the collaboration agreement was a condition of payment for these programs. While a requirement's label as a condition of payment and violation of same is not dispositive under *Escobar I,* "it is certainly probative evidence of materiality," *Lemon*, 924 F.3d at 161 (citation omitted), and, as in *Lemon* and *Escobar II*, the Court finds that Relator has made a plausible showing that this requirement was such.

Defendants barely address these allegations in a two-sentence footnote in their original memorandum. (Doc. 92-1 at 15 n.4.) In their reply, Defendants complain that these regulations are not alleged to be conditions of payment and that some are in fact conditions of participation instead. (Doc. 96 at 6 & n.3.)

22

The Court sees a few problems with these arguments, both procedurally and substantively. Procedurally, the Court could easily find that such skeletal briefing in the original memorandum constitutes waiver. *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because appellant "fail[ed] to do either with regard to its underlying claims, . . . those claims [were] inadequately briefed and therefore waived." (citing, *inter alia*, *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (noting that it is "not enough to merely mention or allude to a legal theory")); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant argument effectively represents a waiver of the point." (citing, *inter alia*, *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")))). With respect to the condition of participation point raised in the reply brief, "[c]ourts in the Fifth Circuit have determined that new arguments raised for the first time in a reply brief need not be considered." *Santos v. Baton Rouge Water Works Co*., No. 18-1098, 2021 WL 1227875, at *11 n.6 (M.D. La. Mar. 31, 2021) (deGravelles, J.) (collecting authorities on issue). Here, Defendants easily could have briefed this argument in their original memorandum, so the Court is not inclined to consider it.

Defendants' position is also weak substantively. First, they point to only two Medicare regulations as being conditions of participation and ignore the numerous other laws Relator cites and discusses. (*Compare* Doc. 96 at 6 n.3, *with SAC* ¶¶ 32–42, Doc. 88.) Second, and even more importantly, Defendants again ignore the certification requirements of the UB-04 format which is

used to submit these claims, (*SAC* ¶¶ 28–29, Doc. 88), and this is particularly problematic considering the Fifth Circuit's finding that certification is critical to a determination of materiality. *See Lemon*, 924 F.3d at 161 ("we find that Defendants' alleged fraudulent certifications of compliance with statutory and regulatory requirements violate conditions of payment under § 1395f(a)(7)."). *Cf. Patel*, 792 F. App'x at 301 ("Importantly, nothing about the alleged misrepresentation here suggests that goods or services were falsely certified or improperly provided."). In sum, the Court rejects Defendants' arguments and finds that this factor weighs in favor of materiality.

Defendants also complain that Relator has not "connect[ed] the dots to allege, with particularity, how compliance with the collaboration requirements of the LNPA is material to the government's decision to pay claims," (Doc. 96 at 6–7), but this contention is equally unavailing. Construing all of the above allegations together as a whole in a light most favorable to Relator and drawing reasonable inferences in his favor, the Court finds that Byrd sufficiently establishes this materiality factor.

### c. "Very Essence of the Bargain"

The second reason why the Court finds materiality is the centrality of supervision to the laws at issue. Specifically, as in *Escobar II*, supervision appears to be at the heart of both the LNPA's regulatory scheme governing APRN and the beneficiary programs about such providers.

The LNPA provides that, as a general rule, "acts of medical diagnosis and prescription by an advanced practice registered nurse shall be in accordance with a collaborative practice agreement." La. Rev. Stat. Ann. § 37:913(8). A " '[c]ollaborative practice agreement' means a formal written statement addressing the parameters of the collaborative practice which are mutually agreed upon by the advanced practice registered nurse and one or more licensed

physicians . . . which shall include but not be limited to" certain described provisions. *Id*. §
37:913(9). " 'Collaborative practice' means the joint management of the health care of a patient
by an advanced practice registered nurse performing advanced practice registered nursing and one
or more consulting physicians[.]" *Id*. § 37:913(8). Thus, as alleged, "under Louisiana law, an
advanced practice nurse may only perform acts of medical diagnosis and prescription pursuant to
a collaborative practice agreement with a licensed physician who is involved in the joint
management of the patient's treatment." (*SAC* ¶ 65, Doc. 88.)

Likewise, Medicare Part B reimburses for services performed by a nurse practitioner
"working in collaboration . . . with a physician . . . which the nurse practitioner . . . is legally
authorized to perform by the State in which the services are performed," (*id.* ¶ 34 (quoting 42
U.S.C. § 1395x(s)(2)(K)(ii)).) Further, the Louisiana Medicaid provider manual requires (a) that
inpatient admission be ordered by physicians and (b) that outpatient hospital services take place
under the direction of a physician. (*Id.* ¶¶ 41–42).

In sum, supervision of APRN by physicians go to the "very essence of the bargain" in
reimbursing care provided by these individuals. As in *Escobar II*, "compliance, or lack thereof,
with these regulations seem to [be] the textbook example of representations that would likely . . .
induce a reasonable person to manifest his assent . . . in determining whether to pay for the
healthcare services." 842 F.3d at 111 (cleaned up).

Defendants maintain that this situation is not as severe as *Escobar II*, where a woman died
from poor supervision, (Doc. 96 at 5–6), but Defendants mischaracterize the *SAC*. Relator
specifically alleges that Ms. Rodrigue saw and treated hundreds of Vermilion patients without the
supervision, participation, or involvement of a physician, all in violation of Louisiana law. (*See
SAC* ¶¶ 67, 79 Doc. 88.) Byrd further pleads:

> Among other things, Ms. Rodriguez would routinely perform inpatient examinations and make decisions to admit patients, including Medicare and Medicaid patients, as hospital inpatients. She would issue inpatient admission orders for such patients without any participation from a collaborating physician. She would manage the patients' care and issue all physician orders for such patients, without collaborating with a physician. No other physician would be part of the patients' treatment team, and Ms. Rodriguez was identified in hospital records as the admitting and attending physician. Ms. Rodriguez would also routinely perform outpatient services for hospital patients, without supervision by a qualified physician.

(*Id.* ¶ 68.)  Relator quotes portions of the state investigative report into these problems, and much of this report is consistent with Byrd's other allegations. (*See id.* ¶¶ 87–92.)  While no one is alleged to have died from Ms. Rodriguez' conduct, the danger Defendants created remains significant, and it cannot be ignored simply because, to date, Relator is unaware of any harm Ms. Rodriguez may have caused from not having a collaboration agreement or proper supervision.  In short, the Court rejects this argument and finds that this factor weighs in favor of materiality.

### d. Government Enforcement

The third reason why Relator has demonstrated materiality is because he has provided at least one instance of a Government enforcement action with respect to such claims: the instant case.  Specifically, Relator points to the settlement agreement between the State of Louisiana and Defendants in which "Defendants agreed to pay $500,000 to the State to resolve claims asserted on behalf of the State in Relator's original complaint." (*Id.* ¶ 83.) The Settlement agreement provided, *inter alia*:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
> . . .

3. Acadia submitted claims for payment to the Medicaid program for services provided by advanced practice registered nurses that did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law.

(*Id.* ¶ 84.)

