**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES** *ex rel.* | ) | |
| **JEFFREY H. BYRD,** | ) | |
| | ) | |
| **Plaintiff-Relator,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | **NO. 18-312-JWD-EWD** |
| | ) | |
| **ACADIA HEALTHCARE** | ) | |
| **COMPANY, INC. and** | ) | |
| **VERMILION HOSPITAL, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT AND AUTHORITY .........................................................................................3

    A. RELATOR'S CLAIMS RELATED TO RODRIGUEZ ARE JURISDICTIONALLY BARRED BY THE FCA'S PUBLIC DISCLOSURE BAR. ....................................................3

    B. RELATOR CANNOT RELY UPON NOTATIONS IN A SPREADSHEET ALONE TO SATISFY HIS BURDEN OF ESTABLISHING AN FCA VIOLATION. ...............................6

        i. But For Vermilion's Bylaws, Rodriguez Could Admit Patients. ................7

        ii. Cursory Notations Are Insufficient to Demonstrate Which Practitioner Certified the Necessity of Care and Retained the Ultimate Responsibility for Patient Care. ...................................................................8

        iii. There is Evidence That Physicians Collaborated with Rodriguez by Admitting Patients, Certifying the Necessity of Care, and Retaining Ultimate Responsibility for Patient Care. ...................................................9

    C. THERE CAN BE NO VIOLATION OF THE FCA BECAUSE THE NOTED DEFICIENCIES ARE NOT MATERIAL TO A CLAIM FOR PAYMENT. ...........................10

        i. Each of the Noted Deficiencies are Conditions of Participation, Not Conditions of Payment. ..............................................................................13

        ii. The Regulatory Deficiencies Are Minor and Do Not Go to the Very Essence of the Bargain With CMS. ........................................................15

        iii. The Settlement Agreement is Irrelevant to a Finding of Materiality.........16

        iv. CMS Continued Paying Claims in Light of the Findings in the Statement of Deficiencies. .......................................................................17

    D. RELATOR'S EFFORTS TO EXTRAPOLATE OR EXTEND FINDINGS RELATED TO THE EIGHT SAMPLE PATIENTS TO ANY WIDER UNIVERSE OF CLAIMS NECESSARILY FAILS AS IT LACKS ANY STATISTICAL BASIS OR SUPPORT. ..............18

    E. RELATOR IMPROPERLY RELIES ON AND ATTACHES EXCERPTED MEDICAL RECORDS THAT LEAVE OUT MATERIAL EVIDENCE OF COLLABORATION BETWEEN RODRIGUEZ AND NUMEROUS PHYSICIANS. ...........................................20

III. CONCLUSION.....................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. BP Expl. & Prod., Inc.*,
  851 F.3d 384 (5th Cir. 2017) ...........................................................................................11

*U.S. ex rel. Berg v. Honeywell Int'l, Inc.*,
  740 F. App'x 535 (9th Cir. 2018) ....................................................................................12

*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*,
  842 F.3d 103 (1st Cir. 2016) ............................................................................................15

*U.S. ex rel. Holland v. DaVita, Inc.*,
  No. 6:17-cv-1592, 2021 WL 4948076 (M.D. Fla. Aug. 11, 2021)...................................13, 15

*U.S. ex rel. Janssen v. Lawrence Memorial Hosp.*,
  949 F.3d 533 (10th Cir. 2020) .........................................................................................12, 16

*U.S. ex rel. Longhi v. U.S.*,
  575 F.3d 458 (5th Cir. 2009) ............................................................................................11

*U.S. ex rel. McBride v. Halliburton Co.*,
  848 F.3d 1027 (D.C. Cir. 2017).......................................................................................12

*U.S. ex rel. Michaels v. Agape Senior Cmty., Inc.*,
  No. C/A 0:12-3466-JFA, 2015 WL 3903675 (D.S.C. June 25, 2015)...................................19

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
  No. 4:17-cv-1817, 2018 WL 2234814 (S.D. Tex. May 16, 2018)..........................................11

*U.S. ex rel. Phillips v. Permian Residential Care Ctr.*,
  386 F. Supp. 2d 879 (W.D. Tex. 2005).............................................................................3

*Smith v. Carolina Med. Ctr.*,
  274 F. Supp. 3d 300 (E.D. Pa. 2017) ...............................................................................14, 15

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
  125 F.3d 899 (5th Cir. 1997) ............................................................................................11

*U.S. v. Medco Phys. Unlimited*,
  No. 98-C-1622, 2000 U.S. Dist. LEXIS 5843 (N.D. Ill. Mar. 15, 2000)..............................18

*U.S. v. Sanford-Brown, Ltd.*,
  840 F.3d 445 (7th Cir. 2016) ............................................................................................12, 14

*U.S. v. Vista Hospice Care, Inc.*,
  No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ............................19, 20

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   579 U.S. 176 (2016)............................................................................... *passim*

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
   778 F. Supp. 2d 709 (N.D. Tex. 2011) ...............................................11

*Yates v. Pinellas Hematology & Oncology, P.A.*,
   21 F.4th 1288 (11th Cir. 2021) ............................................................17

**Statutes**

31 U.S.C. § 3729(b)(4) ...............................................................................11

31 U.S.C. § 3730(e)(4)..................................................................................4

42 U.S.C. § 1395f(a) .....................................................................................8

42 U.S.C. § 1395x(s)(2)(K)(ii) .....................................................................7

La. Rev. Stat. Ann. § 37:913 ........................................................................7

**Other Authorities**

42 C.F.R. § 412.3 ..........................................................................................7

42 C.F.R. § 412.3(a).......................................................................................7

42 C.F.R. § 482.12(c)(1)(i) ..........................................................................8

Fed. R. Civ. P. 56(c) .....................................................................................3

Defendants Acadia Healthcare Company, Inc. and Vermilion Hospital, LLC ("Defendants"), respond to Plaintiff-Relator Jeffrey H. Byrd's ("Byrd" or "Relator") Motion for Partial Summary Judgment (the "Motion") [Dkt. No. 147], and would show the Court that Relator's claims subject to this Motion are jurisdictionally barred, the Motion has no merit, and/or there is a genuine dispute as to material facts underlying Relator's Motion.

