UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| JEFFREY H. BYRD, | ) | Civil Action No. 18-312-JWD-EWD |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ACADIA HEALTHCARE | ) | |
| COMPANY, INC. and | ) | |
| VERMILION HOSPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### RELATOR'S RESPONSE IN OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

J. Marc Vezina LA BAR #24683
Kelli M. Khalaf LA BAR #23213
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
*Counsel for Relator*

# TABLE OF CONTENTS

I.  Defendants are not entitled to summary judgment on Relator's FCA claims………....……1

    A.  Defendants make no serious attempt to engage with the facts or the governing law with respect to the claims involving Kay Rodriguez………………1

    B.  Defendants are not entitled to summary judgment with respect to the referrals from Dr. Uhrich…………………………………………………4

        1.  Defendants misrepresent the evidence regarding who paid Talley………..5

        2.  Relator need not trace a specific referral to the remuneration……………..7

        3.  The free services constitute remuneration, creating a financial relationship under the Stark Law…………………………………………..8

    C.  Defendants have not shown the absence of a genuine issue of fact on the DSH claims……………………………………………………………9

II.  Defendants' public disclosure argument is without merit…………………………….11

    A.  Defendants do not show a public disclosure before the filing of this action……..11

    B.  Defendants do not show a disclosure in a Federal report or investigation……….13

    C.  The public disclosure is not "substantially the same" as Relator's claim………..15

    D.  Defendants do not show the absence of a genuine issue of material fact as to whether Relator is an original source………………………………………18

III.  Defendants' "reverse false claims" arguments are without merit………………………..20

IV.  Defendants have not shown an absence of a genuine issue of fact on Relator's retaliation claim………………………………………………………………………..21

Conclusion …………………………………………………………………………….25

**Cases**

*Cardona v. Garland*, No. 7:19-CV-2, 2021 U.S. Dist. LEXIS 140088
(S.D. Tex. June 22, 2021)……………………………………………………………..24

*Crescent Towing & Salvage Co. v. M/V Anax*, 40 F.3d 741 (5th Cir.1994)………………………9

*Dunigan v. Miss. Valley State Univ.*, No. 4:19-cv-33-DMB-JMV,
2020 U.S. Dist. LEXIS 254835 (N.D. Miss. Oct. 16, 2020)…………………………………..24

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973)……………………………………..22

*Grant v. Chevron Phillips Chem. Co. L.P.*, 309 F.3d 864 (5th Cir. 2002)………………………16

*In re Canton*, No. 08-61683-11,
2010 Bankr. LEXIS 2936 (Bankr. D. Mont. Aug. 26, 2010)…………………………………..22

*JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597 (5th Cir. 2016)……………..15

*Khalfani v. Balfour Beatty Communities, L.L.C.*, 595 F. App'x 363
(5th Cir. 2014) (per curiam)……………………………………………………………..21, 23

*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019)……………………………………….…16

*Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022)………………………………….…1

*Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282 (5th Cir. 2012)………………………………...15

*Lozano v. Bexar Cty.*, No. SA-20-CV-00450-JKP,
2021 U.S. Dist. LEXIS 89298 (W.D. Tex. May 11, 2021)……………………………………..9

*P. R. Mallory & Co. v. NLRB*, 400 F.2d 956 (7th Cir. 1968)
*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992)…………………………………………..22

*Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999)………………………21, 25

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992)…………………………………………1

*United States ex rel. Beauchamp v. Academi Training Ctr., LLC*,
816 F.3d 37 (4th Cir. 2016)……………………………………………………………….13

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati*,
No. 1:03-CV-00167, 2008 U.S. Dist. LEXIS 102411 (S.D. Ohio Dec. 18, 2008)………………..21

*United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180 (5th Cir. 2009)..............16

*United States ex rel. Herbold v. Doctor's Choice Home Care, Inc.*,
No. 8:15-cv-1044-T-33AEP, 2019 U.S. Dist. LEXIS 188682 (M.D. Fla. Oct. 31, 2019)...........20

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols In Healthcare, Inc.*,
No. SA-17-CV-1249-XR, 2019 U.S. Dist. LEXIS 196490 (W.D. Tex. Nov. 13, 2019)............17

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011)...................12

*United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318 (5th Cir. 2017)...........…..........21

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
519 F. App'x 890 (5th Cir. 2013)...........................................................................…..8

*United States v. Safeway, Inc.*, No. 11-3406, 2016 U.S. Dist. LEXIS 165567
(C.D. Ill. Nov. 30, 2016)...............................................................................13

*United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58,
2014 U.S. Dist. LEXIS 169555 (S.D. Ga. Dec. 8, 2014)...........................................…..21

*United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269 (5th Cir. 2021)..........................15

*United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017) ....................16, 18

*United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M,
2016 U.S. Dist. LEXIS 80160 (N.D. Tex. June 20, 2016)...............................................8

*United States v. Cockerell Dermatopathology, P.A.*, No. 3:21-CV-0672-B,
2021 U.S. Dist. LEXIS 201997 (N.D. Tex. Oct. 20, 2021)...............................................20

*United States v. Omnicare, Inc.*, 903 F.3d 78 (3d Cir. 2018)...........................................…...18

## Statutes and Rules

31 U.S.C. § 3729(a)(1) ...............................................................................20

31 U.S.C. § 3730(e)(4)...........................................................................13, 19

42 U.S.C. § 1320a-7b(b)...........................................................................4

42 U.S.C. § 1320a-7b(g)...........................................................................7

42 U.S.C. § 1396r-4(d)(2)...........................................................................9

42 U.S.C. § 1395nn………………………………………………………………..4

Fed. R. Civ. P. 26(a)………………………………………………………..11

Fed. R. Civ. P. 37………………………………………………………………11

I.     Defendants are not entitled to summary judgment on Relator's FCA claims.

Relator asserts three sets of claims under the False Claims Act ("FCA"). First, he asserts that Defendants submitted false claims for payment relating to Kay Rodriguez, an Advanced Practice Registered Nurse ("APRN"). Second, he asserts that Defendants submitted false claims pursuant to referrals from Dr. Susan Uhrich. And third, he contends that Defendants submitted false claims for disproportionate share ("DSH") payments.