This Court previously wrote off the importance of the settlement agreement, but the Court was too quick to do so. The Court had agreed with Defendants and had said that "settlements occur for a number of reasons other than liability" and that "Relator fails to allege in the operative complaint that these payments were made because Defendants were in fact liable to the State for the alleged violations." (Doc. 85 at 50.) But Defendants themselves have undermined the Court's prior conclusion, as they asserted that Relator should be able to provide as evidence of materiality, *inter alia*, other enforcement actions and "settlements involving similar violations to those alleged, or citations to criminal or civil actions based on such violations." (Doc. 92 at 16–17.) Relator is correct that it simply makes no sense that Relator should allege other settlements involving similar conduct when, construing the *SAC* in a light most favorable to him and drawing reasonable inferences in his favor, he has specifically alleged that the state of Louisiana entered into a settlement *in this case for false Medicaid claims for this specific conduct*.

Moreover, Defendants' position on settlements is undermined even further by *Lemon*. Again, as the Fifth Circuit recognized, "it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive. Indeed, the Government's legal investigations are often conducted in secrecy; we do not expect Relators to know precisely the Government's prosecutorial practices without the benefit of discovery." *Lemon*, 924 F.3d at 162 (cleaned up). In sum, while not required, Defendants' settlement with the State for these very

claims is strong support for the conclusion that the collaboration agreement requirement was material to the payment of Medicaid claims.

### e.   No Knowing Payment of Claims by the Government

The fourth reason why Relator has adequately pled materiality is that, like *Escobar II*, there is no allegation that any federal or state claims were paid to Defendants despite knowing of the violations during the times relevant to this complaint. *See Escobar II*, 842 F.3d at 110–11, 112. Defendants complain that Byrd's allegations about the investigation into Ms. Rodriguez weaken his claim of materiality, (*see SAC* ¶¶ 87–92, Doc. 88), but this ignores the fact that Byrd specifically alleges that state inspectors conducted this investigation "[i]n May 2015, after Relator was terminated," (*id.* ¶ 87).  Construing the *SAC* in a light most favorable to Relator, Ms. Rodriguez lacked a collaboration agreement (and so was the source of false claims) *before and during* Relator's time with the company—and, thus, before the investigation. In any event, as Relator argues, the *SAC* discusses only a statewide investigation and never mentions an investigation into Medicare claims. In sum, as alleged, the state investigation does not show, by itself, that the federal or state government paid claims despite knowing of the lack of a collaboration agreement.

### f.   No "Minor or Insubstantial" Violation

The fifth and final reason supporting a finding of materiality is that the noncompliance here is not "minor or insubstantial." *Lemon*, 924 F.3d at 163.  This is demonstrated by how Relator's claim is much closer to *Lemon* and *Escobar* than *Patel*.

Again, in *Lemon*, the facility allegedly "allowed non-medical personnel to complete certifications for hospice patients" and "permitted nurses to conduct required face-to-face encounters with hospice patients instead of a physician or nurse practitioner," among other violations. *Lemon*, 924 F.3d at 156.  The Fifth Circuit found that the false certifications in hospice

28

care were not "minor or insubstantial," *Id.* at 163.  In *Escobar II*, the problem was inadequate licensing and supervision. *Escobar II*, 842 F.3d at 105, 108.  As in *Lemon* and *Escobar II*, false certifications and inadequate supervision are precisely the problems alleged in this case.

Conversely, in *Patel*, the issue was merely who owned the hospital, which is minor compared to the instant deficiencies. *Patel*, 792 F. App'x at 301.  *Patel* also specifically found it "[i]mportant[]" that "nothing about the alleged misrepresentation here suggests that goods or services were falsely certified or improperly provided." *Id.*  Again, false certification is directly alleged here through the UB-04 format. (*SAC* ¶¶ 28–29, 38, 43, Doc. 88.)

Additionally, to use the examples from these cases, Relator's claim is much more analogous to "the United States ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing," *Escobar II*, 842 F.3d at 111, than to the government requiring contractors to use American-made staplers but later learning that foreign-made ones were used, *Patel*, 792 F. App'x at 301.

### g.  Conclusion

In sum, when construing the operative complaint in a light most favorable to Relator and drawing reasonable inferences in his favor, the *SAC* contains enough factual matter, taken as true, to raise a reasonable expectation that discovery will reveal relevant evidence that the collaboration agreement requirement is material to (that is, would have a natural tendency to influence) the payment of Medicare, Medicaid, and Tricare claims. Consequently, Defendants' motion on this issue will be denied.

## B.  Dr. Uhrich Claims

### 1. Parties' Arguments

#### a.  Defendants' Motion (Doc. 92) and Memorandum (Doc. 92-1)

Next, Defendants assert that the claims related to Dr. Uhrich fail for two reasons. (Doc. 92 at 2.)  First, "Relator still fails to connect Defendants' alleged provision of free staff to Dr. Uhrich with her referral of patients to Defendants." (*Id.*)  Second, Relator also does not plead any first-hand experience in the alleged scheme. (*Id.*)  According to Defendants, both are fatal to Byrd's claims. (*Id.*)

Defendants argue that the allegations of the prior complaint are largely the same for Dr. Uhrich save for the inclusion of Exhibit 5, which purportedly shows a partial list of specific claims. (Doc. 92-1 at 22.)  But, Relator again fails to connect the dots between Defendants' alleged providing of free staff and his referrals of patients. (*Id.*)  Relator identifies no contract or meeting of the minds, and there is little to tie the two together. (*Id.* at 22–23.)  The only specific document cited by the *SAC* is a 2015 draft Strategic Plan, and the allegations about this document are largely identical. (*Id.* at 23.)

Further, the *SAC* contains no allegations of first-hand experience about the scheme. (*Id.*) "The specific allegations in the FAC that the Court previously held were insufficient in this regard remain largely unchanged in the SAC." (*Id.* (citations omitted).)  Defendants argue:

> [N]one of these wordsmithed allegations "set[ ] out the particular workings of a scheme that was communicated directly to the [R]elator by those perpetrating the [alleged] fraud" or alleged Relator's "first-hand experience of the scheme unfolding as it related to him." [*United States rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191–92 (5th Cir. 2009)]. Rule 9(b) requires such particularized allegations, and the Court determined they were absent from the prior complaint.

(*Id.* at 24.)  For these reasons, the claims connected to Dr. Uhrich should be dismissed. (*Id.*)

*b.*  Relator's Opposition (Doc. 95)

Byrd responds that the *SAC* addresses the Court's prior concerns. (Doc. 95 at 3–4.) According to Relator, the *SAC* alleges how "the hospital tracked referral source for patients" and that Relator reviewed this information and routinely used it in the performance of his duties. (*Id.* at 4 (citing *SAC* ¶¶ 46, 47, 94, Doc. 88).)  "[T]he *SAC* provides details about Defendants' billing system and Relator's familiarity with it." (*Id.* (citing *SAC* ¶¶ 44–47, 102–03, 146, Doc. 88).) Relator says, "These allegations are more than sufficient to satisfy *Grubbs*, in that they lead to a strong inference (far stronger than in *Grubbs*, where the relator did not review billing information) that claims were actually submitted for patients referred by Dr. Uhrich." (*Id.* at 5.)  Indeed, Relator points to examples of specific claims that were submitted. (*Id.* (citing *SAC* ¶ 103, Doc. 88, & Ex. 5 thereto).)