## I.     INTRODUCTION

Relator's Motion asks the Court to determine liability on 70 inpatient claims submitted to Medicare, based on a sample of eight claims chosen by Relator. (Mot. at 1, 12, 25).[1] Relator appears to seek summary judgment on a narrow set of claims, only those claims submitted by Defendants in which (1) Rhonda Kay Rodriguez, APRN ("Rodriguez") was listed as both the "admitting" and "attending" provider in Defendants' MedHost electronic medical records database, (2) the claims were submitted for inpatient services, and (3) the claims were submitted to Medicare and not another federal healthcare program. (Mot., pp. 11-12). This narrow universe of claims, according to Relator, is limited to 70 claims totaling $417,740.71. (Mot., p. 12). Relator, however, seeks summary judgment on these 70 claims based on his review and analysis of eight "sample" claims selected by Relator, and not subject to statistically valid random sampling. (Mot. at 12, 23); (Defendants' Rebuttal Expert Report of Stefan Boedeker ("Boedeker Report") [Dkt. No. 144-4], p. 29).

As an initial matter, Relator's claims related to Rodriguez are jurisdictionally barred by the False Claims Act's ("FCA") public disclosure bar, meaning that the Motion fails as a matter of law as the court lacks subject matter jurisdiction. The Motion also lacks merit because it is based on an incorrect interpretation and application of relevant Medicare regulations relating to APRN

---

[1] The exact relief sought by Relator is somewhat vague, as he seeks partial summary judgment "holding that all [70] claims for payment . . . , including but not limited to claims for the eight patients for whom records were produced, are false claims." (Mot., p. 25).

collaboration with physicians in the admission and ongoing care of patients in psychological hospitals. Relator contends that Rodriguez, as an APRN, could not admit patients or take a primary role in the care of patients. But the regulations relied upon by Relator do not support this contention. Additionally, despite Relator's reliance on eight exemplar claims, there is significant evidence that Rodriguez did collaborate with numerous physicians in the admission and ongoing care of patients, as permitted by federal and state law.

Relator's Motion also fails because the FCA requires that the false record or statement is "material" to the claim for payment. Here, the exact allegations and claims subject to the Motion were previously reported as deficiencies by a State survey agency acting on behalf of the Centers for Medicare & Medicaid Services ("CMS"). And, after CMS issued its Statement of Deficiencies for these same exact issues, it did not seek any overpayment recovery from Defendants. Rather, CMS approved a Plan of Correction for Defendants to remedy these issues, and it continued to pay claims to Defendants, did not terminate Defendants' Medicare enrollment, and did not seek any payment or penalty from Defendants resulting from these alleged deficiencies. As such, these regulatory deficiencies cannot be considered "material" under the test set forth by the Supreme Court in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 195-96 (2016).

Finally, Relator seeks to extrapolate any findings related to the eight "sample" claims to the universe of 70 claims that he alleges are similar, or possibly to a wider universe of claims. But, Relator's efforts to extend any findings as to these eight claims to any other set of claims, whether facially similar or not, falls flat. Any such effort is statistically invalid for myriad of reasons set forth in Defendants' rebuttal expert report. And, as Defendants demonstrate, Relator cannot prove the falsity of any claims outside of the eight claims at issue here without reviewing the patient records related to those claims and assessing whether Rodriguez appropriately documented collaboration with her collaborating physicians, who signed various forms and certifications in the

patient records, and other fact-intensive inquiries that are not subject to the extrapolation sought by Relator.

## II.     ARGUMENT AND AUTHORITY

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the initial burden of informing the court of the basis for the motion [and supporting evidence] . . . which the moving party believes demonstrate the absence of a genuine issue of material fact." *U.S. ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 881 (W.D. Tex. 2005). Because Relator failed to meet this burden, as set forth below, his Motion should be denied.

If the Court finds that Relator has met his initial burden, only then does "the burden shift to the nonmovant to show the existence of a genuine issue for trial." *Id.* At that stage, "[a]ll justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmovant." *Id.* And, in that case, there remains a genuine issue of material fact as to the extent that Rodriguez collaborated with her collaborating physicians, thereby precluding summary judgment for Relator.

### a.     Relator's Claims Related to Rodriguez Are Jurisdictionally Barred by the FCA's Public Disclosure Bar.

Contemporaneous with Relator's filing of his Motion, Defendants filed a motion for summary judgment. [Dkt. No. 146]. In Defendants' summary judgment motion, they fully briefed the FCA public disclosure bar, which jurisdictionally bars all of Relator's claims related to Rodriguez. Defendants incorporate herein the arguments from Section II of that motion, with additional context related to Relator's Motion.

The public disclosure bar precludes Relator's allegations concerning Rodriguez because substantially the same allegations were publicly disclosed through an audit and report prepared by CMS, and Relator is not the original source of those allegations. In *Rockwell Int'l Corp. v. U.S. ex rel. Stone*, the Supreme Court confirmed that the FCA's public disclosure bar is jurisdictional and that, if triggered, a relator must prove that he or she was the original source on a claim-by-claim basis. 549 U.S. 457, 467-68 (2007) (citing 31 U.S.C. § 3730(e)(4)). The public disclosure bar is implicated here because Relator's allegations are nearly identical to the Statement of Deficiencies noted in a CMS audit conducted of Defendants in May 2015. (*See* Defendants' Response to Relator's Statement of Undisputed Material Facts ("Resp. to SUMF"), ¶¶ 24-26).

The regulatory deficiencies noted in the CMS audit report[2] fall into a handful of categories: (1) patients were not "admitted to the hospital under the care of a doctor of medicine or osteopathy"; (2) patients were not "under the care of a physician as evidenced by no documentation noted in the patient chart that a physician had seen, examined, or evaluated" the patient; (3) patients were "admitted to the hospital under the services of a nurse practitioner (APRN) with no involvement from the physician"; and (4) nurse practitioners failed to practice "in accordance with the Medical Staff By-laws and Federal Rules and Regulations." (Relator's Statement of Material Facts ("Relator's SUMF"), Ex. 11, CMS Statement of Deficiencies and Plan of Correction).