In their motion, Defendants argue that they complied with all relevant laws and regulations, and that the claims at issue are therefore not "false." Doc. 150-1 ("Defendants' Brief"), p. 3-15. Defendants do not argue that the alleged violations are not "material," or that the undisputed evidence shows that they did not act "knowingly" as defined in the FCA. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (movant must "inform[] the court of the basis for its motion, and … identify[] portions of the record which highlight the absence of genuine factual issues"); *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 914-15 (7th Cir. 2022) ("a party opposing a motion for summary judgment needs to respond only to arguments the moving party actually made, not others that the moving party might have made but did not"); Order, Doc. 100, p. 23. As discussed below, Defendants do not show the absence of a genuine factual issue with respect to any of the claims.

A.     Defendants make no serious attempt to engage with the facts or the governing law with respect to the claims involving Kay Rodriguez.

In the four meager pages of their brief discussing Kay Rodriguez, Defendants resolutely fail to engage with either the law or the evidence. Indeed, reading their brief, one would scarcely know why the claims at issue are alleged to be false in the first place. Although they vaguely refer to the Louisiana Nurse Practice Act, Defendants do not discuss the fact that, under federal law, Medicare does not pay for inpatient admissions unless the patient is admitted pursuant to an

order by a physician or other qualified practitioner with admitting privileges at the hospital. *See* Doc. 147-1 ("Relators' MSJ Brief"), p. 17-20[1]; Doc. 88 ("SAC"), ¶¶ 30-31; Order, Doc. 100, p. 21 ("Byrd specifically alleges how … Medicare Part A requires a physician's order to admit someone for inpatient care and how that responsibility cannot be delegated to those who are not allowed to do so under state law"). Similarly, Defendants do not mention that Medicare requires patients to be under the care of a doctor of medicine or osteopathy, and does not allow an APRN to assume responsibility for a patient's care. *See* Relators' MSJ Brief, p. 20; SAC, ¶ 32.

Because they do not discuss these requirements, Defendants make no effort to demonstrate the absence of a genuine issue of material fact regarding whether Defendants violated them. They do not discuss the mountain of evidence that Rodriguez routinely admitted Medicare inpatients even though she did not have admitting privileges and was not authorized by law or her collaboration agreements to do so. Relators' MSJ Brief, p. 2-17; RSMF No. 1-142.[2] Nor do they discuss the voluminous evidence that Rodriguez was responsible for independently managing the care of patients, rather than merely performing "tasks" delegated to her by a "collaborating physician." Relators' MSJ Brief, p. 5-17; RSMF No. 1-142. Although one can certainly understand why Defendants would prefer to avoid discussing this evidence, one

---

[1] Because Relator has already discussed the evidence regarding Kay Rodriguez at length in his Motion for Partial Summary Judgment, he incorporates his motion by reference. Doc. 147. Defendants' motion goes solely to the falsity of the claims for payment, which is the same issue addressed in Relator's motion. The same reasons that require summary judgment to be granted to Relator require that Defendants' motion be denied.

[2] Citations to "RSMF No. __" refer to Relator's numbered statements of material fact. RSMF No. 1-142 are set forth in Relator's Statement of Material Facts in Support of Relator's Motion for Partial Summary Judgment (Doc. 147-2), and incorporated by reference. RSMF No. 143-187 are set forth in Relator's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment, filed contemporaneously herewith. Citations to "DSMF No. __" refer to Defendant's numbered statements of material fact (Doc. 146-2).

wonders why they would expect to be granted summary judgment without doing so. As discussed in Relator's Motion for Partial Summary Judgment, there is abundant evidence that Defendants submitted false claims for payment. Defendants' motion does not address any of that evidence, and is not a "a serious effort to decide the merits of the controversy." Order, Doc. 100, p. 48 fn. 1.

Defendants appear to suggest that the mere existence of a piece of paper with a doctor's name on it and the words "Collaborative Practice Agreement" at the top means that it is legally impossible for Defendants to have submitted false claims, regardless of whether the parties actually practiced in accordance with the agreement and regardless of whether Defendants complied with material payment requirements. Defendants' Brief, p. 5-6 ("Because Rodriguez undisputedly had collaborative practice agreements in place, claims for services rendered by Rodriguez are not 'false' under the FCA."). This assertion – that form, not substance, is what matters – is preposterous, which is perhaps why Defendants do not bother supporting it with any authority other than their own say-so. As discussed in Relator's summary judgment motion, Rodriguez admitted that her collaboration agreements did not authorize her to admit patients or be their attending physician, and yet the evidence shows that she did exactly that. Relator's MSJ Brief, p. 2-17; RSMF No. 8-11.

To the extent they suggest that Rodriguez *actually* "collaborated with physicians in admitting patients and rendering care," Defendants point to no actual *evidence* (much less undisputed evidence), but simply cite self-serving speculation, circular reasoning, and philosophical musings by their own 30(b)(6) witness, who admittedly had no personal knowledge of any of the facts, never spoke with Rodriguez or any of her supposed "collaborating physicians," and never reviewed any medical records (which Defendants have said are the only

documents that would allow them to know whether Rodriguez was collaborating with a physician in connection with a particular patient). RSMF No. 60. It is astounding that Defendants could file a summary judgment motion telling the Court that "[t]he evidence directly refutes th[e] allegation" that "Rodriguez failed to adequately collaborate with physicians" (Defendants' Brief, p. 6), when they are aware of a mountain of evidence showing just that, and do not cite even a *single piece* of evidence showing *actual* collaboration in connection with a *single patient*.

Defendants themselves identified Rodriguez as the admitting and/or attending physician for hundreds of patients, and they point to no contradictory evidence showing that anyone else ordered the patients' admission or was primarily responsible for their care. Indeed, Defendants admit that they are not even *aware* of any such evidence. RSMF No. 61. That alone requires denial of Defendants' motion, since the evidence is construed in the light most favorable to Relator.

B. <u>Defendants are not entitled to summary judgment with respect to the referrals from Dr. Uhrich.</u>

Relator contends that Vermilion had one of its employees, Donna Talley, provide free services to Dr. Susan Uhrich, a significant source of referrals to the hospital in 2014 and 2015. Relator contends that such free services constituted "remuneration" under the Stark Law, 42 U.S.C. § 1395nn, and thus created a "financial relationship" between the hospital and Dr. Uhrich. Because Defendants do not contend that the arrangement satisfied a Stark Law exception, Dr. Uhrich was prevented from referring patients to the hospital for inpatient or outpatient hospital services, and the hospital was prevented from submitting claims for payment to Medicare for such services. SAC, ¶ 100. Relator also contends that such free services constituted "remuneration" under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that one purpose of the remuneration was to induce referrals. SAC, ¶ 101.