Relator maintains that "Defendants' only actual arguments with respect to Dr. Uhrich are based largely on a mischaracterization of the Court's prior order and the [*SAC*]." (*Id.*)  For example, Defendants perform a "stunning mischaracterization" of the Court's prior ruling with respect to the draft Strategic Plan, as the Court did not dismiss this document as "a mere draft." (*Id.* at 5–6.)  Defendants quote sections of the Court's description of their arguments. (*Id.* at 6 (citing Doc. 84 at 41).)  However, the Court expressly relied on this Strategic plan and specifically said it "disagrees with Defendants".  (*Id.* (quoting Doc. 85 at 50–51 n.9).)

As to Relator's alleged failure to have adequate knowledge of the scheme:

> There is no stand-alone requirement that a relator have "first-hand experience in the scheme unfolding" in order to state a claim – rather, such experience is simply one way in which a relator may show a "strong inference" that claims were submitted as a result of the fraudulent scheme.[ ]  Indeed, the "first-hand experience" in *Grubbs* simply consisted of other people telling the relator about the fraudulent scheme, and the Court noted that this made it "probable, nigh likely . . . that the doctors' fraudulent records caused the

> hospital's billing system in due course to present fraudulent claims to the Government." *Grubbs, supra* at 191-192.
>
> . . . [A]s discussed above, the SAC provides abundant allegations, based on Relator's first-hand knowledge and experience, showing that Defendants submitted claims to federal healthcare programs pursuant to referrals from Dr. Uhrich, and even gives examples of actual claims for specific patients.

(*Id.* at 7 (footnote omitted).) Thus, Relator urges that he adequately stated a claim about Dr. Uhrich. (*Id.*)

### c.  Defendants' Reply (Doc. 96)

Defendants respond that Relator added only two paragraphs related to Dr. Uhrich (and Exhibit 5) to his prior complaint, (Doc. 96 at 2 (citing *SAC* ¶¶ 102–03, Doc. 88)), but these paragraphs fail to establish any " 'first-hand experience of the scheme unfolding as it related to him,' " (*id.* (quoting Doc. 85 at 39–40).)  Allegations about the Optima staff questioning the appropriateness of referrals and the settlement agreement are not red-herrings but are in fact highly relevant because the Court previously determined these to be deficient. (*Id.* at 2–3.)  Thus, claims related to Dr. Uhrich should be dismissed. (*Id.* at 3.)

### 2. Applicable Law

As explained in the last ruling, *United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. 18-312, 2021 WL 1081121, at *17–19 (M.D. La. Mar. 18, 2021), "§ 3729(a)(1) . . . makes liable any person who 'knowingly presents, or causes to be presented' a false claim to the Government." *Grubbs*, 565 F.3d at 188. "This provision includes an express presentment requirement." *Id*. "[T]he provision's *sine qua non* is the presentment of a false claim." *Id*

Again, under Rule 9(b), "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' "  *Gage*, 623 F. App'x at 625 (quoting Fed. R. Civ. P. 9(b)). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how"

of the alleged fraud.' " *Id.* (quoting *Steury*, 625 F.3d at 266); *see also id*. ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated . . . in order to satisfy Rule 9(b)." (cleaned up)).

But "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *Grubbs*, 565 F.3d at 190. Thus, " 'to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " *Porter*, 810 F. App'x at 240 (quoting *Grubbs*, 565 F.3d at 190).

*Grubbs* gives guidance in determining what level of detail is necessary. For instance, before laying out the above holding, the Fifth Circuit stated that "surely a procedural rule [such as Rule 9(b)] ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial." *Grubbs*, 565 F.3d at 189 (citation omitted). As *Grubbs* stated:

> Fraudulent presentment requires proof only of the claim's falsity, not of its exact contents. If at trial a *qui tam* plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure—a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation. Of course, the exact dollar amounts fraudulently billed will often surface through discovery and will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty. Nevertheless, a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a

> preponderance that fraudulent bills were actually submitted. To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.

*Id.* at 189–90 (internal citation omitted).

The Fifth Circuit next rejected the defendants' argument that "because presentment is the conduct that gives rise to § 3729(a)(1) liability, Rule 9(b) demands that it is the contents of the presented bill itself that must be pled with particular detail and not inferred from the circumstances." *Id.* at 190. The appellate court stated:

> We must disagree with the sweep of that assertion. Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme. A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone. Standing alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*Id.*

The *Grubbs* court also discussed how the standard it established "comport[ed] with Rule 9(b)'s objectives of ensuring the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.' " *Id.* (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). In doing so, the Fifth Circuit said:

> Confronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong

> inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into—gives defendants adequate notice of the claims. In many cases, the defendants will be in possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records, with which to defend on the grounds that alleged falsely-recorded services were not recorded, were not billed for, or were actually provided.

*Id.* at 190–91.

Further, in explaining why the district court erred in concluding that the relator failed to comply with Rule 9(b), the *Grubbs* court found:

> The complaint sets out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud. Grubbs describes in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot. He alleges his first-hand experience of the scheme unfolding as it related to him, describing how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred. Also alleged are specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill.

> Taking the allegations of the scheme and the relator's own alleged experience as true, as we must on a motion to dismiss, and considering the complaint's list of dates that specified, unprovided services were recorded amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government. It would stretch the imagination to infer the inverse; that the defendant doctors go through the charade of meeting with newly hired doctors to describe their fraudulent practice and that they continually record unprovided services only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed. That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in Grubbs' complaint even though it does not include exact billing numbers or amounts.

*Id.* at 191–92.

35

Later, the Fifth Circuit rejected the argument that *Grubbs* absolved relators of Rule 9(b)'s

heightened pleading requirements. *See Nunnally*, 519 F. App'x at 893. The appellate court stated:

> To the contrary, *Grubbs* reaffirms the importance of Rule 9(b) in
> FCA claims, while explaining that a relator may demonstrate a
> strong inference of fraud without necessitating that the relator detail
> the particular bill. *See* 565 F.3d at 190. We established that a relator
> could, in some circumstances, satisfy Rule 9(b) by providing factual
> or statistical evidence to strengthen the inference of fraud beyond
> mere possibility, without necessarily providing details as
> to *each* false claim. *Id.* This standard nonetheless requires the
> relator to provide other reliable indications of fraud and to plead a
> level of detail that demonstrates that an alleged scheme likely
> resulted in bills submitted for government
> payment. *Id.* Significantly, the complaint in *Grubbs* rested on the
> relator's actual description of a solicitation by two of the defendants
> to the relator to participate in an elaborate scheme to defraud the
> government, the particulars of which were there alleged.