Relator's claims at issue in the Motion relate to allegations that Rodriguez, an APRN, improperly admitted patients to the hospital and provided care to those patients while inpatient without proper involvement, supervision, or collaboration with a physician. (Mot., pp. 5-8). These claims are also premised on Defendants' alleged failure to comply with the hospital's Medical Staff Bylaws relating to the scope of services for APRNs and documentation of the involvement

---

[2] As set out in Defendants' summary judgment motion, the CMS audit report—the Statement of Deficiencies and Plan of Correction—is a "public disclosure" for purposes of the FCA's public disclosure bar. (Defs' Motion, pp. 16-17).

of physicians in the rendering of care to patients. (*Id.* at 3-5). These are the same exact issues identified by CMS in May 2015.

Relator alleges that Rodriguez admitted patients to the hospital without supervision or collaboration with a physician. (*Id.* at 3-4). The Statement of Deficiencies noted that Rodriguez admitted patients to the hospital without proper supervision or collaboration with a physician. (*See, e.g.*, Relator's SUMF, Ex. 11, at AVH_0013693-94) ("Review of the demographic form (face sheet) of the clinical record revealed the Admitting and Attending Physician was identified as [Rodriguez]. Review of the pre-printed admission orders revealed the following was pre-printed on the top of the orders: 'Inpatient Admit to [Dr. Dickens], [Rodriguez].' The orders revealed the following signatures: 'T.O.R.B.V. (Telephone order read back verification) Dr. [Rodriguez]/S21LPN 05/18/15 at 3:53 p.m . . 'The order revealed [Rodriguez] signed the orders on 05/19/15 at 9:15 a.m.").

Relator alleges that Rodriguez wrongly prepared and approved patient treatment plans and was the provider responsible for patient care. (Mot., pp. 4-8). The Statement of Deficiencies noted that Rodriguez signed patient treatment plans without co-signatures from collaborating physicians, and noted lack of documented physician supervision for some patients under Rodriguez's care. (*See, e.g.*, Relator's SUMF, Ex. 11, at AVH_0013712-13) ("The psychiatric evaluation was documented by [Rodriguez], and [Rodriguez] signed the treatment plan under 'Physician approval of treatment plan.' Further review of the records revealed no documented evidence that a physician/psychiatrist had seen, evaluated or examined [three patients] during their hospital stay.").

Relator's Second Amended Complaint bears out this close relationship between his allegations relating to Rodriguez and the CMS Statement of Deficiencies and Plan of Correction. The Statement of Deficiencies holds a prominent place in Relator's allegations related to

Rodriguez. (*See* Second Amended Complaint ("SAC") [Dkt. No. 88], ¶¶ 87-92). Relator goes so far as to copy and paste entire paragraphs from the Statement of Deficiencies into the SAC. *Id.* (copying and pasting findings from the Statement of Deficiencies related to Rodriguez admitting her own patients and managing her own patients, non-compliance with hospital bylaws, physician orders written by Rodriguez without co-signature by a collaborating physician, and Rodriguez making discharge decisions without involvement of a physician). Once again, these quoted findings from the Statement of Deficiencies and Plan of Correction are the same allegations of deficiencies that serve as the basis for Relator's claims that are subject to the Motion.

Relator makes no attempt to prove that he was the "original source" of the claims. His Motion contains no evidence to show that he had any direct or independent knowledge of the information on which his claims relating to Rodriguez are based. To the contrary, Relator notes that the CMS audit and resulting Statement of Deficiencies and Plan of Correction were executed *after* he left his employment at Vermilion. (*Id.*, ¶ 87) ("In May 2015, *after Relator was terminated*, state inspectors conducted an investigation at Vermilion, and interviewed numerous individuals.") (emphasis added). Thus, Relator is not an original source of the claims concerning Rodriguez—each of which is substantially identical to the deficiencies noted in the publicly available Statement of Deficiencies. Accordingly, Relator's claims relating to Rodriguez are jurisdictionally barred.

b. **Relator Cannot Rely Upon Notations in a Spreadsheet Alone to Satisfy His Burden of Establishing an FCA Violation.**

Relator's argument that Rodriguez merely being listed as the admitting and attending physician in Defendants' electronic medical records system proves that the claims submitted for these patients were FCA violations is deeply flawed. This argument fails as a matter of law because Rodriguez was permitted to admit patients but for Vermilion's bylaws, which did not materially impact the Government's payment decisions, and the determination of whether the claims in question were false depends upon evidence of necessary signatures or other signs of collaboration

—rather than cursory notations of the admitting and attending practitioner on a spreadsheet. It also fails factually because there is clear evidence that, when necessary and required by law, Rodriguez collaborated with physicians in the process of admitting and attending to patients in compliance with federal and state law.

      i.      <u>But For Vermilion's Bylaws, Rodriguez Could Admit Patients.</u>

The relevant Medicare regulations provide that:

> (a) For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital, including a critical access hospital, if formally admitted as an inpatient pursuant to an order for inpatient admission by a physician <u>or other qualified practitioner</u> . . .
>
> (b) The order must be furnished by a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition. The practitioner may not delegate the decision (order) to another individual who is not authorized by the State to admit patients, or has not been granted admitting privileges applicable to that patient by the hospital's medical staff.