1.      <u>Defendants misrepresent the evidence regarding who paid Talley</u>.

Defendants admit that, while she was a full-time employee of Vermilion, Donna Talley provided services for Dr. Uhrich by rounding on her patients at nursing homes. DSMF No. 34 ("At the time she was working for Vermilion, Talley also worked for Dr. Uhirch [sic] by checking on Dr. Uhrich's patients at nursing homes."). These services would frequently result in referrals of such patients to Vermilion. Defendants do not deny that Talley's services were a substantial benefit to Dr. Uhrich, as they relieved her of the obligation of rounding on her patients. Defendants claim, however, that Talley was paid by Dr. Uhrich for such work. DSMF No. 38; Defendants' Brief, p. 10.

Defendants' motion turns entirely on the truth of this assertion – i.e., that Talley was paid by Dr. Uhrich, and not by Vermilion, for the work she did rounding on Dr. Uhrich's patients while employed by Vermilion. The problem with Defendants' argument is that Talley testified to the ***exact opposite***, explicitly ***denying*** that she was paid by Dr. Uhrich for this work:

> Q. Okay. You were getting a salary from Vermilion; correct?
> …
> A. Yes.
> Q. Okay. So when Dr. Uhrich would ask you go round on a patient at a nursing home, you wouldn't get paid anything by Dr. Uhrich for that while you were at Vermilion?
> A. No.

RSMF No. 145. It is astonishing that Defendants would tell the Court that Dr. Uhrich paid Talley for the work she did rounding on Dr. Uhrich's patients, without mentioning that Talley said the exact opposite. Because they do not even mention Talley's testimony, Defendants do not explain

how it can be disregarded by the Court on a motion for summary judgment, where the evidence is to be viewed in the light most favorable to Relator.[3]

Although not addressed in Defendants' motion, the evidence is clear that, while Talley's services were a substantial benefit to Dr. Uhrich, Talley provided those services as an employee of Vermilion, in order to induce Dr. Uhrich to refer patients to Vermilion. Indeed, Talley's goal in seeing the patients was to determine if they were candidates for admission to Vermilion. If so, Talley would prepare all the paperwork for Dr. Uhrich to refer the patient to Vermilion. Defendants even developed a special process for processing Dr. Uhrich's referrals, which noted Talley's involvement. At the time Talley saw them for Dr. Uhrich, the patients were not current Vermilion patients, and Vermilion could not bill for Talley's services. RSMF No. 147-150. In essence, Talley was performing services for Dr. Uhrich so that she could "troll" her patient list to generate referrals for Vermilion.

Dr. Uhrich was not a significant referral source until 2014, and it was not until the 2015 Strategic Plan that she was identified as a "Key Referral Source." The Strategic Plan described a "Channeling Mechanism" as "any gate-keeping process required to obtain referrals/admissions." For Dr. Uhrich, the channeling mechanism was the fact that "[n]urse liaison is a part of our staff." Talley acknowledged that this referred to her. RSMF No. 151-152.

---

[3] Defendants base this assertion entirely on what purport to be W-2s from Dr. Uhrich to Talley that were produced by Defendants (not by Talley). Defendants do not explain how they came by these documents, and Talley was not able to authenticate them in her deposition. RSMF No. 146. Even if the W-2s were legitimate, and reflect payments by Dr. Uhrich, there is no evidence as to what these payments were for, and Talley testified that she was *not* paid by Dr. Uhrich for rounding on her patients while employed by Vermilion. Defendants appear to think they are ***defending*** a summary judgment motion, rather than prosecuting one, and that the Court should draw inferences in ***their*** favor based on unexplained and unauthenticated documents, even though those inferences directly contradict sworn testimony. Defendants' Brief, p. 10 (claiming that the evidence "supports" a "perfectly reasonable and benign explanation").

Talley's job review in February 2015 stated that her goal for the year was to get 100 inpatient admissions and 100 partial hospitalization admissions. Talley referred to this as a "quota" in her deposition, and said "everybody had like quotas." She said that about 90% of her quota consisted of Dr. Uhrich's patients. RSMF No. 153-155. Business Development Meeting Agendas in 2015 and 2016 identified admissions from various sources, and referrals from Dr. Uhrich were described as "Dr. Uhrich/Donna Talley" or "Donna Talley/Dr. Uhrich." RSMF No. 156. The evidence is more than sufficient to allow the jury to conclude that at least one purpose of the free services Talley was providing to Dr. Uhrich was to obtain her referrals, and Defendants do not argue to the contrary.

       2.      <u>Relator need not trace a specific referral to the remuneration</u>.

In a single paragraph, Defendants claim they are entitled to summary judgment on the AKS claims because Relator "has not proved any causal link between the compensation arrangement with Talley and a specific patient's referral by Dr. Uhrich." Defendants' Brief, p. 11.[4] This argument is without merit.

As discussed above, there is abundant evidence that Talley's work in rounding on Dr. Uhrich's patients was specifically intended for the purpose of inducing the referral of patients to Vermilion. Not only did Talley assess patients for the specific purpose of determining whether they could be admitted to Vermilion, but she actually prepared the paperwork for Dr. Uhrich to accomplish the referrals. Defendants have identified many patients referred by Dr. Uhrich, for whom Defendants submitted claims to government payors. RSMF No. 157. The jury could easily find that all of those referrals resulted from a violation of the AKS, and that the resulting claims are false claims. 42 U.S.C. § 1320a-7b(g).

---

[4] This argument does not apply to the Stark Law, which does not have an inducement element.

The cases cited by Defendants do not require anything more. *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) did not involve a summary judgment motion, and merely held that a relator must "plead[] that [the defendant] knowingly paid remuneration to specific physicians in exchange for referrals." The Court has already upheld Relator's complaint, and the evidence is more than sufficient for the jury to find that Defendants provided Talley's services to Dr. Uhrich in exchange for referrals.