*Id.* The Fifth Circuit then agreed with the district court that the relator failed to plead with sufficient

particularly under Rule 9(b) and *Grubbs* that the hospital submitted false claims in violation of the

FCA:

> [Relator] Nunnally's wholly generalized allegations of false claims
> presented to the Government do not "alleg[e] *particular* details of a
> scheme" (emphasis added) and are not "paired with reliable indicia
> that lead to a strong inference that [false] claims were actually
> submitted." *See Grubbs*, 565 F.3d at 190. We held in *Grubbs* that
> the contents of a false claim need not always be presented under this
> subsection because, given that the Government need not rely on or
> be damaged by the false claim, "the contents of the bill are less
> significant." *Id.* at 189. This does not absolve Nunnally of the
> burden of otherwise sufficiently pleading the time, place, or identity
> details of the traditional standard, in order to effectuate Rule 9(b)'s
> function of fair notice and protection from frivolous suits. *See id.* at
> 190. Nunnally's allegations of a scheme to submit fraudulent claims
> are entirely conclusory, do not offer factual information with
> sufficient indicia of reliability, and do not demonstrate a strong
> inference that the claims were presented to the Government in
> violation of § 3729(a)(1).

*Id.* at 895. The district court's order dismissing the FCA claims was thus affirmed. *Id.*

### 3. Analysis

In short, both of Defendants' arguments are unconvincing.  Construing the *SAC* in a light most favorable to Relator and drawing reasonable inferences in his favor, the Court finds that he has sufficiently "connected the dots" between the Defendants' giving free staff to Dr. Uhrich and his referrals.  Further, Relator has alleged the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs,* 565 F.3d at 190.  Consequently, Defendants' motion will be denied.

Contrary to Defendants' position, *Grubbs* does not require first-hand experience in the scheme to prevail with a FCA claim.  Rather, *"Grubbs* reaffirms the importance of Rule 9(b) in FCA claims, while explaining that a relator may demonstrate a strong inference of fraud without necessitating that the relator detail the particular bill." *Nunnally*, 519 F. App'x at 893 (citing *Grubbs*, 565 F.3d at 190).  "This standard nonetheless requires the relator to provide other reliable indications of fraud and to plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Id.* (citing *Grubbs*, 565 F.3d at 190).  It was "significant[]" that "*Grubbs* rested on the relator's actual description of a solicitation by two of the defendants to the relator to participate in an elaborate scheme to defraud the government, the particulars of which were there alleged." *Id.*  But "significant" is not "required."

Rather, *Grubbs* found adequate factual allegations where it there was "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." *Grubbs*, 565 F.3d at 191–92*.*  In *Grubbs*, "[i]t would stretch the imagination to infer the inverse," and "[t]hat fraudulent bills were presented to the Government [was] the logical conclusion of the particular allegations in Grubbs' complaint even though it [did] not include exact billing numbers or amounts." *Id.* at 192.

The same reasoning applies here.  Relator alleges:

> From at least 2013, Defendants had an arrangement with Dr. Susan Uhrich, a psychiatrist in Lafayette, Louisiana, in which Defendants provided free staff to Dr. Uhrich in return for referrals of patients to AVH. This scheme was devised and implemented by former AVH CEO Joe Rodriguez and current AVH CEO Luis Betances. Dr. Uhrich was a significant source of patient referrals for AVH, principally to the Optima facility, and Vermilion routinely submitted claims to Medicare, Medicaid, Tricare, and other payors for services furnished pursuant to such referrals. The arrangement continued following Relator's termination in January 2015.

(*SAC* ¶ 93, Doc. 99.)

Relator specifically alleges how the 2015 Strategic Plan "identified Dr. Uhrich as its fifth-highest volume referral source" and the "only individual physician on the list of the top 10 referral sources." (*Id.* ¶ 94.)  The Strategic Plan also described a " 'channeling mechanism,' which it defined as 'any gate-keeping process required to obtain referrals/admissions.' " (*Id.* ¶ 95.) The plan also "expressly identified as a 'channeling mechanism' the fact that Dr. Uhrich's '[n]urse liaison is a part of our staff.' " (*Id.* ¶ 101.)

Byrd also pleads the names of two nurses whose services were provided to Dr. Uhrich. Specifically, the *SAC* alleges that, though nurses Cheryl Smith and Donna Talley "were employed and paid by Vermillion[,]" they "did not actually work at Vermillion, but instead worked at Dr. Uhrich's office." (*Id.* ¶ 96.)

Byrd also alleges how "Optima staff frequently questioned the medical appropriateness of the referrals by Uhrich/Smith. Many of these patients suffered from progressive or degenerative neurological disorders for which acute psychiatric inpatient treatment was unnecessary." (*Id.* ¶ 99.)

This Court also previously found that the Strategic Plan showed that Dr. Uhrich's referrals were not for fair market value and were not commercially reasonable in the absence of referrals, and that ruling still applies.  The undersigned previously said:

The Court notes in closing that, while all false certification claims will be dismissed, the Court disagrees with Defendants in at least one respect: Relator adequately pled that the arrangements with Dr. Uhrich and Dr. Salmeron were not commercially reasonable or for fair market value. As with Dr. Uhrich, Relator specifically alleges that "Defendant[s] provide[d] free staff to Dr. Uhrich in return for referral of patients to AVH." (*First Amend. Compl.* ¶ 40, Doc. 57.) Further, the draft 2015 Strategic Plan also describes the "channeling mechanism" for Dr. Uhrich: "Currently a member of our Medical Staff. Has high volume private practice and nursing home ties. Employs three NP's who work the nursing homes and the IP units. Nurse liaison is a part of our staff.' " (*Id.* ¶ 42.) "The plan noted that 'Dr. Uhrich is exclusively referring patients to VBHS with the support of three mid-level practitioners.' " (*Id.*) A reasonable inference from this draft Strategic Plan allegations is that Defendants paid for Dr. Uhrich's staff. The Court agrees with Relator that providing a doctor free staff solely in exchange for referrals is necessarily a payment below fair market value and one that is not commercially reasonable in the absence of referrals.

(Doc. 85 at 50–51 n.9) These allegations remain largely identical in the new complaint. (*See SAC* ¶¶ 93–95, Doc. 88.)    Indeed, the *SAC* even strengthens Relator's position; Byrd now alleges, "Relator was personally involved in the preparation of the Strategic Plan and was aware of the factual information set forth therein. In all material respects, the information from the draft plan discussed herein was included in the final 2015 Strategic Plan." (*Id.* ¶ 7.)

Additionally, and particularly relevant here, Byrd pleads his first-hand knowledge of the allegedly fraudulent scheme.  Along with Relator's experience with the Strategic Plan highlighted above, (*id.*), the *SAC* states:

As part of his duties, Relator would routinely review financial information, including accounts receivable spreadsheets that identified the referring physician, the patient, the payor, and the amount billed and collected. Relator has personal knowledge that Defendants submitted claims for payment to federal healthcare programs, including Medicare and Medicaid, for services where Dr. Uhrich was the referring physician.