42 C.F.R. § 412.3 (emphasis added). Relator does not challenge that APRNs may be qualified practitioners for purposes of 42 C.F.R. § 412.3(a) and that admitting patients is within the permissible scope of APRN practice under Louisiana law—the Louisiana Nurse Practitioner Act (LNPA)—so long as it is done in accordance with a collaborative practice agreement. La. Rev. Stat. Ann. § 37:913. *See also* 42 U.S.C. § 1395x(s)(2)(K)(ii). Rodriguez's collaborative practice agreements specifically referenced her ability to admit patients. (*See* Relator's SUMF, Ex. 4-6 ("The APRN will collaborate with the physician in continuing to provide care for the patients <u>admitted by APRN.</u>[3]") (emphasis added)). Thus, the only potential argument that Rodriguez admitting patients was improper is that Vermilion's *bylaws* did not provide APRNs with admitting

---

[3] Notably, these collaborative practice agreements are drafted and provided by the Louisiana State Board of Nursing, further evidencing that APRNs are clearly permitted to admit hospital patients under state law. Def's Motion for Summary Judgment [Dkt. No. 146], p. 5 n.5.

privileges. As explained below, this non-compliance with hospital bylaws would not be material to the government's payment decisions and could not support an FCA claim. *See infra* § II.c. Consequently, any argument that Rodriguez being designated as the admitting practitioner proves an FCA violation fails as a matter of law.

        ii.    <u>Cursory Notations Are Insufficient to Demonstrate Which Practitioner Certified the Necessity of Care and Retained the Ultimate Responsibility for Patient Care.</u>

Fundamentally, the fact that Rodriguez was listed as the admitting and attending physician in Defendants' electronic medical records system does not prove that collaborating physicians did not certify the necessity of care or retain ultimate responsibility for patient care. The electronic records and the spreadsheet of claims produced by Defendants did not have a separate field indicating who *certified* or *recertified* the necessity of patients' medical care, so it is illogical to take the leap that the designations therein establish a lack of physician certifications within all seventy patients' records—or any wider universe of patients. The relevant regulations require physician certifications but do not say that an APRN signature in addition to a physician signature renders the certification invalid or that a certification must be made by whomever is designated as the attending practitioner in electronic records. *See* 42 U.S.C. § 1395f(a).

With regard to ultimate responsibility for the care of patients, there is more nuance in the relevant regulations than can be captured in the columns of a spreadsheet. There is a requirement that "[e]very Medicare patient is under the care of . . . [a] doctor of medicine or osteopathy." 42 C.F.R. § 482.12(c)(1)(i). However, this requirement is immediately followed by the qualification that "[t]his provision is not to be construed to limit the authority of a doctor of medicine or osteopathy to delegate tasks to other qualified health care personnel to the extent recognized under State law or a State's regulatory mechanism." *Id.* Therefore, physicians are explicitly permitted to delegate tasks to other qualified health professionals such as APRNs—a practice that is expressly

contemplated and approved by state law, including the LNPA. The spreadsheet of claims provides no indication that Rodriguez's designation as the attending practitioner meant that her role overstepped the permissible scope of delegation from a collaborating physician, or that the physicians Rodriguez collaborated with did not retain ultimate responsibility for the patients' care. Rodriguez and Dr. Dickens, the Medical Director for the majority of the relevant time period, both testified in their depositions that the *collaborating physicians* maintained ultimate responsibility for the care of the patients. (*See* Resp. to SUMF, ¶ 57). For the issues of physician certifications and ultimate responsibility for patient care, the regulations look for more than just simple designations of admitting and attending physicians, so Relator cannot rely on notations in the claims spreadsheet alone to carry his burden.

   iii. <u>There is Evidence That Physicians Collaborated with Rodriguez by Admitting Patients, Certifying the Necessity of Care, and Retaining Ultimate Responsibility for Patient Care.</u>

  Contrary to Relator's portrayal of the evidence, there are multiple indications that physicians collaborated with Rodriguez by admitting patients, certifying the necessity of care, and retaining ultimate responsibility for patient care. Rodriguez testified that she would "sign [ ] treatment plan[s] along with other members of the multidisciplinary treatment team," including Dr. Dickens. (Resp. to SUMF, Ex. 13, Rodriguez Dep. at 70-71). Dr. Dickens also provided testimony to this effect. (Resp. to SUMF, Ex. 8, Dickens Dep. at 47-48). Evidence in the Statement of Deficiencies and Plan of Corrections directly corroborates this testimony. (*See* Relator's SUMF, Ex. 17, pp. 6-7 ([Patient #6's] Multidisciplinary Treatment Plan dated 05/26/15 revealed the Physician Approval of Treatment Plan was <u>signed by S7APRN [Rodriguez]</u> at 9:25 a.m. The treatment plan was <u>co-signed by S9Psychiatrist [Dr. Dickens]</u> on 05/26/15 at 2:22 p.m. . . . [Patient #7's] Physician Approval of Treatment Plan was <u>signed by S7APRN [Rodriguez]</u> at 9:05 a.m. The treatment plan was <u>co-signed by S9Psychiatrist [Dr. Dickens]</u> on 05/26/15 at 9:05 a.m. . . . [Patient

#8's] Multidisciplinary Treatment Plan dated 05/26/15 revealed the Physician Approval of Treatment Plan was signed by S7APRN [Rodriguez] and co-signed by S9Psychiatrist [Dr. Dickens] on 05/26/15.")). These multidisciplinary treatment plans signed by Dr. Dickens are evidence that Rodriguez did not bear ultimate responsibility for the care of these patients. In fact, Rodriguez acknowledged that she did not have the authority to unilaterally sign off on treatment plans because that responsibility fell to Dr. Dickens, her collaborating physician. (Resp. to SUMF, Ex. 13, Rodriguez Dep. at 70-71).

Additionally, multidisciplinary treatment plans like the ones referenced in the Statement of Deficiencies and Plan of Corrections contained re-certifications of necessity of care, belying Relator's argument that claims where Rodriguez was listed as the attending physician were false because they did not contain necessary physician certifications or recertifications. The records relied upon by Relator in his Motion contain numerous other examples of physician collaboration, supervision, ordering, certification, and involvement in admitting patients and managing their care. (*See* Resp. to SUMF, ¶ 142 (citing numerous places in the patient records attached as exhibits to the Motion where Rodriguez clearly collaborated with physicians including Drs. Sanders, Dickens, Salmeron, and Dawson)).