Similarly, *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M, 2016 U.S. Dist. LEXIS 80160 (N.D. Tex. June 20, 2016), did not involve a situation like this case, where a hospital provided remuneration to a specific physician to induce referrals, and the physician duly made referrals to the hospital. Rather, the relator alleged that the defendant paid bonuses to its ***own employees*** for "hitting admissions targets and census goals," and claimed that this was somehow sufficient to show that ***all*** "claims made while such incentives were in place were based on false certifications of compliance with the AKS." *Id*. at *72-73. The relator did not even identify who supposedly referred patients to the hospice. Unsurprisingly, the court was not impressed, holding that "Relator did not sufficiently link the payment of a bonus to a referral, patient, or claim." *Id*. at *82. The court did not, however, hold that the determination must be made on a patient-by-patient basis, but simply noted that "an AKS violation must involve ***some connection*** between kickbacks, referrals, and claims." *Id*. at *83 (emphasis added). The evidence is more than sufficient for the jury to make such a connection, and Defendants make no real argument to the contrary.

3. <u>The free services constitute remuneration, creating a financial relationship under the Stark Law</u>.

Finally, Defendants assert that Relator cannot show the existence of a "direct compensation arrangement" between Vermilion and Dr. Uhrich for purposes of the Stark Law

because he cannot "show that a payment or benefit passed from Vermilion to Dr. Uhrich." Defendants' Brief, p. 12. Relator is puzzled by this assertion, which is not supported by any citation to the record or to authority, since free services are a prototypical example of something that is valuable to the recipient. Indeed, Defendants themselves recognize that it was a benefit to Dr. Uhrich to have Talley round on her patients, since they claim that Dr. Uhrich paid Talley for doing so. As discussed above, they are wrong about the payment, but right about the benefit. The evidence is more than sufficient for the jury to find the existence of a financial relationship between Vermilion and Dr. Uhrich. And because Defendants do not contend that they satisfied a Stark Law exception, any claims for hospital services furnished pursuant to referrals from Dr. Uhrich would not be payable by Medicare, and would thus constitute false claims.

C.   Defendants have not shown the absence of a genuine issue of fact on the DSH claims.

Defendants' argument regarding disproportionate share ("DSH") claims is based entirely on its assertion that Vermilion was entitled to the "grandfather" exemption for hospitals that did "not offer nonemergency obstetric services to the general population as of [December 22, 1987]." 42 U.S.C. § 1396r-4(d)(2)(A)(ii). This Court has held that Vermilion's entitlement to the exemption is an affirmative defense as to which Vermilion has the burden of proof. Order, Doc. 85, p. 57-59. "When the defendant moves for summary judgment on an affirmative defense, the defendant must establish each element of the defense as a matter of law." *Lozano v. Bexar Cty.*, No. SA-20-CV-00450-JKP, 2021 U.S. Dist. LEXIS 89298, at *3 (W.D. Tex. May 11, 2021), citing *Crescent Towing & Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir.1994).

To show its entitlement to the exemption, Defendants must prove that (i) Vermilion is the same hospital that existed in 1987, and (ii) the hospital did not offer obstetric services in December 1987. *See* Defendants' Brief, p. 12.  With respect to the second issue, although

Defendants claim that "[t]here is no dispute that Vermilion never offered nonemergency obstetric services," they do not cite any actual *evidence* on that point, and it is not addressed in their statements of material fact. *Id.*, p. 13. Because it is Defendants' burden to show that they meet each element of the exemption, they cannot simply claim that a fact is "undisputed" without actually presenting evidence of that fact. Indeed, the Court pointed this out in its ruling on Defendants' motion to dismiss. Order, Doc. 85, p. 59 (agreeing with Relator's observation that "[n]othing in the newspaper article addresses whether the hospital offered such [nonemergency obstetric] services as of December 22, 1987"). Because Defendants point to no evidence on the second element of the exemption, their motion must be denied.

Defendants also do not prove the first element, as they do not show that the current hospital, Vermilion Hospital, LLC, is the same hospital that existed in December 1987. The State clearly did not think so, since it entered into a settlement agreement with Defendants in this very case based on its contention that Defendants "misrepresented Acadia's qualification for DSH payments, thereby causing the State to pay to Acadia DSH payments it was not entitled to." Answer, ¶¶ 9, 24; Doc. 88-2, p. 2. For the most part, Defendants simply point to the same newspaper articles that the Court has already agreed "do[] not establish that CDU of Acadiana in 1987 is the same hospital as Acadia Vermilion Hospital in 2007-2015, which would be necessary to claim entitlement to the exemption." Order, Doc. 85, p. 59 (quoting and agreeing with Relator's brief). The only new evidence Defendants point to is an affidavit from someone named Suzanne Boylan Murray, who claims that at unidentified person at the Joint Commission on Accreditation of Healthcare Organizations supposedly "reviewed its records and determined that the first date Vermillion [sic] was accredited by the Joint Commission as a behavioral health facility under its Behavioral Health program was July 14, 1984." Doc. 146-40, ¶ 10. Murray was

not disclosed as someone with information Defendants might use to support their defenses, as required by Fed. R. Civ. P. 26(a)(1)(A)(i), and her affidavit (which was **signed the day after fact discovery closed**) should be stricken under Fed. R. Civ. P. 37. Response to DSMF No. 59-60; RSMF No. 158. In any event, it does not establish as a matter of law that Vermilion Hospital, LLC is the same hospital that existed in 1987.

## II.    Defendants' public disclosure argument is without merit.

Defendants' public disclosure argument is short on legal analysis and long on factual misrepresentations. Nearly every argument they make is premised on a misrepresentation of the facts, which makes it extremely difficult to respond. Relator should not have to guess what arguments Defendants would have made if they had accurately characterized the facts, and they should not be permitted to reshape their argument in a reply brief.

### A.    Defendants do not show a public disclosure before the filing of this action.

Defendants falsely state that "discovery has shown that Byrd obtained the report in question from a *federal* agency, CMS, both online and through a public records request." Defendants' Brief, p. 16 (emphasis in original). Except for spelling Relator's name correctly, every part of that sentence is wrong. What Relator obtained online was not the "report in question," but information excerpted from the Statement of Deficiencies by a private company, which did not include the Plan of Correction. Doc. 146-20. And Relator did not obtain it from "a *federal* agency, CMS," but from a private website, www.hospitalinspections.org.[5] RSMF No.