(*SAC* ¶ 102, Doc. 88.)  On top of that, Relator attaches Exhibit 5, which is a "partial list of some specific claims submitted to Medicare and Medicaid for services where Dr. Uhrich was the referring physician." (*Id.* ¶ 103.) This list, though "not comprehensive[,] [ ] consists of information printed out from a May 2014 spreadsheet, of a type reviewed monthly by Relator in the course of his employment, that identified claims with outstanding balances." (*Id.*)

Considering all of these allegations as a whole and construing them in a light most favorable to Byrd, with reasonable inferences drawn in his favor, the Court finds that there is "more than probable, nigh likely, circumstantial evidence" that false claims were submitted to the Government and that this is the "logical conclusion of the particular allegations in [Relator's] [*SAC*]." *Grubbs*, 565 F.3d at 192.  It would "stretch the imagination" to conclude—based on the AKS and Stark Law violations, the Strategic Plan, the questions about the medical appropriateness of referrals, the partial spreadsheet of claims, and Relator's first-hand knowledge of financial information and the Strategic Plan—that false claims were not submitted. *See id.* Relator has "connected the dots" and alleged the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. As a result, Defendants' motion will be denied.

### C.  DSH Payment Claims

#### *1. Parties' Arguments*

##### *a.*  Defendants' Motion (Doc. 92) and Memorandum (Doc. 92-1)

Defendants next argue that Relator failed to cure the deficiencies of the prior complaint with respect to the DSH payments. (Doc. 92 at 2.)  Specifically, Defendants say the *SAC* "still fails to allege with particularity that Defendants submitted claims for DSH payments to the State of

Louisiana or that Defendants failed to repay any improperly obtained DSH payments" (*Id.*)  The latter problem also means that any "reverse false claims" must be dismissed. (*Id.* at 3.)

Defendants begin by saying that a false claim requires presentment, and, like the last complaint, the *SAC* fails to allege that Vermillion received DSH funds from the submission of a false claim and fails to "identify a single submitted claim with the specificity demanded by Rule 9(b)." (Doc. 92-1 at 25.)  While Relator added allegations about the "background of the DSH program and qualifications for payment," he still "has not . . . allege[d] that Defendants submitted or presented any claims for DSH payments." (*Id.* (citing *SAC* ¶¶ 110–16, Doc. 88).)  Instead, Relator alleges only that Vermillion submitted "requests" for such payments and received same in certain specified amounts. (*Id.*)  "The SAC is devoid of any particularized allegations as to what form those requests took, what specifically was requested, when it was requested, who requested those payments, and, most importantly, what Defendants may or may not have certified in making those 'requests.' " (*Id.*)  This Court dismissed the claims previously because Relator had not demonstrated the " 'time, place, and circumstances,' " and the "SAC fairs no better." (*Id.* (quoting Doc. 85 at 39).)

Defendants also say Byrd was required to show that Vermillion did not return the DSH payments which it knew it should not have received, and the *SAC* has not cured this deficiency. (*Id.* at 26–27.)  Relator states that a counsel for the State of Louisiana has confirmed that no DSH funds were received, but (a) such a claim lacks specificity as to the who said this, when, and what exactly was told, and (b) this allegation in fact weakens Relator's position, as he claims Vermillion "did not return the DSH payments" before Defendants terminated him, which allegation implies that the funds were returned between the filing of the prior complaint and the *SAC*. (*Id.* at 27.)

Further, Byrd's reliance on "upon information and belief" allegations are insufficient for Rule 9(b) standards. (*Id.* at 28–29.) While this can be slightly relaxed when the information is peculiarly within Defendants' knowledge, "such as Defendants' repayment of DSH funds," Relator must still satisfy the requirements of Rule 9(b). (*Id.* at 29 (citations omitted).) Relator has not substantively addressed these issues. (*Id.*) In any event, Relator was allegedly "intimately involved with the DHS audit, . . . chiefly responsible for financial matters at Vermilion," and thus "had access to the necessary information to plead his claims." (*Id.* (citations omitted).)

### b.  Relator's Opposition (Doc. 95)

Relator first argues that he has in fact alleged that a claim was made. (Doc. 95 at 18–19.) The operative complaint specifically pleads that Vermillion "submitted requests for DSH payments to the State of Louisiana" between 2008 and 2015. (*Id.*) Defendants complain about the term "requests" being used instead of "claims," but the FCA itself defines a "claim" as "any request . . . for money . . ." (*Id.* at 19 (emphasis omitted) (quoting 31 U.S.C. § 3729(b)(2)).) Relator then specifically addresses the argument that the *SAC* lacks specificity on this issue:

> Contrary to their assertions, the SAC clearly describes the form of the requests (SAC, ¶ 115 and Exhibit 6), what was requested (*id.*, ¶ 116), who submitted the requests (*id.*), and what was certified (*id.*, ¶¶ 115, 118, and Exhibit 6). If Defendants think that any of these allegations is somehow insufficient, they do not say why, and indeed do not mention them at all.

(*Id.* at 19–20.) Byrd urges waiver on this issue. (*Id.* at 20.)

Relator next contends that he has pled that Defendants did not repay the DSH funds. (*Id.*) Byrd asserts:

> This assertion is plainly incorrect, since the complaint alleges that (i) Defendants did not return the money before Relator was terminated, (ii) after Relator filed his original complaint, the State and Defendants entered into a December 5, 2019 settlement agreement under which Defendants paid $500,000 to settle its

42

> liability to the State for the DSH and other claims, and (iii) counsel for the State has confirmed that, except for the settlement, Defendants have not repaid any of the DSH funds they received. SAC, ¶¶ 9, 123-125.

(*Id*.)

Relator says that Defendants are essentially arguing that he must disclose the name of the attorney for the state and the date he supplied the relevant information, but this misconstrues Rule 9(b). (*Id.* at 20–21.) Byrd need only allege the "circumstances constituting fraud" with particularity, and the desired information does not qualify as such. (*Id.* at 21.) Here, "the State's attorney . . . simply negotiated the settlement with Defendants." (*Id*.) Relator also notes that Defendants previously indicated that they had engaged in negotiations with the State's attorney, and, in any event, this is something that could be cured easily with an amendment, "although Defendants would likely then claim that they need to know some other unpredictable detail." (*Id.* at 21 n.10.)

As to Defendants' argument that Relator's position was "weakened," "Relator confesses that he is at a loss to know what Defendants are talking about[.]" (*Id.* at 21.)

> The SAC makes it clear that, other than in connection with the 2019 settlement (which occurred well after the filing of this lawsuit, and involved the payment of $500,000 to settle Defendants' liability to the State, but not to the federal government), Defendants have not repaid any of the $2,110,977 in DSH funds they received. Relator fails to see how this could possibly support an inference that Defendants actually returned all DSH money they received – and in any event, on a motion to dismiss the allegations are to be viewed in the light most favorable to Relator, with all reasonable inferences drawn in his favor, not the other way around.

(Doc. 95 at 21–22.)

*c.*  Defendants' Reply (Doc. 96)

Defendants respond first that the issue is not the difference between the word "claim" or "request." (Doc. 96 at 7.)  Rather, the problem is the fact that the *SAC* fails to provide the "who, what, when, where, and how" of the purported "request" for DSH funds, as Rule 9(b) requires. (*Id*.)  Relator points to certain paragraphs of and an exhibit to the operative complaint, but these do not solve the problem. (*Id.* at 8.)