This evidence precludes summary judgment against Defendants for the seventy patients for whom Rodriguez was listed as the admitting and attending practitioner because, at a minimum, it creates a patient-specific question of material fact as to whether there was adequate physician involvement with admission orders, certifications, and patient care.

c. **There Can Be No Violation of the FCA Because The Noted Deficiencies Are Not Material to a Claim for Payment.**

Even before the Supreme Court's seminal *Escobar* case in 2016, courts in the Fifth Circuit have long recognized that for FCA liability to attach from the violation of a statute, regulation, or contract, compliance with that statute, regulation, or contract must be *material* to the Government

agency's decision to pay the claim. *See Escobar*, 579 U.S. at 192; *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 467 (5th Cir. 2009) ("[O]ur jurisprudence holds that a false or fraudulent claim or statement violates the FCA only if it is material."); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[T]he FCA interdicts material misrepresentations made to qualify for government privileges and services.").

Materiality, an essential element of any FCA claim, is defined to mean that a claim or statement has "a natural tendency to influence" or is "capable of influencing . . . the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). To establish a violation under this prong of the FCA, the Fifth Circuit requires proof that the alleged violation was material. *See U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 717 (N.D. Tex. 2011). The Supreme Court noted that materiality turns "on whether the government would pay the claim or not if it knew of the claimant's violation." *U.S. ex rel. Patel v. Catholic Health Initiatives*, No. 4:17-cv-1817, 2018 WL 2234814, at *16 (S.D. Tex. May 16, 2018) (citing *Escobar*, 579 U.S. at 194-95). "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) (quoting *Escobar*, 579 U.S. at 195). In *Abbott*, the Fifth Circuit stated that "[a]s recognized in *Escobar*, when the [agency] decided to allow [the defendant] to continue drilling after a substantial investigation into Plaintiffs' allegations, that decision represents 'strong evidence' that the requirements in those regulations are not material." *Id.* at 388 (citing *Escobar*, 579 U.S. at 195).

"The materiality standard is demanding," as the FCA is not "an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194. And, again, it is insufficient "for a finding of materiality that the Government would have the *option* to decline to pay if it knew of the defendant's noncompliance."

*Id.* And, where the government agency was aware of a defendant's noncompliance through its own audit or investigation, and nonetheless continues paying claims, that is very strong evidence that those deficiencies are not material. *Id.; U.S. ex rel. Berg v. Honeywell Int'l, Inc.*, 740 F. App'x 535, 538 (9th Cir. 2018) (affirming summary judgment for FCA defendant and holding that relator failed to raise a triable issue as to materiality where evidence demonstrated that the government agency continued to pay claims despite knowledge of the defendant's alleged fraud through "the results of its own audit"); *U.S. ex rel. Janssen v. Lawrence Memorial Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020) (affirming summary judgment for FCA defendant after finding that CMS was aware of defendant's noncompliance through an audit conducted by a CMS contractor and it continued to pay defendant's Medicare claims); *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (affirming summary judgment for defendant, on remand from the Supreme Court, where the federal agency "already examined [defendant] multiple times over" and concluded "neither administrative penalties nor termination was warranted"); *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("[W]e have the benefit of hindsight and should not ignore what actually occurred: the [Government] investigated [relator's] allegations and did not disallow any charged costs. . . . This is 'very strong evidence' that the requirements allegedly violated . . . are not material.").

Importantly, as the court in *Lawrence Memorial Hospital* held, the question of materiality is assessed from the perspective "of the recipient of the alleged misrepresentation," which in both that case and the present case is CMS. 949 F.3d at 540 (affirming summary judgment for FCA defendant upon holding that the relator failed to prove materiality of noncompliance with CMS decision to pay Medicare claims). Citing *Escobar*, the court noted that materiality "look[s] to the *effect on the likely or actual behavior of the recipient* of the alleged misrepresentation." *Id.* at 540-41 (citing *Escobar*, 579 U.S. at 193). On that basis, because CMS knew about a defendant's non-

compliance and nonetheless elected not to impose penalties or "restrict payment," but rather to "address [the regulatory] violations through the regulatory process, not through the revocation or denial of payment," this factor weighs against a finding of materiality. *U.S. ex rel. Holland v. DaVita, Inc.*, No. 6:17-cv-1592, 2021 WL 4948076, at *4 (M.D. Fla. Aug. 11, 2021) (granting defendant's motion for summary judgment on FCA claims where "no reasonable jury could conclude these deficiencies were material").

In its motion to dismiss the SAC, Defendants previously briefed the issue of materiality as it relates to the deficiencies noted for services provided by Rodriguez. [Dkt. 92, pp. 7-11]. The Court, in denying Defendants' motion, noted five bases for finding that Relator had sufficiently pled materiality: (1) compliance was a condition of payment, (2) the requirement was part of the "very essence of the bargain"; (3) the settlement agreement provides an example of enforcement; (4) there are no allegations that the Government paid claims after learning of the violation; and (5) the violations are not "minor or insubstantial." [Dkt. 100, pp. 21-29]. These findings are addressed below.

i. <u>Each of the Noted Deficiencies are Conditions of Participation, Not Conditions of Payment.</u>

Relator's claims at issue in the Motion are predicated on alleged violations of Medicare regulations and Vermilion's hospital bylaws. But, evidence adduced in discovery makes clear that the Government did not view these deficiencies as material to its payment decisions. The evidence is clear that CMS, through a State survey agency, identified deficiencies in Vermilion's operations as it related to use of APRNs and documentation of collaboration with physicians. (Relator's SUMF, Ex. 11). Each of these deficiencies stemmed from noncompliance with federal regulations categorized as "conditions of participation"—not conditions of payment—or Vermilion's hospital bylaws. (*Id.*); (Resp. to SUMF, ¶ 41); (Mot., p. 8) (conceding that the deficiencies were all violations of conditions of participation). A finding that a particular "requirement is a condition of

participation undermines materiality when violating that requirement would lead the regulatory agency [CMS] to initiate corrective measures other than declining payment." *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 320 (E.D. Pa. 2017) (citing *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 309 (3d Cir. 2011)). The distinction between a condition of participation and condition of payment, therefore, is highly relevant in determining materiality of a finding of a regulatory deficiency. *Id.* ("The purpose of this limitation is to prevent courts from using the FCA to enforce regulatory provisions that the regulatory agencies themselves have chosen either not enforce or to enforce more delicately.").