---

[5] Defendants falsely state that this website "is one of the two repositories for CMS Statements of Deficiencies and Plans of Correction that are explicitly referenced on the CMS website," thus suggesting that it is some sort of official government repository. Defendants' Brief, p. 17 fn. 18. The linked document, however, expressly states that "[t]hese websites are independent of CMS. CMS does not endorse or sponsor any particular private party application." RSMF No. 163. Once again, Defendants casually misstate the facts, and rely on that misstatement as the basis for their argument, hoping no one will check.

159. When, years later, Relator obtained a copy of the Form 2567 Statement of Deficiencies and Plan of Correction pursuant to a public records request, it was not from CMS or any other "*federal* agency," but from the Louisiana Department of Health. RSMF No. 160. It is troubling, as well as insulting to Relator and the Court, that Defendants so casually misrepresent the facts, perhaps fearing that an accurate description would make their argument more difficult.

The facts that Defendants leave out are as telling as those they misrepresent. Defendants conveniently fail to mention ***when*** Relator obtained the documents. Relator did not obtain the document from [www.hospitalinspections.org](www.hospitalinspections.org) until June 2018, more than two years ***after*** filing this action alleging, based on his own knowledge, that Rodriguez was independently seeing and treating patients without collaborating with a physician. RSMF No. 159. Relator did not obtain the actual Form 2567 Statement of Deficiencies and Plan of Correction from the Louisiana Department of Health until July 2022, several months into the discovery period in this case. And the reason Relator had to get the document from the Louisiana Department of Health was because ***Defendants had refused to produce it in discovery***, even though Relator had requested it in his April 12, 2022 document requests. RSMF No. 160-162.

Although this issue is not addressed in Defendants' brief, the timing is critical, because the Fifth Circuit has held that "[w]e … look to [the relator's] original complaint to … determine whether it was based on public disclosures of allegations or transactions." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011). Although the Court was discussing a prior version of the statute, its holding regarding the timing of the analysis still obtains, and Defendants do not argue otherwise. After all, as Defendants agree, the public disclosure rule is designed to bar "parasitic suits," and a suit cannot be considered parasitic if the allegations are made before a public disclosure. Defendants' Brief, p. 15-16; *see United States ex*

*rel. Beauchamp v. Academi Training Ctr., LLC*, 816 F.3d 37, 46 (4th Cir. 2016). Indeed,

Defendants themselves acknowledge that the filing of the original complaint is the relevant date

for determining whether the action is prohibited by a public disclosure. Defendants' Brief, p. 18

("The Statement of Deficiencies is dated May 28, 2015, and Byrd did not file his Complaint until

nearly a year later on April 1, 2016."). They certainly present no argument to the contrary.

Although Defendants want the Court to believe that a public disclosure occurred before

Relator "file[d] his Complaint … on April 1, 2016," they point to ***no evidence whatsoever***

supporting this assertion. Rather, they merely note that "[t]he Statement of Deficiencies is dated

May 28, 2015," before Relator filed this lawsuit. *Id*. But that is simply the date the state

inspectors performed their survey, not the date the report was publicly disclosed (or even the date

the report was prepared). Because Defendants do not show that there was a public disclosure

before Relator filed this lawsuit, and do not argue that a relator cannot use post-filing disclosures

to provide additional details in an amended complaint, the motion must be denied. *See, e.g.,*

*United States v. Safeway, Inc.*, No. 11-3406, 2016 U.S. Dist. LEXIS 165567, at *41 (C.D. Ill.

Nov. 30, 2016) (public disclosure bar "applies only when information exposing the fraud has

already entered the public domain prior to the relator's suit").

B.    Defendants do not show a disclosure in a Federal report or investigation.

Even ignoring the timing issue, for purposes of this motion, the public disclosure rule

applies only if "substantially the same allegations or transactions … were publicly disclosed …

in a … Federal report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A)(ii).[6] Thus, not

---

[6] Defendants do not argue that there was a disclosure "in a Federal criminal, civil, or administrative hearing" or "from the news media." 31 U.S.C. § 3730(E)(4)(A)(i),(iii).

only must there be a "Federal report, hearing, audit, or investigation," but the public disclosure must be "in" such a report, hearing, audit, or investigation.

The only disclosure that is even arguably relevant is the document available online at www.hospitalinspections.org, since Relator did not make his public record request to the State of Louisiana until the discovery period in this case. As discussed above, Defendants do not point to any evidence that the document was available on the website before this case was filed. Even if it had been, the website is not, as Defendants tell the Court, a "repositor[y] for CMS Statements of Deficiencies and Plans of Correction," but is "independent of CMS," which "does not endorse or sponsor any particular private party application." RSMF No. 163. What is posted on the website is thus not publicly disclosed "in" a "Federal report, hearing, audit, or investigation."

Moreover, Defendants do not show that the underlying document excerpted on the website is itself a "Federal report, hearing, audit, or investigation." Rather, Defendants simply claim that the "Plan of Correction" is a federal report because it was supposedly "prepared by CMS" or "jointly prepared by Vermilion and CMS." Defendants' Brief, p. 16. As with much of Defendants' brief, these assertions blatantly misrepresent the evidence, which does not reflect *any involvement whatsoever* by CMS in the preparation of the Plan of Correction. *See* Response to DSMF No. 26-27.[7] Regardless of whether CMS participated in the preparation of the Plan of Correction, however, that plan *was not disclosed* on the website, which expressly noted that it "does not include the steps the hospital plans to take to fix the problem, known as a plan of correction." Doc. 146-20, p. 1.

---

[7] It would be one thing if Defendants simply argued that the Statement of Deficiencies should be considered a "federal report" because CMS receives a copy of it, and it may ultimately serve as the basis for possible CMS action if the deficiencies are not corrected. Defendants do not make such argument, however, but simply misrepresent the facts and base their argument off such misrepresentation.

What *was* excerpted on the website was information from the Statement of Deficiencies, which was a document prepared by the Louisiana Department of Health, not by CMS, reflecting an investigation performed by state surveyors, not by CMS. RSMF No. 165; Response to DSMF No. 22. Although the Statement of Deficiencies may have been *provided* to CMS at some point, it reflects a *state* investigation, not a federal one. Defendants point to no evidence that CMS was involved in any way in the preparation of the Statement of Deficiencies, and do not argue (much less present evidence) that it (as opposed to the Plan of Correction) is a federal report.