For example, in one paragraph, Byrd does not provide "who" submitted the requests. (*Id.* (citing *SAC* ¶ 115, Doc. 88).)   For "how," "Response points to Exhibit 6, a copy of the form that must be submitted, but  [he] does not include the actual form that was submitted, which would presumably include . . . the specific certifications Defendants allegedly made." (*Id*.) Byrd fails to do so, despite his former position as Vermillion's Chief Financial Officer. (*Id*.)  Relator also does not provide "when" specific requests were made and instead only provides a date range of 2008-11, and 2016. (*Id.* (citing *SAC* ¶ 116, Doc. 88).)  Defendants maintain, "This broad brush timeline, setting forth just the year a payment was allegedly received and lacking in any specific names or dates, does not meet this requirement." (*Id.* at 9 (citations omitted).)

Relator tries to allege "what was certified" by referring to one of two possible certifications, but he does not allege which was in fact used. (*Id.* at 9 (citing *SAC* ¶¶ 115, Doc. 88).)   Relator attempts to bypass Rule 9(b)'s requirement with an "upon information and belief" statement, but the Court already rejected this effort. (*Id.* at 9–10 (citing Doc. 85 at 53).)  Here, no allegations are peculiarly within Defendants' knowledge, and, in fact, Relator himself was directly involved with the alleged DSH claims. (*Id.* at 10.)  Relator's allegations about the State Attorney are also unavailing, as Byrd does not establish that he spoke with the unnamed attorney or that he was the original source. (*Id*.)

44

Lastly, Defendants say Relator cannot base this claim on "general allegations describing the State of Louisiana's process for making DSH payments." (*Id.* (citing *SAC* ¶¶ 110–15, Doc. 88).) "The SAC must provide specifics about how the alleged fraud set forth by Relator occurred, not generalized allegations about the DSH program itself. Without those specifics, Relator's DSH claims must fail." (*Id.* at 10–11.)

### d.  Relator's Surreply (Doc. 99)

Relator raises two points in surreply.  Both are centered on his allegation that, ""[u]pon information and belief, based upon discussion with counsel for the State, Vermilion checked the box on the [DSH] qualification form indicating that it did not offer non-emergency obstetric services to the general public as of December 22, 1987." (Doc. 99 at 1 (quoting *SAC* ¶ 118, Doc. 88).)  First, Relator says that Defendants cannot use the argument that he was not the "original source" for this information, as Defendants withdrew all public disclosure arguments in their reply brief. (*Id.* at 1–2.)  Further, Defendants raised this argument for the first time in their reply, so the Court should not consider it. (*Id.* at 2 (citations omitted).)

Second, Byrd asserts that this is a proper "information and belief" allegation and that Defendants err in arguing that it is not. (*Id.* at 3.)  Again, this contention was not raised by Defendants in their original memorandum, as Defendants first made the original "upon information and belief" argument about a different allegation in the *SAC*; that is, Defendants raised this issue on the question of whether they repaid DSH money, not the issue of which box was checked or of Relator's reliance on discussions with the State's attorney.  (*Id.* at 3–4)

In any event, "the SAC provides abundant basis for concluding that the relevant information is not in Relator's possession." (*Id.* at 4.)  Relator worked for Defendants only between

July 2014 and January 2015, and his termination cut off access to Defendants' records. (*Id.* (citing *SAC* ¶¶ 10, 123, Doc. 88).)  Byrd asserts:

> There is no allegation that Relator was involved in the submission of the qualification forms for 2008-2011 and 2015 (which pre- and post-date his period of employment), or that he has even seen them, much less that he has current access to them. It would be an unusual construction of the complaint to infer that Relator somehow has access to the actual qualification forms submitted by Defendants over the years, but has elected not to use them. And on a motion to dismiss, the evidence is to be construed in the light most favorable to Relator, with inferences drawn in his favor, rather than the other way around.

(*Id.*)  Thus, the Court can rely on these "upon information and belief" allegations. (*Id.*)

Relator then details how even Defendants acknowledge that " 'the State took over the substantive investigation of Relator's allegations" during its time in the case and how Defendants and the State's attorney " 'engaged in ongoing dialogue and in-person meetings concerning this action,' " all of which led to the settlement. (*Id.* at 4–5 (quoting Doc. 67-1 at 2).)  Defendants previously argued that the exception for facilities that had been in operation before December 22, 1987, applied, and the *SAC* addresses why the State rejected this claim. (*Id.* (citing *SAC* ¶ 118, Doc. 88).)

In any event, the question of which box was checked is immaterial:

> [I]t is undisputed that Vermilion "did not have at least two obstetricians with staff privileges who agreed to provide obstetric services to individuals entitled to medical assistance for such services, as required by 42 U.S.C. § 1396r-4(d)." SAC, ¶ 117. As the Court held in its prior order, it is ***Defendants'*** burden to show compliance with an exception to the obstetrician requirement, and "Relator need not prove at the pleading phase that the exception to the obstetrician requirement does not apply." Order, Doc. 85, p. 58. Accordingly, even if the Court should consider Defendants' newly-raised arguments about paragraph 118, they should be rejected.

(*Id.* at 5 (emphasis in original).)

### 2. Law and Analysis

In sum, Defendants argue that Relators failed to cure the deficiencies of the prior complaint with respect to two issues: (1) the presentment of a false claim, and (2) the alleged failure to repay the incorrectly paid DSH payments.  Having carefully considered the matter, the Court finds that Relator cured both deficiencies, so Defendants' motion will be denied.

### a.  Repayment of DSH Payments

The second issue is easily dispensed with.  The Court previously held that Relator failed to satisfy Rule 9(b) because:

> Again, Relator was fired on January 21, 2015, *before* the audit was complete. (*First Amend. Compl.* ¶ 66, Doc. 57.) Relator alleges, "Upon information and belief, however, Vermilion has not returned the DSH payments it was aware it was not entitled to receive." (*Id.*) Relator originally filed his complaint on April 1, 2016. (Doc. 1.)
>
> Relator is entitled to plead "upon information and belief" because the question of whether Defendants repaid the DSH money after he was fired and after the audit was completed is peculiarly within their knowledge. *See [United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005)]. But, even when this "relaxed standard" applies, "[p]leading on information and belief does not otherwise relieve a qui tam plaintiff from the requirements of Rule 9(b)." [*United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 723 (5th Cir. 2008) (unreported) (citation omitted).] Thus, given the fact that Relator left before the completion of the audit, and given the fact that over a year passed between when he left Vermilion and when suit was filed, Relator has failed to provide a sufficient factual basis from which the Court can conclude that Defendants in fact failed to repay its obligation to the government. Without more, Relator fails to pass Rule 9(b) muster.

(Doc. 85 at 55–56.)

The Court finds that Relator has resolved this problem.  Relator now alleges that:

> The December 5, 2019 settlement agreement between the State of Louisiana and Defendants provided, among other things, as follows:

> The State contends that it has certain civil and administrative causes of action against Acadia [defined in the agreement to include Acadia and Vermilion] for allegedly engaging in the following conduct in connection with the services Acadia's facilities in Lafayette, Louisiana provided to Louisiana Medicaid beneficiaries (hereinafter referred to as the "Alleged Conduct"):
>
>> 1. From January 1, 2007, through December 31, 2015, Acadia submitted applications to the State of Louisiana for a disproportionate share ("DSH") payments that misrepresented Acadia's qualification for DSH payments, thereby causing the State to pay to Acadia DSH payments it was not entitled to[.]
>
> . . . Counsel for the State of Louisiana has confirmed that, other than in connection with the December 2019 settlement, Defendants have not repaid any of the DSH funds they received.