Resulting from its report of these findings, CMS worked with Defendants to prepare a plan of correction wherein Defendants amended the hospital bylaws and instituted other processes to ensure proper documentation of supervision, collaboration, and delineation of duties. (Resp. to SUMF, Ex. 18, Kennedy Dep. at 85-86); (Resp. to SUMF, Ex. 37, Smith 30(b)(6) Dep. at 110-11). CMS did not demand or otherwise seek repayment for any claims resulting from the noted deficiencies, did not fine or otherwise penalize Defendants, and Vermilion hospital remained an enrolled Medicare provider whose claims continued to be paid by Medicare. And, as the Seventh Circuit noted in *Sanford-Brown,* materiality is not proven where the relevant federal agency investigated the same allegations as those in the relator's FCA complaint and concluded "neither administrative penalties nor termination was warranted." *Sanford-Brown*, 840 F.3d at 447. So too did CMS investigate Defendants and ultimately elect not to impose *any* administrative or financial penalties or terminate Defendants' Medicare enrollment. The deficiencies cited by Relator, therefore, are immaterial to the Government's payment decision and cannot support an FCA claim.

ii. The Regulatory Deficiencies Are Minor and Do Not Go to the Very Essence of the Bargain With CMS.

The deficiencies related to Rodriguez do not go to the "very essence of the bargain" between Defendants and CMS. *See U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016). Relator provides evidence that Defendants were sometimes noncompliant with regulations, "[b]ut given the complex and detailed regulations accompanying Medicare claims, something more needs be shown for violations to go to the essence of the bargain." *DaVita*, 2021 WL 4948076, at *4 (citing *Lawrence Memorial Hosp.*, 949 F.3d at 543). The court in *DaVita* found that the regulatory deficiencies did not go to the essence of the bargain because, "[t]ypically, when [such] deficiencies are found, the laboratory is simply asked to address them to maintain certification." *Id.* And, importantly, because the relator in *DaVita* failed to "produce[ ] other evidence showing the Government considers violations like these significant enough to restrict payment, nor evidence of inaccurate results that led to patient harm," no reasonable jury could conclude that the noted deficiencies went "to the essence of the bargain." *Id.* Where the noncompliance is addressed "through the regulatory process, not through the revocation or denial of payment," it is highly unlikely that the deficiencies go to the essence of the bargain with CMS. *Id.. See also Smith*, 274 F. Supp. 3d at 320 (noting concern with permitting relators to use the FCA to enforce regulations that may be addressed through an administrative process, which would "shift the burden of enforcing the Medicare regulations" to the courts and not the agency that is responsible—CMS).

Similarly, here, CMS identified regulatory noncompliance by Defendants. And these deficiencies were all addressed through a Plan of Correction negotiated with and approved by CMS. At no point did CMS seek repayment of claims, revoke Defendants' Medicare enrollment, or deny claims for services provided by Rodriguez. As such, Relator cannot prove that this noncompliance goes to the very essence of the bargain between Defendants and CMS.

### iii. The Settlement Agreement is Irrelevant to a Finding of Materiality.

For purposes of assessing materiality of a given regulatory violation or deficiency, the relevant government actor is not the Department of Justice or State of Louisiana, but rather the "client agency" that actually approves and pays the claims. As the Tenth Circuit noted in *Lawrence Memorial Hospital*, the question of materiality is assessed from the perspective "of the recipient of the alleged misrepresentation," which in both that case and this case is CMS. 949 F.3d at 540. The court noted that the Supreme Court specifically stated that materiality is tested in relation "to the *effect on the likely or actual behavior of the recipient* of the alleged misrepresentation." *Id.* at 540-41 (citing *Escobar*, 579 U.S. at 193). Relator cannot impose his view over that of CMS, the agency responsible for paying the claims at issue.

Additionally, CMS was not a party to the settlement agreement in question; only the State of Louisiana was a party. (*See* Dkt. No. 88-2, Settlement Agreement). Under the reasoning espoused in *Lawrence Memorial Hospital*, it is only CMS's assessment of materiality that is relevant, not the State of Louisiana (or Relator). Furthermore, the "Alleged Conduct" in the settlement agreement relates to the State's allegation that Rodriguez "did not have the required collaborative practice agreement with a collaborating physician as required by Louisiana law." (*See id.*, SAC, ¶ 84). This allegation has been disproven, as Relator has acknowledged. (Mot., pp. 2-3) ("While working at Vermilion, Rodriguez had collaborative practice agreements with various physicians."). The settlement agreement does not relate whatsoever to the allegations underpinning Relator's Motion relating to certifications and Rodriguez's ability to admit patients and be the attending physician for those patients. The settlement agreement is silent as to any such allegations, and as such is not relevant for purposes of assessing materiality. The settlement agreement is not an example of government enforcement of the regulations at issue because the covered conduct in the agreement is wholly different than that underlying Relator's Motion.

iv.    CMS Continued Paying Claims in Light of the Findings in the Statement of Deficiencies.

The argument that CMS *could* have terminated Vermilion's Medicare enrollment had it not submitted an approved plan of correction, or that CMS *could* have refused to pay Vermilion for claims submitted relating to Rodriguez, undercuts any argument by Relator that the noted deficiencies were material. (Relator's SUMF Ex. 12, Kennedy Dep. at 80-83); (Relator's SUMF Ex. 16, LDHH Letter). In *Escobar*, the Supreme Court rejected the Government's expansive view of materiality "that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government *would be entitled to refuse payment* were it aware of the violation." *Escobar*, 579 U.S. at 195 (emphasis added); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1304-05 (11th Cir. 2021) ("In *Escobar*, the Supreme Court rejected the notion that a false claim is material if the United States merely *could* refuse payment if it were aware of the violation—irrespective of whether it did or would."). Here, CMS *could* have sought overpayment repayments from Defendants, imposed administrative penalties, or terminated Defendants as participating providers in Medicare. (Resp. to SUMF Ex. 37, Smith 30(b)(6) Dep. at 110-11) ("What I would note, though, is that the things that are noted here, the plan of corrections addresses, are all conditions of participation, not conditions of payment. So -- and I also know that nothing here rose to a level of materiality where CMS requested a reimbursement or repayment of any fees paid, which is in their purview, as you know, to do."); (Resp. to SUMF Ex. 60, Kennedy Dep. at 141) ("Q. . . . CMS could have asked Acadia to repay claims that it related to the care identified in the survey. Right? A. Yes. Q. So CMS could have asked for the money back? A. Yes. MR. GARRISON: Object to the form. Q. Did CMS ask for the money back? A. No.").