    C.    <u>The public disclosure is not "substantially the same" as Relator's claim.</u>

Even if www.hospitalinspections.org was a qualifying source, and even if the disclosure had occurred before Relator filed his action, Defendants do not show that the allegations of the complaint are "substantially the same" as in the public disclosure. Although the Fifth Circuit has rarely addressed the meaning of "substantially the same" under the current version of the public disclosure rule, it has stated that "a guiding query is whether one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 275 (5th Cir. 2021) (cleaned up); *see also Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012) ("An irreducible minimum is that the disclosures furnish evidence of the fraudulent scheme alleged."). Defendants' one-paragraph "argument" on this issue, which is entirely devoid of any discussion of authority, does not even mention the relevant test, much less argue that it has been satisfied. Defendants' Brief, p. 17-18; *see* Order, Doc. 100, p. 23 (citing *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) for the proposition that "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases'" and

holding that, because appellant "fail[ed] to do either with regard to its underlying claims, … those claims [were] inadequately briefed and therefore waived.").

Although Defendants note that some of the allegations in the SAC are the same as in the Statement of Deficiencies (which is hardly surprising, since the SAC openly quotes from it), they do not argue that the Statement of Deficiencies describes a "fraudulent scheme," much less that someone without additional knowledge could have produced the substance of the complaint "merely" by "synthesizing" the public disclosure's description of such "scheme." *See* Order, Doc. 100, p. 23 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Although Relator should not have to respond to arguments that Defendants have not made, it is clear that the public disclosures at issue do not meet this test. For one thing, as Defendants themselves have vigorously pointed out, a "*sine qua non*" of a fraudulent scheme is the "presentment of a false claim." Doc. 67-1, p. 6, *quoting United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009); *see Koala v. Khosla*, 931 F.3d 887, 897 n.2 (9th Cir. 2019) (*sine qua non* means "[a]n indispensable condition or thing; something on which something else necessarily depends"); *Grant v. Chevron Phillips Chem. Co. L.P.*, 309 F.3d 864, 871 (5th Cir. 2002) (distinguishing between something that is merely "key" and something that is "'indispensable' or 'prerequisite' or '*sine qua non*', or 'necessary'"). The Court agreed with Defendants on this point. Order, Doc. 85, p. 31. In the SAC, Relator described Defendants' billing processes, and attached spreadsheets showing claims for payment submitted to government payors where Rodriguez was the admitting or attending provider. SAC, ¶¶ 44-45, 80-82, 146. Because these allegations are indispensable, they are necessarily part of the substance of the complaint. *See United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 935

(D.C. Cir. 2017) (public disclosure does not indicate fraud where it "lacks specific information about the company's billing practices"); *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 U.S. Dist. LEXIS 196490, at *28 (W.D. Tex. Nov. 13, 2019) (public disclosure must contain "both the misrepresented state of facts and the true state of facts (the X and the Y)," and the "claims that were submitted for Medicare reimbursement" are "the allegedly misrepresented state of facts"). Since they do not discuss the issue at all, Defendants do not argue that any of this indispensable information was publicly disclosed, or that someone could have reproduced Relator's complaint without it.[8]

Moreover, far from arguing that the Statement of Deficiencies describes a "fraudulent scheme," Defendants have vigorously, and correctly, argued that mere regulatory violations, without more, do not show fraud. Indeed, they have argued the exact opposite – i.e., that the publicly disclosed information *negates* an inference of fraud. Doc. 92-1, p. 10 ("The new allegations in the SAC actually give rise to the opposite inference"). Although Defendants are wrong in thinking that the Statement of Deficiencies helps them, this underscores their complete failure to argue that it describes a "fraudulent scheme."

Finally, nowhere in their one-paragraph "argument" do Defendants even *mention* that the Statement of Deficiencies *does not identify Rodriguez by name*, and does not provide information from which someone without additional knowledge could deduce who the report was referring to and reproduce the substance of Relator's complaint. Indeed, *Defendants themselves* claimed for *years* that they had no idea whether the report was referring to Rodriguez. RSMF No. 166. The identity of Rodriguez is clearly central, indeed indispensable, to

---

[8] To the contrary, Defendants have recognized the critical nature of these allegations, stating that "these exhibits and additional allegations may address the Court's concerns that the FAC failed to identify a single claim with the necessary specificity." Doc. 92-1, p. 7.

the substance of the complaint. Because they do not discuss this issue at all in their one-paragraph "argument," Defendants do not argue that someone could have reproduced the substance of Relator's complaint without knowing who the report was talking about. *See Shea, supra*, 863 F.3d at 935 (D.C. Cir. 2017) (public disclosure bar not triggered where relator "supplied the missing link between the public information and the alleged fraud" by relying on nonpublic information to interpret publicly-disclosed information); *United States v. Omnicare, Inc.*, 903 F.3d 78, 89 (3d Cir. 2018) (public disclosure bar "is not triggered when a relator relies upon non-public information to make sense of publicly available information").

    D.    <u>Defendants do not show the absence of a genuine issue of material fact as to whether Relator is an original source.</u>

Finally, Defendants do not show the absence of a genuine issue of material fact regarding whether Relator qualifies as an original source. With respect to the first prong of the original source test, Defendants simply assert that Relator "cannot satisfy the first subsection because he did not disclose his allegations to the Government prior to the public disclosure." Defendants' Brief, p. 18. This assertion is not supported by any citation to the record, but simply by a statement that "[t]he Statement of Deficiencies is dated May 28, 2015, and Byrd did not file his Complaint until nearly a year later on April 1, 2016." *Id.* As discussed above, however, May 28, 2015 is not the date of any public disclosure, but is simply the date the state surveyors performed their inspection. Defendants point to no evidence whatsoever as to the date of any public disclosure, and in particular do not show that there was a public disclosure before Relator filed his complaint. Because Defendants make no other argument, they have not shown the absence of a genuine issue of material fact, and are not entitled to summary judgment.