(*SAC* ¶¶ 124–25, Doc. 88.)

Construing these allegations in a light most favorable to Relator and drawing reasonable inferences in his favor, the Court finds that the *SAC* provides a basis for Relator's knowledge that the DSH funds have not been repaid. A reasonable inference from these paragraphs is that the same attorney for the State that executed the Settlement Agreement, or at least someone from the same office in which that attorney worked—that is, the Medicaid Fraud Control Unit of the Louisiana Office of the Attorney General, (*see* Doc. 88-2 at 8)—also provided Relator with the information about repayments. (*Id.*; *SAC* ¶¶ 124–25, Doc. 88.)[1] Thus, even assuming that this

---

[1] The Court cannot help but note that this argument reflects a certain undercurrent of unprofessionalism running throughout Defendants' briefing. As Relator notes, Defendants cannot seriously argue that they lack fair notice of who the State Attorneys involved in the settlement were, for Defendants themselves admit in earlier briefing that, during the period in which "the State took over the substantive investigation of Relator's allegations[,] . . . Defendants and counsel for the State engaged in ongoing dialogue and in-person meetings concerning this action," all of which culminated in the settlement. (Doc. 67-1 at 9.) Further, if Defendants were really concerned about the name of the State's attorney, Relator has offered to provide it through an amendment, (Doc. 95 at 21 n.10), yet Defendants urge that any amendment would be futile, (Doc. 96 at 11). Indeed, "[s]ometimes a simple phone call is the best course of action. For example, you can sometimes save time (yours and the court's) and expense (yours or your client's) by calling opposing counsel to prevent a needless motion.)." *McDaniel v. Williams*, No. 20-146, 2021 WL 641544, at *4 (M.D. La. Feb. 18, 2021) (deGravelles, J.) (quoting David Borghardt & Jamie Tullier, *Law Clerk Corner: Part 2*, THE BATON ROUGE LAWYER, Mar.–Apr. 2020, at 8)). In short, this argument strikes the Court as a "gotcha" tactic rather than a serious effort to decide the merits of the controversy.

information needed to be pled with particularity, Relator has done so.  As a result, the motion will be denied on this issue.

### *b.*  Submission of False Claims

Turning to the first issue with the DSH payments, the question is whether Relator adequately pled with particularity that Defendants submitted false claims for DSH payments.  In the last ruling, the Court found that he did not and explained, "Relator fails to allege with particularity the time, place, and circumstances, such as who was involved in the DSH payment process, how the DSH payments were sought (akin to the billing process described in *Grubbs*), when the relevant events occurred (i.e., with specific dates), etc." (Doc. 85 at 39.)  However, examining the *SAC* as a whole, the Court finds that Relator has now satisfied Rule 9(b) with respect to this claim.

At the outset, the Court is again guided by *Grubbs*.  "[A] plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." *Grubbs*, 565 F.3d at 190. "To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.* (citation omitted).  Further, "[i]n many cases, the defendants will be in

---

The Court already "remind[ed] both parties of the need for judicial economy and their obligations under Federal Rule of Civil Procedure 11," and the Court specifically advised Defendants that they "are under a duty to have a good faith basis for legal arguments[.]" *Byrd*, 2021 WL 1081121, at *35.  This admonition was not taken to heart, as Defendants devoted several pages of their original memorandum to the public disclosure bar, (Doc. 92-1 at 17–20), which necessitated a lengthy response from Relator, (Doc. 95 at 22–27), an eventual concession by Defendants that their argument was based on outdated law, (Doc. 96 at 11), and the Court's time in reviewing this unnecessarily spilled ink.  Considering all of these points, "[g]iven this Court's high case load for the past few years, *see* Borghardt & Tullier, *supra* at 9, and given the further burdens on the Court caused by the COVID-19 pandemic," the parties (and particularly Defendants) are again reminded that they "should work together to reduce unnecessary expenditure of resources for themselves and the Court. *McDaniel*, 2021 WL 641544, at *4 (citing Fed. R. Civ. P. 1 (stating that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and *the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding." (emphasis added)).

possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records, with which to defend on the grounds that alleged falsely-recorded services were not recorded, were not billed for, or were actually provided." *Id.* at 191.  Ultimately, the question is whether Relator has alleged "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

Here, Relator provides extensive allegations about the general process to receive DSH payments. (*SAC* ¶¶ 109–115, Doc. 88.)  Defendants must submit, *inter alia,* documentation that includes a Medicaid cost report and a form which establishes that the facility either (a) satisfies the obstetrician requirement, (b) did not offer non-emergency obstetric services as of December 22, 1987, or (c) treats inpatients who are predominately under 18 years of age. (*Id.* ¶ 113–15.) Facilities opening after December 22, 1987, must satisfy criteria (a) or (c). (*Id.* ¶ 115.)  Relator also attaches an incomplete example of this form. (*Id.* ¶ 115 & Ex. 6 thereto.)

Byrd also pleads:

> For the years 2008-2015, Vermilion submitted requests for DSH payments to the State of Louisiana and received DSH payments in the following amounts:

| | |
|---|---|
| 2008 | $309,446 |
| 2009 | $698,903 |
| 2010 | $918,466 |
| 2011 | $150,136 |
| 2015 | $34,026 |

(*SAC* ¶ 116, Doc. 88.)  Relator next alleges that Defendants were "not entitled to such payments because, among other things, it did not have at least two obstetricians with staff privileges who agreed to provide obstetric services to individuals entitled to medical assistance for such services, as required by 42 U.S.C. § 1396r-4(d)." (*Id.* ¶ 117.)

The *SAC* also states:

> Upon information and belief, based upon discussion with counsel
> for the State, Vermilion checked the box on the qualification form
> indicating that it did not offer non-emergency obstetric services to
> the general public as of December 22, 1987. The State believed
> Defendants were not entitled to this exception due to changes in the
> nature of the facility, changes in licensure, and changes in ownership
> occurring after that date. Because of these changes, the hospital that
> submitted claims for DSH payments was not the same hospital that
> had existed in December 1987.

(*Id.* ¶ 118.)