Accordingly, because CMS was well aware of alleged regulatory deficiencies relating to services provided by Rodriguez—based on a survey and Statement of Deficiencies prepared by an

agent of CMS—and then CMS affirmatively elected not to impose any penalties or repayment obligations on Defendants, Relator has failed to raise a triable issue as to the element of materiality on the "demanding" standard established in *Escobar*.

      **d.**     **<u>Relator's Efforts to Extrapolate or Extend Findings Related to the Eight Sample Patients to Any Wider Universe of Claims Necessarily Fails as it Lacks Any Statistical Basis or Support.</u>**

As explained in greater detail in the Boedeker Report [Dkt. No. 144-4] and Defendants' Memorandum in Support of Motion to Preclude Testimony and the Expert Opinion of Relator's Expert Robert D. Church, Jr. [Dkt. No. 144-1], Relator's attempt to extrapolate liability and damages from a non-random sample is statistically invalid because Church did not employ reliable methodologies. Relator admits that he, rather than his expert, "selected a sample of 100 claims where Rodriguez was identified as the admitting and/or attending physician, and requested that Defendants produce medical records for such claims." (Mot., p. 17).[4] This admission resolves the ambiguity in Church's report about who actually engaged in the sample selection process. It is "highly unusual for the expert retained to perform an extrapolation of sample results to not be involved in the sampling plan and the proper selection of the sample which ensures the randomness of the sample to be analyzed," and this further underscores the fact Church did not follow accepted practices among statisticians that would have provided "necessary proof of the randomness of the sample." (Boedeker Report, ¶¶ 61, 64). "Extrapolating from a sample that is not verifiably random is inconsistent with the literature and prevailing practices among statisticians, as set out by the American Statistical Association," and "[t]his flaw alone undermines the reliability of the entirety of the sampling process . . . ." (*Id.*, ¶¶ 61-62).

---

[4] Relator's response in opposition to the Motion to Preclude Testimony and the Expert Opinion of Relator's Expert Robert D. Church, Jr. [Dkt. No. 161] goes on to clarify that "Relator selected the sample and served document requests for the selected admissions a week later." [Dkt. No. 161, p. 7 n.6].

Beyond the fatal flaws in the execution of the statistical sampling and extrapolation, it is fundamentally inappropriate to extrapolate liability in an FCA action where, as is the case here, the determination of whether a given claim constitutes an FCA violation requires a fact-intensive, patient-specific inquiry. *See U.S. v. Medco Phys. Unlimited*, No. 98-C-1622, 2000 U.S. Dist. LEXIS 5843, at \*23 (N.D. Ill. Mar. 15, 2000) (ruling on motion for summary judgment and rejecting an attempted extrapolation of liability from a sixteen-patient sample to a broader set of patients whose records had not been reviewed and noting the lack of "case law or other authority to support such a request"); *U.S. v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at \*11 (N.D. Tex. June 20, 2016) ("[S]tatistical sampling . . . cannot establish liability . . . as the underlying determination . . . is inherently subjective, patient-specific, and dependent on the judgment of involved physicians.") (emphasis added); *U.S. ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. C/A 0:12-3466-JFA, 2015 WL 3903675, at \*8 (D.S.C. June 25, 2015) (holding that because the question of FCA liability "for each of the patients involved in this action is [a] highly fact-intensive inquiry involving medical testimony after a thorough review of the detailed medical chart of each individual patient," extrapolation of liability and damages is inappropriate). As demonstrated by the physician signatures in other patient records and references to physician signatures on treatment plans in the Statement of Deficiencies and Plan of Corrections, there is concrete evidence of physician collaboration in both admitting and attending to patients that precludes a determination of broader liability without a patient-by-patient review of the medical records.[5] (Resp. to SUMF, ¶ 142). Based on a review of these eight records, the Court (or trier of

---

[5] Relator attempts to paint the picture that Defendants refused to produce patient records and are now hiding behind the lack of records as the only means of rebutting Relator's claims. (Mot., p. 24 n.5). To the contrary, Defendants produced the patient records that Relator requested, and these records provide evidence of collaboration with physicians. *See supra* § II.b.iii. After the Court recommended that the parties focus on a reasonable number of claims, rather than all of them, it was Relator—not Defendants—who suggested that the Defendants should produce a sample of one hundred patients' records. (Resp. to SUMF, ¶ 67). Relator's counsel then stated "[w]e don't anticipate seeking any more records . . . ." (*Id.*). Defendants do not bear the burden of proof in this action or an

fact at trial) cannot simply *presume* liability for a broader group of seventy patients or any wider universe of claims.