With respect to the second prong, Defendants do not dispute that Relator possesses independent knowledge, or that he timely provided such information to the government, but

simply deny that such information "materially adds" to the public disclosure. Defendants' "argument" on this point consists of two conclusory sentences, without any development whatsoever. They state that "[m]ost of the information he adds to the allegations in the Statement of Deficiencies is information already known by CMS, such as the identities of the individuals interviewed." *Id*. Notably, Defendants do cite to any actual evidence, and for a very good reason: they do not ***have*** any evidence of what was "known by CMS." Moreover, the statute does not require an original source to have information that is not "already known by CMS," but requires him to have knowledge that "adds to the ***publicly disclosed*** allegations or transactions." 31 U.S.C. § 3730(e)(4)(B)(2) (emphasis added).

Defendants go on to breezily assure the Court that "[n]onetheless, knowing their names does not add, let alone materially add, to the allegations in the Statement of Deficiencies," although they do not bother explaining why they think this is so. Defendants' Brief, p. 18. This does not even constitute an "argument," let alone the kind of "developed argumentation" that is required to avoid waiver. Order, Doc. 100, p. 23. Knowing that the report is referring to Rodriguez ***obviously*** "adds" to the publicly disclosed information, and Rodriguez's identity is central to the allegations of the complaint. Moreover, Defendants do not discuss any of the other independent knowledge possessed by Relator, such as knowledge of Defendants' billing practices and the fact that they submitted claims to government payors where Rodriguez was the admitting or attending physician. As discussed above, this information is a *sine qua non* of Relator's claims, and thus is plainly "material." Relator's knowledge pre-dated not simply the public disclosures, but it pre-dated the state's investigation itself, which did not occur until several months after Relator's termination.

III.     Defendants' "reverse false claims" arguments are without merit.

Defendants' "reverse false claims" argument is largely based on the premise that they did not submit false claims in the first place, and thus had nothing to refund. Defendants' Brief, p. 19. As discussed above, that argument is without merit, as Defendants are not entitled to summary judgment on Relators' claims.

In a single paragraph, based on a decision from another circuit, Defendants assert that "a defendant cannot be held liable for a reverse false claim based on the same factual allegations as the relator's other 'traditional' FCA claims." *Id.*, p. 19-20. Defendants make no attempt to apply this argument to any particular claims in this case, and do not even mention any facts or evidence, but simply state it as an abstract principle of law.

In effect, Defendants' argument would read 31 U.S.C. § 3729(a)(1)(G) out of existence as a separate theory of liability, even though Congress included it in the statute and provided separate elements from § (a)(1)(A). This is why it has been rejected by courts in this and other circuits.[9] *See, e.g., United States v. Cockerell Dermatopathology, P.A.*, No. 3:21-CV-0672-B, 2021 U.S. Dist. LEXIS 201997, at *31 (N.D. Tex. Oct. 20, 2021); *United States ex rel. Herbold v. Doctor's Choice Home Care, Inc.*, No. 8:15-cv-1044-T-33AEP, 2019 U.S. Dist. LEXIS

_____

[9] To give an example of how the claims under § (a)(1)(A) and (a)(1)(G) are not necessarily "based on the same factual allegations," the jury could find that, in January 2015, Defendants submitted inpatient claims that were false because the patients were improperly admitted by Kay Rodriguez, but that Defendants did not "know" they were false at the time the claims were submitted. Accordingly, the jury could find that Defendants were not liable under § (a)(1)(A). The jury could conclude, however, that after the state investigation in May 2015, Defendants were placed on notice that such claims were false and should not have been submitted. The jury could conclude that Defendants concealed the obligation to return the money by submitting a cost report certifying that the services were provided in compliance with the law, and that they are therefore liable under § (a)(1)(G). Because the two claims concern Defendants' knowledge at different times, they are not "based on the same factual allegations," even though they may "seek to recover the same pot of money." *Cockerell, supra* at *31.

188682, at *43 (M.D. Fla. Oct. 31, 2019); *United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 U.S. Dist. LEXIS 169555, at *52 (S.D. Ga. Dec. 8, 2014); *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 U.S. Dist. LEXIS 102411, at *35 (S.D. Ohio Dec. 18, 2008).

IV.  <u>Defendants have not shown an absence of a genuine issue of fact on Relator's retaliation claim</u>.

Defendants do not contend that Relator has not established a prima facie case of retaliation, but simply argue that he cannot show that the stated reason for his termination was pretextual. Although Defendants cite *U.S. ex rel. King v. Solvay Pharm., Inc*., 871 F.3d 318, 334 (5th Cir. 2017), for the proposition that "temporal proximity alone" is not sufficient to survive summary judgment, they fail to provide the rest of the quote:

> But "the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). This standard can be met when "the plaintiff had highly positive performance reviews up until the complaint was leveled against the company, and then suffered a sharp decline in treatment immediately after the protected conduct occurred." *Khalfani v. Balfour Beatty Communities, L.L.C.*, 595 F. App'x 363, 366 (5th Cir. 2014) (per curiam). In *Shackelford*, for example, the plaintiff survived summary judgment because, in addition to showing "tight temporal proximity" of being terminated within days of engaging in several protected activities, there was also evidence of unfounded performance concerns by the employer, warnings not to get involved in the protected activity, and disparate treatment in job reviews. *Shackelford*, 190 F.3d at 408-09.

*King, supra.*

Defendants do not deny that the "temporal proximity" in this case was "tight," as Relator was "terminated within days of engaging in several protected activities." RSMF No. 169-176. And contrary to Defendants' assertions, there is "other significant evidence of pretext," starting with the Corrective Action Report itself. The report did not provide a vague reason for the termination, such as "poor job performance." Rather, the stated reason was quite specific:

"Products and reports that Jeff has submitted to the Corporate Office over the past 30-60 days have fallen below corporate standards and expectations."

One would expect that, if this statement were true, Defendants would be able to identify and produce such "[p]roducts and reports." They have not done so, and do not identify any in their summary judgment motion. Indeed, Relator's supervisor at the corporate office could not recall any reports that fell below expectations. RSMF No. 178. Nor did Defendants produce any emails or other documents indicating that anyone ever expressed displeasure with such products or reports, or any other aspect of Relator's performance, although it would be normal practice to document an employee's poor performance and give him the opportunity to improve. RSMF No. 178-179, 181-184; *see P. R. Mallory & Co. v. NLRB*, 400 F.2d 956, 959 (7th Cir. 1968) ("failure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it"); *In re Canton*, No. 08-61683-11, 2010 Bankr. LEXIS 2936, at *20 (Bankr. D. Mont. Aug. 26, 2010) ("a party's failure to produce evidence, which under the circumstances would be expected, leads to an inference that the evidence would not have buttressed [the party's] position or indeed would have undercut it"), citing *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174 (1973).