Additionally, around August 2014, the State contacted Myers & Stauffer to audit Vermillion's cost reports concerning the DSH issue and that firm asked for additional information to support the DSH payment. (*Id.* ¶ 119.)  Relator claims, "Upon information and belief, Vermilion responded to the audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit." (*Id.*) Vermillion worked with Byron Elsas, a New Orleans CPA, to aid in response to the audit, and "Relator had several discussions with Mr. Elsas, who told Relator that Vermillion should not have received the DSH payments in the first place." (*Id.* ¶ 120.)   Elsas sent Relator an email on December 29, 2014 "noting that, if the state noticed the problems, Vermilion would have to repay $150,136.00, but if it did not, Vermilion would be able to receive an additional $135,833.00:"

> PLEASE SEE LAST PAGE OF 3RD & 4TH ATTACHMENT.
> TITLED"MEDICAID DSH REPORT NOTES"
> **1. OB REQUIREMENT NOT MET**
> THERE EXISTS TWO OUTCOMES TO THESE AUDITS.
> 1. IF MEDICAID (STATE) DOES NOT SEE OR UNDERSTAND
> THE REPORT NOTES YOU WILL RECEIVE ANOTHER
> $135,833.00
> 2. IF MEDICAID (STATE) SEES & UNDERSTANDS THE
> REPORT NOTES YOU WILL OWE $150,136.00
> NEVER CAN TELL.
> IT WILL BE ONE OR THE OTHER.
> GOOD LUCK

BYRON ELSAS

(*Id.* ¶ 121.)  Byrd allegedly "kept management informed of his investigation of the DSH issue and

his discussions with Elsas, included Elsas's concerns that they would have to return the DSH

funds." (*Id.* ¶ 122.)  "Relator was terminated on January 21, 2015, before the audit was complete."

(*Id.* ¶ 123.)

Again, as with the other claims, the *SAC* provides information about a settlement between

the State and Defendants about the DSH payments:

> The December 5, 2019 settlement agreement between the State of
> Louisiana and Defendants provided, among other things, as follows:
>
>> The State contends that it has certain civil and administrative
>> causes of action against Acadia [defined in the agreement to
>> include Acadia and Vermilion] for allegedly engaging in the
>> following conduct in connection with the services Acadia's
>> facilities in Lafayette, Louisiana provided to Louisiana
>> Medicaid beneficiaries (hereinafter referred to as the
>> "Alleged Conduct"):
>>
>>> 1. From January 1, 2007, through December 31,
>>> 2015, Acadia submitted applications to the State of
>>> Louisiana for a disproportionate share ("DSH")
>>> payments that misrepresented Acadia's qualification
>>> for DSH payments, thereby causing the State to pay
>>> to Acadia DSH payments it was not entitled to[.]

(*Id.* ¶ 124.)

Relator also makes specific allegations about those involved in all of the frauds which

Defendants allegedly perpetrated:

> Acadia corporate officers, including division president Keith
> Furman and division CFO David Dempsey, were heavily involved
> in the operation of Vermilion, and were aware of and participated in
> the above actions. Hospital management reported directly to Acadia
> corporate headquarters, and worked closely with headquarters in the
> operation of the hospital. Acadia management closely tracked the
> hospital's financial performance, including its relationship with
> referral sources, and pressured hospital management to increase

business. Every month, the hospital was required to prepare an operations report covering all aspects of the hospital's management and submit it to corporate headquarters. Acadia policy called for all physician contracts to be approved by corporate headquarters. Patient billing was done using an Acadia billing package, and the corporate office oversaw all aspects of the billing and accounts receivable process.

. . . Acadia corporate headquarters was also closely involved in the preparation and review of hospital cost reports, which were outsourced to a private vendor and managed by Acadia. Planning documents such as the 2015 Strategic Plan discussed above were submitted to Acadia for review and approval.

(*Id.* ¶¶ 146, 149.)   Again, cost reports were also used for DSH payments. (*See id.* ¶¶ 113.)

Considering all of these allegations, the Court finds that Relator has sufficiently pled the information necessary to satisfy Rule 9(b).  As to "who," a reasonable inference from the *SAC* is that the "management" involved in the audit were the same ones who were "closely involved in the preparation and review of hospital costs reports" and in the audit and who were "heavily involved in the operation of Vermillion, and were aware of and participated in the above actions." (*Id.* ¶¶ 146, 149.)   Likewise, as to "where," a reasonable inference is that these claims were submitted at the facilities in question.

As to the "what" and "how," Vermilion's DSH claims were false (a) "because, among other things, it did not have at least two obstetricians with staff privileges who agreed to provide obstetric services to individuals entitled to medical assistance for such services," (*id.* ¶ 117); (b) because Vermilion "checked the box on the qualification form indicating that it did not offer non-emergency obstetric services to the general public as of December 22, 1987," (*id.* ¶¶ 118; *see id.* ¶¶ 113–15); and (c) "Vermillion responded to the audit by preparing reports falsely indicating that certain bad debts for patient care had been written off during the 2010-2011 period, when in fact they were not written off until the 2014 audit," (*id.* ¶ 119).

Defendants rely on the rule that, "While fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *Williams*, 417 F.3d at 454. However, Relator has satisfied this burden; he specifically alleges that these statements are "based upon discussion with counsel for the State," (*SAC* ¶¶ 118, Doc. 88; *see id.* ¶ 125), and, as explained above, that is sufficient.

"When" is a closer call, but the Court finds that Relator has met his burden here as well. Defendants complain that Relator gives only a broad date range of 2008 to 2015, (*SAC* ¶ 116, Doc. 88), which is insufficient under the case law, *see Gage*, 623 F. App'x at 627 (finding that relator failed to "allege with any specificity when [any defendant] presented invoices to the [U.S. Air Force] [because] [relator] allege[d] only that defendants submitted nearly $4 million of false invoices to the government between 2009 and 2011" and because "[t]his range [wa]s not specific enough to comply with Rule 9(b)." (citations omitted)).

But there are several problems with this position. First, Relator only worked for Defendants between July 2014 and January 2015, (*SAC* ¶ 10, Doc. 88), so most of this information is within the peculiar knowledge of the Defendants. Second, Byrd specifically alleges that "Counsel for the State of Louisiana has confirmed that, other than in connection with the December 2019 settlement, Defendants have not repaid any of the DSH funds they received." (*Id.* ¶ 125.) And third, Relator does in fact provide some key dates, specifically about the audit (August 2014); when the auditor sent an email conveying that Defendants would need to repay funds "IF MEDICAID (STATE) SEES & UNDERSTANDS THE REPORT NOTES" (December 29, 2014); and when he was terminated before the completion of the audit (January 21, 2015). (*Id.* ¶¶ 119, 121, 123.)

Considering (a) all of the details of the scheme, audit, investigation, and settlement summarized above, (b) the fact that "a plaintiff does not necessarily need the exact . . . dates to prove to a preponderance that fraudulent bills were actually submitted," *Grubbs*, 565 F.3d at 190, and (c) the fact that, "[t]o require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates," *id*., the Court finds that Relator has sufficiently pled that Relator submitted false claims for DSH payments.  That is, Byrd has alleged "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.  Indeed, Relator has provided "more than probable, nigh likely, circumstantial evidence" that false claims were submitted to the Government, and this is the "logical conclusion of the particular allegations in [Relator's] complaint[.]" *Id.* at 192.  It would "stretch the imagination" to find otherwise. *Id.* Accordingly, Relator's motion to dismiss on this issue will be denied.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that *Defendants' Partial Motion to Dismiss Counts I-III of Relator's Second Amended Complaint* (Doc. 92) filed by Defendants Acadia Healthcare Company, Inc. ("Acadia") and Vermilion Hospital is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>March 23, 2022</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**