"The Supreme Court and the Fifth Circuit have made clear that sampling and extrapolation cannot always be used to prove liability, and courts are required to engage in a particularized analysis of the whether extrapolation from a particular data set can reliably prove the elements of the specific claim." *Vista Hospice*, 2016 WL 3449833, at *13 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1017 (5th Cir. 1997)). Relator's attempt at extrapolating liability must be rejected because the method he used to select his sample data set was unreliable and a set of records for eight patients cannot prove the absence of physician involvement in care for a broader set of seventy patients (or the hundreds of other patients seen by Rodriguez), which is a necessary element of his claims. *See Vista Hospice*, 2016 WL 3449833, at *11 (citing *Dukes*, 564 U.S. at 367) ("Where the nature of the claim requires an individualized determination, that determination cannot be replaced by 'Trial by Formula.'").

   e.   **Relator Improperly Relies on and Attaches *Excerpted* Medical Records that Leave Out Material Evidence of Collaboration Between Rodriguez and Numerous Physicians.**

In support of his Motion, Relator cites to and attaches medical records for eight patients for whom Rodriguez was listed as the admitting and attending physician in the spreadsheet pulled from Defendants' MedHost electronic medical records database. (Mot., p. 19 n.6); (Relator's SUMF, Ex. 29-38). These exhibits contain excerpts of medical records for the eight patients, which each range from 17 to 33 pages per patient. The patients' medical records produced in discovery, for these same eight patients ranged from 165 to 405 pages. And, within the pages that were *excluded* from the exhibits filed by Relator were numerous examples of Rodriguez's collaboration with physicians, physician orders, notations to physicians listed as admitting and/or attending

---

obligation to produce documents beyond what was requested and agreed to, and any fault for Relator's inability to prove the necessary elements of his claims due to the limited evidence he gathered falls squarely on his shoulders.

providers, signatures of collaborating physicians, and other evidence undercutting Relator's claims. (*See* Resp. to SUMF, ¶ 142).

What is even more perplexing is the fact that Rodriguez testified about some of these same patients' medical records in her deposition and was shown deposition exhibits that included pages excluded from the versions attached to the Motion. During her deposition, Rodriguez was shown a number of excerpts of patient records in which she was listed as either admitting or attending provider, or both. (*See, e.g.*, Rodriguez Dep. Ex. 12-15). When asked about her collaboration with a physician, Rodriguez specifically pointed out places where the medical records noted her collaboration with a physician. For instance, Rodriguez was shown a 45-page[6] excerpt of the medical records for Patient D.W. (*See* Resp. to SUMF, Ex. 49). In reviewing those records during her deposition, Rodriguez noted places where she collaborated with one of her collaborating physicians, Dr. Sanders. (Resp. to SUMF, Ex. 49, Rodriguez Dep. at 112-114) ("On 2/3 at 11:30, I had spoken with him about an order for pain for the patient, the hydrocodone, and that was from him."). That page of Patient D.W.'s medical records is Bates stamped AVH_0021210. (*Id.*) (Q. Is that on – at the very top, the Bates number, it's upside down, but 21210? A. Yes.")

As exhibits to his Statement of Material Facts, Relator attaches two exhibits containing excerpts of the medical records for this patient—Exhibits 29 and 30. Interestingly, the page of the medical records in which Rodriguez noted Dr. Sanders's collaboration was excluded from Relator's exhibits. (*See* Resp. to SUMF, ¶ 75). These two exhibits comprise 19 pages out of a total of 376 pages within Patient D.W.'s medical records, which were produced to Relator in discovery. As it relates to this same patient, Relator also contends that "Rodriguez prepared and signed the Physician Discharge Summary, which must be signed by the attending physician." (Mot., p. 13);

---

[6] While the medical records shown to Rodriguez in her deposition totaled 45 pages, the version attached to Relator's Motion comprised only 19 pages. (*See* Relator's SUMF Ex. 29-30).

(Relator's SUMF, ¶ 76) ("Rodriguez signed the patient's discharge order on February 10, 2012 [and] [t]here was no signature by a physician" on the discharge order). What Relator fails to note is that the very *next page* of this patient's discharge orders, which Rodriguez was asked about in her deposition, was notably absent from this patient's medical records attached to Relator's Motion, and this page includes signatures other than Rodriguez's. (Resp. to SUMF, ¶ 76) (noting that Relator asked Rodriguez about "[t]he second page of the discharge orders," which was Bates labeled AVH_0021221, but did not include that page in his exhibits). Rodriguez similarly noted in her deposition, in the records for patient J.L., that one of the pages of the records shown to her in her deposition included a reference to the patient being admitted to Dr. Dickens. (Resp. to SUMF, ¶ 79). And, once again, that page showing the patient being admitted to Dr. Dickens in collaboration with Rodriguez, was omitted from the exhibits for this patient. (*Id.*). In responding to Relator's Statement of Material Facts, Defendants note other instances where Relator's exhibits exclude pages explicitly noting the involvement of collaborating physicians, including physician orders and signatures. (*See* Resp. to SUMF, ¶¶ 95-96, 103, 112, 127).

### III. CONCLUSION

For each of the separate and independent grounds stated above, Defendants requests that the Court deny Relator's Motion, grant Defendants' Motion for Summary Judgment, and award Defendants all such other and further relief to which they may be entitled, including but not limited to the complete dismissal of Relator's Second Amended Complaint in this case.

Respectfully submitted,

*/s/ Andrew F. Solinger*

Jennifer Weaver *(Pro Hac Vice forthcoming)*
(Tenn. Bar No. 020142)
Andrew F. Solinger (*Pro Hac Vice*) (Tenn. Bar No. 036943)
HOLLAND & KNIGHT, LLP
511 Union St., Suite 2700
Nashville, TN 37219
Telephone: (615) 850-8596
Facsimile: (615) 244-6804
Jennifer.Weaver@hklaw.com
Andrew.Solinger@hklaw.com

James M. Garner (La. Bar No. 19589)
Joshua S. Force (La. Bar No. 21975)
David A. Freedman (La. Bar No. 36463)
SHER, GARNER, CAHILL, RICHTER, KLEIN, MCALISTER & HILBERT, LLC
909 Poydras St., 28th Floor
New Orleans, LA 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
Jgarner@shergarner.com
Jforce@shergarner.com
Dfreedman@shergarner.com

*Attorneys for Defendants Acadia Healthcare Company, Inc. and Vermilion Hospital, LLC.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I filed this Defendants' Response In Opposition To Relator's Motion For Partial Summary Judgment, using the Court's CM/ECF system, resulting in service on all counsel of record in this matter.


*/s/ Andrew F. Solinger*
Andrew F. Solinger