Indeed, the only "[p]roducts and reports … submitted to the Corporate Office over the past 30-60 days" that are referenced ***anywhere*** concern Relator's work on the facility's denial log management, for which Relator was effusively praised the day before he was fired. As a result of Relator's work on this important project, the hospital was removed from the list of facilities that had to submit denial log reports to the Corporate Office on a daily basis. RSMF No. 167. Although Defendants pooh-pooh the significance of this email (apparently believing the evidence should be construed in their favor), the fact remains that the ***only*** performance review

22

before Relator's sudden termination was "highly positive." *Khalfani*, *supra*. Defendants present no evidence of any other "product or report" that supposedly "f[ell] below corporate standards and expectations," even though such reports would be in their possession. The failure to do so, combined with the effusive praise for Relator's work immediately before his firing, can easily lead the jury to find that the stated reason was pretextual.

The jury can also consider it important that Relator's work was never criticized before his termination, even though Defendants claim that it had been so far below expectations for two months that it required immediate termination. David Dempsey, Relator's boss at corporate headquarters, could recall no reports submitted by Relator that fell below expectations. RSMF No. 178. Eric Kennedy testified that if an employee was performing poorly, that would be communicated to him to inform him how he needed to improve, and that this communication would be maintained in his personnel file. RSMF No. 182-183. He also testified that he knew of no reason why Relator's performance could not have improved. RSMF No. 184. The Corrective Action Report itself provides for multiple levels of action before termination, including verbal warnings, multiple written warnings, and suspension. Doc. 146-4. The jury could find it unbelievable that Relator was actually terminated for the stated reason, when there is no record of supposedly poor performance at any point before his summary termination, and when his corporate superior could not recall any reports that fell below expectations.[10]

Moreover, there is other evidence suggesting that the stated reason for the termination was pretextual, and that Defendants were concerned about Relator bringing an FCA case. In

---

[10] Defendants rely heavily on Luis Betances's self-serving account of the meeting two days before Relator's termination, discussed on pages 22-23 of Defendants' brief. Because his account is contradicted by other evidence, it must be disregarded on a motion for summary judgment. Response to DSMF No. 69-70; RSMF No. 177-179.

connection with his termination, Defendants presented Relator with a severance agreement requiring him to "release[e] all your claims and any right to recovery of any kind … arising under … the False Claims Act." If Relator signed the agreement, he would receive a severance payment. If he did not, Vermilion threatened to recover $5,802.80 in relocation expenses it had paid when Relator was hired. RSMF No. 185. Vermilion's former CEO did not recall seeing such a release before. RSMF No. 186. There is no legitimate reason for a company to attempt to coerce an employee to release his rights under the False Claims Act. Such an attempt is even more suspicious when the employee was suddenly fired after engaging in protected activity.

Relator had previously filed a successful FCA case against a former employer in Florida, which led to a guilty plea by its chief operating officer in mid-November 2014, shortly before Relator's termination. RSMF No. 168. After Relator was terminated, his superior, David Dempsey, who participated in the decision to fire Relator, was heard stating that Relator worked undercover for the government. RSMF No. 180. The jury can clearly take this into account when considering whether Defendants' stated reason for termination was pretextual.[11]

Shortly after his termination, Relator interviewed with Oceans Behavioral Hospital in Texas, and was given a written job offer. A few days later, however, Relator was summoned to Texas to meet with Oceans' president, Stuart Archer, who indicated that he had talked with

---

[11] Defendants state that "Byrd never identifies the individual to whom these comments were made." Defendants' Brief, p. 24. That is because, although Defendants deposed Relator, they never asked. Relator's Rule 26 disclosures identified Kim Guidry and Paul Ammons as people with knowledge of rumors that Relator worked undercover for the government. (Exhibit 22). Such individuals will be available to testify at trial. *See Cardona v. Garland*, No. 7:19-CV-2, 2021 U.S. Dist. LEXIS 140088, at *18 (S.D. Tex. June 22, 2021) ("a party may show that hearsay could be presented in admissible form by identifying the third-party declarant and confirming that the declarant will be available to testify at trial"), quoting *Dunigan v. Miss. Valley State Univ.*, No. 4:19-cv-33-DMB-JMV, 2020 U.S. Dist. LEXIS 254835, at *4 (N.D. Miss. Oct. 16, 2020).

Relator's last supervisor, who did not have any kind words about him. Archer asked whether Relator had had any regulatory issues while in Florida. Later that day, Relator's job offer was withdrawn. RSMF No. 187. Along with all the other evidence, the jury can take this into consideration when deciding whether Defendants' stated reason for termination was pretextual.

As in *Shackleford*, the evidence is more than sufficient to cast doubt on Defendant's stated reason for Relator's termination. "This source of doubt is then combined with both the suspicious timing of [Relator's] termination in tight proximity to [his] protected activity and the other evidence of pretext. The totality of this evidence is sufficient to support the inference that [Defendants] did not actually believe that [Relator's] performance was poor, but instead terminated [him] in retaliation for [his] protected activity." *Shackleford, supra* at 409.

Conclusion

For the reasons discussed above, Defendants' motion for summary judgment should be denied.

This 21st day of July, 2023.

Respectfully submitted,

/s/ J. Marc Vezina
J. Marc Vezina LA BAR #24683
Kelli M. Khalaf LA BAR #23213
Vezina and Gattuso, LLC
401 Weyer St.
P.O. Box 461
Gretna, LA 70054
(504) 368-5223
(504) 361-3624 (fax)
jmv@vezinalaw.com

/s/ David W. Garrison
David W. Garrison (TN Bar No. 024968)
Seth M. Hyatt (TN Bar No. 031171)
Barrett Johnston Martin & Garrison, LLC
Philips Plaza

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

414 Union Street, Suite 900
Nashville, TN 37219
*Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day filed a copy of the foregoing document using the

Court's CM/ECF system, which will automatically send notice of such filing to counsel of

record.

This 21st day of July, 2023.

/s/ G. Mark Simpson
G. Mark Simpson